## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | : | |
| COMMONWEALTH OF MASSACHUSETTS, | : | Case No. |
| | : | |
| *Plaintiff,* | : | COMPLAINT FOR |
| | : | FOR DECLARATORY AND |
| v. | : | AND INJUNCTIVE RELIEF |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| HEALTH AND HUMAN SERVICES; | : | |
| DONALD WRIGHT, in his official capacity as | : | |
| Acting Secretary of Health and Human Services; | : | |
| UNITED STATES DEPARTMENT OF THE | : | |
| TREASURY; STEVEN T. MNUCHIN, in his | : | |
| official capacity as Secretary of the Treasury; | : | |
| UNITED STATES DEPARTMENT OF | : | |
| LABOR; and R. ALEXANDER ACOSTA, in his | : | |
| official capacity as Secretary of Labor, | : | |
| | : | |
| *Defendants.* | : | |
| _____ | : | |

## INTRODUCTION

1.     The Commonwealth of Massachusetts ("Commonwealth") files this action to

protect itself, and thousands of Massachusetts women, from the substantial harms that will result

from the Defendants' attempt to nullify the provisions of the Affordable Care Act that guarantee

women equal access to preventive medical care—specifically contraceptive care and services.

The Defendants have issued two Interim Final Rules ("IFRs") authorizing employers with a

religious or moral objection to contraception to block their employees, and their employees'

dependents, from receiving health insurance coverage for contraceptive care and services.  In

issuing the IFRs, the Departments have ignored the required administrative rulemaking process

and have disregarded a wealth of medical research and evidence demonstrating the critical

importance of contraceptive coverage for women's health.

2.      The IFRs jeopardize the health care of women in Massachusetts and nationwide,

promote the religious freedom of corporations over the autonomy of women, and leave the States

to bear additional health care costs both with regard to contraceptive and prenatal care as well as

other services associated with unintended pregnancies and related negative health outcomes for

both women and their children.

3.      The Defendants have violated the procedural and substantive components of the

Administrative Procedure Act, the Establishment Clause of the First Amendment to the

Constitution, and the Equal Protection guarantee implicit in the Fifth Amendment to the

Constitution.  The Commonwealth seeks to enjoin implementation of, and invalidate, the IFRs so

that no individual or family in Massachusetts, or across the country, is harmed.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action under 28 U.S.C § 1331

and may enter declaratory relief under 28 U.S.C § 2201(a).

5.      The District of Massachusetts is a proper venue for this action under 28 U.S.C.

§§ 1391(b)(2) and 1391(e)(1)(C).

## PARTIES

3.      The Commonwealth of Massachusetts, represented by and through its Attorney

General, is a sovereign State of the United States.

2

4.      Defendant United States Department of Health and Human Services ("HHS") is an executive agency of the United States government.  HHS's principal address is 200 Independence Avenue, SW, Washington, DC 20201.

5.      Defendant Donald Wright is the Acting Secretary of the Department of Health and Human Services.  He is named in his official capacity. His principal address is 200 Independence Avenue, SW, Washington, DC 20201.

6.      Defendant United States Department of the Treasury ("Treasury") is an executive agency of the United States government. Treasury's principal address is 1500 Pennsylvania Avenue, NW, Washington, DC 20220.

7.      Defendant Steven T. Mnuchin is named in his official capacity as Secretary of the Treasury. His principal address is 1500 Pennsylvania Avenue, NW, Washington, DC 20220.

8.      Defendant United States Department of Labor ("DOL") is an executive agency of the United States government. DOL's principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

9.      Defendant R. Alexander Acosta is named in his official capacity as Secretary of DOL. His principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

10.     HHS, Treasury, and DOL (collectively the "Departments") are responsible for implementing various provisions of the Patient Protection and Affordable Care Act ("ACA"). The ACA amends certain provisions of the Public Health Service Act ("PHS Act") concerning group health plans and health insurance issuers in the group and individual markets, and incorporates them into the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code.  HHS regulates and enforces provisions of the ACA applicable to group

health plans and health insurance issuers in the group and individual markets; DOL regulates and

enforces provisions of the ACA incorporated into ERISA and applicable to employer self-

insured health plans; and Treasury regulates and enforces the tax-related provisions of the ACA.

## BACKGROUND

I. **The Affordable Care Act and Implementation of the Contraceptive Mandate**

    A. **Preventive Services Requirement**

13.    The ACA was enacted in March 2010.  It transformed the health care system by

expanding coverage to millions of previously uninsured Americans, protecting individuals

against the denial of coverage for pre-existing conditions, and requiring health plans to guarantee

certain types of coverage to all insured.

14.    The ACA also included new civil rights protections that prohibited discrimination

on the basis of sex and other protected categories in most health care programs and activities.[1]

These protections added to existing federal anti-discrimination provisions, including Title VII of

the Civil Rights Act of 1964, which prohibits discrimination in the provision of employer-

sponsored health care plans.[2]

15.    The ACA generally[3] requires that employer-sponsored health insurance plans

include coverage for certain minimum essential benefits, including a range of preventive care

services ("preventive services requirement").  Preventive services coverage must be provided on

---

[1] 42 U.S.C. § 18116.

[2] 42 U.S.C. § 2000e *et seq.*

[3] The preventive services requirement does not apply to "grandfathered health plans" as defined at 45 C.F.R. § 147.140(a).

a no-cost basis – that is without cost-sharing requirements for employees and their dependents who are covered by the plans.[4]

16.     The ACA was the first law to set minimum coverage requirements across all health markets.  At the time the ACA was passed, many States had laws and regulations concerning coverage requirements for health plans issued by health insurers.  However, States are generally preempted from regulating self-insured employer plans, which are governed by ERISA.  As of 2010, approximately 80% of large employers (over 1000 employees), and 50% of mid-sized employers (200-1000 employees), offered self-insured plans.[5]

17.     As originally drafted, the preventive services requirement mandated that health plans cover three categories of care at no added cost to plan participants: (a) evidence based items or services recommended by the U.S. Preventive Services Task Force; (b) immunizations recommended by an advisory committee of the Centers for Disease Control and Prevention; and (3) preventive care and screenings for infants, children, and adolescents provided for in guidelines issued by the Health Resources and Services Administration ("HRSA").[6]

18.     These three categories did not adequately cover medically necessary preventive care services for women.  Gender-based disparities in health insurance coverage, and health care markets in general, made it more difficult and expensive for women, relative to men, to access a range of medically necessary preventive care services.[7]

---

[4] 42 U.S.C. §§ 18022 & 300gg-13.

[5] Rand Corp., "Employer Self-Insurance Decisions," at 17-18 (Mar. 2011) (prepared for DOL and HHS).

[6] 42 U.S.C. § 300gg-13(a)(1)(3).

[7] 155 Cong. Rec. 28841 (2009) (Statement of Sen. Boxer); 155 Cong. Rec. 28841, 29070 (2009) (Statement of Sen. Feinstein); 155 Cong. Reg. 29302 (Statement of Sen. Mikulski); 155 Cong. Reg.

19.     To redress these disparities, and guarantee women equal access to preventive medicine, Congress passed the Women's Health Amendment.  The Amendment added a fourth category to the preventive services requirement mandating no-cost coverage for "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."[8]

20.     Congress did not mandate coverage for specific preventive care services.  Instead, Congress delegated authority to an expert agency to determine the services that must be covered.  HRSA, responsible for women's preventive care guidelines, is an agency within HHS.[9]

21.     HHS and HRSA enlisted the Institute of Medicine ("IOM") to convene a committee of experts to assess what preventive services were necessary to protect women's health and well-being.  The committee convened by the IOM included specialists in disease prevention, women's health issues, and evidence-based guidelines.[10]

22.     The IOM recommended that the HRSA Guidelines on preventative care services for women include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  The IOM noted that this recommendation was consistent with the

---

29768 (Statement of Sen. Durbin).  *See also* HRSA Women's Preventive Health Guidelines, available at https://www.hrsa.gov/womensguidelines2016/index.html ((noting that the guidelines are intended to "fill gaps" in coverage).

[8] S.Amdt. 2791, 111th Congress (2009-2010).

[9] 42 U.S.C. § 300gg-13(a)(4).

[10] Institute of Medicine, "Clinical Preventive Services for Women: Closing the Gaps," at v-vi, 1-2 ("IOM Report").

position of many professional health care organizations, including the American Congress of

Obstetricians and Gynecologists, the American Academy of Family Physicians, the American

Academy of Pediatrics, the Society of Adolescent Medicine, the American Medical Association,

and many others.  The IOM also noted that coverage of contraceptive care and family planning

services was "standard practice" for most private and federally-funded insurance programs, and

was required by Medicaid.[11]

23.     The IOM found that access to contraception reduced unintended pregnancies,

adverse pregnancy outcomes, and other negative health consequences for women and children.

It recognized that there were many different methods of FDA approved contraception, the

effectiveness and appropriateness of which varied depending on age, sexual practices, and health

conditions.  And it determined that even small cost-sharing requirements could significantly

reduce the use of contraception, particularly more effective, long-lasting methods.[12]

24.     The IOM identified unintended pregnancy as a significant problem in the United

States.  In 2001, for example, 49% of pregnancies nationwide were unintended.  Women

experiencing unintended pregnancies are more likely than women with intended pregnancies to

receive late or no prenatal care, to smoke or consume alcohol during pregnancy, and to be

depressed during pregnancy.  Children born as the result of unintended pregnancy have

significantly increased odds of preterm birth and low birth weight compared with children born

of intended pregnancies, and are less likely to be breastfed.  Babies born prematurely are more

---

[11] IOM Report at 104, 109-110.

[12] *Id.* at 102-110.

likely than full-term babies to experience respiratory problems, heart problems, impaired

cognitive skills, problems with temperature regulation, and a host of other short-term and long-

term medical complications.[13]

26. The IOM also found that contraception provides women with important health

benefits apart from avoiding unwanted pregnancies, including decreasing the risk of certain

cancers, treating menstrual disorders, and protecting against pelvic inflammatory disease and

some benign breast diseases.[14]

26. In accordance with the IOM's recommendation, HRSA's Women's Preventive

Services Guidelines, promulgated in August 2011, required non-exempt employers to provide

"coverage, without cost sharing," for "[a]ll Food and Drug Administration-approved

contraceptive methods, sterilization procedures, and patient education and counseling"

("contraceptive care requirement").[15]

27. The contraceptive care requirement (together with the balance of the HRSA

Guidelines) went into effect beginning in August 2012.

28. HRSA updated the Women's Preventive Services Guidelines in December 2016.

After reviewing the available medical research and evidence, HRSA determined that the

Guidelines should continue to require full coverage for contraceptive care and services.[16]

---

[13] IOM Report at 102-104.

[14] *Id.* at 107.

[15] *See* HRSA, "Women's Preventive Services Guidelines," (https://www.hrsa.gov/womensguidelines/)

[16] Available at https://www.hrsa.gov/womensguidelines2016/index.html

**B.**      **Accommodations for Religious Objections to Contraceptive Coverage**

29.      Significant numbers of Americans have religious-based objections to a range of medical services and procedures, and to medical care in general.

30.      Notwithstanding this issue, Congress declined to include a "conscience amendment" in the ACA that would have permitted employers, insurers, and others to deny coverage based upon religious beliefs or moral convictions.[17]

31.      Between 2011 and 2015, however, the Departments took regulatory action to accommodate religious objections targeting women's contraceptive care to the extent required by federal law, particularly the Religious Freedom Restoration Act.[18]  The Departments undertook several rounds of rulemaking in an attempt to produce regulations that balanced employees' statutory right to receive contraceptive coverage with employers' religious objections to providing that coverage.

32.      Throughout this process, the Departments vigorously defended the government's compelling interest in enforcing the contraceptive care requirement.[19]

33.      In 2011, the Departments issued regulations automatically exempting churches and their integrated auxiliaries, conventions and associations of churches, and the exclusively religious activities of religious orders from the contraceptive care requirement.  The Departments

---

[17] *See* 158 Cong. Rec. S538-S539 (Feb. 9, 2012); 158 Cong. Rec. S1162-S1173 (Mar. 1, 2012).

[18] *See, e.g.*, 75 Fed. Reg. 41,726 (July 2010); 76 Fed. Reg. 46,621 (Aug. 3, 2011); 77 Fed. Reg. 8725 (Feb. 15, 2012; 78 Fed. Reg. 39,870 (July 2, 2013); 79 Fed. Reg. 51,092 (Aug. 27, 2014); 80 Fed. Reg. 41,318 (July 14, 2015).

[19] *See, e.g.*, 75 Fed. Reg. 41,726 (July 2010); 76 Fed. Reg. 46,621 (Aug. 3, 2011); 77 Fed. Reg. 8725 (Feb. 15, 2012; 78 Fed. Reg. 39,870 (July 2, 2013); 79 Fed. Reg. 51,092 (Aug. 27, 2014); 80 Fed. Reg. 41,318 (July 14, 2015).

later explained that the exemption was necessary to respect the special "sphere of autonomy for houses of worship," and was consistent with exemptions provided in state contraceptive coverage laws.[20]

34.     The Departments declined to extend the exemption to cover a broader range of employers, because doing so would have undermined the contraceptive care requirement and improperly empowered non-church employers to impose their religious beliefs on their employees.  The Departments did, however, agree to defer enforcement of the requirement for certain non-profit religious organizations, and pledged to work with these employers to develop an alternative mechanism for providing contraceptive coverage to their employees.[21]

35.     In 2013, the Departments issued regulations that provided an accommodation for religious non-profit organizations that objected to providing contraceptive coverage on religious grounds.  The regulations exempted eligible employers from the contraceptive care requirement, but also set up a separate system through which insurers (and other third parties) paid the full cost of contraceptive care for employees ("accommodation process").  Employees who obtained care through the accommodation process continued to receive seamless coverage for contraceptive care notwithstanding the exemption provided for their employers.[22]

36.     The Departments subsequently expanded the accommodation to cover closely held, for-profit companies in response to the Supreme Court's holding in *Burwell v. Hobby*

---

[20] *See* 76 Fed. Reg. 46,621 (Aug. 3, 2011).

[21] *See* 77 Fed. Reg. 31,8728 (Feb. 15, 2012).

[22] *See* 78 Fed. Reg. 127,39871, 398892-389897 (July 2, 2013).

*Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).[23]  *Hobby Lobby* involved for-profit employers who

contended that the contraceptive care requirement violated their rights to religious liberty under

the Religious Freedom Restoration Act.  The Supreme Court upheld the employers' challenge on

the ground that the accommodation process provided an alternative, less burdensome method for

providing contraceptive coverage to employees of employers with religious objections.

37.     In a separate group of cases, consolidated for review by the Supreme Court as

*Zubik v. Burwell*, 136 S. Ct. 1557 (2016), religious non-profit employers challenged the validity

of the accommodation process itself.  The employers contended that the accommodation process

made them complicit in the provision of contraception to their employees, in violation of their

religious beliefs, and demanded that the Departments provide them with the same exemption

extended to houses-of-worship.  In May 2016, the consolidated cases were remanded for further

consideration of whether the accommodation process could be altered to address employers'

concerns while still providing employees with full, seamless contraceptive coverage.

38.     In July 2016, the Departments published a Request for Information ("ROI"),

seeking input from interested parties as to whether the regulations could be modified to "resolve

the objections asserted by the plaintiffs in [*Zubik*], while still ensuring that the affected women

receive full and equal health coverage, including contraceptive coverage." [24]

---

[23] 80 Fed. Reg. 134,41323 (July 4, 2015).

[24] DOL, <u>FAQs About the Affordable Care Act Implementation Part 36</u> (Jan. 9, 2017), available at <u>https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.</u>

39.     In January 2017, after review of the more than 54,000 comments submitted in response to the ROI, the Departments announced that they had been unable to identify a feasible, less burdensome alternative that would satisfy employers' religious objections while still ensuring that "women receive full and equal health coverage, including contraceptive coverage."[25]

### C.     The Interim Final Rules

40.     On May 4, 2017, President Trump issued an Executive Order[26] that directed the Departments to consider amending the contraceptive coverage regulations in order to "vigorously promote religious liberty."[27]  Specifically, the Executive Order instructed the Departments to "consider issuing amended regulations . . . to address conscience-based objections to the preventative-care mandate."  In remarks explaining the Order, the President indicated that the Departments would amend the contraceptive services regulations to satisfy the objections raised by religious organizations in the *Zubik* cases—that the new regulations would expand the exemption for religious employers and weaken the accommodation process.

41.     The IFRs, issued on October 6, 2017, satisfy this promise and more.  See Ex. A (Religious Exemption IFR), Ex. B (Moral Exemption IFR).

42.     The IFRs create "expanded exemptions" to the contraceptive care requirement. The Religious Exemption IFR automatically exempts all employers—non-profit and for-profit

---

[25] DOL, <u>FAQs About the Affordable Care Act Implementation Part 36</u> (Jan. 9, 2017), available at <u>https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.</u>

[26] Executive Order Promoting Free Speech and Religious Liberty (May 4, 2017)

[27] White House Press Release, May 3, 2017

organizations alike—with a religious objection to contraception from complying with the

contraceptive care requirement.  The Moral Exemption IFR exempts all non-profit employers

and non-publicly traded for-profit employers with a moral objection to contraception from

complying with the contraceptive care requirement. The IFRs also give exempted employers the

authority to decide whether their employees receive independent contraceptive care coverage

through the accommodation process.

43.     The expanded exemptions apply only to the contraceptive care requirement.  The

IFRs do not provide any exemption or accommodation for employers with religious or moral

objections to other medical services covered by the ACA in general, or the preventive care

mandate in particular.

44.     The Departments' decision to create these expanded exemptions is not justified by

any change in the medical research or evidence underlying the contraceptive care requirement.

45.     Instead, the Departments contend that, for the last seven years, they have

misinterpreted the evidence supporting the contraceptive care requirement, and misunderstood

the government's interest in ensuring that women have access to contraceptive care and services.

46.     In the IFRs, the Departments reject the evidence-based studies that they

previously relied upon, and the expert recommendations that led to the creation of the

contraceptive care requirement.

47.     The IFRs create or modify four regulations that codify the expanded exemptions.

*See* 45 CFR §§ 147.130 through 147.133.

48.     In relevant part, the Religious Exemption regulation states that the HRSA "will

exempt from any guidelines' requirements that relate to the provision of contraceptive services"

any "objecting entities" based on those entities' "sincerely held religious beliefs." 45 CFR

147.132(a)(1), (2). Objecting entities include "(A) A church, an integrated auxiliary of a church,

a convention or association of churches, or a religious order[;] (B) A nonprofit organization[;]

(C) A closely held for-profit entity[;] (D) A for-profit entity that is not closely held[;] (E) Any

other non-governmental employer," as well "An institution of higher education as defined in 20

U.S.C. 1002" and "A health insurance issuer offering group or individual insurance coverage."

*Id.* § 147.132(a)(i)–(iii). *See* Ex. A, at 160–62.

49.     In relevant part, the Moral Exemption regulation states that the HRSA "will

exempt from any guidelines' requirements that relate to the provision of contraceptive services"

any "objecting entities" based on those entities' "sincerely held moral convictions." 45 CFR

147.133(a)(1), (2). Objecting entities include "(A) A nonprofit organization; . . . (B) A for-profit

entity that has no publicly traded ownership interests," and well as " An institution of higher

education as defined in 20 U.S.C. 1002," and "A health insurance issuer offering group or

individual insurance coverage." *Id.* § 147.133(a)(i)–(iii). *See* Ex. B, at 98–99.

### D.     Impact of the Interim Final Rules

50.     The IFRs create selective exemptions to provisions of the ACA added by

Congress to guarantee women equal access to preventive medical care.  The expanded

exemptions will impose significant harms on employees and their dependents.

51.     The Departments estimate that more than 100 employers will claim the expanded

exemptions and bar their employees from receiving coverage through the accommodation

process.[28]  This will result in tens of thousands of policy holders (plus their dependents) losing

contraceptive care coverage under the ACA.

52.     In total, the Departments estimate that women who lose coverage will pay

approximately $18.5 million each year in additional out of pocket costs for contraceptive care.

53.     If anything, the Departments' estimates are based upon assumptions that likely

understate the impact of the regulations.  For example, the Departments assume that employees

of exempted non-profit organizations, including religiously affiliated universities and hospitals,

share their employers' religious and moral beliefs, and do not use contraception.  In 2014, HHS

estimated that more than 600,000 non-profit employees (and dependents) were receiving

contraceptive coverage through the accommodation process, a figure that included only self-

insured employer health plans.

54.     Many women who lose coverage will be forced to seek contraceptive care from

sources other than their usual health care providers.  Others will forgo contraception altogether,

leading to an increase in unintended pregnancies and negative health consequences for women

and children.  An increase in negative health consequence will impose additional costs and

burdens on women, their families, and the States in which they live.

## II.     Massachusetts' Commitment to Ensuring Access to Contraception

55.     Massachusetts has long recognized the critical role that access to contraceptive

care and services plays in the health and wellbeing of women, children, and families across the

State.

56.     The Commonwealth supports access to contraceptive care and services through an

interrelated system composed of: (a) direct coverage of family planning services for individuals

---

[28] *See* Ex. A, at at 95-102; Ex. B, at 74-79.

eligible for the Commonwealth's Medicaid program, called MassHealth; (b) a network of family planning program providers that receive reimbursement from the Massachusetts Department of Public Health's ("DPH") Sexual Reproductive and Health Program ("SRHP"); and (c) a contraceptive coverage law that requires health plans to cover contraception on the same terms as other outpatient medical care.

57.     This system works to reduce the number of unintended pregnancies, the rate of sexually transmitted infections, and other negative health consequence for women and children across the State.

58.     The economic costs of unintended pregnancies are a particular concern for the Commonwealth.  A majority of unintended births in Massachusetts are publicly funded.  Publicly funded care for unintended pregnancies, including births, miscarriages, abortions, and essential infant care costs Massachusetts in excess of $100 million per year.[29]

### A.     MassHealth Program

59.     The Commonwealth's Medicaid program, MassHealth, provides access to integrated health care services that promote health, well-being, and quality of life for almost two million Massachusetts residents.[30] As part of that mission, MassHealth guarantees its members access to contraceptive care and services.

60.     Currently, MassHealth provides coverage for approximately 120,000 residents who have alternative commercial coverage, including employer-sponsored insurance and student

---

[29] See Adam Sonfied and Kathryn Kost, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care* (2015), *available at* https://www.guttmacher.org/sites/default/files/report_pdf/public-costs-of-up-2010.pdf.

[30] MassHealth Quarterly Dashboard Report (through August 2016); *available at* http://www.mass.gov/eohhs/docs/masshealth/research/masshealth-dashboard-report-2.pdf.

health insurance.  MassHealth serves as a secondary payer for these residents for services not otherwise covered by their commercial insurance.[31]

61.     Eligibility for MassHealth is determined by a combination of income, household composition, age, and medical status.[32]

62.     Eligible women who lose all or part of their employer-sponsored coverage under the IFR regulations are entitled to receive coverage for contraceptive care and services through MassHealth.

63.     Under Medicaid rules, Massachusetts is responsible for paying 10% of all family planning services covered by MassHealth.[33]

**B.     DPH Funded Clinics**

64.     Women may also access contraceptive care through SRHP funded family planning programs.

65.     SRHP funds health care services, including contraceptive care and services, through reimbursement for services provided by a statewide network of family planning program providers.[34]  Funded services include complete gynecological and breast exams, diagnosis and treatment of sexually transmitted diseases, emergency contraception, and birth control.[35]

---

[31] 103 C.M.R. § 450.105.

[32] 130 C.M.R. §§ 505.000 *et seq.*

[33] 42 U.S.C. § 1396b(a)(5).

[34] http://www.mass.gov/eohhs/gov/departments/dph/programs/community-health/primarycare-healthaccess/family-planning/.

[35] http://www.mass.gov/eohhs/gov/departments/dph/programs/community-health/primarycare-healthaccess/family-planning/services.html.

66.     Populations eligible for services funded by SRHP include uninsured, low-income residents; residents of any insurance status that need confidential care; and low-income residents who have a health plan that does not cover all contraception methods and services.[36]

67.     In Fiscal Year 2017, DPH family health services, including SRHP funded family planning programs, spent $5,455,151.  The appropriation for FY 2018 is $5,711,509.[37]

**C.     Contraceptive Equity Law**

68.     In 2002, Massachusetts enacted legislation, titled "An Act providing equitable coverage of services under health plans," to expand coverage for contraceptive services, drugs and devices ("Contraceptive Equity Law").[38]

69.     The Contraceptive Equity Law requires that employer-sponsored health plans that provide coverage for outpatient services, prescriptions, or devices must provide the same level of coverage for FDA-approved contraceptive services, prescriptions, and devices.[39]

70.     Unlike the ACA, the Contraceptive Equity Law does not mandate no-cost contraceptive coverage.  Women covered by the law may still be responsible for significant cost-sharing payments to access contraceptive care.  Moreover, these payments may vary significantly by the type of contraceptive care involved.[40]

---

[36] http://www.mass.gov/eohhs/gov/departments/dph/programs/community-health/primarycare-healthaccess/family-planning/eligibility.html.

[37] See http://www.mass.gov/bb/gaa/fy2017/app_17/act_17/h45131000.htm. http://www.mass.gov/bb/gaa/fy2018/app_18/act_18/h45131000.htm.

[38] M.G.L. c. 175, § 47W.

[39] M.G.L. c. § 175, § 47W; M.G.L. c. 176A, § 8W; M.G.L. c. 176B, § 4W; M.G.L. c. 176G, § 4O.

[40] M.G.L. c. § 175, § 47W; M.G.L. c. 176A, § 8W; M.G.L. c. 176B, § 4W; M.G.L. c. 176G, § 4O.

71.     The Contraceptive Equity Law does not apply to self-insured employer plans, which are governed by ERISA.  Approximately 56% of Massachusetts residents who have private commercial health insurance receive coverage through a self-insured plan.[41]

**D.     Harm to Massachusetts from the Interim Final Rules**

72.     As a result of the IFRs, the number of Massachusetts residents with employer-sponsored insurance that provides comprehensive coverage for contraceptive care and services will decrease.  This will cause concrete harm to the Commonwealth.

73.     Based upon the information available to the Commonwealth at the time of filing, several Massachusetts employers will qualify for, and claim, the expanded exemption created by the IFRs.[42]

74.     Some, but not all, of the employers who claim the expanded exemption under the IFRs will be subject to Massachusetts' Contraceptive Equity Law.

75.     Employees of exempt employers who are not subject to the law will lose contraceptive coverage; employees of exempt employers who are subject to the law will likely retain some coverage, but will lose the cost-sharing protections provided by the ACA's preventive services requirement.  Employees covered by the Contraceptive Equity Law will be responsible for making any cost-sharing payments required by their health plans.

---

[41] Center for Health Information and Analysis, *Enrollment Trends*, August 2017, *available at* http://www.chiamass.gov/assets/Uploads/enrollment/2017-august/Enrollment-Trends-August-2017-Report.pdf.

[42] On August 31, 2017, the Massachusetts Attorney General's Office requested, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, that the Defendants provide copies of documents detailing the number of employers that have requested accommodations in connection with the coverage of preventive health services under section 2713 of the Public Health Services Act. The Defendants have not produced those documents.

76.     Some Massachusetts women who lose some or all of their employer-sponsored contraceptive coverage will be eligible to receive state-subsidized contraceptive care.

77.     Some Massachusetts women will qualify for MassHealth and will utilize that coverage as a secondary payer for contraceptive care and services.  Massachusetts will be required to pay a portion of the costs for this care.

78.     Some women will be eligible for, and receive, contraceptive care and services through SRHP funded programs.  This increased use will result in an increase in DPH funded expenditures and may result in a budget shortfall for eligible visits.

79.     Some Massachusetts women will forgo contraceptive services altogether, because the loss of their employer-sponsored coverage will make care unaffordable or inaccessible. As a result, Massachusetts will see an increase in unintended pregnancies and other negative health outcomes which will impose direct costs on the Commonwealth.  MassHealth will cover the medical care associated with some of the unintended pregnancies and other preventable conditions attributable to the IFRs.[43]

80.     Finally, the IFRs will cause significant harm to the Commonwealth's sovereign interest in protecting the health, safety, and well-being of its residents, and in ensuring that they are not improperly excluded from the benefits that flow from participation in the federal system, including the rights and privileges secured by the U.S. Constitution and federal law.

---

[43] 130 C.M.R. § 505.002(D)(1)(a).

## CLAIMS

### COUNT ONE
### Procedural Violation of the Administrative Procedure Act

81.     The Commonwealth realleges and incorporates by reference each of the paragraphs of this Complaint.

82.     The Administrative Procedure Act ("APA") provides a cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court.  5 U.S.C. §§ 702–704.

83.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

84.     The APA requires an agency to give a "general notice of proposed rulemaking" and provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. §§ 553(b), (c).

85.     The Departments did not engage in notice and comment rulemaking before issuing the IFRs.  Instead, they announced that the IFRs became effective immediately upon their release on October 6, 2017.

86.     The Departments did not have authority to disregard the APA's rulemaking requirements.  None of the limited exceptions to the notice and comment requirements are applicable to the IFRs.  In particular, the Departments did not have good cause to forgo notice and comment rulemaking because it would not have been "impracticable, unnecessary, or contrary to the public interest" to provide the public with notice and accept public comments before promulgating the rules.  5 U.S.C. § 553(b)(B).

87.     The Departments promulgated the IFRs without adhering to the procedural

requirements of 5 U.S.C. §§ 553 (b) and (c).

## COUNT TWO
**Violation of the Administrative Procedure Act – Not in Accordance with the Law**

88.     The Commonwealth realleges and incorporates by reference each of the

paragraphs of this Complaint.

89.     Under the APA, a reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . not in accordance with the law." 5 U.S.C.

§ 706(2)(A).

90.     The expanded exemptions created by the IFRs are not in accordance with the law.

91.     The ACA requires that group health plans and health insurance issuers offering

group or individual health insurance cover the preventative care services identified in the

HRSA's Women's Preventative Service Guidelines. 42 U.S.C. § 300gg–13(a)(4). Among the

preventative care services identified in HRSA's Guidelines are all FDA-approved contraceptives

and family planning counseling. The ACA and the HRSA Guidelines therefore require that all

group health plans cover contraception.

92.     The ACA does not authorize the Departments to exempt regulated employers

from the contraceptive care mandate.

93.     The expanded exemptions are not required by the Religious Freedom Restoration

Act or any other provision of federal law.

94.     The IFRs are inconsistent with the ACA' anti-discrimination provisions and other

federal anti-discrimination laws, including Title VII of the Civil Rights Act of 1964. The

expanded exemptions selectively target women by nullifying provisions of the ACA intended by

Congress to guarantee women equal access to preventive medicine. The expanded exemptions

will have the effect of denying women access to medically necessary care while leaving

coverage for men unchanged.

## COUNT THREE
### Violations of the Establishment Clause

95.     The Commonwealth realleges and incorporates by reference each of the

paragraphs of this Complaint.

96.     The IFRs violate the Establishment Clause of the First Amendment to the U.S.

Constitution.  The Departments have used their rulemaking authority for the primary purpose,

and with the principal effect, of advancing and endorsing religious interests.

97.     The Departments have acted to promote employers' religious beliefs over the

autonomy of women—and other employees—who do not share those beliefs.

98.     Through the IFRs, the Departments have empowered employers to impose their

religious beliefs on their employees and their employees' dependents.  The expanded exemptions

grant employers veto power over whether employees receive separate contraceptive coverage

through the accommodation process.  Employers have no legitimate interest injecting their

religious beliefs into this independent method for providing contraceptive coverage.

99.     The IFRs accommodate employers' religious beliefs by imposing constitutionally

impermissible harm on employees.  In addition to effectively depriving some women of needed

care entirely, the expanded exemptions will impose significant financial, logistical,

informational, and administrative burdens on the thousands of employees who lose contraceptive

coverage under its terms.

## COUNT FOUR
### Violations of the Equal Protection Clause

100.     The Commonwealth realleges and incorporates by reference each of the foregoing paragraphs of this Complaint.

101.     The Departments have violated the equal protection guarantee implicit in the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  The expanded exemptions created by the IFRs impermissibly target women for adverse treatment.

102.     The IFRs insert a gender-based classification into the ACA's preventive care provisions by selectively authorizing employers to use their religious beliefs to deny critical health insurance coverage for women.

103.     The expanded exemptions undermine protections inserted into the ACA by Congress for the explicit purpose of guaranteeing women equal access to preventive medicine.

104.     The expanded exemptions will result in women losing access to medically necessary contraceptive care and services while leaving coverage for men unchanged.

105.     The expanded exemptions do not serve an important governmental objective sufficient to justify the gender-based discrimination.

### PRAYER FOR RELIEF

WHEREFORE, the Commonwealth of Massachusetts requests that this Court grant the following relief:

(1)     Enter a judgment declaring that the IFRs, as well as the relevant portions of the regulations adopted in the IFRs, 45 CFR 147.130 to 147.133; 26 CFR Part 54; and 29 CFR Part 2590, violate the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and (D), and the First and Fifth Amendments to the U.S. Constitution;

24

(2)      Issue a preliminary injunction barring the Defendants from implementing or

enforcing the IFRs;

(3)      Issue a permanent injunction barring the Defendants from implementing or

enforcing the IFRs; and

(4)      Grant any other or additional relief that this Court may determine is necessary or

appropriate.


Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

ATTORNEY GENERAL
MAURA HEALEY


  /s/ Julia Kobick
Jonathan B. Miller, BBO # 663012
Jon Burke, BBO # 673472
David J. Brill, BBO # 673299
Julia E. Kobick, BBO # 680194
Assistant Attorneys General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2559
Julia.kobick@state.ma.us

Dated: October 6, 2017