IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

COMMONWEALTH OF MASSACHUSETTS, :
 :
   Plaintiff, : Case No. 1:17-cv-11930-NMG
 : (Leave to file granted on
  v. :  December 13, 2017)
 :
UNITED STATES DEPARTMENT OF :
HEALTH AND HUMAN SERVICES *et al.*, :
 :
   Defendants. :
_____:

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION
TO DISMISS OR FOR SUMMARY JUDGMENT AND IN OPPOSITION
<u>TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

ARGUMENT ................................................................................................................... 10

I.      Plaintiff Lacks Standing............................................................................................ 10

II.     Plaintiff's Procedural Administrative Procedure Act Claim Is Meritless........................ 14

      A.     The Agencies Issued the Rules Pursuant to Express Statutory Authority ........... 14

      B.     The Agencies Had Good Cause to Issue Interim Final Rules.............................. 15

      C.     If the Lack of Formal Notice-and-Comment Was an Error, It Was
Harmless ........................................................................................................ 18

III.    The Rules Are Valid Under the APA Because They Are in Accordance with Law,
and Not in Excess of Statutory Authority ................................................................. 19

      A.     The Affordable Care Act Allows the Agencies to Create Exemptions ............... 19

      B.     The Agencies Have Valid Justifications for Creating the Religious and
Moral IFRs ..................................................................................................... 25

      C.     RFRA Requires the Religious Exemption Rule.................................................. 30

      D.     At a Minimum, the Religious Exemption Rule Was a Permissible
Response to the Substantial Burden on Religious Exercise Imposed by the
Mandate.......................................................................................................... 35

IV.    The Rules Do Not Violate the Establishment Clause .................................................. 38

      A.     The Rules Have a Secular Purpose .................................................................. 40

      B.     The Effect of the Rules Is Neither to Advance Nor Inhibit Religion ................. 41

V.     The Rules Do Not Violate the Fifth Amendment's Equal Protection Principle.............. 42

CONCLUSION.................................................................................................................. 45

i

## TABLE OF AUTHORITIES

**CASES**

*ACLU of Mass. v. Sebelius*,
  821 F. Supp. 2d 474 (D. Mass. 2012) ................................................................. 41

*ACLU of Mass. v. U.S. Conf. of Catholic Bishops*,
  705 F.3d 44 (1st Cir. 2013) ................................................................................. 41

*Alfred L. Snapp & Son v. Puerto Rico*,
  458 U.S. 592 (1982) ..................................................................................... 2, 13

*Archdiocese of St. Louis v. Burwell*,
  28 F. Supp. 3d 944 (E.D. Mo. 2014) ..................................................................... 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 11

*Asiana Airlines v. FAA*,
  134 F.3d 393 (D.C. Cir. 1998) ........................................................................... 15

*Associated Builders & Contractors of Texas, Inc. v. NLRB*,
  826 F.3d 215 (5th Cir. 2016) ............................................................................. 27

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
  512 U.S. 687 (1994) ........................................................................................... 38

*Bowen v. Kendrick*,
  487 U.S. 589 (1988) ........................................................................................... 40

*Bowen v. Roy*,
  476 U.S. 693 (1986) ........................................................................................... 41

*Bowman Transp., Inc. v. Ark. Best Freight Sys.*,
  419 U.S. 281 (1974) ........................................................................................... 25

*Boyajian v. Gatzunis*,
  212 F.3d 1 (1st Cir. 2000) ............................................................................. 39, 40

*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014) .................................................................................. *passim*

*Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*,
  624 F.3d 1043 (9th Cir. 2010) ........................................................................... 10

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) ................................................................................ 23, 45

*Chevron U.S.A. v. Nat'l Res. Def. Council,*
    467 U.S. 837 (1984) ................................................................................ 22

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ................................................................................ 25, 26

*City of Arlington v. FCC,*
    *569 U.S. 290 (2013)* ................................................................................ 25

*City of Rohnert Park v. Harris,*
    601 F.2d 1040 (9th Cir. 1979) ................................................................ 13

*Coalition for Parity, Inc. v. Sebelius,*
    709 F. Supp. 2d 10 (D.D.C. 2010) .......................................................... 15

*Conservation Law Found. v. Evans,*
    360 F.3d 21 (1st Cir. 2004) ...................................................................... 16, 18

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v.*
    *Amos,* 483 U.S. 327 (1987) ........................................................... *passim*

*Cty. of Allegheny v. ACLU,*
    492 U.S. 573 (1989) ................................................................................ 39

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005) ................................................................................ 39, 44

*Doe v. Bolton,*
    410 U.S. 179 (1973) ................................................................................ 34, 45

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ................................................................................ 30

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ............................................................................ 22

*Estate of Thornton v. Caldor, Inc.,*
    472 U.S. 703 (1985) ................................................................................ 41-42

*FCC v. Fox Television Studios, Inc.,*
    556 U.S. 502 (2009) ................................................................................ 26, 32

*Freedom From Religion Found. v. Hanover Sch. Dist.*,
  626 F.3d 1 (1st Cir. 2010) ........................................................................... 39

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) ................................................................................... 30

*Heller v. Doe*,
  509 U.S. 312 (1993) ................................................................................... 42

*HHS v. CNS Int'l Ministries*,
  No. 15-775, 2016 WL 2842448 (May 16, 2016) ...................................... 31

*Hobbie v. Unemp. Appeals Comm'n of Fla.*,
  480 U.S. 136 (1987) ................................................................................... 38

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ............................................................................... 39-41

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .............................................................................. 10, 11

*Lyng v. Int'l Union*,
  485 U.S. 360 (1988) ................................................................................... 44

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ............................................................................... 13-14

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) .............................................................................. 13, 14

*Methodist Hosp. of Sacramento v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1994) .................................................................. 15

*Mid-Tex Elec. Co-op., Inc. v. FERC*,
  822 F.2d 1123 (D.C. Cir. 1987) ............................................................ 17, 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................ 22, 26

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*,
  719 F.2d 1159 (D.C. Cir. 1983) ................................................................ 25

*Myers v. United States*,
  272 U.S. 52 (1926) ..................................................................................... 27

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007) ............................................................................. 37

*Nat'l Org. for Marriage v. McKee*,
    649 F.3d 34, 66 (1st Cir. 2011) ........................................................... 15

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*,
    416 F. Supp. 2d 92 (D.D.C. 2006) ............................................... 17, 18

*New York v. United States*,
    505 U.S. 144 (1992) ............................................................................. 10

*Oregon v. Mitchell*,
    400 U.S. 112 (1970) ............................................................................. 10

*Pennsylvania v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ............................................................ 11

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ............................................................................. 12

*People ex rel. Hartigan v. Cheney*,
    726 F. Supp. 219 (C.D. Ill. 1989) ....................................................... 13

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ............................................................................. 42

*Petry v. Block*,
    737 F.2d 1193 (D.C. Cir. 1984) .......................................................... 17

*Priests for Life v. HHS*,
    772 F.3d 229 (D.C. Cir. 2014) ............................................... 16, 17, 41

*Raines v. Byrd*,
    521 U.S. 811 (1997) ............................................................................. 10

*Real Alternatives v. Burwell*,
    150 F. Supp. 3d 419 (M.D. Pa. 2015) ................................................ 14

*Republic Steel Corp. v. Costle*,
    621 F.2d 797 (6th Cir. 1980) ............................................................... 17

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ............................................................................. 37

*Rojas v. Fitch*,
928 F. Supp. 155 (D.R.I. 1996), *aff'd*, 127 F.3d 184 (1st Cir. 1997) ...................................... 40

*Serv. Emps. Int'l Union, Local 102 v. Cty. of San Diego*,
60 F.3d 1346 (9th Cir. 1994) ................................................... 16

*Sharpe Holdings, Inc. v. HHS*,
801 F.3d 927 (8th Cir. 2015) .................................................. 31

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) ................................................. 27

*Shinseki v. Sanders*,
556 U.S. 396 (2009) .............................................................. 18

*Smith v. F.W. Morse & Co.*,
76 F.3d 413 (1st Cir. 1996) ................................................ 34, 35

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) .............................................................. 10

*State of Iowa ex rel. Miller v. Block*,
771 F.2d 347 (8th Cir. 1985) .................................................. 13

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ................................................................ 10

*Texas Monthly, Inc. v. Bullock*,
489 U.S. 1 (1989) .................................................................. 41

*In Re Union Pac. R.R. Emp't Practices Litig.*,
479 F.3d 936 (8th Cir. 2007) .................................................. 35

*United States v. Seeger*,
380 U.S. 163 (1965) .......................................................... 34, 45

*United States v. Thoms*,
684 F.3d 893 (9th Cir. 2012) .................................................. 10

*United States v. Windsor*,
133 S. Ct. 2675 (2013) ........................................................... 42

*Universal Health Servs. of McAllen, Inc. v. Sullivan*,
770 F. Supp. 704 (D.D.C. 1991) .............................................. 17

*Walker v. Exeter Region Co-op. Sch. Dist.*,
 284 F.3d 42 (1st Cir. 2002) ................................................................. 44

*Walz v. Tax Comm'n of N.Y.*,
 397 U.S. 664 (1970) ................................................................. 39, 40

*Wash. Legal Found. v. Alexander*,
 984 F.2d 483 (D.C. Cir. 1993) ................................................................. 34

*Welsh v. United States*,
 398 U.S. 333 (1970) ................................................................. 34, 45

*Wengler v. Druggists Mut. Ins. Co.*,
 446 U.S. 142 (1980) ................................................................. 42

*Wheaton Coll. v. Burwell*,
 134 S. Ct. 2806 (2014) ................................................................. 7, 16

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990) ................................................................. 10

*Wyoming v. U.S. Dep't of the Interior*,
 674 F.3d 1220 (10th Cir. 2012) ................................................................. 11, 12

*Zorach v. Clauson*,
 343 U.S. 306 (1952) ................................................................. 38, 39

*Zubik v. Burwell*,
 136 S. Ct. 1557 (2016) ................................................................. *passim*

## STATUTES

5 U.S.C. § 551 ................................................................. 14
5 U.S.C. § 553(b),(c) ................................................................. 14
5 U.S.C. § 553(b)(3)(B) ................................................................. 15
5 U.S.C. § 704 ................................................................. 34
5 U.S.C. § 706 ................................................................. 18, 25
26 U.S.C. § 501(a) ................................................................. 4
26 U.S.C. § 9833 ................................................................. 14, 20
29 U.S.C. § 1191c ................................................................. 14, 20
42 U.S.C. § 300gg-13 ................................................................. *passim*
42 U.S.C. § 300gg-92 ................................................................. 14, 20
42 U.S.C. § 2000bb-1(b) ................................................................. 31, 33
42 U.S.C. § 18116 ................................................................. 35
130 Mass. Code Regs. § 484.003 ................................................................. 45
Internal Revenue Code of 1986 ................................................................. 6
Mass. Gen. Laws Ann. ch. 112, § 12I ................................................................. 45

Mass. Gen. Laws Ann. ch. 112, § 21B .................................................................... 45
Pub. L. No. 111-148, 124 Stat. 119 (2010) ............................................................. 3
Pub. L. No. 111-152, 124 Stat. 1029 (2010) ........................................................... 3

## REGULATIONS

26 C.F.R. § 54.9815-1251(a) ..................................................................................... 3
26 C.F.R. § 54.9815-2713A ....................................................................................... 9
29 C.F.R. § 2590.715-1251(a) ................................................................................... 3
29 C.F.R. § 2590.715-2713A ..................................................................................... 9
45 C.F.R. § 147.131 ................................................................................................... 9
45 C.F.R. § 147.132(a)(2) ....................................................................................... 8-9
45 C.F.R. § 147.140(a) .............................................................................................. 3
45 C.F.R. §§ 147.132(b), 147.133(b) ....................................................................... 9
45 C.F.R. §§ 147.132(c), 147.133(c) ....................................................................... 9
75 Fed. Reg. 34,358 (June 17, 2010) ................................................................ 4, 24
75 Fed. Reg. 41,726 (July 19, 2010) ................................................................ 14, 18
76 Fed. Reg. 46,621 (Aug. 3, 2011) ................................................................. passim
77 Fed. Reg. 8,725 (Feb. 15, 2012) .......................................................................... 4
77 Fed. Reg. 16,501 (Mar. 21, 2012) ................................................................... 5, 18
78 Fed. Reg. 8,456 (Feb. 6, 2013) .......................................................... 5, 9, 43, 44
78 Fed. Reg. 39,870 (July 2, 2013) .............................................................. 5, 22, 25
79 Fed. Reg. 51,092 (Aug. 27, 2014) ........................................................... 7, 14, 16
80 Fed. Reg. 41,318 (July 14, 2015) ........................................................................ 7
81 Fed. Reg. 47,741 (July 22, 2016) ................................................................... 8, 18
82 Fed. Reg. 21,675 (May 4, 2017) ..................................................................... 8, 28
82 Fed. Reg. 47,792 (Oct. 13, 2017) ................................................................ passim
82 Fed. Reg. 47,838 (Oct. 13, 2017) ................................................................ passim

## CONGRESSIONAL MATERIALS

158 Cong. Rec. S485 (daily ed. Feb. 9, 2012) ...................................................... 23

## MISCELLANEOUS

HHS, Guidance on the Temporary Enforcement Safe Harbor, at 1 n.1 & 3
    (Feb. 10, 2012) ..................................................................................................... 5

HHS, Guidance on the Temporary Enforcement Safe Harbor, at 1 n.1 & 3
    (June 28, 2013) ..................................................................................................... 5

HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines
    ("Guidelines") .................................................................................................. 4, 9

Order, *Notre Dame v. Price*, No. 13-3853 (7th Cir), ECF No. 150 (Aug. 14, 2017) .................. 16

## INTRODUCTION

This case is about religious liberty and freedom of conscience.  In 2010, as part of the Affordable Care Act (ACA), Congress enacted a law requiring employers to cover some recommended preventive services without cost-sharing.  The law does not mention contraceptive coverage.  But the Health Resources and Services Administration (HRSA), an agency within the Department of Health and Human Services (HHS), issued guidelines that required coverage for women of all Food and Drug Administration (FDA)-approved contraceptives without cost-sharing.  At the same time, the government recognized that some employers hold sincere religious objections to providing insurance coverage for contraception, especially certain contraceptives that some employers consider to be abortifacients, but decided to exempt only a fraction of those employers – churches and their integrated auxiliaries – from the requirement.  Other religious employers remained subject to the contraceptive mandate ("Mandate") and were left either to violate their sincerely-held religious beliefs or to be subjected to significant fines.

Years of litigation in dozens of cases followed.  In *Burwell v. Hobby Lobby Stores, Inc.*, the Supreme Court held that the "contraceptive mandate imposes a substantial burden on the exercise of religion" that was unlawful under the Religious Freedom Restoration Act (RFRA). 134 S. Ct. 2751, 2779 (2014).  Rather than extending the church exemption, however, the Departments of HHS, Labor, and the Treasury ("the Agencies") tried "accommodating" religious objectors who did not qualify for that exemption.  That decision triggered a new round of litigation that generated decisions in nine federal courts of appeals.  Ultimately, the Supreme Court vacated those decisions and instructed the courts of appeals to give the parties time to try to resolve their differences.  *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016).

On October 6, 2017, in an effort to address serious religious and moral objections and

finally bring the litigation to a close, the Agencies issued interim final rules that keep the Mandate in place, but exempt religious and moral objectors from having to include contraceptive coverage to which they object – which could be some or all contraceptives – in insurance plans offered to their employees.  *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (the "Religious Exemption Rule"); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (the "Moral Exemption Rule") (collectively, "the Rules").

Plaintiff, the Commonwealth of Massachusetts, seeks to reverse this considered decision, demanding that religious and secular groups facilitate services to which they deeply object. Plaintiff alleges that the Rules violate the Administrative Procedure Act, the Affordable Care Act, the Establishment Clause, and the Equal Protection Clause.  It contends that the Rules interfere with "women['s] equal access to preventive medical care" that is "guarantee[d]" by the ACA. Mem. Supp. Pl. Mot. for Summ. J. at 1, ECF No. 22 ("Pl. MSJ").  Those positions, if adopted, would apply equally to sweep away the longstanding exemption for churches and their integrated auxiliaries, exposing churches to the Mandate for the first time.

But this Court should not reach the merits at all, because Plaintiff lacks standing.  Plaintiff seeks to enjoin Rules that do not apply to it and that do not affect any identified State residents, and it is black-letter law that a State cannot assert the rights of its citizens against the federal government.  *See Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982).

In any event, none of Plaintiff's claims has merit.  The federal government acted lawfully in making a policy choice in accordance with laws protecting religious liberty and moral conscience in the healthcare context.  This case is about protecting a narrow class of sincere

religious and moral objectors from being forced to facilitate practices that conflict with their beliefs. Both the ACA and RFRA provide firm statutory authority for the Rules. The Rules did not require yet another round of notice and comment prior to implementation, and are not arbitrary, as they alleviate a substantial burden on religion and help resolve years of litigation and dozens of cases. And it is settled law that the government may accommodate religion without running afoul of the Establishment Clause; the Rules do not advance religion, but instead relieve a burden on religious and secular objectors. Finally, the Rules do not discriminate on the basis of sex, but instead draw distinctions based on the presence or absence of a sincere religious or moral objection. The Court should therefore dismiss this action, or enter summary judgment for Defendants.

## BACKGROUND

In March 2010, Congress enacted the ACA. *See* Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111-148, 124 Stat. 119 (2010), *as amended by* Pub. L. No. 111-152, 124 Stat. 1029 (2010). Section 1001 of the PPACA added Section 2713 to the Public Health Service Act (PHSA). *See* 42 U.S.C. § 300gg-13. That provision requires group health plans and health insurance issuers that offer group or individual health coverage to provide coverage for certain preventive services without cost-sharing. *Id*. These include, "with respect to women, such additional preventive care and screenings not described in [Section 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by [HRSA]." *Id*. § 300gg-13(a)(4). Congress did not require HRSA to include contraceptive services, and the ACA does not mention such services.

Congress exempted tens of millions of employees from the preventive coverage provision, many because their employers sponsor "grandfathered plans," which are plans "in which an individual was enrolled on March 23, 2010" that comply with certain regulations. *See* 26 C.F.R. § 54.9815-1251(a); 29 C.F.R. § 2590.715-1251(a); 45 C.F.R. § 147.140(a). Congress required

grandfathered plans to cover certain services deemed "particularly significant," including coverage of pre-existing conditions and allowing dependents to remain on plans until age 26, but did not require those plans to cover preventive services.  75 Fed. Reg. 34,358, 34,540 (June 17, 2010).

On August 1, 2011, HRSA adopted guidelines defining as covered preventive services for women the full range of FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity.  *See* HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines ("Guidelines"), Administrative Record (AR) CD1 at 56-57.[1]  Simultaneously, the Agencies issued a set of Interim Final Rules (IFRs) providing an exemption for certain religious employers.  *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the PPACA, 76 Fed. Reg. 46,621, 46,625 (Aug. 3, 2011).  The IFRs limited the exemption to "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order," that are exempt from taxation under 26 U.S.C. § 501(a), where "(1) [t]he inculcation of religious values is the purpose of the organization; (2) [t]he organization primarily employs persons who share the religious tenets of the organization; [and] (3) [t]he organization serves primarily persons who share the religious tenets of the organization.  *Id.* at 46,626.  The Agencies requested comments on the IFRs and specifically on the definition of a "religious employer."  76 Fed. Reg. at 46,623, AR CD9, Doc. 9.

After considering thousands of comments, AR CD1 at 1510-2249, CD2 at 2250-181059, the Agencies issued final regulations that adopted the interim rules' definition of a religious employer.  77 Fed. Reg. 8,725, 8,726-27 (Feb. 15, 2012).  The Agencies also created a temporary

---

[1] Citations herein to the administrative record include citations to the specific CD-ROM (CD1-CD9) that contains the cited material.

enforcement safe harbor for plans sponsored by certain non-profit organizations with religious objections to contraceptive coverage that did not qualify as exempt religious employers (and for any associated group health insurance coverage).[2]

This safe harbor did not extend to for-profit companies with religious objections to providing coverage for contraceptive services, or to companies of any kind with moral objections to providing such coverage.  Dozens of organizations and individuals filed lawsuits challenging the Mandate.  Courts around the country began to issue injunctions against the Mandate.  *See Archdiocese of St. Louis v. Burwell*, 28 F. Supp. 3d 944, 954 (E.D. Mo. 2014) (citing cases).

As part of their continuing attempt to resolve religious objections, the Agencies issued an advance notice of proposed rulemaking (ANPRM) in March 2012, and a notice of proposed rulemaking (NPRM) in February 2013.  77 Fed. Reg. 16,501 (Mar. 21, 2012); 78 Fed. Reg. 8,456 (Feb. 6, 2013).  The Agencies' goal was to address alternatives for providing women access to contraceptive services without cost-sharing and for accommodating religious organizations' liberty interests, *id*. at 16,501-03, and to give "an early opportunity for any interested stakeholder to provide advice and input into the policy development relating to the accommodation to be made" in amendments to the regulations.  *Id*. at 16,503.

After receiving over 400,000 comments, AR CD6 at 25414-289805, 289806-373095, the Agencies published final rules, 78 Fed. Reg. 39,870 (July 2, 2013), which simplified and expanded the religious-employer exemption by defining a "religious employer" to be "an organization that

---

[2] On February 10, 2012, HHS issued guidance describing the safe harbor, and stating that the Agencies would wait one year before enforcing the mandate against certain non-exempt religious organizations.  *See* HHS, Guidance on the Temporary Enforcement Safe Harbor (Feb. 10, 2012), AR CD1 at 58-63.  This guidance was later reissued without changing the substance of the policy, in order to extend the safe harbor for an additional year.  *See* HHS, Guidance on the Temporary Enforcement Safe Harbor, at 1 n.1 & 3 (June 28, 2013), AR CD4 at 263, 265.

is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended." *Id*. at 39,889.  That Code provision refers only to churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order.  *Id*.

But the 2013 final rules did not extend the religious-employer exemption to all objecting organizations.  Instead, they established an "accommodation" for group health plans established or maintained by "eligible organizations."  *Id*. at 39,874-80, 39,896.  Under this process, an eligible organization was not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it had religious objections, *id*. at 39,874, if it completed a self-certification stating that it was an eligible organization and provided a copy of that form to its issuer or third-party administrator (TPA).  *Id*. at 39,878-79.  The organization's health insurance issuer or TPA would then be required to provide or arrange separate payments to participants and beneficiaries for contraceptive services without cost sharing, premium, fee, or other charge to participants or beneficiaries, or to the eligible organization or its plan.[3]  *See id*. at 39,875-80.

The 2013 final rules did not resolve the litigation challenging the Mandate.  In 2014, the Supreme Court held that – at least as applied to closely-held for-profit corporations with religious objections to providing contraceptive coverage – the Mandate violated RFRA.  *Hobby Lobby*, 134 S. Ct. at 2775.  The Court explained that the "contraceptive mandate substantially burden[ed] the exercise of religion" by those employers because it put them to the choice of violating their sincerely-held religious beliefs or facing significant fines.  *Id*. at 2757.  The Court also held that applying the Mandate to the plaintiffs failed the least restrictive means test, because

---

[3] For self-insured plans, any costs incurred by a TPA could be reimbursed through an adjustment to Federally-facilitated Exchange (FFE) user fees.  *See* 78 Fed. Reg. at 39,880.

the accommodation was a less restrictive alternative to applying the Mandate directly.  *See id*. at 2779-80.  The Court cautioned that it was not deciding "whether an approach of this type complies with RFRA for purposes of all religious claims."  *Id*. at 2782.

Less than a week later, the Court granted interim relief in a case involving Wheaton College, a non-profit employer that sincerely believed that the accommodation process rendered it complicit in providing contraceptive coverage.  *See Wheaton Coll. v. Burwell*, 134 S. Ct. 2806, 2808 (2014).  The Court identified an alternative form of accommodation for Wheaton College whereby the employer could notify the government – instead of its insurer or third-party administrator – of the employer's religious objections.  *Id*. at 2807.

In light of that order, the Agencies issued another set of IFRs to augment the regulatory accommodation process.  Coverage of Certain Preventive Services Under the ACA, 79 Fed. Reg. 51,092 (Aug. 27, 2014).  They also issued a second NPRM to extend the accommodation process to closely-held for-profit entities with religious objections to contraceptive coverage in light of the *Hobby Lobby* decision.  *See* 79 Fed. Reg. at 51,118.  After receiving over 75,000 comments, the Agencies finalized both the August 2014 IFRs and the August 2014 proposed rules.  *See* 80 Fed. Reg. 41,318, 41,324 (July 14, 2015).

Meanwhile, litigation about whether the accommodation process satisfied the government's RFRA obligations toward non-profit religious entities had generated a split among the federal appeals courts, and the Supreme Court granted certiorari in *Zubik v. Burwell* to resolve the split.  But on May 16, 2016, the Court issued a *per curiam* opinion vacating the judgments of the courts of appeals and remanding the cases "[i]n light of the . . . substantial clarification and refinement in the positions of the parties" in supplemental briefs they had submitted.  *Zubik*, 136 S. Ct. at 1560.  The Court stated that it anticipated, on remand, that the courts of appeals would

7

"allow the parties sufficient time to resolve any outstanding issues between them." *Id.*

The Agencies then issued a Request for Information ("RFI") seeking public comment on options for modifying the accommodation process in light of the supplemental briefing and remand order in *Zubik*. Request for Information, 81 Fed. Reg. 47,741 (July 22, 2016). In response to the RFI, the Agencies received over 54,000 public comments. AR CD8 at 218051-272990. On January 9, 2017, the Agencies issued a "FAQ" noting that, after a review of the comments and considering various options, the Agencies could not find a way to amend the accommodation to satisfy objecting organizations while also pursuing the Agencies' policy goals. FAQs About ACA Implementation Part 36 ("FAQs") (Jan. 9, 2017), AR CD9 at 370093-370103, 370104-370114. Thus, the litigation on remand, involving dozens of cases and plaintiffs, remained unresolved.

On May 4, 2017, the President issued an "Executive Order Promoting Free Speech and Religious Liberty." Exec. Order No. 13,798, 82 Fed. Reg. 21,675 (May 4, 2017). It instructed the Agencies to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4)." *Id.* Consistent with the Executive Order, the Agencies concluded that it was "appropriate to reexamine the exemption and accommodation scheme currently in place for the Mandate," and issued the Rules at issue here on October 6, 2017. Religious Exemption Rule, 82 Fed. Reg. 47,799; *accord* Moral Exemption Rule, 82 Fed. Reg. 47,838. The Agencies requested public comments on the Rules by December 5, 2017.

The Religious Exemption Rule expands the exemption for non-governmental plan sponsors that object to providing coverage for all or some contraceptive services based on sincerely-held religious beliefs, as well as for institutions of higher education in their arrangement of student health plans, to the extent of these entities' sincerely-held religious beliefs. 45 C.F.R.

§ 147.132(a)(2).  The Moral Exemption Rule provides an exemption for certain non-governmental plan sponsors that object to providing all or some contraceptive services based on sincerely-held moral convictions, as well as for institutions of higher education in their arrangement of student health plans, to the extent of these entities' sincerely-held moral convictions.  *Id*. § 147.133(a)(2).[4]

Under the Rules, HRSA remains free to define "contraceptive services" as "contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv)" for all non-exempt employers.  *See* 82 Fed. Reg. at 47,835; 45 C.F.R. §§ 147.132(c), 147.133(c).  "Contraceptive services" do not include contraceptive services for men, and never have, because the ACA only authorizes HRSA to develop guidelines for "additional preventive care and screenings" to be covered "with respect to women."  42 U.S.C. § 300gg-13(a)(4); 78 Fed. Reg. 8,456, 8,458 n.3 (Feb. 6, 2013) (excluding "services relating to a man's reproductive capacity, such as vasectomies and condoms" from the definition of "preventive services" that must be provided without cost sharing).  As under the previous rule, exempt entities are not required to self-certify, but they are still subject to regulatory disclosure requirements for plan exclusions or reductions in a covered benefit.  82 Fed. Reg. at 47,808 & n.54; *id*. at 47,804 & n.32.  The Rules also maintain the accommodation process as a voluntary mechanism to provide contraceptive availability for women covered by the plans of exempt entities that choose to use it.  45 C.F.R. § 147.131; 26 C.F.R. § 54.9815-2713A; 29 C.F.R. § 2590.715-2713A.  On October 6, 2017, HRSA updated its Guidelines to exempt entities and individuals that qualify for exemptions from the Guidelines' requirements.  *See* Guidelines.

---

[4] Each rule also includes an "individual exemption" that allows a willing plan sponsor of a group health plan or a willing health insurance issuer offering group or individual health insurance coverage to provide a separate benefit package option or policy, certificate, or contract of insurance to an individual who objects to coverage for contraceptive services based on sincerely-held religious beliefs or moral convictions.  45 C.F.R. §§ 147.132(b), 147.133(b).

**ARGUMENT**

## I.    Plaintiff Lacks Standing.

As an initial matter, this Court lacks jurisdiction to adjudicate Plaintiff's claims.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  To establish standing, a plaintiff must show that it has "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and … (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).  Allegations of possible future injury do not suffice; "[a] threatened injury must be certainly impending to constitute injury in fact."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  Likewise, a plaintiff that "alleges only an injury at some indefinite future time" has not shown an injury in fact; "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all."  *Lujan*, 504 U.S. at 564 n.2.  The standing inquiry is "especially rigorous" where, as here, a plaintiff asks a federal court "to decide whether an action taken by one of the . . . branches of the Federal Government was unconstitutional."  *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).[5]

The challenged Rules apply to non-governmental employers, not to States.  They do not command Massachusetts to take, or refrain from taking, any action.  Accordingly, this case is unlike the most common situation in which States have standing to challenge federal law.  *See, e.g., New York v. United States*, 505 U.S. 144 (1992); *Oregon v. Mitchell*, 400 U.S. 112 (1970).

---

[5] As to Count IV, a State is not a "person" protected by the Due Process Clause of the Fifth Amendment.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-34 (1966); *United States v. Thoms*, 684 F.3d 893, 899 n.4 (9th Cir. 2012).  As to Count III, Plaintiff cites no case recognizing the standing of a State to bring an Establishment Clause challenge, and it is not clear how the Commonwealth can suffer "spiritual or psychological harm" or have "religious beliefs" that can be "stigmatized."  *See Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1050-53 (9th Cir. 2010).

Massachusetts therefore complains of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," but that theory makes standing "substantially more difficult to establish." *See Lujan*, 504 U.S. at 562. As is evident from its filings, Massachusetts seeks to challenge the Rules based on mere conjecture about indirect or incidental financial consequences that allegedly will flow from them. It fails to show that the Rules will result in any injury for the Commonwealth, much less a "*certainly* impending" injury. *Id.* at 564 n.2.

Plaintiff's primary theory of harm is that the Commonwealth "will be legally obligated to assume the costs of contraceptive, prenatal, and postnatal care for many women who lose coverage" as a result of the expanded exemptions, "inflict[ing] significant financial harm" on the Commonwealth. Pl. MSJ at 13; Am. Compl. ¶¶ 73-79, ECF No. 17. But conclusory allegations that a State's budget or tax revenues will be harmed in some general way by a federal policy are not sufficient to support standing. *See, e.g., Pennsylvania v. Kleppe*, 533 F.2d 668, 672-73 (D.C. Cir. 1976); *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In its Amended Complaint, Plaintiff does not allege that any particular employer will imminently avail itself of the exemption, rather than the accommodation.[6] Plaintiff also does not allege that the employees of any Massachusetts employer that avails itself of the exemption would seek access to contraceptive coverage that was unavailable through, for example, a family member's plan. Indeed, Plaintiff itself notes that many such employers may be required to cover contraception under Plaintiff's own Contraceptive Equity Act and ACCESS Act, even if an objecting employer invokes the Rules' exemptions to the federal Mandate. *Cf.* Pl. MSJ at 11-12.

---

[6] Employers seeking the exemption are subject to ERISA's timely disclosure requirements for plan exclusions or reductions in a covered service or benefit. *See* 82 Fed. Reg. at 47,808 & n.54; *id.* at 47,804 & n.32.

In short, Plaintiff has failed to sufficiently allege that any state residents will imminently lose coverage as a result of the expanded exemptions.

Even if state residents do lose coverage as a result of the Rules, the Commonwealth's alleged harms rely on an attenuated chain of causation.  It is pure speculation that "[s]ome Massachusetts women who lose coverage" as a result of the expanded exemptions will seek (and qualify for) contraceptive care and services through programs that are at least partially state-funded, thus requiring increased state spending.  *See* Am. Compl. ¶¶ 76-77; Pl. MSJ at 14.  The Commonwealth's allegation that the expanded exemptions will result in "an increase in unintended pregnancies and other negative health outcomes which will impose direct costs on the Commonwealth" is even more attenuated.  Am. Compl. ¶ 78; Pl. MSJ at 14-15.  The costs of such "unintended pregnancies" would likely be otherwise covered by the health plans of the affected employees (who are, by hypothesis, employed).

Even if the Commonwealth had adequately alleged that it would "be responsible for a significant share of the[] costs" of "providing replacement contraceptive coverage and care," including prenatal care and delivery services, for a certain number of state residents, Pl. MSJ at 13-14, that allegation would be insufficient as a matter of law.  A State suffers no legally cognizable injury when an eligible person applies for a benefit that a State has elected to provide (such as one available through a State's public health department programs).  *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (holding that "[n]o State can be heard to complain about damage inflicted by its own hand").  And in any event, if such hypothetical impacts on state finances were enough to establish Article III standing, a State could challenge virtually any federal policy.[7]  *See Wyoming*, 674 F.3d at 1234 ("concrete evidence" of an impact on state finances is

---

[7] Even if the Commonwealth had alleged concrete fiscal injuries traceable to the Rules, those injuries would not suffice to support standing here.  The Commonwealth's generalized allegation

needed because of "the unavoidable economic repercussions of virtually all federal policies); *see also State of Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) ("[T]hese injuries fail to constitute distinct, palpable injuries to the State as a state").

Nor can the Commonwealth overcome its lack of standing in its own right by asserting a "sovereign interest in protecting the health, safety, and well-being of its residents." Am. Compl. ¶ 79; *see also* Pl. MSJ at 13. As *parens patriae*, a State can sue a private party to protect its "quasi-sovereign interest" in the health and well-being of its citizens. *Snapp*, 458 U.S. at 602-03. But a State cannot sue the federal government "to protect citizens of the United States from the operation" of federal law. *See Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923). "It is the United States, and not the state, which represents [its citizens] as *parens patriae*" and "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id*. at 485-86. This well-settled rule controls here.

*Massachusetts v. EPA*, 549 U.S. 497, 522–23 (2007), illustrates how far removed the Commonwealth's allegations are from stating an injury in fact. In that case, the Supreme Court allowed the Commonwealth to sue the federal government to vindicate a claim of a concrete, direct injury to its quasi-sovereign interests: alleged harm to the physical integrity of "sovereign territory," implicating the Commonwealth's "independent interest in all the earth and air within its domain." *Id*. at 519. Here, the Commonwealth alleges no such concrete, direct injury to its own interests. Allegations of harm to its residents do not suffice to establish harm to the Commonwealth itself, and the Commonwealth can assert no "sovereign interest" in the health of its residents against the federal government. *Snapp*, 458 U.S. at 602-03. "[T]here is a critical

---

of harm to its finances or loss of increased tax revenue is not a proprietary interest apart from the interests of its citizens. *See City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044-45 (9th Cir. 1979); *People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 225 (C.D. Ill. 1989).

difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Massachusetts*, 549 U.S. at 520 n.17.  Plaintiff has no standing to sue.

## II.    Plaintiff's Procedural Administrative Procedure Act Claim Is Meritless.

Plaintiff asserts that the Rules should be enjoined because they were issued without notice and comment.  Pl. MSJ at 16-21.  That claim is meritless.

### A.    The Agencies Issued the Rules Pursuant to Express Statutory Authority.

The informal rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. (APA) generally require that agencies provide notice of a proposed rule, invite and consider public comments, and adopt a final rule that includes a statement of basis and purpose.  *See id*. § 553(b), (c).  But these provisions give way in the face of express statutory authorization to the contrary, and the Rules were issued pursuant to such express statutory authorization.  Specifically, each agency was authorized by statute to "promulgate *any* interim final rules *as the Secretary determines* are appropriate" relating to health coverage.  *See* 26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92 (emphasis added).  These statutory provisions are unique; other statutes granting general regulatory authority do not similarly authorize IFRs.  The Agencies relied on this statutory authority to issue IFRs in 2010, 2011, and 2014 regarding the Mandate.  75 Fed. Reg. at 41,729-30; 76 Fed. Reg. at 46,624; 79 Fed. Reg. at 51,095; *cf. Real Alternatives v. Burwell*, 150 F. Supp. 3d 419, 427 n.6 (M.D. Pa. 2015) (noting that APA notice-and-comment requirements did not apply to the 2011 IFR that was issued under this specific statutory authority).  The Agencies thus have met the APA's only procedural requirements that apply here: they requested comments for a period of sixty days on the IFRs and will not issue final rules until they have received and carefully considered those comments.  *See* 82 Fed. Reg. 47,792; 82 Fed. Reg. 47,838.

Plaintiff's contrary position writes this express grant of statutory authority out of the statute. Under the Commonwealth's view, the grant of authority is meaningless; it would merely give the Secretaries the same authority they already possessed. *See generally Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 66 (1st Cir. 2011) (a statute should "be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (citation omitted). But when Congress sets forth its "clear intent that APA notice and comment procedures need not be followed," an agency may dispense with those requirements and issue an IFR. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994); *Asiana Airlines v. FAA*, 134 F.3d 393, 397-98 (D.C. Cir. 1998). The relevant question is "whether Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Id*. at 397. That is the case here. Express authority to issue "any interim final rules *as the Secretar[ies] determine[]* are appropriate" is quite different from the default standard of good cause under the APA.

### B.    The Agencies Had Good Cause to Issue Interim Final Rules.

In any event, the Agencies' decision to issue the Rules on an interim final basis would have been justified under the APA itself. The APA authorizes an agency to dispense with notice-and-comment rulemaking procedures "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor[e] in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). That Congress "has specifically authorized the Secretaries to promulgate interim final rules," at a minimum, "provides support towards a finding of 'good cause' to proceed without notice and comment." *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 20 (D.D.C. 2010).

15

And even without that thumb on the scale, good cause existed to issue the Rules as interim final rules with an accompanying request for comment. First, the Agencies found that any additional delay in issuing the Rules would be contrary to the public interest.[8] 82 Fed. Reg. at 47,814-15; 82 Fed. Reg. at 47,855-56. Prompt effectiveness provided entities and individuals facing unlawful burdens on their sincerely-held religious beliefs and moral convictions with important and urgent relief. *Id.* at 47,814; *see also id.* at 47,855.[9] The Rules also resolved the uncertainty, inconsistency, and costs resulting from the dozens of lawsuits over the Mandate for nearly five years. *See Serv. Emps. Int'l Union, Local 102 v. Cty. of San Diego*, 60 F.3d 1346, 1352 n.3 (9th Cir. 1994) (finding good cause where "the federal courts were issuing conflicting decisions" and the agency had reviewed public comments six years before). Indeed, because more than a year has elapsed since the *Zubik* remand, some courts had begun pressing for resolution. *See, e.g.*, Order, *Notre Dame v. Price*, No. 13-3853 (7th Cir), ECF No. 150 (Aug. 14, 2017). The Religious Exemption Rule "provide[d] a specific policy resolution that courts ha[d] been waiting to receive from the [Agencies] for more than a year" following *Zubik*. 82 Fed. Reg. at 47,814.

Second, the Agencies demonstrated a willingness to consider public comment, both prior to and following issuance of the Rules. *See Priests for Life v. HHS*, 772 F.3d 229, 276 (D.C. Cir. 2014), *vacated and remanded by Zubik v. Burwell*, 136 S. Ct. 1557 (2016);[10] *Conservation Law*

---

[8] The Agencies noted similar reasons for good cause to issue the 2011 and 2014 IFRs, underscoring the long-recognized need for prompt guidance and clarity on the scope of these exemptions and accommodations. 76 Fed. Reg. at 46,624; 79 Fed. Reg. at 51,095.

[9] The clarity provided in the Rules also serves the public interest by removing barriers to participation in the insurance market and reducing the cost of health insurance. 82 Fed. Reg. at 47,815. And the Rules also remove any deterrent to objectors considering organizing entities that would be subject to the Mandate, or from offering health insurance in the first place. *Id.* at 47,814.

[10] Plaintiff attempts to distinguish the D.C. Circuit's decision in *Priests for Life* by arguing the court's decision there hinged on the "minor" nature of the modifications to the regulations, Pl. MSJ at 20, but the *Priests for Life* court found several reasons supporting the Agencies' decision not to engage in notice-and-comment rulemaking, and it noted that the Agencies "reasonably interpreted the Supreme Court's order in *Wheaton College* as obligating [them] to take action to

*Found. v. Evans*, 360 F.3d 21, 29-30 (1st Cir. 2004). As discussed above, the Agencies received and considered "more than 100,000 public comments on multiple occasions" on the exemption and accommodation issues. 82 Fed. Reg. at 47,814. After reviewing these thousands of comments, the Agencies could not find a way to amend the accommodation to eliminate fully the substantial burden on religious practice. There is no question that the exemption and accommodation have been "tested via exposure to diverse public comment." Pl. MSJ at 16.

The Agencies have also solicited comments for 60 days following issuance of the Rules. *See* 82 Fed. Reg. at 47,792 (requesting comments on or before December 5, 2017); 82 Fed. Reg. at 47,838 (same). Their solicitation of post-promulgation comments "suggests that the [Departments have] been open-minded," with the result that "real 'public reconsideration of the issued rule' [is taking] place." *Petry v. Block*, 737 F.2d 1193, 1203 (D.C. Cir. 1984) (citation omitted) (in light of post-promulgation comment period, remand to the agency for further proceedings was unnecessary); *see also Republic Steel Corp. v. Costle*, 621 F.2d 797, 804 (6th Cir. 1980) (upholding rule where agency provided only post-promulgation comment period); *Universal Health Servs. of McAllen, Inc. v. Sullivan*, 770 F. Supp. 704, 721 (D.D.C. 1991).

Finally, the Rules are effective only until final rules are issued. "The interim nature of a challenged rule is a significant factor in evaluating an agency's good cause claim." *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 107 (D.D.C. 2006) (citation omitted); *see also Mid-Tex Elec. Co-op., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987). These Rules are temporary. The Agencies have given interested parties two full

---

further alleviate any burden on the religious liberty of objecting religious organizations." *Priests for Life*, 772 F.3d at 276. While Plaintiff argues that the "Court's order in *Zubik* had no such urgency," Pl. MSJ at 21, in the Rules, the Agencies reasonably interpreted the *Zubik* remand as requiring "a specific policy resolution that courts ha[d] been waiting to receive from the [Agencies] for more than a year." 82 Fed. Reg. at 47,814.

months to review and comment upon the Rules before the Agencies issue final rules.

Even if a single justification "standing alone" would not constitute good cause, the Court must consider whether the "combined effect" suffices. *Nat'l Women Ass'n*, 416 F. Supp. 2d at 107; *Mid-Tex Elec. Coop., Inc.*, 822 F.2d at 1132-33. The factors discussed above – whether considered individually or together – justified the Agencies' finding of "good cause." *See Nat'l Women Ass'n*, 416 F. Supp. 2d at 104-05.

### C.    If the Lack of Formal Notice-and-Comment Was an Error, It Was Harmless.

In any event, any error in forgoing notice and comment was harmless. The APA's judicial review provision instructs courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Courts routinely apply this instruction when they determine whether an agency has failed to comply with the APA's notice-and-comment requirement. *See Conservation Law Found.*, 360 F.3d at 29. The burden falls on the party asserting error to demonstrate prejudice. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Here, the Agencies issued the Rules after receiving "more than 100,000 public comments" throughout six years of publishing and modifying these regulations, as part of an extensive discussion about whether and by what extent to expand the exemptions at issue here. 82 Fed. Reg. at 47,814. Plaintiff, like all interested parties, has had multiple opportunities to comment on the scope of the exemptions and accommodations through multiple rounds of rulemaking, including the issuance of three IFRs, one ANPRM, two NPRMs, and one RFI on these issues. *See* 75 Fed. Reg. 41,726; 77 Fed. Reg. 16,501; 81 Fed. Reg. 47,741. The Commonwealth does not allege any specific comments that it would have submitted on the Rules. And comments addressing each of the claims that the Commonwealth now asserts were submitted in response to earlier rounds of rulemaking on the exemption and accommodation. *See, e.g.*, AR CD8 at 272126, 272089 (raising

RFRA concerns), *id*. at 264554, 269764 (raising anti-discrimination concerns), *id*. at 264577, 265920 (raising Establishment Clause concerns), *id*. at 218156, 262356 (raising equal protection concerns). Finally, the Commonwealth had another opportunity to comment on the expanded exemptions before final rules are issued.  The Commonwealth cannot meet its burden to establish prejudice from any error in foregoing a comment period before the issuance of these IFRs.

### III.    The Rules Are Valid Under the APA Because They Are in Accordance with Law, and Not in Excess of Statutory Authority.

Plaintiff contends that the Rules violate the APA's substantive limits on legislative rules because they (1) are not in accord with various laws (including the ACA and RFRA) and (2) are arbitrary and capricious.  Pl. MSJ at 21-33.  These contentions are incorrect.

### A.    The Affordable Care Act Allows the Agencies to Create Exemptions.

Plaintiff asks this Court to read out of the statute *any* discretion for the Agencies to provide exemptions for conscience, notwithstanding the fact that multiple administrations have enacted such exemptions, and that courts have approved these actions.  Plaintiff contends that (with the exception of grandfathered plans) "Congress did not intend to give HRSA authority to devise additional exemptions."  *See* Pl. MSJ at 23.  Plaintiff leans heavily on the fact that the word "shall" is included in the statute, but entirely ignores the numerous textual indications that the statute leaves the Agencies to determine the contours of the Mandate.

The preventive services requirement of the Public Health Service Act (PHS Act), as modified by the ACA, is structured to operate through an exercise of agency discretion to craft minimum requirements for women's preventive healthcare and screenings.  That is, the statute itself does not mandate coverage of any particular services; instead, the PHS Act requires that covered group health plans "shall, . . . at a minimum provide coverage for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive

guidelines supported by the Health Resources and Services Administration for purposes of this paragraph." 42 U.S.C. § 300gg-13(a)(4). The ACA then delegates general regulatory authority to the Agencies to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of the ACA. *Id.* § 300gg-92; 26 U.S.C. § 9833; 29 U.S.C. § 1191c. Inherent in these provisions is a direction by Congress to develop "comprehensive guidelines . . . for purposes of this paragraph" to determine how such "preventive care and screenings" will be "provided"; no such guidelines pre-dated the ACA. *See* 76 Fed. Reg. at 46,623; 82 Fed. Reg. at 47,794.

The Agencies (as administering agencies of the applicable statutes) and HHS (as the agency within which HRSA is located) possess general rulemaking authority to guide the development of those guidelines. The text and structure of the preventive coverage provision are a clear grant of authority to the Agencies. Section (a) of that provision identifies four categories of services for which covered health plans must provide coverage without any cost-sharing requirements:

> (1) evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force;
>
> (2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and
>
> (3) with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.
>
> (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

42 U.S.C. § 300gg-13(a)(1)-(4). Because the recommendations and guidelines noted in subsections (a)(1) - (3) were in existence at the time Congress enacted that statutory provision, but the guidelines described in subsection (a)(4) were not, the reference to such guidelines must be

20

understood as a grant of authority to develop them.

Several textual indicia underline the Agencies' broad latitude to determine the scope of coverage and to establish exemptions. The preventive services Mandate is only one among a list of four coverage requirements included in the relevant portion of the ACA. *See* 42 U.S.C. § 300gg-13(a)(1)-(a)(4). Yet it differs textually from the other requirements. For example, the textually-adjacent requirement that employers cover children's health services renders obligatory those children's services "provided for" by HRSA. *See id*. § 300gg-13(a)(3) (requiring coverage of, "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings *provided for* in the comprehensive guidelines supported by the Health Resources and Services Administration") (emphasis added). By contrast, the preventive services Mandate requires provision of preventive services "*as* provided for" by HRSA (emphasis added). *See id*. § 300gg-13(a)(4) (requiring coverage of, "with respect to women, such additional preventive care and screenings not described in paragraph (1) *as provided for* in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph") (emphasis added). The use of the word "as" reinforces Congress's delegation to HRSA to determine not only the services covered, but also the manner and reach of that coverage.

Similarly, two of the coverage requirements adjacent to the women's preventive services Mandate require coverage that is "evidence-based" or "evidence-informed." *See id*. § 300gg-13(a)(3) (requiring "evidence-informed preventive care and screenings" for children); *id*. § 300gg-13(a)(1) (requiring coverage of "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force"). The Mandate includes no such requirement. *See id*. § 300gg-13(a)(4). To be sure, the Agencies' Guidelines are grounded in evidence. But the omission of the requirement that the Mandate cover

21

all "evidence-based" services leaves open the possibility that other, policy-based concerns should play a role in determining its scope.

For these reasons, since their very first rulemaking on this subject in 2011, the Agencies have consistently interpreted this delegation of authority to include the power to provide limited exceptions that reconcile the ACA's preventive-services provision with strongly held religious and moral views on the sensitive issue of contraceptive coverage. *See, e.g.*, 76 Fed. Reg. at 46,625; 78 Fed. Reg. at 39,889. Because the Agencies acted within the authority granted to them under these statutes, they did not violate the APA. *See Chevron U.S.A. v. Nat'l Res. Def. Council*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Even if the statutory text were somehow ambiguous, this Court should defer to the Agencies' reasonable interpretation; under the familiar *Chevron* framework, a court must defer to an agency's reasonable interpretation of an ambiguous statute if the agency was given rulemaking authority. *Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").[11] Hence, even if the statutes were ambiguous in their grant of discretion to the Agencies to craft or modify contraceptive coverage exemptions, the Agencies' construction must prevail because it is a reasonable one.

Plaintiff's alternative suggestion, that the Guidelines supported by HRSA for subsection (a)(4) can *never* allow exemptions except as required by RFRA or the First Amendment, cannot

---

[11] Contrary to Plaintiff's assertion, *see* Pl. MSJ at 27, the Court may consider the applicability of the *Chevron* framework regardless of whether the Rules expressly cite *Chevron*, and nothing in either *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), or *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), provides to the contrary.

be correct.  As noted above, the statute expressly contemplates a policy decision about the extent to which preventive services for women must be covered under that subsection.  Although the statute does not expressly mention exemptions, neither does the statute mention contraception.  *See* 42 U.S.C. § 300gg-13(a)(4).  What the statute does say is that the Guidelines only "shall" apply to the extent HRSA provides for and supports their application.  HRSA has decided to do neither with respect to exempt entities.   In light of other provisions of federal law that limit the government's power to require contraceptive coverage, *see, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2785 (holding that "[t]he contraceptive mandate, as applied to closely held corporations, violates RFRA"), Plaintiff's reading of the statute as prohibiting any exemptions would threaten the validity of the contraceptive mandate itself.  And even a reading of subsection (a)(4) as authorizing HRSA to adopt exemptions only when absolutely required to do so would make it nearly impossible for the Agencies to maintain a contraceptive mandate, due to the threat of perpetual litigation about the scope of such exemptions.

Plaintiff also observes that Congress, years after it enacted the ACA, failed to pass a proposed "conscience amendment" to the preventive services provision, *see* Pl. MSJ at 26-27, but "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute."  *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187 (1994) (citation omitted).  Congress may decline to adopt a proposal for any number of reasons, including "that the existing legislation already incorporated the offered change."  *Id.*  At most, the failure of a proposed conscience amendment shows that Congress chose not to mandate such an exemption; it says nothing about whether Congress granted the Agencies an authority to craft one.  *See* 158 Cong. Rec. S485 (daily ed. Feb. 9, 2012) (statement of Sen. Reid) ("They are talking about first amendment rights, the Constitution.  I appreciate that.  But that is so senseless.  This debate

that is going on dealing with this issue, dealing with contraception, is a rule that has not been made final yet. There is no final rule. Let's wait until there is at least a rule we can talk about.").

Plaintiff also attempts to cull from the enactment of the grandfathered plans exemption the inference that Congress meant that to be the *only* exemption. *See* Pl. MSJ at 23. But the grandfathering exemption is significant primarily because it demonstrates that Congress did not intend absolutely uniform minimum coverage across employers. *Contra* Pl. MSJ at 25-26 (claiming incorrectly that the "purpose of the Amendment was to ensure that *all* health plans cover cost-free preventative care services for women"). No such intention can be gleaned with respect to some other coverage requirements; Congress exempted millions of individuals from this preventive services provision, an exemption that it did not extend to other provisions of the ACA previously described by the Agencies as "particularly significant protections," 75 Fed. Reg. at 34,540. Indeed, "of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans" not subject to the preventive coverage provision. 82 Fed. Reg. at 47,794. No federal law requires this exemption ever to be phased out. *Id.*

Notwithstanding Plaintiff's protestations, it is thus fully reasonable that the Agencies would promulgate rules allowing HRSA to issue Guidelines supporting contraceptive coverage so long as such Guidelines afford exemptions to those with religious or moral objections to providing such coverage. The history and purpose of the regulations underscore the reasonableness of the Agencies' interpretation. The Agencies have long interpreted the statutory language to authorize the Guidelines to delineate both the nature and the extent of coverage. *See id.* (describing the regulatory history of the contraceptive coverage mandate exemptions). From the very beginning of the Agencies' rulemaking process, they have interpreted Section 300gg-13(a)(4) to authorize

24

them to craft exemptions from a contraceptive-coverage requirement for objecting entities.  *See* 76 Fed. Reg. at 46,621 (creating the first religious exemption from the contraceptive coverage requirement in the 2011 IFR).  The exemptions have persisted through multiple rulemakings and administrations, although, consistent with the statute's grant of discretionary authority, they have not remained static.  For example, in 2013, the definition of "religious employer" was expanded by eliminating the three-part test that had been present in the original 2011 IFRs.  *See* 78 Fed. Reg. at 39,896 (2013 Final Rules).  The 2013 rules also created the accommodation process through which religious employers could claim the exemption.  *Id.*  The new IFRs represent simply one further exercise of the statute's discretionary grant.

Because the text of the statute, history, and the purpose of the Rules demonstrate that the Agencies reasonably interpreted the bounds of their statutory jurisdiction, this Court should defer to the Agencies' interpretation if it determines that the statute is ambiguous.  *See City of Arlington v. FCC*, 569 U.S. 290, 296-305 (2013).

### B.    The Agencies Have Valid Justifications for Creating the Religious and Moral IFRs.

Plaintiff claims that that the Agencies acted without valid justification, but entirely fail to discuss the prevailing legal standard, as set forth under 5 U.S.C. § 706.  *See* Pl. MSJ at 15 (quoting the standard without discussion, and failing to mention it elsewhere).  In fact, the arbitrary and capricious standard is highly deferential, and presumes the validity of agency action.  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159 (D.C. Cir. 1983).  A court may not substitute its judgment for that of the agency, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but must instead affirm an agency's decision if a rational basis for that decision has been provided, even if the court disagrees.  *E.g., Bowman Transp.*, *Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 285 (1974) ("The agency must articulate a rational connection between

the facts found and the choice made."). Agency action is not arbitrary or capricious if it "is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *State Farm*, 463 U.S. at 42; *see also Overton Park*, 401 U.S. at 416 (holding that an agency must consider relevant factors and reasonable alternatives).

Agency action is not subject to any more searching standard of review simply because it represents a change in administrative policy. *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009). An agency that implements a change in policy "need not demonstrate, to a court's satisfaction, that the reasons for the new policy are better than the reasons for the old one." *Id.* Instead, it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes the new policy to be better. *Id.*

Contrary to Plaintiff's assertions, the Agencies listed multiple valid justifications for issuing the IFRs, including (1) numerous comments submitted in recent requests for public comment; (2) the interest in concluding long-running litigation; (3) Executive Order 13798 "Promoting Free Speech and Religious Liberty" (May 4, 2017); (4) reconsideration of the interests served by the existing Guidelines, regulations, and accommodation process (which remains available as an optional avenue for exempt entities); and (5) the structure and intent of Section 2713(a)(4)'s grant of discretion to HRSA, along with Congress' history of protecting religious and moral beliefs in the context of health. *See* 82 Fed. Reg. at 47,793. Having considered these factors, the Agencies concluded that extending a broader exemption and optional accommodation process to those with sincere religious or moral objections to providing contraceptive coverage "better balance[s] the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the Government's interests, including as reflected throughout Federal law, to provide conscience protections . . . and to minimize burdens in . . . regulation of the health

insurance market." *Id.* Plaintiff's arguments that that action was arbitrary and capricious manifestly fail.

First, the Agencies properly considered their interest in concluding the litigation over the previous rules. An agency does not act arbitrarily or capriciously where it considers the burdens of ongoing litigation when changing agency policy. *Associated Builders & Contractors of Texas, Inc. v. NLRB,* 826 F.3d 215, 229 (5th Cir. 2016) (agency did not act arbitrarily where the decision to change an NLRB rule was informed partially by a desire to reduce the burdens of ongoing litigation). The litigation engendered by the Mandate has consumed substantial government resources and has required attention at the highest levels. Indeed, since the *Zubik* remand, the government has been filing monthly status reports around the country and has been warned that failure to resolve the outstanding issues with the litigants in a timely manner will lead to oral argument on the merits of some cases. 82 Fed. Reg. at 47,814. By extending a broader exemption, the Agencies have effectively provided the relief that plaintiffs sought in those suits.

Second, an Executive Order provides an agency with a valid, non-arbitrary reason to act, because such Orders carry the weight of the President's Article II directive power. *See Myers v. United States*, 272 U.S. 52 (1926) (recognizing an implied directive power flowing from Article II's Appointments Clause, Executive Vesting Clause, and Take Care Clause). For purposes of the APA, an agency has a reasoned basis to enter into a rulemaking where the President has instructed it to do so. *See Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (finding that agency rulemaking was not arbitrary and capricious, because the agency "may not simply disregard an Executive Order. To the contrary, as an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law"). On May 4, 2017, the President issued an Executive Order entitled "Promoting Free Speech and Religious

Liberty," which, under a heading labeled "Conscience Protections with Respect to Preventive-Care Mandate," instructed the Secretaries of Treasury, Labor, and HHS to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4) of title 42, United States Code." Exec. Order No. 13,798, 82 Fed. Reg. at 21,765. This Executive Order, as an exercise of the President's constitutional directive powers, provides the Agencies with yet another valid reason for promulgating the IFRs.

Third, the Agencies carefully reconsidered the interests served by the former regulations and concluded that the interests served by applying the Mandate to certain organizations with sincere religious or moral objections to providing such contraception coverage did not justify the burden on conscience from requiring them to do so. The Agencies noted that Congress had not required any provision of contraceptive coverage under the ACA and had elected not to apply the preventive-services provision to grandfathered plans, and that the Agencies had provided exemptions from the Mandate since its creation. Each of these facts undermines the government's interest in applying the Mandate to entities with sincere conscience objections. Congress's repeated efforts to protect religious beliefs and moral convictions in the healthcare context likewise weigh against applying the Mandate to such entities, as does the fact that many objecting entities have been willing to provide coverage of at least some contraceptives, and the litigation evidence that employees of objecting entities are more likely to share the conscience objections of their employer than are employees of other organizations. 82 Fed. Reg. at 47,799-803, 47,844-48.

Fourth, the Agencies determined that the administrative record was insufficient to overcome their concerns about these conscience objections, particularly in light of the ambiguity of evidence concerning whether contraceptive coverage accounts for a significant portion of the

preventive services cost gap between men and women, the existence of numerous other governmental programs to assist low-income women to access free or subsidized contraception, the lack of tailoring between the Mandate and women most likely to experience unintended pregnancies, and the ambiguity of evidence that access to contraceptive coverage actually decreases unintended pregnancies. *Id.* at 47,804. For all these reasons, the Agencies decided that although the Mandate continued to be justified in the ordinary course, the serious conscience objections raised in opposition to the Mandate warranted expanded exemptions.

Finally, Plaintiff's attempt to cast the new exemption as boundless or extreme are unfounded. *See* Pl. MSJ at 15 (the new Rules "empower[ ] virtually any employer, university, or health insurer to drop coverage for contraceptive services for women"). As an initial matter, the Rules create two exemptions – one religious and one moral – not ten. *See* Pl. MSJ at 27. Moreover, the Rules not only allow HRSA to maintain the mandate for contraceptive coverage without cost sharing for non-exempt plans, *see* 82 Fed. Reg. at 47,807 ("granting exemptions . . . does not undermine the Government's interest in ensuring the provision of such coverage to other individuals who wish to receive it"), but also keep the former accommodation process as an optional avenue for eligible employers, 82 Fed. Reg. at 47,806. In addition, the Rules' exemptions are available only to a tiny subset of employers – those with sincere religious and moral objections to providing contraceptive coverage – and apply only to the extent of the objection. *Id.*; 82 Fed. Reg. at 47,853-54 (scope of the individual moral exemption). The new exemptions also serve to level the playing field for employers that share the same kinds of religious convictions the old exemption rules were intended to address, but that would not previously have been eligible for an exemption for reasons unrelated to their religious objections. *See* 82 Fed. Reg. at 47,801 ("[M]any similar religious organizations are being treated very differently [under the previous rules] with

29

respect to their employees receiving contraceptive coverage"). The Agencies anticipate that the Rules will only moderately expand the number of employers who take advantage of the exemptions. *See* 82 Fed. Reg. at 47,819 ("We expect that some non-litigating entities will use the [expanded exemption], but . . . we believe it might not be very many more."). Far from being arbitrary or capricious action, the Rules embody the care that the Agencies took not to forsake the interests of the previous regulatory regime, while nonetheless protecting religious beliefs and moral convictions.

### C.    RFRA Requires the Religious Exemption Rule.

Massachusetts argues both Rules are unlawful because they are not required by RFRA. Pl. MSJ at 29-33. As to the Moral Exemption Rule, this argument is a straw man, because the Agencies did not rely on RFRA as support for that rule; the ACA itself provides ample support for both Rules by affording the Agencies and HRSA the discretion to create exemptions to accommodate sincere religious and moral objections to providing contraceptive coverage. *See supra* III.A. By contrast, the Religious Exemption Rule is not only permitted by the ACA, but also required by RFRA.

Congress enacted RFRA in 1993 in response to *Employment Division v. Smith*, 494 U.S. 872 (1990), which "held that the Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). Through RFRA, Congress sought to provide fuller protection for the exercise of religion than the Supreme Court had interpreted the Constitution to provide. Accordingly, with one exception, "[u]nder RFRA, the Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability." *Id*. The exception is this:

a law that imposes a substantial burden on the exercise of religion is allowed under RFRA if the government "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).

The Commonwealth initially argues that the Rules (and the exemptions they enact) are lawful only if they are required by RFRA because the ACA otherwise requires the provision of contraceptive coverage.  Pl. MSJ. at 29.  Building from this premise, Massachusetts contends that RFRA does not require the Rules – because the accommodation is consistent with RFRA – and that, in any case, the Agencies have not explained their change in position regarding the existence of a substantial burden.  *Id.* at 31-33.  Nor, the Commonwealth argues, have the Agencies adequately considered the burden that the Rules will impose on women, as required by *Hobby Lobby*.  *Id.* at 32.  Finally, Massachusetts concludes that the Moral Exemption Rule is not required by RFRA because it does not relieve religious burdens.  *Id.* at 33.

Massachusetts' arguments are meritless.  First, as explained above, the ACA affords the Agencies and HRSA the discretion to exempt from the Mandate those with sincere religious and moral objections to the provision of contraceptive services.  *See supra* III.A.

Second, contrary to the Commonwealth's argument, the Religious Exemption Rule is required by RFRA because the accommodation violates RFRA with respect to certain entities.  As the Eighth Circuit recognized in *Sharpe Holdings, Inc. v. HHS*, the accommodation requires some religious objectors to "act in a manner that they sincerely believe would make them complicit in a grave moral wrong as the price of avoiding a ruinous financial penalty."  801 F.3d 927, 941 (8th Cir. 2015), *cert. granted*, *judgment vacated sub nom. HHS v. CNS Int'l Ministries*., No. 15-775, 2016 WL 2842448 (May 16, 2016).  The Commonwealth counters that the accommodation

31

required only that an objector mail in an opt-out form and that this duty cannot constitute a substantial burden on anyone's religious beliefs.  Pl. MSJ at 31-32.  But it is not the government's role "to say that [objectors'] religious beliefs are mistaken or insubstantial," *Hobby Lobby*, 134 S. Ct. at 2779, and many objectors – about a thousand plaintiffs litigated over fifty cases on this issue – concluded that complying with the accommodation would, in fact, violate their sincerely-held religious beliefs.  The Agencies thus reasonably concluded that "requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA."  82 Fed. Reg. at 47,800.

Third, Massachusetts' argument that the Agencies did not adequately explain their change in position regarding whether the accommodation imposes a substantial burden similarly fails.  As noted earlier, the Agencies "need not demonstrate, to a court's satisfaction, that the reasons for the new policy are better than the reasons for the old one."  *Fox Television Studios,* 556 U.S. at 515. Rather, it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes the new policy to be better.  *Id.*  The conclusion that the accommodation imposes a substantial burden comports with the statute, as discussed in the preceding paragraph.  Moreover, as the Agencies explained, there are good reasons to reach this conclusion: "We believe that the Court's analysis in *Hobby Lobby* extends, for the purposes of analyzing a substantial burden, to the burdens that an entity faces when it religiously opposes participating in the accommodation process or the straightforward Mandate, and is subject to penalties or disadvantages that apply in this context if it chooses neither."  82 Fed. Reg. at 47,800. And the Agencies concluded that this decision was not only better, but legally required: "[T]here is not a way to satisfy all religious objections by amending the accommodation.  Accordingly, the [Agencies] have decided it is necessary and appropriate to provide the expanded exemptions."  *Id.*

And as explained above, the Agencies concluded on January 9, 2017 that, after reviewing comments and considering various options, they were unable to find a way to amend the accommodation to satisfy objecting organizations while also pursuing their own policy goals.

Fourth, consistent with RFRA and *Hobby Lobby*, the Agencies *did* address the burden that adoption of the expanded religious exemption would have on women. *Hobby Lobby* counseled that "in applying RFRA courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries" and that such "consideration will often inform the analysis of the Government's compelling interest and the availability of a less restrictive means of advancing that interest." 134 S. Ct. at 2781 n.37 (citation omitted). Pursuant to that discretion, the Religious Exemption Rule addressed the effect of the expanded exemption on women in the context of considering whether the government has a compelling interest. 82 Fed. Reg. at 47,803-06. For example, the Agencies considered at length evidence regarding whether enacting a broader exemption would meaningfully alter access to contraception or the number of unwanted pregnancies, as well as evidence regarding the health effects of contraceptives. *Id*. at 47,803-05. Ultimately, they found that the limited impact on a small number of women was warranted by the comparatively large intrusion on religious liberty and freedom of conscience.

Fifth, the logic of Plaintiff's position would sweep away the longstanding church exemption. Plaintiff tries to cabin its position, asserting that the church exemption is required by RFRA, but that the broader exemption in the new Rules is not. Pl. MSJ at 30. But there is no principled basis in RFRA to cabin the exemption only to churches. *See* 42 U.S.C. § 2000bb-1 (protecting "a person's exercise of religion"); 1 U.S.C. § 1 (defining "person" broadly). If the church exemption is required under RFRA, as Plaintiff concedes, then so too are the new Rules' exemptions. Alternatively, if Plaintiff were to deny that even the church exemption is permissible,

that would call into question the legality of the contraceptive coverage mandate itself. *Hobby Lobby* establishes that the unadorned contraceptive coverage mandate, without exemptions, is unlawful. *See Hobby Lobby*, 134 S. Ct. at 2785. And it would be particularly problematic if the statute were read to require churches to provide contraceptive services that they consider to be abortifacients.

Finally, Massachusetts contends that the Moral Exemption Rule lacks legal foundation because it is not supported by RFRA. Not so. To be clear, RFRA plays no part in the Agencies' defense of the Moral Exemption Rule. But as explained above, the ACA gives the Agencies the discretion to determine what services will be covered, and to what extent, by the Mandate. Federal law has long recognized that it is appropriate for the government to protect freedom of conscience. *See Welsh v. United States*, 398 U.S. 333, 340 (1970) (individual qualified as a religious conscientious objector to the draft if he or she "deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons") (plurality opinion); *United States v. Seeger*, 380 U.S. 163 (1965) (similar holding); *Doe v. Bolton*, 410 U.S. 179, 197-98 (1973).[12] The moral exemptions bring the Mandate into harmony with

---

[12] Massachusetts argues, in a footnote, that the Rules violate Title VII and, therefore, the APA. Pl. MSJ at 33 n.28. This argument is flawed. As an initial matter, no relief is available for a Title VII violation under the APA. A plaintiff may bring an APA claim only if there is no other adequate legal remedy available. 5 U.S.C. § 704. But, if the Title VII argument had any merit, an adequate remedy would be available: a Title VII suit against allegedly discriminating employers who avail themselves of the exemptions. *See Wash. Legal Found. v. Alexander*, 984 F.2d 483, 486 (D.C. Cir. 1993) (discrimination suits against third parties provide an adequate alternative remedy). In any event, the Title VII argument has no merit. The Rules do not violate Title VII's prohibition on sex-based disparate treatment, *see Smith v. F.W. Morse & Co.*, 76 F.3d 413, 420 (1st Cir. 1996). They draw coverage distinctions based on whether an employer religiously or morally objects to facilitating the provision of contraceptives, not on whether an individual is a woman or pregnant.

numerous federal statutes providing parallel conscience protections for religious beliefs and moral convictions. *See, e.g.*, 82 Fed. Reg. at 47,844-46. The Agencies have policy discretion under the ACA to provide for and support the Mandate in such a manner.

> **D.    At a Minimum, the Religious Exemption Rule Was a Permissible Response to the Substantial Burden on Religious Exercise Imposed by the Mandate.**

Even if this Court determines that RFRA does not *require* the expansion of the religious exemption – or opts not to resolve that question here – it should hold that, at a minimum, RFRA *authorized* the Agencies to adopt the Religious Exemption Rule. The Supreme Court's decision in *Hobby Lobby* makes clear that, absent some form of exemption or accommodation, the Mandate imposes a substantial burden on employers with religious objections to providing contraceptive coverage. 134 S. Ct. at 2775. As discussed above, previously, the Agencies "attempted to develop an accommodation that would either alleviate the substantial burden imposed on religious exercise or satisfy RFRA's requirements for imposing that burden." 82 Fed. Reg. at 47,806. But the Agencies' attempts did not resolve the sincere religious objections asserted by dozens of employers, and instead led to half a decade of RFRA litigation and serial regulatory amendments. *Id.* at 47,814. Those efforts imposed significant costs on the Agencies and the courts – as well as on regulated entities and their plan participants and beneficiaries, who were left uncertain about

---

That the Rules relate to contraceptives for women does not establish that they discriminate on the basis of sex. Contraceptives are used by both men and women, and though the Rules expand the exemption for female contraceptives, male contraceptives remain completely uncovered under federal law. *See In Re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 940-42 & n.1 (8th Cir. 2007) (holding that Title VII "does not require coverage of contraception because contraception is not a gender-specific term like potential pregnancy, but rather applies to both men and women"). Nor do they run afoul of Title VII's disparate impact prohibition. *See Smith*, 76 F.3d at 420. The Rules do not have a disproportionate impact on women because no male may receive contraceptive services covered under 42 U.S.C. § 300gg-13(a)(4), whereas female contraceptive services are covered except where an exemption applies. Massachusetts also argues that the Rules violate the ACA's anti-discrimination provision. *See* 42 U.S.C. § 18116. But, as explained here, the Rules do not discriminate against women on the basis of sex.

their legal rights and obligations.

Under the circumstances, the Agencies reasonably determined that rather than engaging in further efforts to "revis[e] the accommodations previously offered" – an approach that would have entailed continued litigation in dozens of cases, with no foreseeable end – a broader exemption was "the most appropriate administrative response" to the substantial burden identified in *Hobby Lobby*. *Id*. at 47,806. The Agencies emphasized that they would have adopted the Religious Exemption Rule "[e]ven if RFRA does not compel [it]." *Id.*

This independent ground identified by the Agencies provides a fully sufficient basis for upholding the Religious Exemption Rule. Under *Hobby Lobby*, RFRA required the Agencies to take *some* action to respond to the substantial burden imposed by the unmodified Mandate. 134 S. Ct. at 2775. Plaintiff essentially asserts that because (in its view) the prior administrative accommodation did not violate RFRA, the Agencies were required to maintain it. But even if Plaintiff were correct that the accommodation did not violate RFRA, Plaintiff identifies no legal authority *precluding* the Agencies from responding to the substantial burden identified in *Hobby Lobby* with a broader exemption. No such authority exists. "RFRA does not . . . prescribe the accommodation that the government must adopt" in response to a substantial burden; instead, it leaves agencies with a measure of "discretion to fashion an appropriate and administrable response to respect religious liberty interests implicated by their own regulations." 82 Fed. Reg. at 47,806. And allowing agencies to choose to respond to a substantial burden on religious exercise with an exemption rather than an accommodation is particularly appropriate here, where the Agencies have already attempted several accommodations, and those accommodations were the subject of widespread legal challenges that divided the courts and (at an absolute minimum) raised serious questions about their validity.

Plaintiff's contrary approach would place agencies in an impossible position. Agencies are often presented with claims that statutory or regulatory requirements substantially burden the exercise of religion. On Plaintiff's view, an agency faced with such a claim would apparently be legally prohibited from allowing an exemption unless it concluded that no possible accommodation short of an exemption would be possible and consistent with RFRA. That is a recipe for protracted and unnecessary litigation.

It is also inconsistent with the Supreme Court's recognition in analogous contexts that an entity faced with potentially conflicting legal obligations should be afforded some leeway. For example, the Court has held that, under Title VII, an employer may "engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact" if the employer has "a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009). Critically, the Court did not require the employer to prove that it *actually would* "be subject to disparate-impact liability." The Court explained that the more flexible standard it adopted "appropriately constrains employers' discretion in making race-based decisions" but was not "so restrictive that it allows employers to act only when there is a provable, actual violation" – a standard that would have left employers in an untenable position. *Id*. at 583. So too here. Particularly where, as in this case, the Agencies are faced with substantial claims that RFRA compels an exemption – claims that have been accepted by many courts – the Agencies should be permitted to adopt that exemption even if the courts might ultimately have concluded that some form of accommodation would have been consistent with RFRA. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (when a statutory scheme contains "a fundamental ambiguity" arising from "the differing mandates" of two provisions, "it

is appropriate to look to the implementing agency's expert interpretation" to determine which "must give way").

## IV.    The Rules Do Not Violate the Establishment Clause.

Plaintiff alleges that the Rules violate the Establishment Clause.  Am. Compl. ¶¶ 94-99; Pl. MSJ at 33-37.  Specifically, Plaintiff alleges that the Rules intend to and do have the effect of advancing religious interests.  Am. Compl. ¶ 96; Pl. MSJ at 34.  This allegation has no merit.  The Rules' protections of religious exercise for entities and individuals with objections to contraception coverage do not run afoul of the Establishment Clause.  The Rules do not themselves promote or subsidize a religious belief or message, as demonstrated most clearly by the fact that the exemptions expressly include nonreligious entities and persons.  Instead of establishing religion, the Rules free entities and individuals with objections to the provision of contraception coverage to act as they otherwise would in the absence of government-imposed regulations.  The Rules represent a constitutional exercise of executive authority to alleviate unjustified substantial burdens on the exercise of moral convictions and religious beliefs.

When government relieves such burdens, it does not violate the Establishment Clause; rather, "it follows the best of our traditions."  *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).  "[I]n commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994).  Rather, "government may (and sometimes must) accommodate religious practices."  *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987)). And "'there is room for play in the joints between' the Free Exercise and Establishment Clauses,

allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005). Thus, the Supreme Court has upheld a broad range of accommodations against Establishment Clause challenges, including the exemption of religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion, *see Amos*, 483 U.S. at 335-39; a state property tax exemption for religious organizations, *see Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 672-80 (1970); and a state program releasing public school children during the school day to receive religious instruction at religious centers, *see Zorach*, 343 U.S. at 315.

The Supreme Court and the First Circuit continue to apply the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to evaluate Establishment Clause challenges to government acts seeking to accommodate the practice of religious beliefs. *See Amos*, 483 U.S. at 335; *Boyajian v. Gatzunis*, 212 F.3d 1, 4 (1st Cir. 2000). As relevant here, under *Lemon*, a government act is consistent with the Establishment Clause if "(1) it has a secular legislative purpose, [and] (2) its principal or primary effect neither advances nor inhibits religion[.]" *Boyajian*, 212 F.3d at 4 (citations omitted).[13] The Rules easily satisfy this test.[14]

### A.     The Rules Have a Secular Purpose.

With respect to *Lemon*'s first prong – that the government act serves a secular legislative

---

[13] *Lemon* also requires that a government act "not foster excessive government entanglement with religion." *Id*. at 4 (citations omitted). Plaintiff does not challenge the Rules under this prong of *Lemon*. *See* Pl. MSJ at 35 & n.31.

[14] The First Circuit has also occasionally applied an alternative "endorsement analysis" in Establishment Clause cases, under which a court "must consider whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion." *Freedom From Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 10 (1st Cir. 2010) (citing *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 593-94 (1989)). As demonstrated herein, the Rules satisfy the endorsement analysis, regardless of whether it is understood to be a separate factor or merely part of the inquiry into the Rules' purpose and effect.

purpose – the Supreme Court has recognized that it is a permissible governmental purpose to alleviate significant governmental interference with the exercise of religion. *Amos*, 483 U.S. at 335. This was the precise aim of the Agencies in promulgating the Religious Exemption Rule. *See* 82 Fed. Reg. at 47,793 (purpose of the Rules is "to better balance the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the Government's interests, including as reflected throughout Federal law, to provide conscience protections for individuals and entities with sincerely held religious beliefs in certain health care contexts, and to minimize burdens in our regulation of the health insurance market"). And the aim of the Agencies in promulgating the Moral Exemption Rule was patently secular: the accommodation of moral convictions not based in religion. *Id*. at 47,844.

The first prong of the *Lemon* test "does not mean that the law's purpose must be unrelated to religion – that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted." *Boyajian*, 212 F.3d at 5 (quoting *Amos*, 483 U.S. at 335). Rather, a law fails this prong "only if it is motivated *wholly* by an impermissible purpose." *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988) (emphasis added). Here, nothing in the Rules shows any intent to advance any particular faith or to promote religion in general. *See Rojas v. Fitch*, 928 F. Supp. 155, 162 (D.R.I. 1996), *aff'd*, 127 F.3d 184 (1st Cir. 1997) ("The purpose of the Establishment Clause is to ensure that government will not sponsor or promote any particular religion.") (citing *Walz*, 397 U.S. at 669). Instead, the Rules merely seek to alleviate certain substantial hardships faced by entities and individuals in the provision of health insurance. Indeed, the fact that the Rules apply to entities and individuals with secular, non-religious moral beliefs regarding the provision of contraception coverage confirms that the Rules possess a secular purpose.

40

**B.    The Effect of the Rules Is Neither to Advance Nor Inhibit Religion.**

The second prong of the *Lemon* test requires that a law's "principal or primary effect . . . neither advance[] nor inhibit[] religion."  *Lemon*, 403 U.S. at 612.  Removing barriers to the exercise of religious freedom does not advance religion; to the contrary, "there is ample room for accommodation of religion under the Establishment Clause." *Amos*, 483 U.S. at 338.  The Rules do not promote or subsidize a religious belief or message; they merely free entities and individuals with religious or moral objections to contraception coverage to practice those beliefs and convictions as they otherwise would in the absence of certain government-imposed regulations.

Plaintiff misplaces its reliance on cases such as *Estate of Thornton v. Caldor, Inc*., 472 U.S. 703 (1985).  Pl. MSJ at 34-36.[15]  *Thornton* involved a statute that "compel[led] people to act in the name of . . . religion" by requiring private employers to permit employees to take off work on their chosen Sabbath day.  *Thornton*, 472 U.S. at 708.  By contrast, the Rules neither compel nor encourage any action on private employer's part.  Rather, they leave room for private employers to exercise their religion or moral conscience by declining to provide contraceptive coverage if doing so would conflict with the employers' religious beliefs or moral convictions.  The lifting of a *government-imposed* burden on religious exercise is permitted under the accommodation doctrine referenced in *Amos*.  *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989)

---

[15] Also misplaced is Plaintiff's reliance on the vacated decision in *ACLU of Mass. v. Sebelius*, 821 F. Supp. 2d 474 (D. Mass. 2012), *vacated sub nom. ACLU of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44 (1st Cir. 2013).  *See* Pl. MSJ at 35.  The court in *ACLU* specifically distinguished the case before it from "challenges to government actions that coincided with religious beliefs, but were not found to be explicitly motivated by the beliefs of a particular religious group," 821 F. Supp. 2d at 486, and the Rules here are not so motivated.  Moreover, because the Establishment Clause is nowhere mentioned in the portions of *Priests for Life* cited by Plaintiff, *see* Pl. MSJ at 36, 37, and no Establishment Clause violation was found in that case, *see* 772 F.3d at 272-74, it is irrelevant to the present claim.  Nor does *Bowen v. Roy*, 476 U.S. 693 (1986), cited by Plaintiff, involve the Establishment Clause.

41

(plurality opinion).  In addition, *Thornton* involved government interference with private contracts. By contrast, the Rules involve a benefit that the government need not have required at all.  The Establishment Clause should not be interpreted to require the government to broadly withdraw benefits where a more targeted exemption would accommodate religious objectors.

## V.    The Rules Do Not Violate the Fifth Amendment's Equal Protection Principle.

The Commonwealth argues that the Rules violate the equal protection component of the Fifth Amendment's Due Process Clause.  Pl. MSJ at 37-40; *see United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).  It lacks standing to bring this claim, *see supra n.*5, and the claim is meritless for much the same reason as the Title VII claim is.

When faced with a claim of discrimination on the basis of sex, courts assess (i) whether the classification is facially based upon sex and, if not, (ii) whether there are other factors – such as the purpose of the law or the existence of a disparate impact – that demonstrate an invidious intent to discriminate on the basis of sex.  *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979).  With regard to "this second inquiry, [that] impact provides an important starting point, but purposeful discrimination is the condition that offends the Constitution."  *Id.*  (citations omitted).   Sex-based distinctions are subject to intermediate scrutiny, meaning that such distinctions must be substantially related to an important governmental interest.  *Wengler v. Druggists Mut. Ins. Co*., 446 U.S. 142, 150 (1980).  Distinctions that do not target a protected class or burden a fundamental right are subject to rational-basis review.  *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).  Under this standard, "a classification must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," regardless of the actual basis for the distinction.  *Id*. at 320 (citation omitted).

The Rules do not draw any sex-based distinction.  Consistent with the ACA, the Rules do *not* require health plans to cover male contraceptives, but do allow HRSA generally to require coverage for female contraceptives without cost-sharing, while providing an exemption for those with conscience objections.  *See* 78 Fed. Reg. at 8,458 n.3.  Any distinctions in coverage among women are not premised on sex, but on whether the employer, other plan sponsor, or institution of higher education objects, for religious or moral reasons, to facilitating the provision of contraceptives.  Men receive no better treatment.  To the contrary, as noted, there is no requirement in 42 U.S.C. § 300gg-13(a)(4) for any plan to cover male contraceptives.  The statutory provision requiring coverage for additional preventive services supported by HRSA pertains only to such services for "women."  42 U.S.C. § 300gg-13(a)(4).  Any sex-based distinction is a function of the statute, not the Rules.

No other factor reflects any invidious intent to discriminate on the basis of sex.  Consider first the Rules' purpose.  Their stated purpose is sex-neutral: to "better balance the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the Government's interests, including as reflected throughout Federal law, [in] provid[ing] conscience protections for individuals and entities with sincerely held religious beliefs [or moral convictions] in certain health care contexts, and [in] minimiz[ing] burdens in our regulation of the health insurance market."  82 Fed. Reg. at 47,793, 47,839.  This purpose finds support in the history of the Rules.  The Rules were not written on a blank slate, but against the backdrop of years of litigation and negotiation between the Agencies and religious and moral objectors, who, prior to these Rules, struggled to find common ground with the government.  *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2764 n.10; *Zubik*, 136 S. Ct. at 1560.

Massachusetts argues that the Rules have a discriminatory impact against women, in violation of the Fifth Amendment, because they "create exemptions only for women's preventive care . . . while leaving coverage for male employees untouched." Pl. MSJ at 38-39. This argument is flawed because it ignores the statutory and historical context of the Rules. The Agencies did not arbitrarily target the Mandate. They focused on the Mandate because it was the source of scores of lawsuits that (correctly) alleged that the Mandate imposed substantial burdens on religious and moral objectors. *See* 82 Fed. Reg. at 47,793, 47,807, 47,839. And while male coverage is "untouched," that is because 42 U.S.C. § 300gg-13(a)(4) does not authorize a male contraceptive services mandate in the first place, not because the Rules chose to afford different treatment to male and female contraceptives. 78 Fed. Reg. at 8,458 n.3. Plaintiff's argument, in short, does not highlight any invidious discrimination.

Because the Rules do not create sex-based distinctions, they are subject to rational basis review. They satisfy this "lenient" test, *Walker v. Exeter Region Co-op. Sch. Dist.*, 284 F.3d 42, 46 (1st Cir. 2002), because they are rationally related to legitimate government interests, *Lyng v. Int'l Union,* 485 U.S. 360, 370 (1988). The Religious Exemption Rule accommodates religion by "provid[ing] conscience protections for individuals and entities with sincerely held religious beliefs in certain health care contexts." 82 Fed. Reg. at 47,793. And the accommodation of religious beliefs is an important government interest, as the Supreme Court recognized in *Cutter,* 544 U.S. at 720. (It would, therefore, satisfy intermediate scrutiny, if that standard applied.)

The Moral Exemption Rule also has a rational basis (and would satisfy intermediate scrutiny, if that standard applied). The Rule is designed to protect "sincerely held moral convictions" by exempting those with such convictions from facilitating the provision of contraceptive services. 82 Fed. Reg. at 47,839. The government may permissibly accommodate

44

deeply-held moral, but not religious, convictions; the accommodation of such beliefs is, in fact, an important interest that the government has long pursued. *See Welsh*, 398 U.S. at 340 (plurality opinion); *Seeger*, 380 U.S. at 169-70; *Doe*, 410 U.S. at 197-98. Congress has repeatedly legislated conscience protections in sensitive health contexts, including the provision of contraceptive services. Indeed, the Commonwealth has repeatedly recognized, in both legislation and regulations, that it is legitimate to protect non-religious moral beliefs in the context of healthcare. *See* Mass. Gen. Laws ch. 112, § 12I; *id*. ch. 272, § 21B; 130 Mass. Code Regs. § 484.003.[16]

## CONCLUSION

Defendants respectfully request the Court to dismiss this action or enter summary judgment for Defendants, and to deny Plaintiff's motion for summary judgment.

Dated:  December 8, 2017                    Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

---

[16] In the course of arguing that the Rules do not satisfy intermediate scrutiny – a standard that does not apply – Plaintiff makes several points that warrant a response. First, it argues that the Agencies should have created exemptions to other services, such as immunizations, for which coverage is mandated because those services too could be subject to religious objections. Pl. MSJ at 39. This insistence on more expansive religious exemptions is odd given Plaintiff's complaints about the Agencies advancing religion at the expense of non-adherents. In any case, the Agencies have not been subjected to a spate of lawsuits regarding these other services. Second, Massachusetts suggests that the Agencies have no interest in protecting the religious and moral beliefs of objectors because Congress declined to adopt an exemption to the Mandate. *Id.* at 40. But RFRA and precedent such as *Welsh, Seeger,* and *Doe* demonstrate otherwise. Congress can decline to adopt a proposal for any number of reasons, including "that the existing legislation already incorporated the offered change." *Cent. Bank of Denver*, 511 U.S. at 187 (citation omitted). In that vein, a floor statement by the then-Senate Majority Leader indicates that the exemption may have been rejected because Congress thought that the Agencies would enact an exemption if necessary. *See supra* III.A. Finally, Plaintiff questions the validity of the Agencies' desire to resolve litigation, because the new Rules are now the subject of litigation. Pl. MSJ at 40. Resolution of litigation was not the only reason for the Rules – they also alleviate substantial burdens on religion and conscience. That the Rules have spawned several new cases does not demonstrate that the Agencies' desire to resolve the more than fifty cases that then existed was not genuine.

WILLIAM D. WEINREB
Acting United States Attorney

ETHAN P. DAVIS
Deputy Assistant Attorney General

JASON C. WEIDA
Assistant United States Attorney

JOEL McELVAIN
Assistant Branch Director

  /s/ Daniel Riess
DANIEL RIESS (Texas Bar # 24037359)
Trial Attorney
U.S. Department of Justice
Civil Division, Rm. 6122
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on December 8, 2017, I caused a copy of the foregoing to be filed electronically and that the document is available for viewing and downloading from the ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  If any counsel of record requires a paper copy, I will cause a paper copy to be served upon them by U.S. mail.

/s/ Daniel Riess
Daniel Riess