## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, : | Case No. 1:17-cv-11930 |
| *Plaintiff,* : | |
| v. : | |
| UNITED STATES DEPARTMENT OF : <br> HEALTH AND HUMAN SERVICES; : <br> ERIC D. HARGAN, in his official capacity as : <br> Acting Secretary of Health and Human Services; : <br> UNITED STATES DEPARTMENT OF THE : <br> TREASURY; STEVEN T. MNUCHIN, in his : <br> official capacity as Secretary of the Treasury; : <br> UNITED STATES DEPARTMENT OF : <br> LABOR; and R. ALEXANDER ACOSTA, in his : <br> official capacity as Secretary of Labor, : | |
| *Defendants.* : | |

## DECLARATION OF GABRIELLE CROSSNOE

I, Gabrielle Crossnoe, do hereby depose and state the following based on my personal knowledge and under pains and penalties of perjury:

1.     I am a paralegal in the Consumer Protection Division of the Office of the Massachusetts Attorney General.

2.     Attached as **Exhibit A** to this declaration is a true and correct copy of the comments submitted by the Commonwealth of Massachusetts, 14 other States, and the District of Columbia to the Department of Health and Human Services regarding the Interim Final Rules on December 5, 2017.

3.    Attached as **Exhibit B** to this declaration is a true and correct copy of the

Respondents Brief filed in *Zubik v. Burwell,* 136 S. Ct. 1557 (2016) (No. 14-1418).

PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT
THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON January _19__, 2018.

_____
Gabrielle Crossnoe

# Exhibit A

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
HEALTH CARE BUREAU

\

December 5, 2017

**Via Federal eRulemaking Portal**
Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G
Washington, DC 20201

Re:   Comments on Interim Final Rules: Religious Exemptions and Accommodations
for Coverage of Certain Preventive Services under the Affordable Care Act, and
Moral Exemptions and Accommodations for Coverage of Certain Preventive
Services under the Affordable Care Act
**45 C.F.R §§ 147.130-147.133**

Dear Acting Secretary Hargan:

The undersigned State Attorneys General submit these comments in response to the
Departments of Health and Human Services, Labor, and Treasury's (the "Departments")
issuance of the proposed interim final rules ("IFRs"): the Religious Exemptions and
Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
(filed Oct. 6, 2017), and Moral Exemptions and Accommodations for Coverage of Certain
Preventive Services under the Affordable Care Act (filed Oct. 6, 2017).  By creating broad new
exemptions from the Affordable Care Act's contraceptive mandate, thereby allowing employers
to deprive women of contraceptive health coverage, the IFRs will harm women and children, and
the public health in general, and result in significant financial and administrative burdens to the
States.  As discussed more fully below, the IFRs violate the Administrative Procedure Act, the
equal protection guarantee of the Fifth Amendment, and the Establishment Clause of the First
Amendment, and as such, the undersigned Attorneys General urge that the IFRs be rescinded.[1]

---

[1] State Attorneys General have also filed lawsuits challenging the IFRs.  *See* States' Notice Mot. & Mot. Prelim. Inj.,
with Mem. P. & A., § I.A.–E., at 11–27, California v. Eric D. Hargan, No. 4:17-cv-05783-HSG (N.D. Cal. filed
Nov. 9, 2017) ("*CA Br.*") (attached as Exhibit 1); Mem. Law Support Pls.' Mot. Prelim. Inj., § I.A., C.–D., at 18–

Eric Hargan, Acting Secretary
December 5, 2017
Page 2 of 9

## I.     Background

Before implementation of the Affordable Care Act ("ACA"), one in seven women with private health insurance, and nearly one-third of women covered by Medicaid, either postponed or went without needed health care because they could not afford it.[2]  With respect to birth control in particular, women were forced to spend between 30 percent and 44 percent of their total out-of-pocket health costs.[3]  These out-of-pocket costs prevented many women, not solely those with lower incomes, from accessing preventive services, including contraception.[4]

During this period before the ACA's passage, an estimated 49 percent of all pregnancies in the United States were unintended, and 42 percent of those unintended pregnancies ended in abortion.[5]  Unintended pregnancies are associated with increases in maternal and child morbidity, including increased odds of preterm birth, low birth weight, and the potentially life-long negative health effects of premature birth.[6]  Significantly, the risk of unintended pregnancy is greatest for the most vulnerable women: young, low-income, minority women, without high school or college education.[7]

Within this public health landscape, Congress passed the "Women's Health Amendment" ("WHA") to expand women's access to preventive services through health plan coverage and no cost-sharing responsibilities.[8]  The Department of Health and Human Services ("HHS") commissioned the Institute of Medicine ("IOM") to issue recommendations identifying the

---

22, 32–38, Pennsylvania v. Donald J. Trump, No. 2:17-cv-04540-WB (E.D. Pa. filed Oct. 11, 2017) ("*PA Br.*") (attached as Exhibit 2); Complt. Declaratory & Injunctive Relief, Massachusetts v. U.S. Dept. of Health & Human Servs., No. 17-cv-11930-NMG (D. Mass. filed Oct. 6, 2017); Complt. Declaratory & Injunctive Relief, Washington v. Trump, No. 2:17-cv-01510-RBL (W.D. Wa. filed Oct. 9, 2017).  State Attorneys General have also submitted amicus briefs in support of plaintiffs in two lawsuits.  *See, e.g.*, Br. for Mass. & Cal. et al. as Amici Curiae in Support of Pls.' Mot. Prelim. Inj., § II, at 18–30, Pennsylvania v. Donald J. Trump, No. 2:17-cv-04540-WB (E.D. Pa. filed Oct. 11, 2017) ("*Amici Br.*") (attached as Exhibit 3).

[2] Usha Ranji & Alina Salganicoff, *Women's Health Care Chartbook: Key Findings from the Kaiser Women's Health Survey*, Henry J. Kaiser Family Found.1, 4 (2011), http://www.kaiserfamilyfoundation.files.wordpress.com/2013/01/8164.pdf.

[3] Laurie Sobel et al., *The Future of Contraceptive Coverage*, Henry J. Kaiser Family Found. 1, 4 (2017), http://www.files.kff.org/attachment/Issue-Brief-The-Future-of-Contraceptive-Coverage.

[4] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 Contraception 491, 531 (2010); *see also* Comm. on Preventive Servs. for Women & Bd. on Population Health & Pub. Health Practice, Inst. of Med. of the Nat'l Acads., Clinical Preventive Services for Women: Closing the Gaps 19 (Nat'l Acad. Press, 2011), *available at* https://www.nap.edu/read/13181/chapter/1 ("IOM Report").  Another study of approximately 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography.  Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 Health Servs. Research 1331, 1342-43 (2000), *available at* http://www.pubmedcentralcanada.ca/pmcc/articles/PMC1089084/pdf/hsresearch00023-0075.pdf; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing*, Nat'l Health Law Program 2-3 (2014), http://www.healthlaw.org/component/jsfsubmit/showAttachment?tmpl=raw&id=00Pd000000ANrCpEAL.

[5] IOM Report at 102.

[6] *Id.* at 103.

[7] *Id.*

[8] *See* S. Amdt. 2791, 111th Congress (2009-2010); Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq. (2010); Public Health Service Act (as amended by ACA) § 2713, 42 U.S.C. §300gg-13(a)(4).

Eric Hargan, Acting Secretary
December 5, 2017
Page 3 of 9

specific preventive women's health services that should be covered under the ACA.  In 2011, the IOM recommended, and the Health Resources and Services Administration ("HRSA") adopted, a list that includes all FDA-approved contraceptives, sterilization procedures, and reproductive education and counseling.[9]  In 2016, the Women's Preventive Services Initiative,[10] led by the American Congress of Obstetricians and Gynecologists ("ACOG"), updated the preventive services guidelines and continued to include coverage of all FDA-approved contraceptive methods, reiterating their importance to women.

The IOM, ACOG, and other experts based their decisions to include coverage of contraception on the considerable evidence that the use of contraception has contributed to lower unintended pregnancy and abortion rates in the United States.[11]  With the decrease in unintended pregnancies, there has been a corresponding decrease in the risk of maternal mortality, adverse child outcomes, behavior problems in children, and negative psychological outcomes associated with unintended pregnancies for both mothers and children.[12]  Contraceptive use contributes to longer spacing between pregnancies, which decreases the risk of adverse health outcomes for pregnancies that are too closely spaced, and is especially critical for the health of women with certain medical conditions.[13]

Significantly, access to contraceptive coverage has given women the option to delay childbearing and pursue additional education, spend additional time in their careers, and increase earning power over the long-term.  One-third of the wage gains women have made since the 1960s have been attributed to access to oral contraceptives.[14]  Access to birth control has helped narrow the wage gap between women and men.  The decrease in the wage gap among 25 to 49-year-olds between men's and women's annual incomes would have been 10 percent smaller in the 1980s and 30 percent smaller in the 1990s in the absence of widespread legal birth control access for women.[15]

---

[9] *Women's Preventive Services Guidelines: Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being*, HEALTH RESOURCES & SERVS. ADMIN., http://www.hrsa.gov/womens-guidelines/index.html (last reviewed Oct. 2017).

[10] The Women's Preventive Services Initiative also included the American Academy of Family Physicians, the American College of Physicians, and the National Association of Nurse Practitioners in Women's Health.

[11] IOM Report at 104–05.

[12] *See* IOM Report 103–04.

[13] IOM Report at 103–04.  There are additional benefits of contraceptive use for treating medical conditions, including menstrual disorders and pelvic pain, and long-term use of oral contraceptives has been shown to reduce women's risk of endometrial cancer, pelvic inflammatory disease, and some benign breast diseases.  *Id.* at 107.

[14] *Birth Control Has Expanded Opportunity for Women–in Economic Advancement, Educational Attainment, and Health Outcomes*, PLANNED PARENTHOOD 1,1 (June 2015),
http://www.plannedparenthood.org/files/1614/3275/8659/BC_factsheet_may2015_updated_1.pdf.

[15] *See* Martha J. Bailey et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages* 27 (Nat'l Bureau of Econ. Research, Working Paper No. 17322, 2012), http://www-personal.umich.edu/~baileymj/Opt_In_Revolution.pdf.

Eric Hargan, Acting Secretary
December 5, 2017
Page 4 of 9

Since the ACA's requirement that health plans cover contraception benefits and services, women with employer-sponsored coverage have had increased access to contraception,[16] and have saved $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[17]  The share of women of reproductive age who had out-of-pocket spending on oral contraceptive pills fell sharply after the ACA's implementation; spending on oral contraceptive pills plummeted from 20.9 percent in 2012 to 3.6 percent in 2014, corresponding to the timing of the contraception provision.[18] Also during this time, the proportion of privately insured women who paid no out-of-pocket costs for oral contraception increased from 15 percent to 67 percent, with similar changes for injectable contraceptives, the vaginal ring and the intrauterine device.[19]  To date, over 62.4 million women have benefited from ACA-mandated contraceptive coverage.[20]

Several of the undersigned States, in recognition that no-cost contraception is critical to women's health and autonomy, have enacted statutory schemes to require no-cost coverage for state-regulated plans.[21]  However, the federal Employee Retirement Income Security Act of 1974 ("ERISA") preempts States from imposing coverage requirements on self-funded plans offered by employers.[22]  Such plans cover about 58 percent of workers with employer-sponsored insurance.[23]  The IFRs threaten this access by allowing virtually any employer with a self-insured plan to opt-out of the contraceptive-coverage requirement based on the employer's own religious or moral beliefs without offering any explanation or requiring any certification process

---

[16] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014), *available at* http://www.contraceptionjournal.org/article/S0010-7824(14)00687-8/pdf.

[17] *Reproductive Rights & Health: The Affordable Care Act's Birth Control Benefit Is Working for Women*, NAT'L WOMEN'S LAW CTR. (Dec. 2016), http://www.nwlc.org/wp-content/uploads/2016/06/The-ACAs-Birth-Control-Benefit-1.pdf.

[18] Laurie Sobel et al., *Private Insurance Coverage of Contraception*, HENRY J. KAISER FAMILY FOUND. (2016), http://www.files.kff.org/attachment/issue-brief-private-insurance-coverage-of-contraception.

[19] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTIVE 44, 45 (2015), *available at* http://www.contraceptionjournal.org/article/S0010-7824(14)00687-8/pdf.

[20] *Reproductive Rights & Health: New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs*, NAT'L WOMEN'S LAW CTR. 1, 2 (2017), http://www.nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[21] An overview of State laws and regulations is provided by Guttmacher Institute. *Insurance Coverage of Contraceptives*, GUTTMACHER INST., http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives (last updated Dec. 1, 2017). *See also* Cal. Ins. Code § 10123.196; Conn. Gen. Stat. § 38A-503e; Haw. Rev. Stat. § 432:1-604.5; 215 Ill. Comp. Stat. 5/356Z.4; Iowa Code § 514C.19; Me. Rev. Stat. tit. 24, § 2332-J, amended by Public Law, Chapter 190 (June 13, 2017); Md. Code, Ins. §§ 15-826, 15-826.1; Mass. Gen. Laws. ch. 175, § 47W, amended by Chapter 120 of the Acts of 2017; N.M. Stat. Ann. §§ 59A-22-42; 59A-46-44; N.Y. Ins. Law §§ 3216, 3221, and 4303; N.C. Gen. Stat. § 58-3-178; Or. Rev. Stat. § 743A.066; R.I. Gen. Laws §§ 27-19-48, 27-18-57, 27-20-43; Vt. Stat. tit. 8, § 4099c; Wash. Admin. Code § 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.  State laws routinely include exemptions from mandatory coverage for prescription contraceptives for religious employers. *See, e.g.,* Conn. Gen. Stat. § 38A-503e; Mass. Gen. Laws. ch. 175, § 47W, amended by Chapter 120 of the Acts of 2017; N.Y. Insur. L. § 4303(cc).

[22] 29 U.S.C. § 1144(b).

[23] *Medical Expenditure Panel Survey: Percent of Private-Sector Enrollees That Are Enrolled in Self-Insured Plans at Establishments That Offer Health Insurance by Firm Size and State: United States, 2016*, U.S. DEPT. OF HEALTH & HUMAN SERVS., http://www.meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiib2b1.pdf (last visited Dec. 4, 2017) ("ARHQ Database").

Eric Hargan, Acting Secretary
December 5, 2017
Page 5 of 9

by regulators charged with enforcing the ACA's requirements.  Moreover, some of the undersigned States do not have state laws requiring no-cost contraception coverage for state-regulated plans, and as such, the threatened harm of the IFRs extends to *all* employee insurance plans.

## II.     The IFRs violate the Administrative Procedure Act

   (A) *The IFRs are contrary to law.*

   The IFRs violate numerous requirements of the ACA.  First, the IFRs stand in direct conflict with the WHA, which mandates that employers provide health plans that cover women's preventive care with no cost-sharing.[24]  While the Religious Freedom Restoration Act (RFRA) requires protection of religious beliefs, the ACA already provides religious exemptions that satisfy RFRA's requirements.[25]  The IFRs' vast exemptions go well beyond what is required to avoid a substantial religious burden by permitting a broad range of employers, including publicly-traded companies, to evade compliance with the contraceptive mandate, rather than the narrower class of churches, religious non-profits, and closely held for-profit corporations that the Supreme Court has held are protected by RFRA.[26]  The IFRs also excuse these employers from undertaking any steps, however minimal, to ensure that their employees retain access to contraceptive coverage through other means, eviscerating any accommodation requirements.[27]  As such, the IFRs allow for noncompliance with a mandatory statute so long as there is *any* religious burden, rather than a *substantial* one.  Moreover, RFRA's protection of religious belief does not authorize the IFRs' exemptions for wholly expansive moral beliefs.  (*See* further discussion in *CA Br.* § I.A.1.–2., at 11–14; *PA Br.* § I.A.2.i.–ii., at 23–27; *Amici Br.* § II.B.2., at 21–24.)

   Second, the IFRs violate the ACA's nondiscrimination provision that prohibits an individual from being "excluded from participation in," "denied the benefits of," or "subjected to discrimination under, any health program or activity" receiving federal funds, to the extent that the grounds for such discrimination are otherwise unlawful under federal law.[28]  The IFRs violate this nondiscrimination provision because they selectively authorize denial of coverage for women's preventive care benefits only.  Indeed, the Equal Employment Opportunity Commission has previously held that an employer who offers coverage for preventive

---

[24] *See FAQs about Affordable Care Act Implementation Part 36*, EMPLOYEE BENEFITS SEC. ADMIN., U.S. DEPT. OF LABOR, 1, 1 (2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf (explaining the effects of the Women's Health Amendment on insurance coverage of women's preventive care).

[25] *Id.* at 4-5.

[26] *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768–69 (2014).

[27] The IFRs also eliminate the requirement for employers to notify the federal government if they choose to avail themselves of the exemption, thereby allowing for contraceptive coverage to be quietly eliminated without oversight or transparency.

[28] 42 U.S.C. § 18116.

Eric Hargan, Acting Secretary
December 5, 2017
Page 6 of 9

prescription drugs and services but does not offer coverage for contraception violates Title VII.[29] (*See* further discussion in *CA Br.* § I.A.3., at 14; *PA Br.* § II.B., at 43–46; *Amici Br.* § II.B.2., at 21–24.)

Third, the ACA prohibits the Secretary of Health and Human Services from "promulgat[ing] any regulation that creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," or "impedes timely access to health care services."[30] The IFRs clearly violate this provision by preventing women from accessing important and often medically necessary contraceptive services.  (*See* further discussion in *CA Br.* § I.A.3., at 14; *PA Br.* § I.A.2.iii., at 27–28; *Amici Br.* § I.A.1.–2., at 4–6.)

(B) *The IFRs are arbitrary and capricious.*

The IFRs radically depart from prior policy without adequate or reasonable justification, as required by law.  First, the IFRs do not provide sufficient justification for discarding the prior regulations' finding of a compelling government interest in ensuring that women have contraceptive coverage even if their employers object to providing it.  Five justices of the Supreme Court have expressly recognized such a compelling interest.[31]  The IFRs cite scant evidence to support the assertion that access to contraception has little effect on unintended pregnancies, and indeed, the vast majority of studies have shown precisely the opposite.[32] Moreover, the IFRs ignore the other public health interests served by the contraceptive mandate—including the need for some women to avoid pregnancy, which can be hazardous or life-threatening to them due to a medical condition.  (*See* further discussion in *CA Br.* § I.C., at 19–21; *PA Br.* § I.A.2.iii., at 27–28; *Amici Br.* § II.C., at 24–26.)

Second, the IFRs provide inadequate explanation for expanding the universe of employers who are exempt from compliance with the contraceptive mandate from churches, houses of worship, religious non-profits, and closely held for-profit corporations, to *any and all* non-governmental employers and *any and all* private universities.  Relatedly, the IFRs fail to justify the creation of the broader religious employer exemption, rather than the narrower eligible organization accommodation, to these employers.  The offered explanations for this approach is disagreement with the former Administration; but a disagreement with the previous approach is far from the reasoned and evidence-based explanation required for the evisceration of the relied-upon accommodation requirements, which balanced religious exercise and full and equal health coverage for women.  (*See* further discussion in *CA Br.* § I.C., at 19–21; *PA Br.* § I.A.2.iii., at 27–28; *Amici Br.* § II.C., at 24–26.)

Third, the IFRs extend the applicability of the religious and moral exemption to insurance companies, without reasonable explanation for this entirely new expansion.  In fact, the IFRs

---

[29] *See* Commission Decision on Coverage of Contraception, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM., 2000 WL 33407187 (Dec. 14, 2000), http://www.eeoc.gov/policy/docs/decision-contraception.html.
[30] 42 U.S.C. § 18114.
[31] *See Hobby Lobby*, 134 S. Ct. at 2785 (Kennedy, J., concurring); *id.* at 2799 (Ginsburg, J., dissenting).
[32] *See, e.g.*, IOM Report at 102–07 (collecting studies on effects of women's access to contraceptives).

acknowledge that the Departments are not aware of any insurance company with such an objection—it is undoubtedly arbitrary to promulgate a rule with no intended use.

### III.     The IFRs Violate the Equal Protection Guarantee of the Fifth Amendment

Although the ACA requires coverage for many different types of preventive services, the IFRs single out only women's health benefits and services.  The President's Executive Order directed the Departments to consider allowing additional "conscience-based objections" to services mandated by the WHA specifically.[33]  The IFRs create vast exemptions for contraceptive coverage only, clearly targeting women's preventive services, while leaving preventive service coverage for male employees untouched.  The IFRs include a gender-based classification[34] and are thus subject to heightened scrutiny.

The government interest motivating both IFRs is articulated as providing protections for "sincerely held ['religious beliefs' or 'moral convictions'] in certain health care contexts."[35]  Even if an unbounded moral conviction is found to be a compelling interest, this gender-based classification does not have an "exceedingly persuasive justification" and is not "substantially related to the achievement of those objectives."[36]  The IFRs fail any "means" test as the staggering breadth of the exemptions—to virtually *any* employer for virtually *any* religious or moral objection—lacks any tailoring whatsoever, and flies in the face of any reasonable interpretation of the "substantial relationship" standard.  (*See* further discussion in *CA Br.* § I.E., at 25–28; *PA Br.* § I.C., at 32–34; *Amici Br.* § II.D.2., at 29–30.)

### IV.     The IFRs Violate the Establishment Clause

The IFRs violate the Establishment Clause because their purpose and effect is clearly the advancement of religious beliefs.[37]  The Rules do not even bother to feign a non-religious purpose.  The IFRs also violate the Establishment Clause because they allow employers to obtain religious exemptions in a manner that substantially burdens female employees who may not share the employers' faith.[38]  The burdens here imposed go well beyond any justified by religious exercise—they result in the potentially dramatic loss of contraceptive coverage for millions of women, with no alternative structure to obtain care.  The Supreme Court relied

---

[33] Exec. Order No. 13798, 82 Fed. Reg. 21,675 (May 4, 2017), http://www.gpo.gov/fdsys/pkg/FR-2017-05-09/pdf/2017-09574.pdf.

[34] The IFRs are also overtly discriminatory because they single out women's health care services, including benefits that are only used by women.  Aside from the reference to only women's services, the IFRs are infused with overt references to purported "sensitive" areas of health, which all concern women's reproductive health and rely on overly-broad generalizations of women's health care.  *See* 82 Fed. Reg. 47,838 (2017); 82 Fed. Reg. 47,813 (2017).  The IFRs are also covertly discriminatory because they have a direct impact on women only.  Women alone will be forced to struggle to pay for contraception themselves, forgo contraceptives, or to try to seek out services from some entity other than their employer.

[35] 82 Fed. Reg. 47,845 (2017); 82 Fed. Reg. 47,800 (2017).

[36] *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017).

[37] *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

[38] *See* 42 U.S.C. § 2000bb–1(a) (the "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability").

Eric Hargan, Acting Secretary
December 5, 2017
Page 8 of 9

heavily on the notification and accommodation mechanisms previously in place as necessary protections of women's ability to access contraception.[39]  Without such accommodation, notice, and justification requirements, the burdens on women have grown dramatically, resulting in a clear violation of the Establishment Clause.  (*See* further discussion in *CA Br.* § I.D., at 21–24; *PA Br.* § I.D., at 34–38; *Amici Br.* § II. D.1., at 27–28.)

## V.      Conclusion

The IFRs at issue will result in harms that are both direct and indirect, tangible and intangible.  Access to contraception is fundamental to women's rights to bodily freedom and to emotional autonomy.  It is a public health issue, with effects on unintended pregnancy, maternal health, and infant morbidity.  It also implicates economic mobility and wage parity, educational opportunity and social equality.  These far-reaching effects are too great to ignore, and are protected by the Constitution, our laws and regulations.  Accordingly, we urge the Secretary to rescind the IFRs.

Respectfully submitted,
ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: */s/ Sara Haviva Mark*
SARA HAVIVA MARK
Special Counsel, Social Justice Division
LISA LANDAU
Chief, Health Care Bureau
SIKA YEBOAH-SAMPONG
Social Justice Fellow
New York State Office of the Attorney General
120 Broadway
New York, New York 10271-0332
(212) 416-8460

---

[39] In *Hobby Lobby*, for example, the Court explained that the accommodation sought by closely held for-profit corporations would not violate the Establishment Clause because it has "precisely zero" effect on the women employed by Hobby Lobby. The Court noted that "these women would still be entitled to all FDA-approved contraceptives without cost sharing."  134 S. Ct. at 2760.  In his concurrence, Justice Kennedy underscored that an accommodation of religious exercise must not "unduly restrict other persons, such as employees, in protecting their own interests." *Id*. at 2786–87 (Kennedy, J., concurring).  Similarly, the Court in *Wheaton College v. Burwell* expressly noted that its order allowing employers to notify the government rather than their insurer about a religious objection would not "affect[] the ability of [Wheaton's] employees and students to obtain, without cost, the full range of FDA approved contraceptives." 134 S. Ct. 2806, 2807 (2014).

Eric Hargan, Acting Secretary
December 5, 2017
Page 9 of 9


XAVIER BECERRA
Attorney General of California
1300 I Street
Sacramento, CA 95814


KARL A. RACINE
Attorney General of the District of Columbia
One Judiciary Square
441 4th Street, N.W.
Washington, DC 20001


LISA MADIGAN
Attorney General of Illinois
100 West Randolph Street
Chicago, IL 60601


BRIAN E. FROSH
Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202


LORI SWANSON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155


JOSH SHAPIRO
Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120


THOMAS J. DONOVAN, JR.
Attorney General of Vermont
109 State Street
Montpelier, VT 05609


ROBERT W. FERGUSON
Attorney General of Washington
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504


MATTHEW P. DENN
Attorney General of Delaware
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801


DOUGLAS S. CHIN
Attorney General of Hawaii
425 Queen Street
Honolulu, HI 96813


JANET T. MILLS
Attorney General of Maine
6 State House Station
Augusta, ME 04333


MAURA HEALEY
Attorney General of Massachusetts
One Ashburton Place
Boston, MA 02108


ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, OR 97301


PETER F. KILMARTIN
Attorney General of Rhode Island
150 South Main Street
Providence, RI 02903


MARK R. HERRING
Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219

# Exhibit B

Nos. 14-1418, 14-1453, 14-1505,
15-35, 15-105, 15-119, and 15-191

# In the Supreme Court of the United States

---

DAVID A. ZUBIK, ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

---

*ON WRITS OF CERTIORARI TO THE UNITED STATES
COURTS OF APPEALS FOR THE THIRD, FIFTH,
TENTH, AND DISTRICT OF COLUMBIA CIRCUITS*

---

## BRIEF FOR THE RESPONDENTS

---

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
BENJAMIN C. MIZER
  *Principal Deputy Assistant
  Attorney General*
IAN HEATH GERSHENGORN
EDWIN S. KNEEDLER
  *Deputy Solicitors General*
BRIAN H. FLETCHER
  *Assistant to the Solicitor
  General*
MARK B. STERN
ALISA B. KLEIN
ADAM C. JED
PATRICK G. NEMEROFF
MEGAN BARBERO
JOSHUA SALZMAN
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

(Additional Captions Listed on Inside Cover)

PRIESTS FOR LIFE, ET AL., PETITIONERS

*v.*

DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.

———

ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, ET AL.,
PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———

EAST TEXAS BAPTIST UNIVERSITY, ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———

LITTLE SISTERS OF THE POOR HOME FOR THE AGED,
DENVER, COLORADO, ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———

SOUTHERN NAZARENE UNIVERSITY, ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———

GENEVA COLLEGE, PETITIONER

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———

## QUESTION PRESENTED

Under federal law, health insurers and employer-sponsored group health plans generally must cover certain preventive health services, including contraceptive services prescribed for women by their doctors.   Petitioners object to providing contraceptive coverage on religious grounds but are eligible for a regulatory accommodation that would allow them to opt out of the contraceptive-coverage requirement. Petitioners contend, however, that the accommodation itself violates the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. 2000bb *et seq.*, because the government will require or encourage third parties to provide petitioners' employees and students with separate contraceptive coverage if petitioners opt out. The question presented is:

Whether RFRA entitles petitioners not only to opt out of providing contraceptive coverage themselves, but also to prevent the government from arranging for third parties to provide separate coverage to the affected women.

(I)

**TABLE OF CONTENTS**

Page

Opinions below ............................................................2
Jurisdiction ..................................................................4
Statutory and regulatory  provisions involved ..........................4
Statement....................................................................5
   A.  The contraceptive-coverage requirement ......................6
   B.  The accommodation regulations .....................................11
   C.  The present controversy .................................................19
Summary of argument ..................................................25
Argument....................................................................29
   I.  The accommodation regulations do not impose a
      substantial burden cognizable under RFRA.................32
     A.  The regulations allow petitioners to opt
        out of the contraceptive-coverage requirement.....34
     B.  Petitioners' objections to the government's
        independent arrangements with third parties
        do not establish a substantial burden cognizable
        under RFRA ...............................................41
   II.  The accommodation is the least-restrictive means
      of furthering the government's compelling interest
      in providing women with full and equal health
      coverage............................................................53
     A.  The regulations further the government's
        compelling interest in ensuring that women
        receive full and equal health coverage,
        including contraceptive coverage .............................54
       1.  The government has a compelling interest
          in ensuring that women's health coverage
          includes contraceptive coverage .......................55
       2.  The Affordable Care Act's provisions
          governing grandfathered plans and small
          employers do not undermine the compell-
          ing nature of the government's interest...........61
       3.  The regulatory exemption for houses of
          worship does not undermine the compell-
          ing nature of the government's interest...........67

(III)

IV

Table of Contents—Continued:                                    Page

    B.  The accommodation is the least restrictive
        means of ensuring that women receive full and
        equal health coverage, including contracep-
        tive coverage ............................................................... 72
        1.  The government's interest in securing
            full and equal health coverage for women
            requires the provision of contraceptive
            coverage without financial, administrative,
            or logistical burdens ........................................... 73
        2.  Petitioners' proposals do not qualify as
            less-restrictive alternatives ............................... 76
        3.  Petitioners do not endorse an alternative
            notice procedure, which is in any event
            not a valid less-restrictive means ...................... 86
Conclusion .................................................................................... 89
Appendix — Statutory and regulatory provisions ................. 1a

v

## TABLE OF AUTHORITIES

Cases:                                                        Page

*Ashcroft* v. *ACLU*, 542 U.S. 656 (2004)..................................84

*Bob Jones Univ.* v. *United States*, 461 U.S. 574
   (1983) ................................................................81, 84

*Bowen* v. *Roy*, 476 U.S. 693 (1986) ...............26, 42, 43, 46, 47

*Burwell* v. *Hobby Lobby Stores, Inc.*,
   134 S. Ct. 2751 (2014) ...................................*passim*

*Catholic Charities of the Diocese of Albany* v. *Serio*,
   859 N.E.2d 459 (N.Y. 2006), cert. denied, 552 U.S.
   816 (2007) ...............................................................69

*Catholic Charities of Sacramento, Inc.* v. *Superior
   Ct.*, 85 P.3d 67 (Cal.), cert. denied, 543 U.S. 816
   (2004). .....................................................................69

*Catholic Health Care Sys.* v. *Burwell*,
   796 F.3d 207 (2d Cir. 2015).....................................20, 24, 51

*Church of the Lukumi Babalu Aye, Inc.* v. *City of
   Hialeh*, 508 U.S. 520 (1993) ..................................66

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) .....................81

*Cutter* v. *Wilkinson*, 544 U.S. 709 (2005) ................29, 31, 79

*Dole* v. *Shenandoah Baptist Church*, 899 F.2d 1389
   (4th Cir.), cert. denied, 498 U.S. 846 (1990) .....................62

*Dordt College* v. *Burwell*, 801 F.3d 946 (8th Cir.
   2015), petition for cert. pending, No. 15-774
   (filed Dec. 15, 2015) ...............................................24

*Employment Div.* v. *Smith*, 494 U.S. 872 (1990) ...............41

*Estate of Thornton* v. *Caldor, Inc.*, 472 U.S. 703
   (1985) ......................................................................44

*Faircloth* v. *Lundy Packing Co.*, 91 F.3d 648
   (4th Cir. 1996), cert. denied, 519 U.S. 1077 (1997) ...........16

*Gonzales* v. *O Centro Espirita Beneficente Uniao do
   Vegetal*, 546 U.S. 418 (2006) ........................41, 66, 79, 81, 88

VI

Cases—Continued:                                      Page

*Grace Schools* v. *Burwell*, 801 F.3d 788
  (7th Cir. 2015).............................................................24

*Heckler* v. *Mathews*, 465 U.S. 728 (1984) ............................63

*Holt* v. *Hobbs*, 135 S. Ct. 853 (2015) ....................................45

*Hosanna-Tabor Evangelical Lutheran Church &*
  *School* v. *EEOC*, 132 S. Ct. 694 (2012) ..............................67

*Larson* v. *Valente*, 456 U.S. 228 (1982)................................72

*Liberty Univ., Inc.* v. *Lew*, 733 F.3d 72 (4th Cir.),
  cert. denied, 134 S. Ct. 683 (2013) ................................11, 77

*Lyng* v. *Northwest Indian Cemetery Protective*
  *Ass'n*, 485 U.S. 439 (1988)...................................................43

*Michigan Catholic Conference & Catholic Family*
  *Servs.* v. *Burwell*, 807 F.3d 738 (6th Cir. 2015) ...............24

*Pegram* v. *Herdrich*, 530 U.S. 211 (2000) ......................39

*Public Citizen* v. *DOJ*,  491 U.S. 440 (1989) ..........................8

*Sharpe Holdings, Inc.* v. *HHS*, 801 F.3d 927 (8th Cir.
  2015), petition for cert. pending, No. 15-775 (filed
  Dec. 15, 2015)...................................................................24

*Sossamon* v. *Texas*, 563 U.S. 277 (2011) .............................81

*Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.*, 450
  U.S. 707 (1981) .............................................................49, 81

*Tony & Susan Alamo Found.* v. *Secretary of Labor*,
  471 U.S. 290 (1985) .............................................................80

*United States* v. *Lee*, 455 U.S. 252 (1982)................68, 78, 80

*University of Notre Dame* v. *Burwell*, 786 F.3d 606
  (7th Cir. 2015), petition for cert. pending,
  No. 15-812 (filed Dec. 18, 2015)........................24, 77, 84, 85

*Walz* v. *Tax Comm'n*, 397 U.S. 664 (1970) ..........................67

*Wheaton College* v. *Burwell*, 134 S. Ct. 2806
  (2014) .................................................................14, 15, 86, 87

*Wheaton College* v. *Burwell*, 791 F.3d 792
  (7th Cir. 2015)...............................................................24, 39

VII

Constitution, statutes and regulations                    Page

U.S. Const. Amend. I (Free Exercise
    Clause)............................................................32, 41, 44, 72, 81
Age Discrimination in Employment Act of 1967,
    29 U.S.C. 630(b) ..................................................................65
Civil Rights Act of 1964, Tit. VII, 42 U.S.C. 2000e
    *et seq.*:
        42 U.S.C. 2000e(b).................................................27, 62, 65
        42 U.S.C. 2000e-1(a)..........................................................70
Employee Retirement Income Security Act of 1974,
    29 U.S.C. 1001 *et seq.* ......................................................10
    29 U.S.C. 1002(16)(A) .......................................................16
    29 U.S.C. 1002(33)(A) .......................................................17
    29 U.S.C. 1002(33)(C)(ii)(II) ............................................17
    29 U.S.C. 1003(b)(2) ..........................................................17
    29 U.S.C. 1185d .................................................................10
Family and Medical Leave Act of 1993, 29 U.S.C.
    2611(4)(A)(i).......................................................................65
Internal Revenue Code (26 U.S.C.):
    § 36B(b)(3) .........................................................................82
    § 36B(c)(2)(B).....................................................................82
    § 36B(c)(2)(C).....................................................................82
    § 508(c)(1)(A)......................................................................71
    § 512(b)(12) ........................................................................71
    § 3121(w)(1)........................................................................71
    § 3309(b)(1)........................................................................71
    § 4980D ..............................................................................60
    § 4980D(b)(1)......................................................................10
    § 4980H ........................................................................51, 64
    § 4980H(a) ..........................................................................11
    § 6033 .................................................................................12

VIII

Statutes and regulations—Continued:                    Page

    § 6033(a)(3)(A)(i)....................................................12, 67

    § 6033(a)(3)(A)(iii) ...................................................12, 67

    § 7611 .........................................................................71

    § 9815 .........................................................................60

    § 9815(a)(1) ................................................................10

    § 9834 .........................................................................10

Military Selective Service Act, 50 U.S.C. App.
    § 456(j) (to be codified at 50 U.S.C. 3806(j)) ...................48

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat. 119.......................................6

Public Health Service Act, 42 U.S.C. 201 *et seq.*:

    42 U.S.C. 300 ..............................................................83

    42 U.S.C. 300a-4 .........................................................83

    42 U.S.C. 300gg-13.............................................6, 38, 64, 4a

    42 U.S.C. 300gg-13(a) ....................................10, 11, 15, 4a

    42 U.S.C. 300gg-13(a)(1)-(3) ........................................7, 4a

    42 U.S.C. 300gg-13(a)(2).............................................63, 5a

    42 U.S.C. 300gg-13(a)(3).............................................63, 5a

    42 U.S.C. 300gg-13(a)(4)...............................8, 34, 65, 5a

    42 U.S.C. 300gg-22(a) .................................................10

Religious Freedom Restoration Act of 1993,
    42 U.S.C. 2000bb *et seq.*.................................................5, 1a

    42 U.S.C. 2000bb(a)(5)........................25, 31, 79, 81, 88, 1a

    42 U.S.C. 2000bb(b)(1).............................................81, 1a

    42 U.S.C. 2000bb-1....................................................32, 2a

    42 U.S.C. 2000bb-1(a) ...........................................20, 42, 2a

    42 U.S.C. 2000bb-1(b).............................................53, 2a

    42 U.S.C. 2000bb-1(b)(2) .....................................20, 54, 2a

    42 U.S.C. 2000bb-4....................................................68, 4a

42 U.S.C. 18011 ............................................................11, 63, 6a

IX

Statutes and regulations—Continued: Page

42 U.S.C. 18021(a)(1)(B) .......................................82
42 U.S.C. 18031(d)(2)(B)(i) ...................................82
Ariz. Rev. Stat. Ann. (2011):
   § 20-826(Z)...........................................................12
   § 20-826(AA)(3).....................................................12
Cal. Bus. & Prof. Code § 733(b)(3) (West Supp. 2016) .......48
Cal. Ins. Code §  10123.196(e) (McKinney 2011) ................12
Conn. Agencies Regs. § 19a-580d-9 (2014)...........................48
N.Y. Ins. Law §  3221(*l*)(16)(A) (2011) ...................................12
Or. Rev. Stat. Ann. §  743A.066(4) (2011)............................12
49 Pa. Code §  27.103(b)(2) (2014).........................................48
26 C.F.R. 54.9815-2713(a)(1)(iv) ...................................10, 11a
29 C.F.R.:
   Section 2510.3-16(b) ...............................16, 17, 38, 39, 20a
   Section 2510.3-16(c) ..........................................16, 39, 21a
   Section 2590.715-1251(g)(1)(i)..........................................64
   Section 2590.715-2713(a)(1)(iv)................................10, 23a
   Section 2590.715-2713A(b)(1)(ii)(A) .......................14, 27a
   Section 2590.715-2713A(b)(1)(ii)(B) .......................14, 27a
   Section 2590.715-2713A(b)(2) ...................17, 18, 35, 27a
   Section 2590.715-2713A(b)(3) .................................17, 28a
   Section 2590.715-2713A(c)(1)..................................14, 29a
   Section 2590.715-2713A(d) .................................18, 36, 31a
42 C.F.R. 59.5(a)(8) ................................................................83
45 C.F.R.:
   Section 46.202(f) ...............................................................19
   Section 147.130(a)(1)(iv) ....................................10, 34, 34a
   Section 147.131(a).......................................12, 19, 67, 34a
   Section 147.131(b)(1)................................................13, 34a
   Section 147.131(b)(2)(i) ...........................................13, 35a

X

Regulations—Continued:                                         Page

    Section 147.131(b)(2)(ii)............................................13, 35a

    Section 147.131(c)....................................................15, 37a

    Section 147.131(c)(1) ...............................................40, 37a

    Section 147.131(c)(1)(i) ......................................14, 15, 37a

    Section 147.131(c)(2)(i) ........................................38, 38a

    Section 147.131(c)(2)(ii) ...................................18, 35, 38a

    Section 147.131(d) ..................................................36, 39a

    Section 147.140(g) ......................................................63

    Section 156.50(d) ........................................................17

Miscellaneous:

    Jonathan M. Bearak et al., *Changes in Out-of-Pocket Costs for Hormonal IUDs After Implementation of the Affordable Care Act*, 93 Contraception 139 (2016) ..................................................................4

    139 Cong. Rec. (1993):

        p. 26,180 .........................................................42

        p. 26,193 .........................................................44

        p. 26,415 .........................................................44

    155 Cong. Rec. (2009):

        p. 28,841 ......................................................7, 8

        p. 28,843 .........................................................8

        p. 28,844 .........................................................8

        p. 28,869 .........................................................8

        p. 29,070 .....................................................8, 58

        p. 29,302 .........................................................8

        p. 29,307 .........................................................8

        p. 29,768 .........................................................8

    *EBSA Form 700*, http://www.dol.gov/ebsa/pdf/ preventiveserviceseligibleorganizationcertification form.pdf (Aug. 2014) ...........................................14

XI

Miscellaneous—Continued:                                  Page

62 Fed. Reg. 8611 (Feb. 25, 1997) .......................................... 19
75 Fed. Reg. 34,541 (June 17, 2010) ...................................... 63
76 Fed. Reg. 46,623 (Aug. 3, 2011) ..................... 12, 69, 70, 71
77 Fed. Reg. (Feb. 15, 2012):
    p. 8725 ..................................................................... 10
    p. 8726 ..................................................................... 13
    pp. 8727-8728........................................................... 75
    p. 8728 ......................................................... 13, 57, 74
77 Fed. Reg. (Mar. 21, 2012):
    p. 16,503 .................................................................. 12
    p. 16,507 .................................................................. 39
78 Fed. Reg. (Feb. 6, 2013):
    p. 8459 ..................................................................... 72
    p. 8461 ..................................................................... 12
78 Fed. Reg. (July 2, 2013):
    p. 39,872 .................................................. 6, 56, 57, 74
    p. 39,874 .................................................... 13, 69, 70
    pp. 39,874-39,875 .................................................. 13
    pp. 39,875-39,880 .................................................. 15
    p. 39,877 .................................................................. 16
    p. 39,879 .................................................................. 40
    pp. 39,879-39,880 ........................................ 16, 38, 39
    p. 39,878 ........................................................... 14, 37
    pp. 39,881-39,882 .................................................. 16
    p. 39,888 ................................................ 74, 78, 82, 85
    p. 39,893 ........................................................... 16, 17
79 Fed. Reg. 51,092 (Aug. 27, 2014) ..................................... 14
80 Fed. Reg. (July 14, 2015):
    p. 41,323 ............................................ 17, 35, 38, 60, 87, 88
    pp. 41,323-41,328 ............................................... 13

XII

Miscellaneous—Continued:                                    Page

    p. 41,325 ...............................................................12, 67, 69

    p. 41,328 ...................................................39, 40, 75, 78, 82

H.R. Rep. No. 88, 103d Cong., 1st Sess. (1993) ...................42

Kaiser Family Found., *Women and Health Care in
the Early Years of the Affordable Care Act* (2014) ..........78

Kaiser Family Found. & Health Research & Educ.
Trust:

    *Employer Health Benefits 2010 Annual Survey
(2010)* ............................................................................64

    *Employer Health Benefits 2015 Annual Survey
(2015)* ......................................................6, 11, 16, 39, 62

Liberty Counsel, *Compulsory Vaccinations
Threaten Religious Freedom* (2007), http://www.
lc.org/Uploads/files/pdf/memo_vaccination.pdf ...............80

Jeffrey F. Peipert et al., *Preventing Unintended
Pregnancies by Providing No-Cost Contraception*,
120 Obstetrics & Gynecology 1291 (2012) .........................58

Planned Parenthood, *IUD: Where Can I Get an
IUD? How Much Does an IUD Cost?*, http://www.
plannedparenthood.org/health-topics/birth-control/
iud-4245.htm (last visited Feb. 9, 2016) .............................57

Debbie Postlethwaite et al., *A Comparison of
Contraceptive Procurement Pre- and Post-Benefit
Change*, 76 Contraception 360 (2007) ...............................57

S. Rep. No. 111, 103d Cong., 1st Sess. (1993) ...............42, 43

Laurie Sobel et al., Kaiser Family Found., *Data
Note: Are Nonprofits Requesting an
Accommodation for Contraceptive Coverage?*
(Dec. 2015) .........................................................................19

Richard H. Thaler & Cass R. Sunstein, *Nudge* (2008).......75

XIII

Miscellaneous—Continued:                                    Page

U.S. Census Bureau, *U.S. & States, NAICS Sectors, Small Employment Sizes* (2012), http://www2.census.gov/econ/susb/data/2012/us_state_naicssector_small_emplsize_2012.xls ...............................66

U.S. Dep't of Health and Human Services:

    *Notice of Availability of Separate Payments for Contraceptive Services*, https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/cms-10459-enrollee-notice.pdf (last visited Feb. 9, 2016)..........18

    *Preventive Health Services*, https://www.healthcare.gov/coverage/preventive-care-benefits (last visited Feb. 9, 2016)..............................7

    *Title X:  The National Family Planning Program* (May 2014), http://www.hhs.gov/opa/pdfs/title-x-national-family-planning-overview.pdf................................................................83

U.S. Dep't of Treasury, *Form 8274* (Aug. 2014), https://www.irs.gov/pub/irs-pdf/f8274.pdf.........................48

Carol S. Weisman & Cynthia H. Chuang, *Making the Most of the Affordable Care Act's Contraceptive Coverage Mandate for Privately-Insured Women*, 24 Women's Health Issues 465 (2014) ..............................57

# In the Supreme Court of the United States

---

No. 14-1418

DAVID A. ZUBIK, ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

---

No. 14-1453

PRIESTS FOR LIFE, ET AL., PETITIONERS

*v.*

DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.

---

No. 14-1505

ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON,
ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

---

No. 15-35

EAST TEXAS BAPTIST UNIVERSITY, ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

---

(1)

2

No. 15-105

LITTLE SISTERS OF THE POOR HOME FOR THE AGED,
DENVER, COLORADO, ET AL., PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———————

No. 15-119

SOUTHERN NAZARENE UNIVERSITY, ET AL.,
PETITIONERS

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———————

No. 15-191

GENEVA COLLEGE, PETITIONER

*v.*

SYLVIA BURWELL, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

———————

*ON WRITS OF CERTIORARI TO THE UNITED STATES
COURTS OF APPEALS FOR THE THIRD, FIFTH,
TENTH, AND DISTRICT OF COLUMBIA CIRCUITS*

———————

**BRIEF FOR THE RESPONDENTS**

———————

**OPINIONS BELOW**

In No. 14-1418 (*Zubik*) and No. 15-191 (*Geneva College*), the opinion of the court of appeals (*Zubik* Pet. App. 1a-47a) is reported at 778 F.3d 422. The opinion of the district court granting a preliminary

3

injunction in *Zubik* (Pet. App. 50a-130a) is reported at 983 F. Supp. 2d 576. The order granting a permanent injunction (Pet. App. 131a-134a) is not published in the *Federal Supplement* but is available at 2013 WL 6922024. The opinions of the district court granting preliminary injunctions in *Geneva College* (Pet. App. 50a-79a, 83a-121a) are reported at 960 F. Supp. 2d 588 and 988 F. Supp. 2d 511.

In No. 14-1453 (*Priests for Life*) and No. 14-1505 (*Roman Catholic Archbishop of Washington* (*RCAW*)), the opinion of the court of appeals (*RCAW* Pet. App. 1a-93a) is reported at 772 F.3d 229. The opinion of the district court in *Priests for Life* (Pet. App. 96-135) is reported at 7 F. Supp. 3d 88. The opinion of the district court in *RCAW* (Pet. App. 94a-211a) is reported at 19 F. Supp. 3d 48.

In No. 15-35 (*East Texas Baptist University* (*ETBU*)), the opinion of the court of appeals (Pet. App. 1a-28a) is reported at 793 F.3d 449. The opinion of the district court (Pet. App. 31a-88a) is reported at 988 F. Supp. 2d 743.

In No. 15-105 (*Little Sisters of the Poor Home for the Aged* (*Little Sisters*)) and No. 15-119 (*Southern Nazarene University*), the opinion of the court of appeals (*Little Sisters* Pet. App. 2a-149a) is reported at 794 F.3d 1151. The order of the district court denying a preliminary injunction to some of the *Little Sisters* petitioners (Pet. App. 152a-189a) is reported at 6 F. Supp. 3d 1225. The order of a different district court granting a preliminary injunction to the remaining *Little Sisters* petitioners (Pet. App. 190a-210a) is not published in the *Federal Supplement* but is available at 2013 WL 6804259. The order of the district court granting a preliminary injunction in *Southern*

4

*Nazarene University* (Pet. App. 156a-184a) is not published in the *Federal Supplement* but is available at 2013 WL 6804265.

### JURISDICTION

In *Zubik* and *Geneva College*, the judgment of the court of appeals was entered on February 11, 2015. Petitions for rehearing were denied on April 6 and April 13, 2015 (*Zubik* Pet. App. 135a-137a; *Geneva College* Pet. App. 125a-127a). The petition for a writ of certiorari in *Zubik* was filed on May 29, 2015. On June 30, 2015, Justice Alito extended the time within which to file a petition for a writ of certiorari in *Geneva College* to and including August 11, 2015, and the petition was filed on that date. In *Priests for Life* and *RCAW*, the judgment of the court of appeals was entered on November 14, 2014. A petition for rehearing was denied on May 20, 2015 (*RCAW* Pet. App. 222a-224a). The petitions for writs of certiorari were filed on June 9 and June 19, 2015. In *ETBU*, the judgment of the court of appeals was entered on June 22, 2015. The petition for a writ of certiorari was filed on July 8, 2015. In *Little Sisters* and *Southern Nazarene University*, the judgment of the court of appeals was entered on July 14, 2015. The petitions for writs of certiorari were filed on July 23 and July 24, 2015. The petitions were granted on November 6, 2015. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

### STATUTORY AND REGULATORY PROVISIONS INVOLVED

Pertinent statutory and regulatory provisions are set forth in an appendix to this brief. App., *infra*, 1a-41a.

5

## STATEMENT

To ensure that women receive full and equal health coverage appropriate to their medical needs, federal law generally requires health insurers and employer-sponsored group health plans to cover certain preventive services, including contraceptive services prescribed for women by their doctors. In *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) (*Hobby Lobby*), this Court held that the contraceptive-coverage requirement could not be applied to closely held for-profit companies that objected on religious grounds to providing contraceptive coverage. But the Court emphasized that the effect of its decision "on the women employed by [those companies] would be precisely zero" because the government could expand an already-existing accommodation that "effectively exempted" objecting religious nonprofit employers from the contraceptive-coverage requirement while still ensuring that the affected women received coverage from third parties. *Id.* at 2760, 2763.

In these consolidated cases, petitioners contend that the accommodation on which *Hobby Lobby* relied is itself a violation of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. 2000bb *et seq.* In so doing, they assert a right not only to be relieved of the obligation to provide contraceptive coverage themselves, but also to prevent the government from arranging for third parties to fill the resulting gap. If accepted, that claim would deny tens of thousands of women the health coverage to which they are entitled under federal law, and subject them to the harms the law is designed to eliminate. We do not question the sincerity or importance of petitioners' religious beliefs. But as seven courts of appeals have held, their

6

legal claim stretches RFRA too far.  In our diverse and pluralistic Nation, the right to the free exercise of religion does not encompass a right to insist that the government take measures that "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling." *Hobby Lobby*, 134 S. Ct. at 2787 (Kennedy, J., concurring).

### A.  The Contraceptive-Coverage Requirement

1. "Employers are the principal source of health insurance in the United States," providing coverage to roughly 147 million people.  Kaiser Family Found. & Health Research & Educ. Trust, *Employer Health Benefits 2015 Annual Survey* 58 (2015) (*Benefits Survey*).  The Patient Protection and Affordable Care Act (Affordable Care Act or Act), Pub. L. No. 111-148, 124 Stat. 119, builds on the country's established employer-based system to ensure that all Americans have access to quality, affordable health coverage.

One of the Act's reforms requires insurers and employer-sponsored group health plans to provide coverage for immunizations, screenings, and other preventive services without imposing copayments, deductibles, or other cost-sharing charges.  42 U.S.C. 300gg-13.  "Prevention is a well-recognized, effective tool" that saves lives and reduces health care costs, but "the U.S. health care system has fallen short in the provision of such services."  J.A. 551.  Congress determined that broader and more consistent use of preventive services is critical to improving public health and that people would be more likely to get appropriate preventive care if they did not have to pay for it out of pocket.  *RCAW* Pet. App. 57a-58a; see 78 Fed. Reg. 39,872 (July 2, 2013).

7

Congress did not create a fixed list of covered preventive services.  Instead, it provided for coverage of categories of services according to the current recommendations of medical experts.  The Act requires coverage of "evidence-based items or services" recommended by the United States Preventive Services Task Force, "immunizations" endorsed by the Centers for Disease Control and Prevention, and "preventive care and screenings" for children identified in guidelines issued by the Health Resources and Services Administration (HRSA), a component of the Department of Health and Human Services (HHS).  42 U.S.C. 300gg-13(a)(1)-(3).  Those recommendations and guidelines include, among other services, vaccinations for measles, polio, and other diseases, as well as screenings for diabetes, certain cancers, and other conditions.  HHS, *Preventive Health Services*, https://www.healthcare.gov/coverage/preventive-care-benefits (last visited Feb. 9, 2016).

2. As originally drafted, the bill that became the Affordable Care Act would not have covered additional preventive services that "many women's health advocates and medical professionals believe are critically important" to meeting women's unique health needs.  155 Cong. Rec. 28,841 (2009) (Sen. Boxer).  "To correct this oversight," the Senate adopted a "Women's Health Amendment" adding "a new category of preventive services specific to women's health."  *Hobby Lobby*, 134 S. Ct. at 2788 (Ginsburg, J., dissenting).  The amendment was intended "to remedy the problem that women were paying significantly more out of pocket for preventive care and thus often failed to seek preventive services."  *RCAW* Pet. App. 4a; see *Hobby Lobby*, 134 S. Ct. at 2785-2786 (Kennedy, J.,

8

concurring).  Supporters of the amendment observed that "women have different health needs than men, and [that] these needs often generate additional costs."  155 Cong. Rec. at 29,070 (Sen. Feinstein). They also noted that many women found that cost-sharing requirements were "so high that they avoid[ed] getting [preventive services] in the first place."  *Id.* at 29,302 (Sen. Mikulski).

Supporters of the Women's Health Amendment emphasized that it would reduce "unintended pregnancies" by ensuring that women receive coverage for "contraceptive services" without cost-sharing.  155 Cong. Rec. at 29,768 (Sen. Durbin).[1]  Consistent with the Act's approach to other preventive services, however, the amendment relied on experts to identify the specific women's preventive services to be covered, providing for coverage of "preventive care and screenings" specified in "comprehensive guidelines supported by [HRSA]."  42 U.S.C. 300gg-13(a)(4).

3.  In developing the required guidelines, HRSA relied on recommendations from the Institute of Medicine (IOM).  *Hobby Lobby*, 134 S. Ct. at 2762.  IOM is part of the National Academy of Sciences, a "semi-private" organization established by Congress "for the explicit purpose of furnishing advice to the Government."  *Public Citizen* v. *DOJ*, 491 U.S. 440, 460 & n.11 (1989) (citation omitted).  To formulate its recommendations, IOM convened a committee of experts, "including specialists in disease prevention, women's

---

[1]  See, *e.g.*, 155 Cong. Rec. at 28,841 (Sen. Boxer) ("family planning services"); *id.* at 28,843 (Sen. Gillibrand) ("family planning"); *id.* at 28,844 (Sen. Mikulski) (same); *id.* at 28,869 (Sen. Franken) ("contraception"); *id.* at 29,070 (Sen. Feinstein) ("family planning services"); *id.* at 29,307 (Sen. Murray) (same).

9

health issues, adolescent health issues, and evidence-based guidelines." J.A. 542.

IOM's recommended preventive services included annual checkups, screening for gestational diabetes, and screening and counseling for domestic violence and sexually transmitted diseases. J.A. 295-296. IOM also recommended covering the full range of contraceptive methods approved by the Food and Drug Administration (FDA), as well as sterilization procedures and related patient education and counseling. J.A. 546-548, 576. FDA-approved contraceptive methods include oral contraceptive pills, diaphragms, injections and implants, emergency contraceptive drugs, and intrauterine devices (IUDs). J.A. 903-933.

IOM based its recommendation on extensive medical literature establishing that contraceptives greatly decrease the risk of unintended pregnancies, adverse pregnancy outcomes, and other negative health consequences for women and children. J.A. 546-548, 562-571. IOM explained that leading "health care professional associations"—including the American Medical Association and the American Academy of Pediatrics—"recommend the use of family planning services as part of preventive care for women," and that "[c]ontraceptive coverage has become standard practice for most private insurance and federally funded insurance programs." J.A. 565, 573.

IOM further explained that while some contraceptives are available over the counter, "more effective" methods, "such as oral contraceptives and [IUDs], are available [only] by prescription or require insertion by a medical professional." J.A. 567. IOM noted that women face particularly significant "[c]ost barriers" to obtaining the "most effective contraceptive meth-

10

ods," including IUDs, because those methods "have high up-front costs." J.A. 572. IOM cited studies establishing that "even moderate copayments for preventive services" may "deter patients from receiving those services." J.A. 556; see J.A. 574-575. And it concluded that "[t]he elimination of cost sharing for contraception therefore could greatly increase its use, including use of the more effective and longer-acting methods." J.A. 575.

Consistent with IOM's recommendation, HRSA's guidelines include all FDA-approved contraceptive methods, as prescribed by a health care provider. 77 Fed. Reg. 8725 (Feb. 15, 2012). The regulations promulgated by the three Departments responsible for implementing the preventive-services requirement (HHS, Labor, and the Treasury) incorporate the HRSA guidelines. 45 C.F.R. 147.130(a)(1)(iv) (HHS); 29 C.F.R. 2590.715-2713(a)(1)(iv) (Labor); 26 C.F.R. 54.9815-2713(a)(1)(iv) (Treasury).

4. The Affordable Care Act's preventive-services requirement applies to "health insurance issuer[s]" and to employer-sponsored "group health plan[s]." 42 U.S.C. 300gg-13(a). With respect to insurers, the requirement is enforced by state insurance regulators and by HHS. 42 U.S.C. 300gg-22(a). As applied to most employer-sponsored group health plans, it is incorporated into the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001 *et seq.* 29 U.S.C. 1185d. Like other requirements for group health plans, the preventive-services requirement is also enforced by a tax penalty on employers that have noncompliant plans, which is generally equal to $100 per day for each affected individual. 26 U.S.C. 4980D(b)(1); see 26 U.S.C. 9815(a)(1), 9834.

11

Employers are not required to provide health coverage. The Affordable Care Act imposes a tax on employers with 50 or more full-time employees that do not offer coverage, but the tax "is proportionate rather than punitive" and "leaves large employers with a choice" between providing coverage and paying the tax. *Liberty Univ., Inc.* v. *Lew*, 733 F.3d 72, 98 (4th Cir.), cert. denied, 134 S. Ct. 683 (2013); see 26 U.S.C. 4980H(a). In general, all employers that do elect to offer health coverage—including employers with fewer than 50 employees—must comply with the Act's requirements, including the requirement to cover preventive services. 42 U.S.C. 300gg-13(a). Under the Act's grandfathering provision, however, plans that have not made specified changes since the Act's enactment are exempt from a number of its reforms, including the preventive-services requirement. *Hobby Lobby*, 134 S. Ct. at 2763-2764; see 42 U.S.C. 18011. That grandfathering provision is a transitional measure, and the percentage of employees covered by grandfathered plans has fallen from 56% in 2011 to 25% in 2015. *Benefits Survey* 8, 217.

### B. The Accommodation Regulations

In implementing the preventive-services requirement, the Departments recognized that some employers have religious objections to contraceptives. To accommodate those objections, the Departments have "devised and implemented a system that seeks to respect the religious liberty" of objecting employers while also "ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives" as other individuals with employer-sponsored health coverage. *Hobby Lobby*, 134 S. Ct. at 2759. That accommodation has been

12

developed and refined through notice-and-comment rulemaking and consultation with "religious organizations, insurers, women's groups, insurance experts, and other interested stakeholders." 77 Fed. Reg. 16,503 (Mar. 21, 2012).

1. In 2011, the Departments authorized HRSA to provide an automatic exemption from the contraceptive-coverage requirement for "'churches, their integrated auxiliaries, and conventions or associations of churches,' as well as 'the exclusively religious activities of any religious order,'" a category of employers defined in the Internal Revenue Code. *Hobby Lobby*, 134 S. Ct. at 2763 (quoting 26 U.S.C. 6033(a)(3)(A)(i) and (iii)); see 45 C.F.R. 147.131(a). That exemption was adopted "against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship." 80 Fed. Reg. 41,325 (July 14, 2015); see 76 Fed. Reg. 46,623 (Aug. 3, 2011). The Departments also noted that the exemption was "consistent with the policies of States that require contraceptive services coverage." 76 Fed. Reg. at 46,623. At the time, 28 States required insurers to cover contraceptives, J.A. 574, and several of those States made an exception for houses of worship as defined in 26 U.S.C. 6033. See Ariz. Rev. Stat. Ann. § 20-826(Z) and (AA)(3) (2011); Cal. Ins. Code § 10123.196(e) (McKinney 2011); N.Y. Ins. Law § 3221(*l*)(16)(A) (2011); Or. Rev. Stat. Ann. § 743A.066(4) (2011).[2]

---

[2] Those state laws limited the exemption to houses of worship that satisfied other requirements, including primarily serving and employing coreligionists. The Departments initially adopted those requirements as well, but later dropped them in response to comments from religious groups. 78 Fed. Reg. 8461 (Feb. 6, 2013).

13

Some commenters urged the Departments to expand the exemption to *all* religious nonprofit organizations, a class that "encompasses a vast array of religiously affiliated universities, hospitals, service providers, and charities, some of them employing thousands of people." *Little Sisters* Pet. App. 110a; see 77 Fed. Reg. at 8726. The Departments declined to adopt such a broad exemption, explaining that it would have undermined the preventive-services requirement and "subject[ed] * * * employees to the religious views of the[ir] employer[s]." 77 Fed. Reg. at 8728. But the Departments announced a temporary enforcement safe harbor for religious nonprofit employers and pledged to "work with stakeholders to develop alternative ways of providing contraceptive coverage" to the employees of such organizations without the involvement of objecting employers. *Ibid.*

2. In 2013, the Departments promulgated regulations creating an accommodation for religious nonprofit organizations that oppose covering contraceptive services on religious grounds. 78 Fed. Reg. at 39,874-39,875; see 45 C.F.R. 147.131(b)(1) and (2)(i). In light of this Court's decision in *Hobby Lobby*, the Departments have extended the same accommodation to closely held for-profit entities. 80 Fed. Reg. at 41,323-41,328; see 45 C.F.R. 147.131(b)(2)(ii). The regulations allow an objecting employer to opt out of any requirement to "contract, arrange, pay, or refer

---

The Departments reiterated that the exemption was intended to respect the autonomy of houses of worship and concluded that it should be available even if a house of worship hires or provides charitable services to some individuals of other faiths. *Ibid.*; see 78 Fed. Reg. at 39,874.

14

for contraceptive coverage," 78 Fed. Reg. at 39,878, by providing notice of its objection in either of two ways.

First, an eligible employer can opt out by sending a form to the plan's health insurer or, in the case of a self-insured plan, to its third-party administrator (TPA). *Hobby Lobby*, 134 S. Ct. at 2782; see 29 C.F.R. 2590.715-2713A(b)(1)(ii)(A); 45 C.F.R. 147.131(c)(1)(i). That form, known as EBSA Form 700, requires the employer to certify that it has a religious objection to providing contraceptive coverage and that it is eligible to opt out. *EBSA Form 700*, http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertification form.pdf (Aug. 2014). The only other information the form requires is the name and contact information of the person making the certification. *Ibid.*

Second, the Departments added an alternative opt-out procedure after this Court's interim order in *Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014) (*Wheaton*). In *Wheaton* and two of the cases currently before the Court, this Court granted interim injunctions allowing eligible organizations "to opt out of the contraceptive mandate by providing written notifications of their objections to the Secretary of HHS, rather than to their insurers or [TPAs]." *Hobby Lobby*, 134 S. Ct. at 2763 n.9; see *Wheaton*, 134 S. Ct. at 2807; 135 S. Ct. 2924 (*Zubik*); 134 S. Ct. 1022 (*Little Sisters*). In light of the Court's order in *Wheaton*, the Departments augmented the accommodation to provide all eligible employers with the option to opt out by notifying HHS. 29 C.F.R. 2590.715-2713A(b)(1)(ii)(B) and (c)(1); 45 C.F.R. 147.131(c)(1); see 79 Fed. Reg. 51,092 (Aug. 27, 2014). The employer need not use any particular form and need only provide information comparable to what Wheaton had

15

already provided to the government in litigation:  the basis on which it is eligible to opt out, as well as the type of plan it offers and contact information for the plan's insurer or TPA.  *Ibid.*; see *Wheaton*, 134 S. Ct. at 2815 (Sotomayor, J., dissenting).

3. If an objecting employer opts out by notifying HHS or its insurer or TPA, it is relieved of any obligation to provide contraceptive coverage.  Instead, the regulations provide for a third party to make separate payments for contraceptive services for employees (and their covered dependents) who choose to use those services.  78 Fed. Reg. at 39,875-39,880.

a. The identity of the third party, and the precise workings of the regulations, depend on the nature of the objecting employer's health plan.

*Insured plans.*  If the employer has an insured plan—that is, if it purchases coverage from a health insurer such as BlueCross BlueShield—the regulations require the insurer to provide employees with separate contraceptive coverage.  *Hobby Lobby*, 134 S. Ct. at 2763.  Insurers are already subject to the statutory requirement to provide coverage for preventive services, including contraceptive services.  42 U.S.C. 300gg-13(a).  But if an eligible employer opts out, the regulations assign the insurer "*sole* responsibility for providing such coverage."  45 C.F.R. 147.131(c)(1)(i) (emphasis added).  The insurer must "exclude contraceptive coverage from the employer's plan and provide separate payments for contraceptive services for plan participants without imposing any cost-sharing requirements on the eligible organization, its insurance plan, or its employee beneficiaries."  *Hobby Lobby*, 134 S. Ct. at 2763; see 45 C.F.R. 147.131(c).  The same accommodation is available to colleges and universi-

16

ties that arrange for their students to obtain coverage from health insurers. 45 C.F.R. 147.131(f); see 78 Fed. Reg. at 39,881-39,882.[3]

*Self-insured plans.* Rather than purchasing coverage from an insurer, some employers "self-insure" by assuming direct financial responsibility for employee health claims. *Benefits Survey* 174. Self-insured employers typically hire an insurance company or other outside entity to serve as a TPA responsible for developing a network of health-care providers, negotiating payment rates, and processing claims for benefits. *Ibid.*; see 78 Fed. Reg. at 39,879-39,880 & n.40. If a self-insured employer opts out, the regulations designate the TPA as the plan "administrator" with sole legal responsibility for providing contraceptive coverage under ERISA. 29 C.F.R. 2510.3-16(b) and (c), 2590.715-2713A(b)(2); see 78 Fed. Reg. at 39,893.[4]

---

[3] The regulations require the insurer to bear the expense of providing separate contraceptive coverage, but that cost is offset by savings resulting from the coverage of contraceptive services. *Hobby Lobby*, 134 S. Ct. at 2763; see 78 Fed. Reg. at 39,877.

[4] Under ERISA, a plan "administrator" is a "person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. 1002(16)(A). ERISA plans are typically governed by multiple "instruments," a term that "encompasses [the] formal or legal documents under which a plan is set up or managed." *Faircloth* v. *Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996), cert. denied, 519 U.S. 1077 (1997). If a self-insured employer opts out by submitting the self-certification form to its TPA, the regulations treat that form as a plan instrument that, among other things, has the legal effect of designating the TPA as the plan administrator responsible for providing contraceptive coverage. 29 C.F.R. 2510.3-16(b). If a self-insured employer opts out by notifying HHS directly, the Department of Labor sends a separate notification to the TPA, and the regulations treat that notification as a plan instrument designating the TPA as the plan

17

The TPA "must 'provide or arrange payments for contraceptive services' for the organization's employees without imposing any cost-sharing requirements on the eligible organization, its insurance plan, or its employee beneficiaries." *Hobby Lobby*, 134 S. Ct. at 2763 n.8 (quoting 78 Fed. Reg. at 39,893); see 29 C.F.R. 2590.715-2713A(b)(2). The TPA may obtain compensation for the cost of providing contraceptive coverage by seeking a reduction in the user fees insurers pay to participate in the Affordable Care Act's Exchanges. 29 C.F.R. 2590.715-2713A(b)(3); 45 C.F.R. 156.50(d); see *Hobby Lobby*, 134 S. Ct. at 2763 n.8.

*Self-insured church plans.* A church plan is "a plan established and maintained * * * for its employees (or their beneficiaries) by a church or by a convention or association of churches." 29 U.S.C. 1002(33)(A). A church plan may also provide health coverage for employees of tax-exempt organizations that are "controlled by or associated with" a church. 29 U.S.C. 1002(33)(C)(ii)(II). Church plans are generally exempt from regulation under ERISA. 29 U.S.C. 1003(b)(2). Because the government's authority to require a TPA to provide separate contraceptive coverage under the regulations derives from ERISA, the government cannot require the TPA for a self-insured church plan to provide separate contraceptive coverage if the employer opts out. 80 Fed. Reg. at 41,323 n.22; *Little Sisters* Pet. App. 32a. The government instead offers to compensate the TPA if it provides separate coverage voluntarily. *Ibid.* The employer is

---

administrator responsible for providing separate contraceptive coverage. *Ibid.*

18

relieved of its obligations whether or not the TPA chooses to provide coverage.[5]

b. In all cases, the regulations mandate strict separation between the contraceptive coverage provided by an insurer or TPA and other coverage provided on behalf of the employer. Insurers and TPAs must provide contraceptive coverage without imposing "any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization" or on its "group health plan." 45 C.F.R. 147.131(c)(2)(ii); see 29 C.F.R. 2590.715-2713A(b)(2) (same). Insurers and TPAs must notify employees of the availability of separate contraceptive coverage, must do so "separate[ly] from" materials distributed in connection with the coverage provided by the employer, and must make clear that the employer "does not administer or fund contraceptive benefits." 29 C.F.R. 2590.715-2713A(d); 45 C.F.R. 147.131(d).[6] The regulations thus "effectively exempt[]" objecting employers from the contraceptive-coverage requirement. *Hobby Lobby*, 134 S. Ct. at 2763.

4. "Many religiously affiliated educational institutions, hospitals, and social-service organizations have taken advantage of the accommodation." *RCAW* Pet. App. 12a. In the self-insured context, HHS informs this Office that in 2014, it provided user-fee reductions to compensate TPAs for making contraceptive cover-

---

[5] Because the regulations requiring insurers to provide separate coverage do not depend on ERISA, they apply to the insurers of church plans in the same manner as insurers of other plans.

[6] See HHS, *Notice of Availability of Separate Payments for Contraceptive Services*, https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/cms-10459-enrollee-notice.pdf (last visited Feb. 9, 2016) (model notice).

19

age available to more than 600,000 employees and beneficiaries.[7] More broadly, a 2015 survey found that 10% of *all* nonprofit organizations with 1000 or more employees had invoked the accommodation. Laurie Sobel et al., Kaiser Family Found., *Data Note: Are Nonprofits Requesting an Accommodation for Contraceptive Coverage?* 2 (Dec. 2015). Those employers include many religious hospitals and universities, some of which are among the Nation's largest health care and educational institutions. *Id.* at 2-3.

### C. The Present Controversy

1. Petitioners include 29 nonprofit religious employers that object to contraceptives on religious grounds.[8] Those employer-petitioners provide health coverage to their employees through insured plans, self-insured plans, and ERISA-exempt self-insured church plans. *Zubik* Pet. App. 20a, 24a-25a; *RCAW* Pet. App. 12a-15a; *ETBU* Pet. App. 9a; *Little Sisters* Pet. App. 33a-38a. Three of the employer-petitioners are Catholic dioceses that are automatically exempt from the contraceptive-coverage requirement as houses of worship. *Zubik* Pet. App. 24a-25a; *RCAW* Pet.

---

[7] That figure includes both men and women covered under the relevant plans.

[8] Many petitioners object to all contraceptives. *Zubik* Br. 17; *ETBU* Br. 30. Others object to certain contraceptive methods that primarily operate to prevent fertilization, but may also prevent the implantation of a fertilized egg in the uterus. *ETBU* Br. 26-27, 31, 33, 36; see J.A. 922-925. Petitioners regard those methods as causing abortions, but federal law, "which define[s] pregnancy as beginning at implantation, do[es] not so classify them." *Hobby Lobby*, 134 S. Ct. at 2763 n.7 (citation omitted); see 45 C.F.R. 46.202(f); 62 Fed. Reg. 8611 (Feb. 25, 1997).

20

App. 13a; see 45 C.F.R. 147.131(a). The remaining employer-petitioners are eligible to opt out.

The employer-petitioners eligible to opt out have more than 5300 full-time employees and provide health coverage to thousands of additional dependents.[9] Four of those petitioners are colleges or universities that have also sought relief in connection with their student health plans; those petitioners have more than 12,000 students. J.A. 358, 1312, 1384. Petitioners also include the sponsors of two multi-employer church plans that have sought relief on behalf of all eligible employers participating in their plans. *Little Sisters* Pet. App. 14a-15a. Those participating employers have approximately 16,000 full-time employees. J.A. 1003, 1179. Organizations with tens of thousands of additional employees and students have brought parallel challenges. See, *e.g.*, *Catholic Health Care Sys.* v. *Burwell*, 796 F.3d 207, 214 (2d Cir. 2015) (suit filed by a hospital system that "provides coverage to approximately 11,000 employees and their dependents").

2. Petitioners filed nine suits challenging the accommodation regulations under RFRA, which provides that the government may not "substantially burden a person's exercise of religion" unless that burden is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. 2000bb-1(a) and (b)(2). In the district courts, petitioners' suits resulted in three preliminary injunctions, *Zubik* Pet. App. 20a-24a; *Little Sisters* Pet. App. 40a-42a; three permanent injunctions, *Zubik* Pet. App. 25a-27a; *ETBU* Pet. App. 9a; one order denying pre-

---

[9]  J.A. 76, 107, 367, 372, 377, 382, 392, 397, 402, 408, 638, 647, 736, 978, 1194, 1206, 1315-1317, 1382.

21

liminary relief, *Little Sisters* Pet. App. 39a-40a; one final judgment denying relief, *RCAW* Pet. App. 16a-17a; and one final judgment granting relief to a petitioner with a self-insured plan but denying it to petitioners with insured plans and self-insured church plans, *id.* at 17a-18a.

3. On appeals from those orders and judgments, the Third, Fifth, Tenth, and D.C. Circuits rejected petitioners' RFRA challenges. *Zubik* Pet. App. 1a-47a; *RCAW* Pet. App. 1a-93a; *ETBU* Pet. App. 1a-28a; *Little Sisters* Pet. App. 2a-149a.

a. All four courts of appeals held that the accommodation does not "substantially burden" petitioners' exercise of religion within the meaning of RFRA. The courts emphasized that, under the regulations, "the act of opting out * * * excuses [objecting employers] from participating in the provision of contraceptive coverage" and ensures that they do not "provide, pay for, or otherwise facilitate that coverage." *Little Sisters* Pet. App. 60a. Instead, the regulations place those obligations on third parties—an approach that is "typical of religious objection accommodations that shift responsibility to non-objecting entities * * * after an objector declines to perform a task on religious grounds." *Id.* at 68a-69a; see, *e.g.*, *RCAW* Pet. App. 35a.

The courts of appeals emphasized that they were not questioning petitioners' religious views about the accommodation. *Little Sisters* Pet. App. 55a; see *id.* at 86a-87a & n.46; *Zubik* Pet. App. 29a-30a; *RCAW* Pet. App. 28a-29a; *ETBU* Pet. App. 13a. But the courts explained that petitioners' substantial-burden arguments either mischaracterized the regulations or "amount[ed] to an objection to the regulations' re-

22

quirement that third parties provide * * * products and services that [petitioners] believe are sinful." *RCAW* Pet. App. 37a; see, *e.g.*, *id.* at 40a-48a; *Little Sisters* Pet. App. 63a-95a. The courts held that, as a *legal* matter, petitioners' sincere objections to the government's arrangements with third parties do not establish a substantial burden on petitioners' own exercise of religion. Thus, Judge Smith explained for the Fifth Circuit that "RFRA does not entitle [petitioners] to block third parties from engaging in conduct with which they disagree." *ETBU* Pet. App. 23a; accord *Zubik* Pet. App. 37a; *RCAW* Pet. App. 38a; *Little Sisters* Pet. App. 91a.

b. The D.C. Circuit also held, in the alternative, that the regulations are consistent with RFRA because they are the least restrictive means of furthering the government's "compelling interest in providing women full and equal benefits of preventive health coverage." *RCAW* Pet. App. 66a; see *id.* at 49a-73a. The court explained that "use of contraceptives furthers women and children's health in a variety of ways" and that health coverage omitting contraceptives "would not give women access, equal to that enjoyed by men, to the full range of health care services recommended for their specific needs." *Id.* at 60a, 64a. The court further held that the regulations are the least-restrictive means of furthering those interests. *Id.* at 66a-72a. The court explained that petitioners' proffered alternatives would impose "financial, logistical, informational, and administrative burdens" on women by requiring them to seek out contraceptive coverage from a separate government program. *Id.* at 68a-69a. The court concluded that those burdens would frustrate the basic aims of the

23

preventive-services requirement and violate the principle that "RFRA does not permit religious exercise to 'unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling.'" *Id.* at 70a (quoting *Hobby Lobby*, 134 S. Ct. at 2787 (Kennedy, J., concurring)).

c. The decisions of the Third, Fifth, and D.C. Circuits were unanimous. In the Tenth Circuit, Judge Baldock dissented in part. *Little Sisters* Pet. App. 122a-149a. He agreed that the regulations do not impose a substantial burden on the exercise of religion by employers with insured plans, but would have reached a different result for employers with self-insured plans. *Id.* at 122a, 127a-128a.[10]

4. The courts of appeals denied rehearing en banc. *Zubik* Pet. App. 135a-137a; *RCAW* Pet. App. 222a-224a; 807 F.3d 630 (*ETBU*); 799 F.3d 1315 (*Little Sisters*). No judge dissented in the Third Circuit. *Zubik* Pet. App. 135a-137a. In the Fifth Circuit, Judge Jones, joined by Judges Clement and Owen, dissented. 807 F.3d at 631-635. Judge Jones would have held that the accommodation substantially burdens the exercise of religion, but she expressed no view on whether the regulations qualify as the least-restrictive means of furthering a compelling interest. *Id.* at 634-635.[11] In the Tenth Circuit, Judge Hartz, joined by Judges Kelly, Tymkovich, Gorsuch, and

---

[10] Judge Baldock also agreed with the denial of relief to the lead petitioners in *Little Sisters* because those entities provide coverage through a self-insured church plan and the plan's primary TPA has made clear that it would not provide contraceptive coverage if those petitioners opted out. *Little Sisters* Pet. App. 145a.

[11] Judge Elrod voted in favor of rehearing en banc, but did not join Judge Jones's dissent. 807 F.3d at 631.

24

Holmes, dissented on the same grounds.  799 F.3d at 1316-1318.  In the D.C. Circuit, Judge Brown, joined by Judge Henderson, dissented and would have held that the regulations violate RFRA.  *RCAW* Pet. App. 231a-251a.  Judge Kavanaugh dissented on narrower grounds.  *Id.* at 252a-278a.  He would have required the government to allow objecting employers to opt out without identifying their insurers and TPAs.  *Id.* at 277a.  But he emphasized that "[t]he Government may of course continue to require [petitioners'] *insurers* [*and TPAs*] to provide contraceptive coverage to [petitioners'] employees" because "RFRA does not authorize religious organizations to dictate the independent actions of third-parties."  *Id.* at 278a (citation and internal quotation marks omitted).

5. Four other courts of appeals have addressed RFRA challenges to the accommodation.  The Second, Sixth, and Seventh Circuits have held, consistent with the decisions below, that the accommodation does not substantially burden the exercise of religion.  Only the Eighth Circuit has disagreed.[12]

---

[12] See *Michigan Catholic Conference & Catholic Family Servs.* v. *Burwell*, 807 F.3d 738, 749 (6th Cir. 2015); *Grace Schools* v. *Burwell*, 801 F.3d 788, 807-808 (7th Cir. 2015); *Catholic Health Care Sys.*, 796 F.3d at 223; *Wheaton College* v. *Burwell*, 791 F.3d 792, 799-801 (7th Cir. 2015); *University of Notre Dame* v. *Burwell*, 786 F.3d 606, 618-619 (7th Cir. 2015), petition for cert. pending, No. 15-812 (filed Dec. 18, 2015).  But see *Dordt College* v. *Burwell*, 801 F.3d 946, 949-950 (8th Cir. 2015), petition for cert. pending, No. 15-774 (filed Dec. 15, 2015); *Sharpe Holdings, Inc.* v. *HHS*, 801 F.3d 927, 945-946 (8th Cir. 2015), petition for cert. pending, No. 15-775 (filed Dec. 15, 2015).

25

## SUMMARY OF ARGUMENT

The accommodation made available under the Affordable Care Act respects religious liberty by allowing objecting employers to opt out of the generally applicable requirement to provide contraceptive coverage.  It also respects the rights, dignity, and autonomy of female employees, students, and beneficiaries by arranging for third parties to provide those women with the full and equal health coverage to which they are entitled by law.  That approach embodies precisely the sort of "sensible balance[]" that Congress sought in enacting RFRA.  42 U.S.C. 2000bb(a)(5).

I.  The accommodation does not substantially burden the exercise of religion under RFRA.

A. The accommodation allows an objecting employer to opt out of the contraceptive-coverage requirement by notifying HHS of its objection, or by notifying its insurer or TPA directly.  That notice relieves the employer of any duty to provide contraceptive coverage.  Instead, the government arranges for the insurer or TPA to provide the required coverage and mandates that it be kept strictly separate from coverage provided on the employer's behalf.  The accommodation thus "effectively exempt[s]" objecting employers from the contraceptive-coverage requirement.  *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2763 (2014).

Petitioners state that the accommodation requires them to "authorize" the provision of contraceptive coverage using their "plan infrastructure."  To the extent those statements describe petitioners' religious judgment that opting out would make them complicit in conduct they deem wrongful, we neither question that judgment nor quarrel with the manner in which

26

petitioners choose to express it.  As a *legal* matter, however, petitioners' briefs mischaracterize the way the accommodation works.  Once objecting employers opt out, the government invokes its own independent authority to arrange for insurers and TPAs to provide contraceptive coverage.  That coverage is delivered through arrangements among third parties—not through an "infrastructure" owned or controlled by employers.

B. Petitioners' sincere religious objections to the government's arrangements with third parties do not establish a cognizable burden under RFRA.  This Court has instructed that an adherent may not use a religious objection to dictate the government's con-duct of its internal affairs.  See *Bowen* v. *Roy*, 476 U.S. 693, 699-701 (1986).  The same principle applies where, as here, an adherent objects to taking an otherwise-unobjectionable act because it believes that act will make it complicit in the government's subse-quent arrangements with third parties.  Treating such objections as sufficient to establish a substantial bur-den under RFRA would have startling consequences, subjecting countless government programs to strict scrutiny.

As seven courts of appeals have emphasized, it would be particularly inappropriate to hold that the government's dealings with third parties can form the basis for a substantial burden where, as here, the government is acting to fill a gap left because religious objectors have opted out of a generally applicable law.  On petitioners' view of RFRA, all such accommoda-tions—or, indeed, *any* requirement that a religious objector give notice of its objection—could be cast as a substantial burden and subjected to strict scrutiny.

27

Such a rule would profoundly impair the government's ability to accommodate religious objections and protect the vital interests of third parties. The Court should decline to adopt an understanding of RFRA so inconsistent with our Nation's tradition of religious accommodation.

II. Even if petitioners could establish a substantial burden on their exercise of religion, the accommodation would be consistent with RFRA because it furthers a compelling governmental interest by the least restrictive means available.

A. The accommodation "serves the Government's compelling interest in providing insurance coverage that is necessary to protect the health of female employees." *Hobby Lobby*, 134 S. Ct. at 2785-2786 (Kennedy, J., concurring); accord *id.* at 2799-2800 & n.23 (Ginsburg, J., dissenting). The compelling nature of that interest is confirmed by extensive medical evidence demonstrating that contraceptives are an essential component of women's health care.

Petitioners do not seriously dispute the medical evidence supporting the contraceptive-coverage requirement. Instead, they assert that the interests at stake cannot be regarded as compelling because the requirement is subject to exceptions. But most laws have exceptions. To take just a few examples, the tax code, the draft, and Title VII all contain significant secular and religious exceptions—yet no one could deny that they serve compelling interests.

The specific features of the exceptions on which petitioners rely here further undermine their argument. First, the Affordable Care Act's grandfathering provision is a transitional measure and the number of employees in grandfathered plans continues to decline.

28

Second, small employers are not exempt from the contraceptive-coverage requirement. If they offer health coverage, they must include contraceptive coverage. And if they do not, their employees generally obtain coverage from other sources, all of which must by law include contraceptive coverage. Third, the automatic exemption for houses of worship is consistent with—and was predicated upon—our Nation's long tradition of recognizing a special sphere of autonomy for houses of worship. Petitioners' contention that the government cannot furnish such special solicitude without extending the same treatment to all religious objectors—including, presumably, for-profit corporations, see *Hobby Lobby*, 134 S. Ct. at 2767-2775—is profoundly at odds with that tradition and with RFRA's animating spirit.

B. The accommodation serves the government's compelling interest by the least restrictive means available. By arranging for separate contraceptive coverage from the same insurers and TPAs that administer the affected women's other health coverage, the accommodation ensures that those women automatically receive the coverage to which they are entitled and that they can obtain contraceptive services from their regular doctors, as part of their regular medical care. Petitioners propose various government-run programs as supposed less-restrictive means of furnishing coverage. But the legal authority to implement those alternatives does not now exist. Petitioners' employees and students would therefore be stripped of their existing right to coverage unless and until Congress acted, and RFRA cannot in any event be interpreted to require Congress to enact a new statutory benefits program. And even if Con-

29

gress acted, petitioners' alternatives would require women—and only women—to take burdensome steps "to learn about, and to sign up for, a new government funded and administered health benefit" in order to get coverage for an important aspect of their medical care. *Hobby Lobby*, 134 S. Ct. at 2783 (citation omitted). Those burdens would thwart the basic purposes of the Women's Health Amendment, which was enacted to ensure that women receive *equal* health coverage and to remove barriers to the use of preventive services. Those disproportionate burdens would also contravene this Court's instruction that courts applying RFRA "must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries" like the women whose health coverage is at stake here. *Cutter* v. *Wilkinson*, 544 U.S. 709, 720, 722 (2005).

**ARGUMENT**

In the Women's Health Amendment incorporated into the Affordable Care Act, Congress sought to ensure that employers providing health coverage include "coverage that is necessary to protect the health of female employees." *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2785-2786 (2014) (Kennedy, J., concurring). In implementing that directive, HRSA determined that coverage for contraceptive services prescribed for women by their doctors is an essential component of the full and equal coverage mandated by Congress. That determination is supported by a wealth of evidence that demonstrates the importance of contraceptive services to the health and well-being of women and their families, and the disproportionate burdens imposed on women by obstacles to obtaining those services.

30

Petitioners object to contraceptives on religious grounds.  For that reason, they object to complying with the requirement that contraceptive coverage be included in the health coverage they provide or arrange for their employees and students.  Those objections merit great respect.  But petitioners employ many thousands of workers and educate many thousands of students, not all of whom share petitioners' beliefs.  For some, the use of contraception may be medically necessary to avoid a dangerous or even life-threatening pregnancy.  For others, the use of contraception may be a morally responsible choice consistent with the tenets of their own faith.  And still others may rely on contraception to allow them to make important decisions about their families and careers and how they will participate in the social and economic life of our Nation.  The basic human dignity of these employees and students and their families—and the choices they make for reasons of health, morality, or personal autonomy—also merit great respect.  Indeed, reciprocal respect and protection under the law for petitioners' religious objections *and* for the rights and dignity of those who may not share petitioners' beliefs is essential to the harmonious functioning of a society like ours, in which people of every faith and belief live and work side by side.

The accommodation that has been afforded to petitioners embodies that principle of reciprocal respect and protection.  As this Court recognized in *Hobby Lobby*, the accommodation is "a system that seeks to respect [petitioners'] religious liberty" by extinguishing any obligation on their part to provide contraceptive coverage, while still ensuring that their employees and students "have precisely the same access to all

31

FDA-approved contraceptives" as the law guarantees to employees and students generally. 134 S. Ct. at 2759. The accommodation strikes precisely the "sensible balance[] between religious liberty and competing prior governmental interests," 42 U.S.C. 2000bb(a)(5), that Congress made the touchstone under RFRA—a balance that takes on particular importance where, as here, the statutory entitlements and liberty interests of third parties are at stake. See *Cutter* v. *Wilkinson*, 544 U.S. 709, 720 (2005).

Petitioners, however, argue that RFRA goes much further and authorizes them not merely to decline to provide the contraceptive coverage to which they object, but also to prevent the government from providing that coverage to petitioners' employees and students through independent arrangements with insurers and TPAs. Petitioners make that argument because they sincerely believe that, under the system the government has created, the very act of opting out would render them complicit in bringing about actions by the government and by third parties to which they object on religious grounds.

But the reading of RFRA that petitioners espouse—whether expressed as an argument that the act of opting out substantially burdens their religious exercise; that women's interest in receiving contraceptive coverage is not important enough to overcome their religious objection; or that Congress must enact a new program to provide contraceptive coverage, even if doing so imposes burdens on women—would relegate the interests of petitioners' employees and students to a subordinate, unequal status before the law. Because petitioners object, their employees and students would suffer the loss of statutory rights and

32

benefits that may be of central importance to their
health, their concept of moral responsibility, and even
their sense of their place in the world.  And they
would be deprived of those rights because their em-
ployer holds religious convictions that they may not
share.

That is a divisive reading of the law.  The free ex-
ercise of religion protected under the First Amend-
ment and RFRA creates a sphere of religious liberty
and autonomy that is to be free of governmental inter-
ference.  But that protection is afforded by a Constitu-
tion and fabric of laws that presuppose that others in
our pluralistic and democratic society also have a
sphere of liberty and autonomy deserving of the law's
respect and protection—including protection against
deprivation of their rights and benefits under the law
on the basis of someone else's religious beliefs.  Peti-
tioners' contrary view is seriously out of step with our
legal and societal traditions, and it could not have
been within the contemplation of the Congress that
enacted RFRA.

## I. THE ACCOMMODATION REGULATIONS DO NOT IMPOSE A SUBSTANTIAL BURDEN COGNIZABLE UNDER RFRA

RFRA protects religious liberty by mandating
exemptions to generally applicable laws that substan-
tially burden the exercise of religion unless those
burdens are the least restrictive means of furthering
compelling interests.  42 U.S.C. 2000bb-1.  In this
case, however, petitioners have already received the
relief RFRA would ordinarily provide:  they are eligi-
ble to opt out under regulations that render them
"effectively exempt[]" from the generally applicable
contraceptive-coverage requirement.  *Hobby Lobby*,

33

134 S. Ct. at 2759, 2763. Petitioners nonetheless assert that the accommodation itself substantially burdens their exercise of religion, and therefore triggers strict judicial scrutiny. That is so, petitioners maintain, because the government (1) requires them to give notice of their refusal to provide contraceptive coverage in a specified manner, and (2) arranges for third parties—the insurers and TPAs that provide or administer other benefits for petitioners' employees—to provide the required coverage if petitioners themselves opt out.

We do not suggest that petitioners' assertion of a substantial burden rests on any theological error or misjudgment, or that their beliefs are not sincerely held. Nor do we suggest that the burden petitioners have identified cannot qualify as a substantial burden within the meaning of RFRA merely because opting out of the contraceptive-coverage requirement is, as an objective matter, administratively easy.

But we cannot agree—and seven courts of appeals have not agreed—with petitioners' *legal* contention that their sincere objection establishes a cognizable burden under RFRA and subjects the accommodation to strict scrutiny. A sincere objection to *opting out* of a legal requirement based on the knowledge that the government will then arrange for others to fulfill the requirement does not establish a substantial burden cognizable under RFRA. That is how religious accommodations often function. And, as this case illustrates, accommodations structured in that manner can be essential to protecting third parties from the harms to their statutory entitlements, their personal autonomy, and their very dignity that could otherwise result from religious exemptions to generally applicable

34

laws that grant them important rights and benefits. There is no precedent under RFRA, or in the long history of this Court's Free Exercise jurisprudence, for applying strict scrutiny in these circumstances.

### A. The Regulations Allow Petitioners To Opt Out Of The Contraceptive-Coverage Requirement

1. The Affordable Care Act and its implementing regulations require insurers and employer-sponsored group health plans to cover preventive services, including contraceptive services, without cost-sharing. 42 U.S.C. 300gg-13(a)(4); 45 C.F.R. 147.130(a)(1)(iv). In *Hobby Lobby*, this Court considered a RFRA challenge to that requirement brought by closely held for-profit companies that (at the time) were *not* eligible to opt out. 134 S. Ct. at 2759-2760. The Court held that the requirement substantially burdened the exercise of religion because the companies faced substantial fines unless they provided coverage that violated the owners' religious beliefs. *Id.* at 2775-2776.

*Hobby Lobby* further held that the requirement was not the least-restrictive means of furthering the government's interests because the already-existing accommodation for religious nonprofit employers could be extended to for-profit companies. 134 S. Ct. at 2782-2783. Under the accommodation, the Court explained, "the plaintiffs' female employees would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to face minimal logistical and administrative obstacles, because their employers' insurers [and TPAs] would be responsible for providing information and coverage." *Id.* at 2782 (citation and internal quotation marks omitted). The Court had no occasion to decide whether the accommodation

35

"complies with RFRA for purposes of all religious claims." *Ibid.* But the Court's decision was predicated on the availability of the accommodation as a less-restrictive alternative.

2. Petitioners are eligible for the precise accommodation on which *Hobby Lobby* relied. Under the accommodation, an eligible employer may opt out of the contraceptive-coverage requirement by taking either of two actions: notifying HHS that it objects to providing coverage and telling HHS who its insurer or TPA is, or notifying its insurer or TPA directly using a one-page form. Either step extinguishes the employer's obligation to provide, arrange, or pay for the coverage to which it objects. *Hobby Lobby*, 134 S. Ct. at 2763. And either step conveys to the employer's insurer or TPA (either directly or via the government) that the employer may legally decline to provide coverage.

If an employer opts out, the government places the sole responsibility to provide separate coverage on the insurer or TPA.[13] To ensure that the employer incurs no cost, the regulations prohibit the insurer or TPA from imposing "any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization" or the "group health plan." 45 C.F.R. 147.131(c)(2)(ii); see 29 C.F.R. 2590.715-2713A(b)(2) (same). The regulations also require the insurer or TPA to take sole responsibility for notifying employees of the availability of payments for contraceptive services, to provide that notice "separate

---

[13] If the employer has an ERISA-exempt self-insured church plan, the government offers the TPA a financial incentive to provide separate coverage voluntarily. 80 Fed. Reg. at 41,323 n.22; *Little Sisters* Pet. App. 32a.

36

from" any communications related to the coverage provided by the employer, and to make clear that the employer "does not administer or fund contraceptive benefits."    45 C.F.R. 147.131(d); see 29 C.F.R. 2590.715-2713A(d) (same).  In this manner, the regulations "effectively exempt[]" objecting employers such as petitioners from the contraceptive-coverage requirement.  *Hobby Lobby*, 134 S. Ct. at 2763; see *id.* at 2763 n.9 (describing the mechanism for invoking the accommodation as an "opt out").

3. Petitioners nevertheless assert that the exemption substantially burdens their religious exercise within the meaning of RFRA.  But petitioners do not object to the act of notifying their insurers and TPAs that they have religious objections to providing contraceptive coverage.  Nor do petitioners object to the act of notifying the government of their objections and identifying their insurers and TPAs—in fact, many of them have provided that information in this litigation.[14]  Thus, petitioners have never suggested that they would have any religious objection if they were required to provide exactly the same notice to opt out of the contraceptive-coverage requirement, but the government thereafter took no steps to ensure that the affected women receive coverage.  Petitioners' objections instead hinge on the fact that if they opt out, the regulations require (or encourage) the insurers and TPAs that provide or administer other health coverage for their employees—companies like Aetna, BlueCross BlueShield, and Highmark, J.A. 113-114, 122, 402, 1174, 1315, 1317—to provide the required contraceptive coverage separately.

---

[14] See, *e.g.*, J.A. 76, 85, 113-114, 122, 361-362, 402, 408, 647, 740, 802, 993, 995, 1192, 1204, 1315-1317, 1389, 1395.

37

Petitioners use various rhetorical formulations to express their objection to this arrangement. For example, the *Zubik* petitioners assert (*e.g.*, Br. 1) that the accommodation requires them to "sign and submit documentation that authorizes, obligates, and incentivizes" their insurers and TPAs to provide contraceptive coverage. And the *ETBU* petitioners assert (*e.g.*, Br. 2) that the accommodation would use their "plan infrastructure" to deliver contraceptive coverage.

To the extent petitioners are explicating their religious judgment that opting out of the contraceptive-coverage requirement would render them morally responsible for the government's subsequent actions, they have every right to express that judgment in these or any other terms. But that does not mean that the Court is bound to accept petitioners' characterizations in deciding whether, as a legal matter, they have established a cognizable burden on their exercise of religion that triggers RFRA scrutiny. And that is of critical importance, because petitioners' briefs do not accurately describe how the accommodation actually works.

Petitioners are not, in fact, required to exercise any contractual or other authority that they possess to "authorize, obligate, or incentivize" insurers or TPAs to provide contraceptive coverage. To the contrary, employers that opt out extinguish any legal obligation they would otherwise have to "contract, arrange, pay, or refer" for contraceptive coverage. 78 Fed. Reg. at 39,878. The government instead exercises its own independent authority to require insurers and TPAs to provide the coverage petitioners have elected not to provide: The Affordable Care Act itself imposes an obligation on insurers to provide contraceptive cover-

38

age, 42 U.S.C. 300gg-13, and in the self-insured context it is the government by regulation—not the objecting employer—that designates the relevant TPA as the entity responsible for providing separate contraceptive coverage under ERISA, 29 C.F.R. 2510.3-16(b); *Zubik* Pet. App. 35a-36a. See pp. 15-18, *supra*. The employer's act of opting out gives rise to the *occasion* for the government to act. But that does not mean that the government's action and the insurer's or TPA's legal obligation to provide contraceptive coverage *derive from* any authorization or permission given by the employer.

Nor does the government, in fact, provide contraceptive coverage using any "plan infrastructure" belonging to petitioners. If an objecting employer has an insured plan, the regulations provide that the insurer must "[e]*xpressly exclude* contraceptive coverage from the group health insurance coverage provided in connection with the group health plan" and must instead "[p]rovide separate payments" for contraceptive services. 45 C.F.R. 147.131(c)(2)(i) (emphasis added). If an objecting employer has a self-insured plan subject to ERISA, the Departments' authority to require the TPA to provide contraceptive coverage derives from ERISA. See 29 C.F.R. 2510.3-16(b); 80 Fed. Reg. at 41,323. As a result, the coverage provided by the TPA is, as a formal ERISA matter, part of the same "plan" as the coverage provided by the employer. See 78 Fed. Reg. at 39,879-39,880.[15] But an ERISA plan in this sense is simply "a set of rules that

---

[15] If the employer has a self-insured church plan, its TPA cannot become the plan administrator by operation of 29 C.F.R. 2510.3-16(b) and any contraceptive coverage voluntarily provided by the TPA is not part of the employer's ERISA-exempt plan.

39

define the rights of a beneficiary and provide for their enforcement." *Pegram* v. *Herdrich*, 530 U.S. 211, 223 (2000). The rules governing contraceptive coverage are established by the government, not the employer, and the employer does not fund, control, or have any other involvement in that separate coverage—instead, the TPA alone does so. 29 C.F.R. 2510.3-16(b) and (c); see 78 Fed. Reg. at 39,879-39,880; *Wheaton*, 791 F.3d at 800.[16]

Although petitioners are generally vague about what they mean when they state that the accommodation uses their "plan infrastructure," at one point they quote the Departments in an effort to suggest that the accommodation regulations rely on "insurance coverage network[s]" or "coverage administration infrastructure" belonging to objecting employers. *ETBU* Br. 18-19 (quoting 80 Fed. Reg. at 41,328). They are mistaken. An "insurance coverage network" is a set of doctors, hospitals, and other providers with which an insurer or TPA has negotiated rates of payment. The quoted document explained that the accommodation ensures that women can get contraceptive services

---

[16] In any event, neither the ERISA status of the separate coverage provided by the TPA nor any other feature of the regulations unique to self-insured plans subject to ERISA could constitute a substantial burden under RFRA. Only three petitioners have self-insured plans subject to ERISA, see *RCAW* Pet. App. 14a; *ETBU* Pet. App. 9a; *Little Sisters* Pet. App. 35a, and those petitioners could avoid any objectionable features of the regulations applicable to such plans by switching to insured plans, *Little Sisters* Pet App. 70a n.32; 77 Fed. Reg. at 16,507. Petitioners have never suggested that the alternative of switching to an insured plan would constitute a substantial burden. Cf. *Benefits Survey* 29-30, 176 (noting that the costs of insured and self-insured plans are comparable and that most smaller employers use insured plans).

40

from health care providers in their existing "insurance coverage networks"—typically, from their regular doctors. 80 Fed. Reg. at 41,328. And because those providers already have relationships with the women's insurers and TPAs, they also have the "coverage administration infrastructure" to verify the women's eligibility for benefits and bill the insurers and TPAs for contraceptive services. *Ibid.* But the "networks" and "infrastructure" through which the insurers and TPAs furnish contraceptive coverage are not owned or controlled by objecting employers—they are relationships among the third-party insurers, TPAs, and medical providers.

Finally, petitioners assert (*Zubik* Br. 43; *ETBU* Br. 42-43) that the accommodation is not a true opt-out because an employer that invokes it is deemed to "compl[y]" with the contraceptive-coverage requirement. 45 C.F.R. 147.131(c)(1). But petitioners do not explain how being *deemed* to comply with an objectionable requirement imposes a substantial burden on a religious objector excused from *actual* compliance. Here, employers that opt out are merely "considered to comply with the contraceptive coverage requirement," 78 Fed. Reg. at 39,879; they have no obligation to actually provide contraceptive coverage. Petitioners' objection would be no different if the relevant regulatory provisions deemed them "excused" from the coverage requirement rather than "in compliance" with it. Petitioners would have to take exactly the same steps to opt out, and the government would take exactly the same steps to fill the resulting gap.

4. In sum, as this Court recognized in *Hobby Lobby*, religious objectors who invoke the accommodation do, in fact, opt out of the requirement to provide con-

41

traceptive coverage to their employees, and are, in fact, "effectively exempt[]."  134 S. Ct. at 2763.  The question, therefore, is whether petitioners' sincere belief that their exercise of religion is substantially burdened by the need to invoke this exemption establishes a cognizable burden under RFRA that triggers strict scrutiny of the government's independent actions to provide petitioners' employees and their beneficiaries with full and equal access to the health coverage to which the law entitles them.  It does not.

**B. Petitioners' Objections To The Government's Independent Arrangements With Third Parties Do Not Establish A Substantial Burden Cognizable Under RFRA**

Seven courts of appeals have held that the accommodation does not impose a substantial burden cognizable under RFRA.  See pp. 21-24 & n.12, *supra*.  That is no surprise.  As a practical matter, "[t]he accommodation here works in the way such mechanisms ordinarily do:  the objector completes the written equivalent of raising a hand" to register its objection, and the government then "ensures that a separation is effectuated and arranges for other entities to step in and fill the gap."  *RCAW* Pet. App. 35a.  And as a legal matter, a religious adherent's sincere objection to an opt-out procedure based on steps the government will take to fill the gap created when the adherent itself is excused cannot establish a substantial burden cognizable under RFRA.

1. RFRA "adopts a statutory rule comparable to the constitutional rule rejected in [*Employment Division* v. *Smith*, 494 U.S. 872 (1990)]."  *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (*O Centro*).  Prior to *Smith*, this Court's decisions applying the Free Exercise Clause

42

had "used a balancing test that took into account whether the challenged action imposed a substantial burden on the practice of religion, and if it did, whether it was needed to serve a compelling government interest." *Hobby Lobby*, 134 S. Ct. at 2760. Consistent with those decisions, a RFRA claimant bears the burden of establishing that the challenged government action "substantially burden[s]" its exercise of religion. 42 U.S.C. 2000bb-1(a).[17]

2. This Court's pre-*Smith* decisions establish objective limits on the burdens the law deems cognizable. One of those limits is the principle that a sincere religious objection to the government's conduct of its own affairs cannot establish a substantial burden that subjects the government's actions to strict scrutiny. In *Bowen* v. *Roy*, 476 U.S. 693 (1986), the Court considered a Free Exercise claim asserted by parents who objected to a law requiring the government to use a Social Security number to identify their daughter in processing a claim for welfare benefits filed on her behalf. *Id.* at 695-697. The Court did not question or minimize the parents' belief that the government's use of the Social Security number would inflict grave

---

[17] The original draft of RFRA would have applied to any government action that imposed a "burden" on religious exercise. The qualifier "substantially" was added "to make it clear that the compelling interest standards set forth in the act" apply only to "substantial burden[s]" and that "pre-*Smith* law is applied under the RFRA in determining" whether a burden qualifies as substantial. 139 Cong. Rec. 26,180 (1993) (Sen. Kennedy); see *ibid.* (Sen. Hatch). Congress expected courts considering RFRA claims to "look to free exercise cases decided prior to *Smith* for guidance in determining whether the exercise of religion has been substantially burdened." S. Rep. No. 111, 103d Cong., 1st Sess. 8 (1993); see H.R. Rep. No. 88, 103d Cong., 1st Sess. 6-7 (1993) (same).

43

spiritual harm. *Id.* at 701 n.6. But the Court explained that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens," and that the parents thus could not "demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter." *Id.* at 699-700.

The Court applied a similar rule in *Lyng* v. *Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), which rejected a Free Exercise challenge to the construction of a road through a National Forest that would have prevented members of several Native American tribes from continuing to use sacred sites for religious rites. *Id.* at 447-458. Again, the Court did not question or denigrate the claimants' beliefs. And the Court acknowledged that the challenged project would have "devastating effects on traditional Indian religious practices." *Id.* at 451. The religious harms experienced by tribal members were thus unquestionably "substantial burdens" in some sense. But the Court emphasized the countervailing principle that "government simply could not operate if it were required to satisfy every citizen's religious needs and desires," because "[a] broad range of governmental activities * * * will always be considered essential to the spiritual well-being of some citizens" yet "deeply offensive" to others. *Id.* at 452.

*Roy* and *Lyng* are among the pre-*Smith* decisions that give content to RFRA's substantial-burden standard. See S. Rep. No. 111, 103d Cong., 1st Sess. 9 & n.19 (1993) (citing these decisions for the proposition that "strict scrutiny does not apply to government

44

actions involving only management of internal Government affairs or the use of the Government's own property or resources"); 139 Cong. Rec. 26,193 (1993) (Sen. Hatch) ("RFRA would have no effect on cases like *Bowen* v. *Roy*."); 139 Cong. Rec. at 26,415 (Sen. Grassley) (same). "Pre-*Smith* case law and RFRA's legislative history" thus "underscore that religious exercise is not substantially burdened merely because the Government spends its money or arranges its own affairs in ways that [religious adherents] find objectionable." *Little Sisters* Pet. App. 91a.

The same rule that applies to the government's conduct of its internal affairs applies *a fortiori* to its arrangements with third parties—especially arrangements to secure third parties' rights and interests. The First Amendment and RFRA recognize a zone of autonomy for religious exercise that is protected against government interference. But just as *Roy* and *Lyng* instruct that a religious objector may not dictate the government's internal activities, the religious objections of some individuals cannot control the government's dealings with others. It is, after all, a "fundamental principle of the Religion Clauses" that "[t]he First Amendment gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Estate of Thornton* v. *Caldor, Inc.*, 472 U.S. 703, 710 (1985) (citation and ellipses omitted).

3. Petitioners neither dispute the principles established by *Roy*, *Lyng*, and *Estate of Thornton* nor contest their continued force under RFRA. But they assert (*Zubik* Br. 45-47; *ETBU* Br. 53-55) that this case is different because they object to a requirement imposed on *them*—the obligation to notify the gov-

45

ernment in a specified manner in order to opt out under the accommodation. In petitioners' view (*Zubik* Br. 38; *ETBU* Br. 41-42), RFRA's substantial-burden standard is satisfied whenever a plaintiff asserts a sincere religious objection to obeying *any* requirement enforced through non-trivial sanctions—even if what is at issue is an opt out, and even if the objection is predicated not on the nature of the acts required of the religious objector, but instead on the independent actions the government will take in response. That is a proposition of astonishing breadth, and it is incorrect.

We do not deny that a substantial burden will often exist when the government requires (or pressures) a person to take an action that is inconsistent with his sincere religious beliefs. See, *e.g.*, *Holt* v. *Hobbs*, 135 S. Ct. 853, 862 (2015). But this Court's pre-*Smith* decisions establish that there are objective limits on the burdens that qualify as cognizable, and that those limits operate where, as here, a person objects to taking an otherwise-unobjectionable action only because of how the government will conduct its affairs in response. *Holt*, *Hobby Lobby*, and the other decisions on which petitioners rely did not involve claims of that nature. In fact, petitioners have identified no case vindicating a claim like the one they press here. And when such a claim was asserted in *Roy*, the Court squarely rejected it.

The parents in *Roy*—like petitioners—argued that the challenged statute pressured *them* to take an action that would violate their beliefs. The parents emphasized that the government would use their daughter's Social Security number only if they filed an application for welfare benefits, and they argued that

46

"the Government's threat to put the social security number into active use if they apply for benefits for their daughter require[d] them to choose between the child's physical sustenance and the dictates of their faith." *Roy*, 476 U.S. at 713 (Blackmun, J., concurring in part). Again like petitioners, the parents framed that claim not as an objection to the independent actions of the government, but instead as an assertion that the thing *they* were pressured to do—apply for needed benefits for their daughter—would render them complicit in the government's actions. The parents contended that they were "not merely witnesses to the government's unilateral decision" to use their daughter's Social Security number, because the government would use the number "if, and only if, [the parents] opt[ed] to apply for public benefits." Appellees' Br. at 47, *Roy, supra* (No. 84-780).

Under petitioners' theory, strict scrutiny should have applied because the challenged statute placed substantial pressure on the parents to take an action they sincerely believed to be wrongful. Yet this Court rejected the parents' claim in a portion of the opinion joined by eight Justices. *Roy*, 476 U.S. at 699-701. The Court held that the parents' objection to submitting an application that would trigger the government's use of their daughter's Social Security number did not establish a cognizable burden because the right to free exercise of religion "does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* at 700. Critically, the Court acknowledged that the parents' "religious views may not accept this distinction between individual and governmental conduct." *Id.* at 701 n.6. But the Court explained that "the Free Exercise Clause,

47

and the Constitution generally, recognize such a distinction," and it held that "for the adjudication of a constitutional claim, the Constitution, rather than an individual's religion, must supply the frame of reference." *Ibid.*[18]

The same is true here. Petitioners' religious beliefs do not accept the distinction between their own act of opting out of the contraceptive-coverage requirement and the government's subsequent arrangements with third parties. But the Constitution—and, by extension, RFRA—recognizes such a distinction, and precludes petitioners from establishing a cognizable burden based on the independent actions the government will take to protect the interests of petitioners' employees and students if petitioners themselves opt out.

4. Wherever the line might be drawn in other contexts, it would be particularly inappropriate to hold that the government's dealings with third parties can form the basis for a cognizable substantial burden in

---

[18] As petitioners observe (*Zubik* Br. 47; *ETBU* Br. 53), the parents in *Roy* also challenged a separate statutory provision requiring them to *furnish* their daughter's Social Security number in any application for benefits. 476 U.S. at 695-698. Although the Court did not decide that separate claim, five Justices stated that the requirement to furnish the Social Security number imposed a substantial burden. *Id.* at 731 (O'Connor, J., concurring in part and dissenting in part). But that aspect of *Roy* does not assist petitioners. The parents were burdened by the provision at issue in their separate claim because it required them to take an action they found objectionable quite apart from any subsequent action by the government: In order to apply for welfare benefits, the parents *themselves* were required to use their daughter's Social Security number. Here, petitioners object to invoking the opt out not because they regard providing the required notice as inherently objectionable, but only because of what the government and third parties will do after petitioners opt out.

48

this case, where the government is acting to prevent harms to third parties by filling a gap left because religious objectors have been given the choice to opt out of a requirement to which they object. In our pluralistic society, it is not unusual to allow religious objectors to invoke exemptions from generally applicable requirements while obligating others to fill their shoes. *Little Sisters* Pet. App. 49a. Federal, state and local governments rely on a "diverse array of mechanisms" that operate in a such a manner. *Id.* at 69a n.31 (collecting examples).[19]

Under petitioners' view of RFRA, all such accommodations—indeed, *any* systems that require religious objectors to register their objections—could be reframed as substantial burdens on religious exercise. A conscientious objector to the draft could claim that "the act of identifying himself as such on his Selective Service card constitutes a substantial burden because that identification would then 'trigger' the draft of a fellow selective service registrant in his place." *RCAW* Pet. App. 26a-27a; see *id.* at 41a. An employee

---

[19] See, *e.g.*, Military Selective Service Act, 50 U.S.C. App. § 456(j) (to be codified at 50 U.S.C. 3806(j)) (providing for conscientious objections to military service); U.S. Dep't of Treasury, *Form 8274* (Aug. 2014), https://www.irs.gov/pub/irs-pdf/f8274.pdf (certification filed by certain religious employers to opt out of Social Security and Medicare taxes and shift the obligation to pay those taxes to employees); Cal. Bus. & Prof. Code § 733(b)(3) (West Supp. 2016) (requiring pharmacists with religious objections to dispensing particular drugs to notify their employers so that substitute pharmacists can be arranged); 49 Pa. Code § 27.103(b)(2) (2014) (similar policy); Conn. Agencies Regs. § 19a-580d-9 (2014) (requiring health care providers with objections to implementing a do-not-resuscitate order to transfer care of the patient to other providers).

49

who objects to working on the Sabbath could object to a requirement that he request time off in advance because the request would "facilitate * * * someone else working in his place." *Zubik* Pet. App. 37a n.14. And a factory worker opposed to producing weapons could demand not only that he be excused from duty himself, but also that he not be required to opt out lest someone else take his place. Cf. *Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981). That startlingly broad interpretation of RFRA follows ineluctably from petitioners' position, and petitioners have never disclaimed it.

In the present context, moreover, petitioners' view would allow employers religiously opposed to contraception to require the government to justify under strict scrutiny *any* system in which objecting employers were required to opt out, but the government then arranged for the affected women to get separate coverage through other means. That logic would extend to the very alternatives petitioners themselves propose here. Cf. *Zubik* Br. 72-82; *ETBU* Br. 72-78. Petitioners do not say whether they would challenge an opt-out requirement if the government adopted one of their alternatives. But even if petitioners themselves would not, their interpretation of RFRA would encompass other employers' assertion of such objections. See p. 85, *infra*.

Nor are the implications of petitioners' position limited to religious accommodations. A vast range of government programs—from taxes, to the census, to social welfare programs, to environmental and labor regulations—require citizens to provide information to the government in order to obtain benefits or avoid penalties. Many of those programs involve conduct by

50

the government or by third parties that religious adherents may find objectionable. But if an adherent could establish a substantial burden merely by asserting a sincere belief that submitting the required information would make it complicit in objectionable conduct by the government, "a wide range of federal programs" would be subject to strict scrutiny. *ETBU* Pet. App. 24a. A Sabbath observer "could challenge a requirement that he use a form" that the government "might process * * * on a Sunday." *Ibid.* A person who shared the beliefs held by the parents in *Roy* might object to the submission of any information "that would facilitate the use of a number" to identify him. *Id.* at 23a. "The possibilities are endless," but it is not plausible to assert that "Congress, in enacting RFRA, intended for them to be." *Id.* at 24a.

5. The *Zubik* petitioners would extend RFRA still further. They state (Br. 1, 36) that in addition to objecting to delivering the notice required to opt out, they also object to maintaining contracts with any entities that provide contraceptive coverage to their employees and students. But the regulations would not require petitioners to enter into any new contracts or to modify their existing arrangements with their insurers and TPAs in any way. Petitioners would continue to inform their insurers and TPAs that they do not wish to provide contraceptive coverage, and their contracts with those entities would continue to be "solely for services to which [they] do not object." *ETBU* Pet. App. 22a. The only difference is that the insurers and TPAs would separately provide contraceptive coverage for the affected women as independently required by federal law.

51

The *Zubik* petitioners' objection to maintaining contracts with insurers and TPAs if those entities provide contraceptive coverage to petitioners' employees and students thus amounts to an objection to requirements imposed on third parties, not on petitioners themselves.[20] But any contracts petitioners have with insurers and TPAs "do not provide them an avenue to dictate these entities' independent interactions with the government." *Catholic Health Care Sys.* v. *Burwell*, 796 F.3d 207, 224 (2d Cir. 2015). Thus, Judge Kavanaugh—who generally endorsed petitioners' understanding of the substantial burdens cognizable under RFRA—took care to emphasize that "[t]he Government may of course continue to require [petitioners'] *insurers* [*and TPAs*] to provide contraceptive coverage to [petitioners'] employees" because "RFRA does not authorize religious organizations to dictate the independent actions of third-parties." *RCAW* Pet. App. 278a (citation and internal quotation marks omitted).

---

[20] The *Zubik* petitioners at times appear to suggest (*e.g.*, Br. 40) that the government forces them to enter into contracts they regard as objectionable because employers with more than 50 employees must pay a tax if they do not offer health coverage to their full-time employees. See 26 U.S.C. 4980H. But petitioners have not challenged that tax—which, in any event, does not appear to apply to some of them, see J.A. 382, 397 (describing petitioners with 9 and 44 full-time employees). Petitioners have never suggested that they would prefer not to offer health coverage. To the contrary, they offer it already, and they want to continue to do so. The contraceptive-coverage requirement and the regulations petitioners challenge here do not require petitioners to change their existing contracts in any way; the government simply imposes separate regulatory obligations on third parties with which petitioners have contracts.

52

The *Zubik* petitioners' contrary understanding of RFRA has no limit.  Petitioners' beliefs place special emphasis on the dealings between "their" insurers and TPAs and "their" employees, but other employers might object to having contracts with insurers and TPAs that provide contraceptive coverage to anyone. And still other persons might assert objections based on conduct by different entities with which they have contracts—or for that matter, based on the government's dealings with their neighbors, coworkers, or any other third parties.

\*       \*       \*       \*       \*

The rule petitioners urge this Court to adopt lacks any principled limits.  It has no basis in RFRA, and it is contrary to the body of precedent that Congress sought to restore.  It would also profoundly impair the government's ability to function—and, in particular, to respond to religious objections in a pluralistic society made up of citizens with diverse and sometimes incompatible religious beliefs and values.  The Court should be deeply skeptical of an understanding of RFRA that is so inconsistent with our Nation's tradition of religious accommodation and reciprocal respect and protection—and that would set RFRA on a collision course with the rights and interests of third parties by requiring the government to satisfy strict scrutiny before it could fill gaps left after religious objectors receive exemptions.  Instead, the Court should hold, as seven courts of appeals have done, that "[w]hen the government establishes a scheme that anticipates religious concerns by allowing objectors to opt out but ensuring that others will take up their responsibilities, [the objectors] are not substantially burdened merely because their decision to opt out

53

cannot prevent the responsibility from being met."
*Little Sisters* Pet. App. 77a.

Holding that petitioners have not established a
substantial burden cognizable under RFRA would not
denigrate the significance of their objections to con-
traceptives or their views on moral complicity, any
more than this Court's decisions in *Roy* and *Lyng*
demeaned the importance of the beliefs asserted in
those cases. Nor would it require second-guessing
petitioners' religious beliefs. As this Court has em-
phasized, each individual must answer those "religious
and philosophical question[s]" for herself. *Hobby
Lobby*, 134 S. Ct. at 2778. And because the definition
of what constitutes the "exercise of religion" protected
by RFRA is left largely to individuals' religious views,
it can extend to a virtually limitless range of religious-
ly motivated conduct. Precisely for that reason, how-
ever, this Court has recognized the need for *objective*
limits on the impacts on religious exercise that the law
treats as cognizable—*i.e.*, as "substantial[] burdens."
42 U.S.C. 2000bb-1(b). Those objective limits pre-
serve the government's ability to structure its internal
affairs and protect the autonomy and vital interests of
third parties, and they are essential to democratic
government in a pluralistic society like ours.

## II. THE ACCOMMODATION IS THE LEAST-RESTRICTIVE MEANS OF FURTHERING THE GOVERNMENT'S COMPELLING INTEREST IN PROVIDING WOMEN WITH FULL AND EQUAL HEALTH COVERAGE

Even if petitioners could establish a substantial
burden on their exercise of religion, the accommoda-
tion would be consistent with RFRA because it fur-
thers a compelling interest in securing for women the

54

full and equal health coverage the Affordable Care
Act provides, and does so by the least restrictive
means available. 42 U.S.C. 2000bb-1(b)(2). As five
Members of this Court recognized in *Hobby Lobby*,
the contraceptive-coverage requirement serves the
government's compelling interest in providing women
with health coverage necessary for their medical
needs. And unlike *Hobby Lobby*, this is not a case
where an already-existing alternative mechanism
would serve that compelling interest "equally well."
134 S. Ct. at 2782. Indeed, the regulations petitioners
challenge embody the very alternative on which *Hob-
by Lobby* relied.

In insisting that those regulations are nonetheless
inadequate, petitioners would require Congress to
enact a new government-administered health benefit
for the affected individuals. But that approach could
extinguish the rights that petitioners' employees and
their beneficiaries now possess and leave them with-
out benefits unless and until Congress acted. And
even if Congress were to enact such a new benefit,
petitioners' approach would impose additional finan-
cial, logistical, and administrative hurdles on tens of
thousands of women seeking contraceptive coverage,
thereby thwarting the basic purposes of the Afforda-
ble Care Act's Women's Health Amendment.

A. **The Regulations Further The Government's Compel-
ling Interest In Ensuring That Women Receive Full
And Equal Health Coverage, Including Contraceptive
Coverage**

The accommodation regulations further the gov-
ernment's compelling interest in ensuring that women
receive the full and equal benefits of preventive health
coverage guaranteed by the Affordable Care Act,

55

including coverage of contraception and other services of particular importance to women's health. This Court's decision in *Hobby Lobby* assumed without deciding that this interest qualified as compelling. 134 S. Ct. at 2780. But five Justices separately affirmed that the government has a "compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." *Id.* at 2785-2786 (Kennedy, J., concurring); accord *id.* at 2799-2800 & n.23 (Ginsburg, J., dissenting). As Judge Kavanaugh observed, "[i]t is not difficult to comprehend why a majority of the Justices" reached that conclusion, given the wealth of evidence demonstrating the benefits of contraceptive coverage. *RCAW* Pet. App. 270a. Petitioners identify no sound reason to reach a different conclusion here.

### 1. The government has a compelling interest in ensuring that women's health coverage includes contraceptive coverage

a. IOM determined that contraceptive services are an essential component of women's health care. J.A. 546-548, 562-576. That conclusion is supported by the recommendations of leading medical and public health organizations, including the American Medical Association, the American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, the Centers for Disease Control and Prevention, and the March of Dimes. J.A. 565. It is also confirmed by a wealth of evidence.

First, contraceptive coverage "enables women to avoid the health problems unintended pregnancies may visit on them and their children." *Hobby Lobby*, 134 S. Ct. at 2799 (Ginsburg, J., dissenting). "About

56

50% of all pregnancies in the United States are unintended." *RCAW* Pet. App. 270a (Kavanaugh, J., dissenting from denial of rehearing en banc); see J.A. 563. A woman with an unintended pregnancy "may not immediately be aware that [she is] pregnant, and thus delay prenatal care," and she is also more likely to engage in "behaviors during pregnancy, such as smoking and consumption of alcohol, that pose pregnancy-related risks." 78 Fed. Reg. at 39,872; see J.A. 563-564. As a result, "[s]tudies show a greater risk of preterm birth and low birth weight among unintended pregnancies." 78 Fed. Reg. at 39,872; see J.A. 564. And by reducing the number of unintended pregnancies, contraceptives also "reduce the number of women seeking abortions." 78 Fed. Reg. at 39,872; see *RCAW* Pet. App. 271a & n.9 (Kavanaugh, J., dissenting from denial of rehearing en banc).

Second, contraceptive use helps women "avoid the increased risk of adverse pregnancy outcomes that comes with pregnancies that are too closely spaced." 78 Fed. Reg. at 39,872; see J.A. 565. "Short intervals between pregnancies increase maternal mortality and pregnancy-related complications." *RCAW* Pet. App. 60a-61a. "Short intervals between pregnancies also can have serious health consequences for infants, such as low birth weight, prematurity, and small-for-gestational age." *Id.* at 63a; see J.A. 565.

Third, "[t]here are many medical conditions for which pregnancy is contraindicated." *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring). For example, women with "certain chronic medical conditions" such as diabetes "may need to postpone pregnancy" until their conditions are under control. J.A. 565. Pregnancy is also contraindicated for women

57

with "serious medical conditions" such as "pulmonary hypertension," "cyanotic heart disease," and "the Marfan Syndrome." *Ibid.* For those women, pregnancy may be "hazardous, even life threatening." *Hobby Lobby*, 134 S. Ct. at 2799 (Ginsburg, J., dissenting).

Fourth, contraceptive coverage "secures benefits wholly unrelated to pregnancy, preventing certain cancers, menstrual disorders, and pelvic pain." *Hobby Lobby*, 134 S. Ct. at 2799 (Ginsburg, J., dissenting); see 78 Fed. Reg. at 39,872; J.A. 570-571.

Finally, coverage of contraceptives without cost-sharing is particularly important because cost barriers discourage the use of contraceptives, see J.A. 556, 574-575, and because the most reliable and effective contraceptive methods such as IUDs also have the highest "up-front costs," J.A. 572.[21] Studies show that women are more likely to choose those methods—and thus less likely to experience unintended pregnancies and their attendant harms—if cost barriers are removed. 77 Fed. Reg. at 8728.[22]

---

[21] For example, the cost of an IUD (including the required medical examination, insertion, and follow-up visits) can be up to $1000. Planned Parenthood, *IUD: Where Can I Get an IUD? How Much Does an IUD Cost?*, http://www.plannedparenthood.org/health-topics/birth-control/iud-4245.htm (last visited Feb. 9, 2016).

[22] See, *e.g.*, Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360, 363 (2007) (finding that an insurer's provision of "100% coverage" of IUDs and other long-acting contraceptive methods "resulted in increased [use] of these methods"); Carol S. Weisman & Cynthia H. Chuang, *Making the Most of the Affordable Care Act's Contraceptive Coverage Mandate for Privately-Insured Women*, 24 Women's Health Issues 465, 466 (2014) ("[S]tudies of privately insured women found that lower cost sharing was associ-

58

b. Contraceptive coverage also furthers the compelling interest in ensuring that women have *equal* health coverage. Contraceptives have myriad health benefits for women who choose to use them, and more than 99% of sexually active women have used at least one contraceptive method at some point. J.A. 564. In light of the importance of contraceptives to women's health care, "a preventive care package that failed to cover contraception would not give women access, equal to that enjoyed by men, to the full range of health care services recommended for their specific needs." *RCAW* Pet. App. 64a.

In enacting the Women's Health Amendment, Congress recognized that "women have different health needs than men, and these needs often generate additional costs." 155 Cong. Rec. 29,070 (2009) (Sen. Feinstein); see *Hobby Lobby*, 134 S. Ct. at 2785-2786 (Kennedy, J., concurring). "Women of childbearing age spen[t] 68 percent more in out-of-pocket health care costs than men." 155 Cong. Rec. at 29,070 (Sen. Feinstein). And women faced those greater expenses in substantial part because "the cost of reproductive health care, including contraceptives, is significant, and it falls disproportionately on women." *RCAW* Pet. App. 59a. The contraceptive-coverage requirement addresses that inequality by ensuring "women's equal access to health care appropriate to their needs." *Id.* at 65a.

---

ated with greater adoption of IUDs."); see also, *e.g.*, Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291 (2012) (describing "a clinically and statistically significant reduction in abortion rates, repeat abortions, and teenage birth rates" associated with cost-free access to long-acting contraceptives).

59

c. The *Zubik* petitioners assert (Br. 67-68) that even if the government generally has a compelling interest in ensuring that women's health coverage includes contraceptive coverage, that interest is not compelling as applied to the employees of religious institutions that oppose contraception.  But religious organizations opposed to contraceptives employ and enroll as students hundreds of thousands of people— not all of whom share their faiths or their religious views on contraception.  *RCAW* Pet. App. 5a; see *id.* at 12a (noting that the *RCAW* petitioners "employ both Catholics and non-Catholics"); J.A. 157, 164, 173, 178, 183 (same for the *Zubik* petitioners).  Such organizations also provide coverage to employees' dependents, who likewise may not share the organizations' religious beliefs regarding contraception.  Cf. J.A. 557 ("[W]omen with employer-based insurance are almost twice as likely as men to be covered as dependents.").

The decision whether to *use* contraceptives is for each woman to make in accordance with her own medical needs and religious beliefs.  But the government has a compelling interest in ensuring that all women can make that choice with the benefit of full and equal health coverage, and that interest is no less compelling with respect to the women who obtain their health coverage through employers with religious objections to contraception.  The *Zubik* petitioners are deeply misguided in asserting that the government must conduct an intrusive "field study" of the religious beliefs, sexual activities, and health needs of the women covered under each employer's health plan in order to justify the application of the accommodation regulations to that particular employer.  Br. 68-69 (citation omitted).

60

d. The *ETBU* petitioners contend (Br. 68-71) that the government's compelling interest does not extend to employers with ERISA-exempt self-insured church plans because the Departments cannot require the TPAs serving such plans to provide separate contraceptive coverage, and instead offer to compensate the TPAs if they provide coverage voluntarily. 80 Fed. Reg. at 41,323 n.22; *Little Sisters* Pet. App. 32a. That feature of the regulations does not undermine the compelling nature of the government's interest in the church-plan context.

First, the *ETBU* petitioners cite no authority suggesting that the government cannot have a compelling interest in a program that relies in part on voluntary participation.[23] Second, the record indicates that providing financial incentives to church-plan TPAs serves the government's interest in ensuring that women's health coverage includes contraceptive coverage. Petitioner GuideStone Financial Resources is the sponsor of a large church plan that covers the employees of several employer-petitioners and hundreds of other employers eligible for the accommodation. *Little Sisters* Pet. App. 14a-15a. Petitioners state (*ETBU* Br. 32) that "[t]he largest TPA with

---

[23] The *ETBU* petitioners are wrong to suggest (Br. 70-71) that applying the regulations to church plans is inconsistent with Congress's decision to exempt those plans from ERISA. Church plans are subject to the provisions of the Internal Revenue Code incorporating regulatory requirements for group health plans, including the preventive-services requirement. 26 U.S.C. 9815. Employers with church plans are also subject to the tax penalty for failure to satisfy those requirements. 26 U.S.C. 4980D. The ERISA exemption affects the scope of the government's authority over church-plan TPAs, not the strength of its underlying interest in arranging for women to receive contraceptive coverage.

61

which GuideStone contracts" has indicated that it would provide separate coverage under the accommodation regulations. See J.A. 1218-1222. The same TPA (Highmark) also serves several of the other employer-petitioners with self-insured church plans. J.A. 76, 113-114, 122.

As the *ETBU* petitioners note (Br. 68-69), the primary TPA used by the Christian Brothers Employee Benefit Trust—another petitioner that sponsors a multiemployer church plan—is itself a religious organization that objects to providing contraceptive coverage. *Little Sisters* Pet. App. 14a-15a. That TPA has made clear that it will not provide separate contraceptive coverage if participating employers opt out. *Ibid.* But the Christian Brothers plan apparently also relies on a company called Express Scripts to administer prescription-drug claims. See *Little Sisters* Pet. 12 n.2. It appears that Express Scripts may qualify as a TPA, and petitioners have previously represented that Express Scripts may well be willing to provide separate contraceptive coverage under the regulations. *Ibid.*; see *Little Sisters* Pet. App. 145a; *Little Sisters* Pet. C.A. Br. 22.[24]

> ### 2. The Affordable Care Act's provisions governing grandfathered plans and small employers do not undermine the compelling nature of the government's interest

Petitioners do not seriously dispute the wealth of medical and public-health evidence supporting the contraceptive-coverage requirement. Instead, they

---

[24] The facts surrounding Express Scripts are uncertain because of the limited preliminary-injunction record in the *Little Sisters* case. See *Little Sisters* Gov't C.A. Br. 19 n.3.

62

principally assert (*Zubik* Br. 60-62; *ETBU* Br. 59-64) that the interests advanced by that requirement cannot qualify as compelling because the requirement does not apply to employers with grandfathered group health plans and small employers. Those same arguments were before the Court in *Hobby Lobby*, and they are, if anything, even less persuasive now than they were then.

Petitioners are correct that not every employer is currently required to provide contraceptive coverage. But it is implausible to suggest that the government cannot have a compelling interest in the application of a law because that law allows for some exceptions— particularly a law like this one that already protects well over 100 million employees and dependents. See *Benefits Survey* 3, 217. Numerous organizations are not required to pay taxes; half the country's draft-age population is exempt from registering for the draft; and Title VII does not apply to millions of employers with fewer than 15 employees, see 42 U.S.C. 2000e(b). Yet no one would suggest that raising tax revenue, raising an army, and combating employment discrimination are not compelling interests. On petitioners' view, however, an employer who asserted a religious objection to hiring women or paying them equally, cf. *Dole* v. *Shenandoah Baptist Church*, 899 F.2d 1389, 1392 (4th Cir.), cert. denied, 498 U.S. 846 (1990), would be entitled to a RFRA exemption from Title VII because the government would lack a compelling interest in enforcing that law, which does not protect the millions of Americans who work for small employers.

63

In all events, petitioners have vastly overstated the extent and effect of the purported exceptions they have identified.

a. The Affordable Care Act's grandfathering provision was "designed to ease the transition of the healthcare industry into the reforms established by the Affordable Care Act by allowing for gradual implementation of reforms through a reasonable grandfathering rule." 75 Fed. Reg. 34,541 (June 17, 2010). It specifies that a number of the Act's reforms become applicable when a plan makes one or more specified changes, such as an increase in cost-sharing requirements or a decrease in employer contributions beyond certain limits, or the elimination of certain benefits. 42 U.S.C. 18011; see 45 C.F.R. 147.140(g). The exception created by the grandfathering provision is "temporary and transitional," and thus entirely different from the permanent exemption petitioners seek. *Little Sisters* Pet. App. 20a-21a & n.5.

The compelling nature of an interest is not diminished merely because Congress phases in a new requirement advancing that interest to avoid undue disruption—either through a grandfathering provision or a delayed effective date. Cf. *Heckler* v. *Mathews*, 465 U.S. 728, 746-748 (1984) ("[P]rotection of reasonable reliance interests is * * * a legitimate governmental objective."). Petitioners' contrary rule would mean that *none* of the requirements imposed under the preventive-services provision—including coverage of cancer screenings and immunizations for children, 42 U.S.C. 300gg-13(a)(2) and (3)—could qualify as compelling.

Petitioners' argument also rests on the unstated premise that employees covered by grandfathered

64

plans lack contraceptive coverage. That premise is incorrect. Even before the Affordable Care Act, "[c]ontraceptive coverage ha[d] become standard practice for most private insurance" and 28 States had required such coverage by law. J.A. 573-574. The large majority of all employers—including 85% of large employers—already provided coverage for prescription contraceptives.[25] Those employers could not eliminate contraceptive coverage without losing their grandfathered status. See 29 C.F.R. 2590.715-1251(g)(1)(i). Accordingly, most women currently covered under grandfathered plans likely have (and will continue to have) some contraceptive coverage.[26]

b. Petitioners' reliance on the Affordable Care Act's treatment of small employers fares no better. Employers with fewer than 50 employees are exempt from a *separate* provision imposing a tax on certain large employers that fail to offer adequate health coverage to their full-time employees, 26 U.S.C. 4980H. But those small employers that do provide coverage must comply with the preventive-services requirement and are subject to the same enforcement mechanisms as other employers. 42 U.S.C. 300gg-13. Indeed, it appears that several of the petitioners chal-

[25] Kaiser Family Found. & Health Research & Educ. Trust, *Employer Health Benefits 2010 Annual Survey* 196 (2010). The figure for employers with fewer than 200 employees was 62%, but only 6% of those employers reported that they did *not* provide contraceptive coverage—the rest were simply uncertain. *Ibid.*

[26] For example, a study found that by the first quarter of 2014, more than 96% of women who inquired about their health plans' coverage of IUDs had coverage, and more than 86% had coverage without cost-sharing. Jonathan M. Bearak et al., *Changes in Out-of-Pocket Costs for Hormonal IUDs After Implementation of the Affordable Care Act*, 93 Contraception 139, 143 (2016).

65

lenging the contraceptive-coverage requirement here are themselves small employers.  J.A. 382, 397, 1194.

In all events, the point of the contraceptive-coverage requirement is to ensure that organizations that *do* provide health coverage—whether employers or insurers—include full and equal coverage appropriate to women's health needs.  If a small employer elects not to provide health coverage (or if a large employer chooses to pay the tax rather than providing coverage), employees will ordinarily obtain coverage through a family member's employer, through an individual insurance policy purchased on an Exchange or directly from an insurer, or through Medicaid or another government program.  *All* of those sources would include contraceptive coverage.  42 U.S.C. 300gg-13(a)(4); see J.A. 573.

But even if small employers were regarded as somehow exempt from the contraceptive-coverage requirement in particular, "[f]ederal statutes often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."  *Hobby Lobby*, 134 S. Ct. at 2800 (Ginsburg, J., dissenting).  The statutes that contain such exemptions—and that, on petitioners' logic, could not be regarded as serving compelling interests—include Title VII, the Age Discrimination in Employment Act of 1967 (ADEA), and the Family and Medical Leave Act of 1993 (FMLA).  *Ibid.*[27]  Given

---

[27] More than 17 million people work for companies exempt from Title VII because they have fewer than 15 employees, 42 U.S.C. 2000e(b); more than 20 million people work for companies exempt from the ADEA because they have fewer than 20 employees, 29 U.S.C. 630(b); and more than 31 million people work for companies exempt from the FMLA because they have fewer than 50 employ-

66

the ubiquity of statutory exemptions, petitioners'
argument, if accepted, would entitle employers with
religious objections to opt out of virtually every stat-
ute protecting their employees.   Petitioners are well
aware of this problem with their argument, see *Hobby
Lobby*, 134 S. Ct. at 2800-2801 (Ginsburg, J., dissent-
ing), but they make no effort to address it.

   c.   This case bears no resemblance to *O Centro* and
*Church of the Lukumi Babalu Aye, Inc.* v. *City of
Hialeah*, 508 U.S. 520 (1993) (*Lukumi*), the decisions
on which petitioners rely.   In *Lukumi*, exemptions in
the challenged ordinances resulted in a "gerryman-
der" prohibiting animal sacrifice by a disfavored reli-
gious sect but permitting the slaughter of animals for
virtually any other purpose.   *Id.* at 536.   In *O Centro*,
the Court held that the exemption from the Controlled
Substances Act for the sacramental use of hoasca that
was sought by 130 members of a Christian Spiritist
sect was materially equivalent to the exemption for
the sacramental use of peyote that had already been
granted to hundreds of thousands of members of Na-
tive American tribes.   546 U.S. at 433.

   Here, unlike in *Lukumi*, there is no suggestion that
the government has targeted a specific religious group
(or religious groups in general) for disfavored treat-
ment.   To the contrary, the government has gone to
great lengths to "respect the religious liberty" of
employers that object to the contraceptive-coverage
requirement on religious grounds.   *Hobby Lobby*, 134
S. Ct. at 2759.   Unlike in *O Centro*, the exemption

---

ees, 29 U.S.C. 2611(4)(A)(i).   See U.S. Census Bureau, *U.S. &
States, NAICS Sectors, Small Employment Sizes* (2012), http://
www2.census.gov/econ/susb/data/2012/us_state_naicssector_small_
emplsize_2012.xls.

67

petitioners seek is fundamentally different from the transitional-grandfathering and small-employer provisions they put forth as analogies. And unlike the simple exceptions from free-standing prohibitions at issue in both *Lukumi* and *O Centro*, the result petitioners seek would dictate the government's arrangements with third parties under a broad statutory benefits program and deprive tens of thousands of individuals of benefits to which they are statutorily entitled.

### 3. The regulatory exemption for houses of worship does not undermine the compelling nature of the government's interest

Petitioners assert (*Zubik* Pet. 57-60; *ETBU* Pet. 64-69) that the automatic exemption for houses of worship demonstrates that the contraceptive-coverage requirement does not serve a compelling interest. They are mistaken.

a. In implementing the contraceptive-coverage requirement, the Departments created an automatic exemption for "'churches, their integrated auxiliaries, and conventions or associations of churches,' as well as 'the exclusively religious activities of any religious order,'" a category of employers defined by the Internal Revenue Code. *Hobby Lobby*, 134 S. Ct. at 2763 (quoting 26 U.S.C. 6033(a)(3)(A)(i) and (iii)); see 45 C.F.R. 147.131(a). That exemption "was provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship." 80 Fed. Reg. at 41,325. Such special solicitude for houses of worship has deep historical roots. See *Walz* v. *Tax Comm'n*, 397 U.S. 664, 676 (1970); cf. *Hosanna-Tabor Evangelical Lutheran*

68

*Church & School* v. *EEOC*, 132 S. Ct. 694, 705-706 (2012).

It would be perverse and profoundly at odds with our Nation's traditions to hold, as petitioners suggest, that the provision of an exemption for houses of worship precludes the government from establishing a compelling interest in the underlying requirement—thus effectively mandating, through RFRA, the extension of the same exemption not merely to all religious nonprofit organizations, but to all religious objectors (including for-profit corporations, see *Hobby Lobby*, 134 S. Ct. at 2767-2775), a result that could extinguish the statutory rights of millions of people. Such a rule would powerfully *discourage* the government from creating exemptions for houses of worship. It is hard to imagine a proposition more deeply inconsistent with RFRA's animating spirit or with its express provision recognizing the permissibility of discretionary religious exemptions, above and beyond those that RFRA compels. See 42 U.S.C. 2000bb-4 ("Granting * * * exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of [RFRA].").

Petitioners' argument also cannot be squared with *United States* v. *Lee*, 455 U.S. 252 (1982). In that case, this Court rejected a Free Exercise claim on the ground that it would have undermined the comprehensive Social Security system, *id.* at 258-260, even as the Court noted that Congress had provided a religious exemption for self-employed individuals, *id.* at 260-261. The Court explained that "[c]onfining the * * * exemption to the self-employed provided for a narrow category which was readily identifiable," *id.* at 261, and held that such a limited exemption did not

69

vitiate the compelling interest in enforcing the law outside the exemption's confines. Here, too, the limited exemption for houses of worship—as defined by reference to a long-established and administrable statute—does not undermine the government's interest outside that special and narrow context.

b. Petitioners and their amici separately assert that the distinction between the automatic exemption for houses of worship and the accommodation available to other religious employers impermissibly discriminates among religious institutions. That contention is not properly before the Court. Petitioners sought to raise it at the petition stage, *Zubik* Pet. i; *Little Sisters* Pet. i, but this Court limited its grant of review to other questions, 136 S. Ct. 444; 136 S. Ct. 446. Petitioners' contention also lacks merit.

Petitioners' criticism of the automatic exemption rests in substantial part on the premise that "[t]he government's only proffered explanation" for exempting houses of worship was the observation that they are "'more likely than other employers to employ people of the same faith who share the same objection'" to contraception. *ETBU* Br. 65 (quoting 78 Fed. Reg. at 39,874). That premise is wrong. The exemption was based on existing exceptions to state contraceptive-coverage requirements, which had been upheld by the courts. 76 Fed. Reg. at 46,623.[28] It was also expressly based on "the longstanding governmental recognition of a particular sphere of autonomy for houses of worship," 80 Fed. Reg. at 41,325, and the

---

[28] *Catholic Charities of the Diocese of Albany* v. *Serio*, 859 N.E.2d 459, 461 (N.Y. 2006), cert. denied, 552 U.S. 816 (2007); *Catholic Charities of Sacramento, Inc.* v. *Superior Ct.*, 85 P.3d 67, 91 (Cal.), cert. denied, 543 U.S. 816 (2004).

70

Departments explained the exemption in terms tradi-
tionally used to describe that special solicitude.  See
76 Fed. Reg. at 46,623 (explaining that the exemption
was intended in part to "respect[] the unique relation-
ship between a house of worship and its employees in
ministerial positions").

The Departments did later observe, in rejecting
proposals to *eliminate* the automatic exemption, that
it did not unduly undermine the interests served by
the contraceptive-coverage requirement because
houses of worship are more likely than other employ-
ers to hire coreligionists.  78 Fed. Reg. at 39,874.[29]
But the Departments have consistently emphasized
that the automatic exemption is "not a mere product
of the likelihood that [exempted organizations] hire
coreligionists," but rather reflects the "special status"
of houses of worship "under longstanding tradition in
our society and under federal law."  80 Fed. Reg. at
41,325.[30]

Houses of worship as defined in the exemption reg-
ulation "have long enjoyed advantages (notably tax
advantages) over other entities."  *RCAW* Pet. App.
84a (citation omitted); see *Little Sisters* Pet. App.
105a (citing examples).  Petitioners' argument would
thus call into question numerous other provisions of

_____

[29] That conclusion was supported by comments confirming that
elimination of a requirement limiting the exemption to houses of
worship that primarily employed coreligionists "would not materi-
ally expand the universe" of exempt organizations.  78 Fed. Reg. at
39,874.

[30] For that reason, petitioners err in asserting (*ETBU* Br. 66-67)
that the automatic exemption should have been based on Title
VII's exception for religious employers, 42 U.S.C. 2000e-1(a),
rather than on a longstanding statutory provision identifying
houses of worship.

71

federal law incorporating the "familiar regulatory distinction between houses of worship and religiously affiliated organizations." *RCAW* Pet. App. 84a-85a. Many provisions of the Internal Revenue Code confer benefits on houses of worship and certain related organizations, without extending the same treatment to *all* religious organizations. See, *e.g.*, 26 U.S.C. 508(c)(1)(A) ("churches, their integrated auxiliaries, and conventions or associations of churches"), 512(b)(12) ("a diocese, province of a religious order, or a convention or association of churches"), 3121(w)(1) ("church or qualified church-controlled organization"), 3309(b)(1) ("church or convention or association of churches" and certain related organizations), 7611 ("church").

The *Zubik* petitioners further assert (Br. 58-60) that the automatic exemption is arbitrary because some schools and charities qualify for the exemption as "integrated auxiliaries" of houses of worship, while other organizations performing similar work do not. But the Departments reasonably chose to identify houses of worship by using "a bright line that was already statutorily codified and frequently applied," rather than by crafting a novel test requiring intrusive inquiries into the nature of a particular organization's activities. *Zubik* Pet. App. 46a. Indeed, the Departments initially restricted the exemption to organizations that had "the inculcation of religious values as [their] purpose" and that "primarily employ[ed]" and "serve[d]" individuals "who share[d] [their] religious tenets." 76 Fed. Reg. at 46,623. That narrower exemption would have answered the particular objections that petitioners now raise, but numerous religious organizations—including organizations repre-

72

senting petitioners—objected to those additional inquiries, maintaining that they required "excessive entanglement with religion." *Little Sisters* Pet. App. 111a n.54; see 78 Fed. Reg. 8459 (Feb. 6, 2013); J.A. 427 (comment describing the additional requirements as "intrusive and constitutionally improper"); J.A. 1121 (similar). In response to those comments, the Departments eliminated the objectionable requirements and based the automatic exemption "solely on organizational form." *Little Sisters* Pet. App. 111a n.54.

The automatic exemption for houses of worship does not discriminate on the basis of denomination or religious belief. Cf. *Larson* v. *Valente*, 456 U.S. 228, 244 (1982). Instead, it rests on "neutral, objective criteria" of organizational form. *Little Sisters* Pet. App. 109a (citation omitted). Similar exemptions have long been part of our Nation's tradition and have never been regarded as inconsistent with RFRA or the Religion Clauses of the First Amendment. And petitioners have "cite[d] no case holding that [such] organizational distinctions" are impermissible. *Id.* at 108a-109a.

### B. The Accommodation Is The Least Restrictive Means Of Ensuring That Women Receive Full And Equal Health Coverage, Including Contraceptive Coverage

In *Hobby Lobby*, this Court held that the very accommodation petitioners challenge qualified as a less-restrictive alternative to the direct application of the contraceptive-coverage requirement. 134 S. Ct. at 2781-2783. The Court emphasized that the accommodation was an "already established" mechanism that would serve the relevant government interests "equally well" by ensuring that the affected women receive

73

"precisely the same access to all FDA-approved contraceptives." *Id.* at 2759, 2782. Those conclusions underpinned the Court's decision, and the Court repeatedly emphasized that the Departments' ability to extend the accommodation meant that its holding would not "result in any detrimental effect on any third party." *Id.* at 2781 n.37; see, *e.g.*, *id.* at 2760; *id.* at 2786 (Kennedy, J., concurring). Here, in contrast, petitioners' purported less-restrictive alternatives would require Congress itself to depart from the comprehensive statutory framework adopted in the Affordable Care Act by creating a new government-administered benefit for petitioners' employees. Even if those alternatives were enacted, they would undermine the government's compelling interest by imposing on tens of thousands of women seeking contraceptive coverage the very sort of obstacles the Women's Health Amendment was designed to eliminate. RFRA—which is, after all, an Act of Congress like the Affordable Care Act—cannot reasonably be construed to require Congress to take such a step.

### 1. The government's interest in securing full and equal health coverage for women requires the provision of contraceptive coverage without financial, administrative, or logistical burdens

The accommodation regulations ensure that women "continue to receive contraceptive coverage without cost sharing" and without "logistical and administrative obstacles" if their employers opt out of providing coverage. *Hobby Lobby*, 134 S. Ct. at 2782 (citation omitted). They do so by arranging for the same insurers and TPAs that are already providing those women with other health coverage to provide separate contraceptive coverage as well—and to do so automatical-

74

ly, without requiring women to seek out or sign up for a new program. *Ibid.* For two reasons, those features of the regulations are essential to achieving the compelling interests served by the contraceptive-coverage requirement.

First, the purpose of the Affordable Care Act's preventive-services requirement is to increase the use of preventive health services by making it as easy as possible for people to use them. *RCAW* Pet. App. 57a-58a; see 78 Fed. Reg. at 39,872. Congress required insurers and employer-sponsored group health plans to cover preventive services without cost-sharing because "even moderate copayments for preventive services * * * deter patients from receiving those services." J.A. 556, 574-575; see 77 Fed. Reg. at 8728 ("Research * * * shows that cost sharing can be a significant barrier to effective contraception."). There is no reason to doubt IOM's expert judgment that placing financial, logistical, or administrative hurdles in the path of people who would benefit from cancer screenings or immunizations would have such a deterrent effect. Placing such obstacles in the path of women seeking contraceptive coverage—for example, "by requiring them to take steps to learn about, and to sign up for, a new health benefit"—would have the same deterrent effect. *Hobby Lobby*, 134 S. Ct. at 2783 (citation and internal quotation marks omitted); see 78 Fed. Reg. at 39,888. Those "added steps would dissuade women from obtaining contraceptives and defeat the compelling interests in enhancing access to such coverage." *RCAW* Pet. App. 68a. Indeed, "[t]he medical evidence prompting the contraceptive coverage requirement showed that even minor obstacles to obtaining contraception led to more unplanned and

75

risky pregnancies, with attendant adverse effects on women and their families." *Id.* at 4a; see generally Richard H. Thaler & Cass R. Sunstein, *Nudge* 7-8 (2008) (observing that modern social science demonstrates that "people have a strong tendency to go along with the status quo or default option").

Second, Congress enacted the Women's Health Amendment to ensure that women receive *equal* health coverage appropriate to their medical needs—needs that make women's health care "significantly more costly" than men's. *Hobby Lobby*, 134 S. Ct. at 2785-2786 (Kennedy, J., concurring). The Departments determined, based on a voluminous record, that "a preventive care package that failed to cover contraception would not give women access, equal to that enjoyed by men, to the full range of health care services recommended for their specific needs." *RCAW* Pet. App. 64a; see 77 Fed. Reg. at 8727-8728 ("Congress   *  *  *   recognized that women have unique health care needs and burdens.  Such needs include contraceptive services."); see also J.A. 562-576.  The gender equity that Congress sought to attain would be thwarted if women—and only women—were required to "enroll in new programs or to surmount other hurdles" to get coverage for a critical aspect of their medical care.  80 Fed. Reg. at 41,328.  Even the women who succeeded in signing up for such a program and obtaining coverage would still bear the sort of disproportionate burdens that Congress sought to eliminate.

The regulations adopted by the Departments relieve objecting employers of any obligation to provide contraceptive coverage, while still securing for women the ability to receive the coverage the Affordable Care Act guarantees them "in a seamless manner" from the

same insurers and TPAs that administer coverage for their other medical care. *RCAW* Pet. App. 72a. That process "requires as little as it can from the objectors while still serving the government's compelling interests" in ensuring that women receive full and equal health coverage. *Id.* at 8a.

### 2. Petitioners' proposals do not qualify as less-restrictive alternatives

Petitioners assert (*Zubik* Br. 72-82; *ETBU* Br. 72-78) that the government should instead be required to provide contraceptive coverage to petitioners' employees through an entirely new government program or a major overhaul of an existing one. Those proposals are not valid less-restrictive alternatives because they would not serve the government's compelling interests "equally well." *Hobby Lobby*, 134 S. Ct. at 2782; see *id.* at 2786 (Kennedy, J., concurring). And those alternatives would require Congress to pass a new law creating a government-administered benefit—a step that RFRA has never been understood to require, and one with startlingly broad and unacceptable implications.

a. Petitioners assert (*ETBU* Br. 72) that "[i]f [their] employees would prefer to have a health plan that includes contraceptive coverage," those employees should be required to obtain coverage through a government program—such as the Affordable Care Act's Exchanges (*Zubik* Br. 75-80; *ETBU* Br. 72-75); the "Title X program" (*Zubik* Br. 80-81; *ETBU* Br. 75-76); "Medicaid" or "Medicare" (*Zubik* Br. 81); or some new statutory scheme of "refundable tax credits" for contraceptives (*Zubik* Br. 81-82).

None of those options is currently available, and all would require new legislation. But even if Congress

77

were to make them available, they would not advance the government's interests nearly as effectively as the existing accommodation—under which the effects on employees are "precisely zero" because those employees "continue to receive contraceptive coverage without cost-sharing for all FDA-approved contraceptives, and  *  *  *  continue to face minimal logistical and administrative obstacles." *Hobby Lobby*, 134 S. Ct. at 2782.

In contrast, all of petitioners' various alternatives "would impose significant financial, administrative, and logistical obstacles by requiring women to sign up for separate coverage either with a government agency or with another private insurer." *University of Notre Dame* v. *Burwell*, 786 F.3d 606, 618 (7th Cir. 2015), petition for cert. pending, No. 15-812 (filed Dec. 18, 2015); accord 80 Fed. Reg. at 41,328; 78 Fed. Reg. at 39,888.

For example, the *ETBU* petitioners' principal proposal (Br. 72-75) is that women who want contraceptive coverage should forgo employer-sponsored coverage altogether and sign up for an individual-market policy on an Exchange—an approach that would severely penalize those employees by forcing them to give up "part of [their] compensation package," *Liberty Univ., Inc.* v. *Lew*, 733 F.3d 72, 91 (4th Cir.) (citation omitted), cert. denied, 134 S. Ct. 683 (2013).  Petitioners' various alternative proposals for contraceptive-only coverage would likewise require women to "enroll in additional and unfamiliar programs" or "identify different [medical] providers" than the doctors they rely on for their other medical care. *RCAW*

78

Pet. App. 69a; see 80 Fed. Reg. at 41,328.[31] Petitioners' proposals "would not serve the government's compelling interest with anywhere near the efficacy of the challenged accommodation," *RCAW* Pet. App. 69a, because they would interpose the very sort of obstacles that the Act and its implementing regulations are designed to eliminate.  They thus do not qualify as viable less-restrictive alternatives under RFRA.

Petitioners' proposals also cannot be valid less-restrictive alternatives because they would inflict tangible harms on tens of thousands of women based on their employers' religious beliefs, even though the employer has been exempted from any legal obligations.  This Court's pre-*Smith* decisions instruct that a religious exemption is not required where—as here— it would "impose [an] employer's religious faith on [its] employees" by denying those employees benefits to which they are entitled under federal law.  *Lee*, 455 U.S. at 261.  Consistent with that principle, this Court has emphasized that courts applying RFRA "*must* take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries," *Hobby Lobby*, 134 S. Ct. at 2781 n.37 (quoting *Cutter*, 544 U.S. at 720) (emphasis added), and must ensure that religious accommodations "do[] not override

---

[31] Contraceptives are an integral part of women's overall medical care.  Among other things, they are used by women with "medical conditions for which pregnancy is contraindicated," *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring), and a recent study found that 21% of women using contraceptives relied on them to "manage a medical condition" in addition to preventing pregnancy, Kaiser Family Found., *Women and Health Care in the Early Years of the Affordable Care Act* 35 (2014).  More broadly, women's selection of contraceptive methods are informed by consultations with their doctors about their individual needs.  J.A. 570-571.

79

other significant interests," *Cutter*, 544 U.S. at 722. The exercise of religion by an employer may not "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling." *Hobby Lobby*, 134 S. Ct. at 2787 (Kennedy, J., concurring).

b. Petitioners' proposals also operate outside any "existing, recognized, workable, and already-implemented framework to provide coverage." *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring). Indeed, petitioners' various proposals boil down to a demand that Congress enact and fund a new government-administered contraceptive benefit for their employees, imposing "a whole new program or burden on the Government." *Ibid.* There is no basis for construing RFRA, which is an Act of Congress, to have the startling effect of requiring Congress itself to enact another law in order to furnish third parties benefits to which they are already entitled under existing law. Such a result would be at odds with the text of RFRA itself, which is expressly intended to "strik[e] sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. 2000bb(a)(5); see *O Centro*, 546 U.S. at 439 (RFRA requires courts to "strike sensible balances.").

In virtually every RFRA case, some imaginable new governmental program could be cast as a less-restrictive alternative. On petitioners' logic, for example, employers with religious objections would be entitled to exemptions from virtually any employment regulation on the ground that the government could always step in and provide the benefit to the employees directly. An employer with religious objections to rubella or hepatitis immunizations would be entitled to

80

an exemption from the obligation to cover those im-
munizations, because Congress could enact a new law
establishing separate insurance for such vaccina-
tions.[32]  Any objecting employer would be entitled to a
RFRA exemption from minimum-wage laws on the
theory that Congress could make up the difference
between what the employer is willing to pay and what
the law guarantees.   See *Tony & Susan Alamo
Found.* v. *Secretary of Labor*, 471 U.S. 290, 303-306
(1985).

That mode of analysis has no support in any Free
Exercise or RFRA precedent, and it is impossible to
reconcile with *Lee*.  In that case, the Court denied an
exemption to an Amish employer with religious objec-
tions to participating in the Social Security system in
part because the exemption would have resulted in the
denial of benefits to employees.  455 U.S. at 259-261.
On petitioners' theory, however, the government itself
should have stepped in to pay Social Security benefits
directly to the employees, or restructured the Social
Security system to rely on direct employee contribu-
tions or general tax revenues rather than employer
withholding.   All of those steps were theoretically
within Congress's power, and all of them would have
been less burdensome on the employer than requiring
his participation in the Social Security system.  This
Court rejected that logic under the Free Exercise

---

[32] See Liberty Counsel, *Compulsory Vaccinations Threaten
Religious Freedom* (2007), http://www.lc.org/Uploads/files/pdf/
memo_vaccination.pdf (argument by one of petitioners' amici
asserting religious objections to rubella and hepatitis vaccines).

81

Clause, and it should not attribute to Congress an intent to take such a dramatic step in RFRA.[33]

Petitioners suggest that their proposals would require only modest changes to existing programs, and in some instances they deny that those proposals would require any action by Congress. But as the Departments have explained, they "lack the statutory authority and funding to implement these proposals," each of which would require the transformation of a program designed for other purposes into one funding government-administered contraceptive coverage (or comprehensive coverage) for petitioners' employees. 78 Fed. Reg. at 39,888; accord 80 Fed. Reg. at 41,328.

First, petitioners assert (*Zubik* Br. 77-78; *ETBU* Br. 72-75) that female employees should be required

---

[33] In *City of Boerne* v. *Flores*, 521 U.S. 507 (1997), this Court stated in dicta that RFRA's "least restrictive means requirement * * * was not used" in pre-*Smith* decisions. *Id.* at 535. That statement suggested that RFRA "did more than merely restore the balancing test" used in pre-*Smith* decisions such as *Lee* and instead imposed a more stringent standard. *Hobby Lobby*, 134 S. Ct. at 2761 n.3. But *City of Boerne* had no occasion to decide the issue, and this Court has not endorsed or relied on its characterization. See *id.* at 2767 n.18 (reserving the question). In fact, pre-*Smith* decisions *did* apply a least-restrictive-means standard. *Id.* at 2792-2793 (Ginsburg, J., dissenting); see, *e.g.*, *Bob Jones Univ.* v. *United States*, 461 U.S. 574, 604 (1983) ("no less restrictive means") (citation and internal quotation marks omitted); *Thomas*, 450 U.S. at 718 ("least restrictive means"). And RFRA itself endorses the Court's pre-*Smith* decisions as establishing a "workable test for striking sensible balances between religious liberty and competing prior governmental interests" and confirms that the purpose of the statute is to "restore" the test as set forth in those decisions—not to impose a different and more demanding standard. 42 U.S.C. 2000bb(a)(5) and (b)(1); see *Sossamon* v. *Texas*, 563 U.S. 277, 281 (2011); *O Centro*, 546 U.S. at 439.

82

to forgo employer-sponsored coverage altogether and obtain individual health policies through the Affordable Care Act's Exchanges. Absent action by Congress, this approach would severely penalize petitioners' employees by forcing them to pay the considerable cost of those policies entirely out of pocket: The tax credits that (partially) subsidize coverage for the vast majority of Exchange customers are available only to individuals whose employers do *not* offer coverage. 26 U.S.C. 36B(c)(2)(B).[34] Those credits are also limited to taxpayers with household incomes below 400% of the federal poverty level. 26 U.S.C. 36B(b)(3). And in any event, petitioners' assertion that the government should assume the financial burden of subsidizing *all* health coverage for their female employees (and male employees with female dependents) is scarcely a reasonable proposal for ensuring the provision of contraceptive coverage.

Second, petitioners suggest (*Zubik* Br. 75-77; *ETBU* Br. 74) that the government should pay for their employees to receive "contraceptive-only health plans" on the Exchanges. By statute, however, Exchanges may make available only "qualified health plans" providing comprehensive coverage; they could not offer contraceptive-only policies. 42 U.S.C. 18031(d)(2)(B)(i); see 42 U.S.C. 18021(a)(1)(B). Such policies do not exist in the private insurance market at all, and would not be consistent with existing insur-

---

[34] There are exceptions where the employer-sponsored coverage is unaffordable or fails to cover a sufficient share of expected medical expenses. 26 U.S.C. 36B(c)(2)(C). But those exceptions do not apply where, as here, an employer fails to comply with statutory requirements like the requirement to cover preventive services without cost-sharing.

83

ance regulations.   Petitioners thus would have Congress mandate a new insurance product in addition to fundamentally changing the type of coverage available on the Exchanges.

Third, petitioners assert (*Zubik* Br. 80-81; *ETBU* Br. 75-76) that the government could offer contraceptive coverage under Title X of the Public Health Service Act, 42 U.S.C. 300 *et seq.*, to the women denied coverage as a result of petitioners' opt-out.   But Title X does not establish a health-coverage program providing payments for medical services rendered to a population of eligible individuals.   It is a grant program that directly funds family-planning clinics (subject to the availability of varying annual appropriations). 42 U.S.C. 300.   By statute, moreover, all clinics receiving Title X grants must prioritize "persons from low-income families." 42 U.S.C. 300a-4.[35]   And contrary to petitioners' assertion (*Zubik* Br. 80-81), HHS cannot interpret "persons from low-income families" to mean "persons employed by organizations religiously opposed to contraceptive coverage."

Fourth, the *Zubik* petitioners contend (Br. 81-82) that the government should make contraceptive-coverage available through "some other 'public option'" such as "Medicaid" or "Medicare," or by establishing a new scheme of "refundable tax credits" specifically for contraceptives.   Those proposals would

---

[35] HHS regulations provide that patients with incomes above 250% of the federal poverty level must pay the reasonable cost of any services they receive through a Title X clinic.   42 C.F.R. 59.5(a)(8).   More than 90% of patients served at Title X clinics have incomes below that level.   HHS, *Title X: The National Family Planning Program* 1 (May 2014), http://www.hhs.gov/opa/pdfs/title-x-national-family-planning-overview.pdf

84

unquestionably require congressional action to create a "whole new program" (in substance if not in name). *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring).

Petitioners' various alternative proposals thus reduce to the assertion that Congress must provide contraceptive coverage to their employees through legislation establishing a new government-administered program, rather than under the statutory framework Congress has already put in place. But petitioners cite no authority suggesting that RFRA's least-restrictive-means test requires consideration of such "radically different alternatives" to an existing regulatory regime. *University of Notre Dame*, 786 F.3d at 625 (Hamilton, J., concurring). And if RFRA were construed to require such an alternative, petitioners' employees would suffer the elimination of their statutorily guaranteed benefits—with consequent harms to their health, their autonomy, and their basic dignity—unless and until Congress enacted new legislation.

Once it is established that the challenged policy serves a compelling interest, the question is whether the government has pursued that interest through the least-restrictive means "available." *Bob Jones Univ.* v. *United States*, 461 U.S. 574, 604 (1983).[36] The accommodation amply satisfies that standard. "The heart of the Affordable Care Act was a decision to approach universal health insurance by expanding"

---

[36] Even in the free-speech context, the least-restrictive-means standard requires the government to demonstrate that "the challenged regulation is the least restrictive means among *available, effective* alternatives." *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004) (emphasis added).

85

and improving the existing "employer-based system of private health insurance that had evolved in our country, rather than to substitute a new 'single payer' government program to pay for health care, like the systems in place in the United Kingdom and Canada." *University of Notre Dame*, 786 F.3d at 625 (Hamilton, J., concurring); see 78 Fed. Reg. at 39,888.  The accommodation works within that system of private, employer-based coverage to ensure that the compelling interests served by the contraceptive-coverage requirement are met, while also eliminating any role for objecting employers.

c. Finally, there is no assurance that any of petitioners' proffered alternatives could be administered in a manner consistent with their religious objections to the accommodation, or those of other employers.  In order to provide special contraceptive coverage through the Exchanges, Title X, or some other government program, the government would still need objecting employers to give notice of their objection in some fashion so that the government could identify their employees, confirm their eligibility, and provide the benefits.  That notice requirement would be subject to an objection like the one petitioners press here: employers could assert that providing notice in any form would make them complicit in the government's subsequent provision of contraceptive coverage.  Cf. *Little Sisters* Pet. App. 59a n.25 (noting that some of the *ETBU* petitioners previously opposed any requirement that they "affirmatively voic[e] a religious objection" to providing contraceptive coverage).

   3. ***Petitioners do not endorse an alternative notice procedure, which is in any event not a valid less-restrictive means***

   In dissenting from the denial of rehearing en banc in the D.C. Circuit, Judge Kavanaugh suggested that the accommodation regulations do not furnish the least-restrictive means of serving the government's compelling interests because they require an objecting employer that chooses to opt out by providing notice to HHS to identify its insurers or TPAs—information that this Court did not require in its interim order *Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014), or in similar interim injunctions granted to some of the petitioners in these cases. *RCAW* Pet. App. 277a; see 135 S. Ct. 2924 (*Zubik*); 134 S. Ct. 1022 (*Little Sisters*). Judge Kavanaugh inferred from this Court's orders that "the Government can independently determine the identity of the [objecting] organizations' insurers [and TPAs]." *RCAW* Pet. App. 273a. Therefore, although he emphasized that "[t]he Government may of course continue to require the religious organizations' *insurers* [*and TPAs*] to provide contraceptive coverage to the religious organizations' employees," he would have required the government to allow objecting employers to invoke the accommodation by providing notice to HHS without identifying those third parties. *Id.* at 278a.

   a. Petitioners have conspicuously declined to endorse the procedure contemplated by Judge Kavanaugh. That is presumably because such a procedure would trigger exactly the same religious objections petitioners' press here: It would still require objecting employers to take action to opt out of the contraceptive-coverage requirement, and the govern-

87

ment would still respond by requiring or encouraging their insurers and TPAs to provide coverage separately. Because petitioners have not endorsed it, and because it would not resolve their religious objections, the notice procedure identified by Judge Kavanaugh does not qualify as an available less-restrictive alternative for RFRA purposes. See *Hobby Lobby*, 134 S. Ct. at 2782 n.40 (to qualify as a less-restrictive means, a proposed alternative must "accommodate[] the religious beliefs asserted in the[] cases" before the court).

b. In any event, Judge Kavanaugh's conclusion that the notice procedure he described is a viable alternative rested on a mistaken premise. He appeared to assume that this Court's interim orders in *Wheaton* and *Zubik* did not require the challengers to identify their insurers and TPAs because the government is able to determine that information "independently." *RCAW* Pet. App. 273a. But as this Court was aware, the government knew the identities of the relevant insurers and TPAs in *Wheaton* and *Zubik* because the challengers themselves had *already* provided that information in the course of the litigation. *Wheaton*, 134 S. Ct. at 2815 (Sotomayor, J., dissenting); Mem. for Resps. in Opp. at 31 & n.17, No. 14A1065 (*Zubik*). The government does not have records of employers' insurers and TPAs as a general matter; that information is not reliably made public; and neither the Departments nor public commenters have identified "any alternative means the Departments c[ould] use to obtain the required information" if it were not provided by objecting employers. 80 Fed. Reg. at 41,323.

The information required by the alternative notice procedure thus "represents the minimum information

88

necessary" for the Departments to administer the accommodation if an objecting employer chooses to opt out by providing notice of its objection to HHS. 80 Fed. Reg. at 41,323. And the information is neither religious nor confidential. RFRA does not confer a right on a religious employer to withhold that factual information from the Departments responsible for implementing the Affordable Care Act. Furnishing such information is, rather, the kind of routine administrative task that may be required of a religious objector "in the administration of governmental programs." *Little Sisters* Pet. App. 90a. But to the extent that objecting employers do not wish to provide that information to the government, they also retain the option of opting out by sending the self-certification form directly to their insurers and TPAs, without involving the government at all.

\*   \*   \*   \*   \*

The regulations petitioners challenge serve the government's compelling interest in ensuring that women receive full and equal health coverage, while also allowing objecting employers to opt out of any role in providing the coverage to which they object. That solution embodies precisely the sort of "sensible balance[]" that Congress contemplated in enacting RFRA. *O Centro*, 546 U.S. at 439 (quoting 42 U.S.C. 2000bb(a)(5)). This Court has never before held that RFRA (or the pre-*Smith* standard it restores) mandates the recognition of a religious exemption that would abridge the rights of third parties under federal law or compel the creation of a new government-administered benefit. It should not do so for the first time here.

89

**CONCLUSION**

The judgments of the courts of appeals should be affirmed.

Respectfully submitted.

DONALD B. VERRILLI, JR.
  *Solicitor General*
BENJAMIN C. MIZER
  *Principal Deputy Assistant*
  *Attorney General*
IAN HEATH GERSHENGORN
EDWIN S. KNEEDLER
  *Deputy Solicitors General*
BRIAN H. FLETCHER
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
ALISA B. KLEIN
ADAM C. JED
PATRICK G. NEMEROFF
MEGAN BARBERO
JOSHUA SALZMAN
  *Attorneys*

FEBRUARY 2016

# APPENDIX

1.   42 U.S.C. 2000bb provides:

**Congressional findings and declaration of purposes**

**(a)   Findings**

The Congress finds that—

(1)   the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2)   laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3)   governments should not substantially burden religious exercise without compelling justification;

(4)   in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5)   the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b)   Purposes**

The purposes of this chapter are—

(1)   to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guar-

(1a)

2a

antee its application in all cases where free exercise of religion is substantially burdened; and

(2)   to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

2.   42 U.S.C. 2000bb-1 provides:

**Free exercise of religion protected**

**(a)   In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b)   Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1)   is in furtherance of a compelling governmental interest; and

(2)   is the least restrictive means of furthering that compelling governmental interest.

**(c)   Judicial relief**

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.   Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

3a

3.   42 U.S.C. 2000bb-2 provides:

**Definitions**

As used in this chapter—

(1)   the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

(2)   the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

(3)   the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4)   the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.


4.   42 U.S.C. 2000bb-3 provides:

**Applicability**

**(a)   In general**

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

**(b)   Rule of construction**

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

4a

**(c)     Religious belief unaffected**

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

5.   42 U.S.C. 2000bb-4 provides:

**Establishment clause unaffected**

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause").   Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter.   As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

6.   42 U.S.C. 300gg-13 provides:

**Coverage of preventive health services**

**(a)     In general**

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—

(1)   evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force;

5a

(2)   immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and[1]

(3)   with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.[2]

(4)   with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.[2]

(5)   for the purposes of this chapter, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.

Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by United States Preventive Services Task Force or to deny coverage for services that are not recommended by such Task Force.

---

[1]  So in original.   The word "and" probably should not appear.
[2]  So in original.   The period probably should be a semicolon.

6a

**(b)   Interval**

**(1)   In general**

The Secretary shall establish a minimum interval between the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline.

**(2)   Minimum**

The interval described in paragraph (1) shall not be less than 1 year.

**(c)   Value-based insurance design**

The Secretary may develop guidelines to permit a group health plan and a health insurance issuer offering group or individual health insurance coverage to utilize value-based insurance designs.


7.   42 U.S.C. 18011 provides:

**Preservation of right to maintain existing coverage**

**(a)   No changes to existing coverage**

**(1)   In general**

Nothing in this Act (or an amendment made by this Act) shall be construed to require that an individual terminate coverage under a group health plan or health insurance coverage in which such individual was enrolled on March 23, 2010.

7a

**(2)   Continuation of coverage**

Except as provided in paragraph (3), with respect to a group health plan or health insurance coverage in which an individual was enrolled on March 23, 2010, this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply to such plan or coverage, regardless of whether the individual renews such coverage after March 23, 2010.

**(3)   Application of certain provisions**

The provisions of sections 2715 [42 U.S.C. 300gg-15] and 2718 [42 U.S.C. 300gg-18] of the Public Health Service Act (as added by subtitle A) shall apply to grandfathered health plans for plan years beginning on or after March 23, 2010.

**(4)   Application of certain provisions**

**(A)   In general**

The following provisions of the Public Health Service Act [42 U.S.C. 201 et seq.] (as added by this title)[1] shall apply to grandfathered health plans for plan years beginning with the first plan year to which such provisions would otherwise apply:

(i)   Section 2708 [42 U.S.C. 300gg-7] (relating to excessive waiting periods).

(ii)   Those provisions of section 2711 [42 U.S.C. 300gg-11] relating to lifetime limits.

(iii)   Section 2712 [42 U.S.C. 300gg-12] (relating to rescissions).

---

[1]   See References in Text note below.

8a

(iv)  Section 2714 [42 U.S.C. 300gg-14] (relating to extension of dependent coverage).

**(B)  Provisions applicable only to group health plans**

**(i)    Provisions described**

Those provisions of section 2711 [42 U.S.C. 300gg-11] relating to annual limits and the provisions of section 2704 [42 U.S.C. 300gg-3] (relating to pre-existing condition exclusions) of the Public Health Service Act (as added by this subtitle) shall apply to grandfathered health plans that are group health plans for plan years beginning with the first plan year to which such provisions otherwise apply.

**(ii)    Adult child coverage**

For plan years beginning before January 1, 2014, the provisions of section 2714 of the Public Health Service Act [42 U.S.C. 300gg-14] (as added by this subtitle) shall apply in the case of an adult child with respect to a grandfathered health plan that is a group health plan only if such adult child is not eligible to enroll in an eligible employer-sponsored health plan (as defined in section 5000A(f)(2) of title 26) other than such grandfathered health plan.

**(b)    Allowance for family members to join current coverage**

With respect to a group health plan or health insurance coverage in which an individual was enrolled on March 23, 2010, and which is renewed after such date, family members of such individual shall be permitted to

9a

enroll in such plan or coverage if such enrollment is permitted under the terms of the plan in effect as of March 23, 2010.

**(c)     Allowance for new employees to join current plan**

A group health plan that provides coverage on March 23, 2010, may provide for the enrolling of new employees (and their families) in such plan, and this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply with respect to such plan and such new employees (and their families).

**(d)     Effect on collective bargaining agreements**

In the case of health insurance coverage maintained pursuant to one or more collective bargaining agreements between employee representatives and one or more employers that was ratified before March 23, 2010, the provisions of this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply until the date on which the last of the collective bargaining agreements relating to the coverage terminates.  Any coverage amendment made pursuant to a collective bargaining agreement relating to the coverage which amends the coverage solely to conform to any requirement added by this subtitle or subtitle A (or amendments) shall not be treated as a termination of such collective bargaining agreement.

**(e)     Definition**

In this title,[1] the term "grandfathered health plan" means any group health plan or health insurance coverage to which this section applies.

---

[1] See References in Text note below.

10a

8.   26 C.F.R. 54.9815-2713 (as amended by 80 Fed. Reg. 41,342-41,343 (July 14, 2015)) provides in pertinent part:

**Coverage of preventive health services.**

(a)  *Services*—(1) *In general.*   Beginning at the time described in paragraph (b) of this section and subject to § 54.9815-2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

(i)   Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii)   Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been adopted by the Director of the Centers for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii)  With respect to infants, children, and adolescents, evidence-informed preventive care and screenings pro-

11a

vided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

\* \* \* \* \*

9.   26 C.F.R. 54.9815-2713A (as amended by 80 Fed. Reg. 41,343-41,344 (July 14, 2015)) provides:

**Accommodations in connection with coverage of preventive health services.**

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (3) of this section.

(1)   The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 54.9815-2713(a)(1)(iv) on account of religious objections.

(2)(i)   The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii)   The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the

12a

organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owner's sincerely held religious beliefs.

(3)   The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section.   The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies.   The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4)   A closely held for-profit entity is an entity that—

(i)   Is not a nonprofit entity;

(ii)   Has no publicly traded ownership interests, (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

(iii) Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv) For the purpose of the calculation in paragraph (a)(4)(iii) of this section, the following rules apply:

13a

(A) Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries. Ownership interests owned by a nonprofit entity are considered owned by a single owner.

(B) An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

(C) If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

(v) A for profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services. An entity must submit the letter in the manner described by the Department of Health and Human Services. If the entity does not receive a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (a)(4)(iii) of this section.

(b) *Contraceptive coverage—self-insured group health plans.* (1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 54.9815-2713(a)(1)(iv) to provide contraceptive coverage

14a

if all of the requirements of this paragraph (b)(1) are satisfied:

(i)   The eligible organization or its plan contracts with one or more third party administrators.

(ii)   The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

(A)   When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3-16 and this section.

(B)   When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.   If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services.   The Department of Labor (working with the

15a

Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3-16 and this section.

(2)   If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i)   Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii)   Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

16a

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(c) *Contraceptive coverage—insured group health plans.* (1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 54.9815-2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815-2713. An issuer may not require any further documentation from the eligible organization regarding its status as such.

17a

(ii)   When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.   If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services.   The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2)   *Payments for contraceptive services.*   (i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 54.9815-2713(a)(1)(iv) must—

18a

(A)  Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B)  Provide separate payments for any contraceptive services required to be covered under § 54.9815-2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii)  With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.  The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services.  The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815.  If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 54.9815-2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage.  However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d)  *Notice of availability of separate payments for contraceptive services—self-insured and insured group health plans.*  For each plan year to which the accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or ar-

19a

range payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year.  The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints.  The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing.  This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage.  Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan.  Your employer will not administer or fund these payments.  If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

20a

(e)  *Reliance—insured group health plans.*  (1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 54.9815-2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2)  A group health plan is considered to comply with any requirement under § 54.9815-2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

(f)  [Reserved].    For  further  guidance,  see § 54.9815-2713AT(f).


10.   29 C.F.R. 2510.3-16 provides:

**Definition of "plan administrator."**

(a)  *In general.*   The term "plan administrator" or "administrator" means the person specifically so designated by the terms of the instrument under which the plan is operated.   If an administrator is not so designated, the plan administrator is the plan sponsor, as defined in section 3(16)(B) of ERISA.

(b)  In the case of a self-insured group health plan established or maintained by an eligible organization, as  defined  in  § 2590.715-2713A(a)  of  this  chapter,  if the eligible organization provides a copy of the self-certification of its objection to administering or funding

21a

any contraceptive benefits in accordance with § 2590.715-2713A(b)(1)(ii) of this chapter to a third party administrator, the self-certification shall be an instrument under which the plan is operated, shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, and shall supersede any earlier designation. If, instead, the eligible organization notifies the Secretary of Health and Human Services of its objection to administering or funding any contraceptive benefits in accordance with § 2590.715-2713A(b)(1)(ii) of this chapter, the Department of Labor, working with the Department of Health and Human Services, shall separately provide notification to each third party administrator that such third party administrator shall be the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, with respect to benefits for contraceptive services that the third party administrator would otherwise manage. Such notification from the Department of Labor shall be an instrument under which the plan is operated and shall supersede any earlier designation.

(c) A third party administrator that becomes a plan administrator pursuant to this section shall be responsible for—

(1) Complying with section 2713 of the Public Health Service Act (42 U.S.C. 300gg-13) (as incorporated into section 715 of ERISA) and § 2590.715-2713 of this chapter with respect to coverage of contraceptive services. To

22a

the extent the plan contracts with different third party administrators for different classifications of benefits (such as prescription drug benefits versus inpatient and outpatient benefits), each third party administrator is responsible for providing contraceptive coverage that complies with section 2713 of the Public Health Service Act (as incorporated into section 715 of ERISA) and § 2590.715-2713 of this chapter with respect to the classification or classifications of benefits subject to its contract.

(2)   Establishing and operating a procedure for determining such claims for contraceptive services in accordance with § 2560.503-1 of this chapter.

(3)   Complying with disclosure and other requirements applicable to group health plans under Title I of ERISA with respect to such benefits.

11.   29 C.F.R. 2590.715-2713 provides in pertinent part:

**Coverage of preventive health services.**

(a)   *Services*—(1) *In general.*   Beginning at the time described in paragraph (b) of this section and subject to § 2590.715-2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

(i)   Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with

23a

respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii) Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been adopted by the Director of the Centers for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii) With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

*   *   *   *   *

24a

12.   29 C.F.R. 2590.715-2713A (as amended by 80 Fed. Reg. 41,345-41,346 (July 14, 2015)) provides:

**Accommodations in connection with coverage of preventive health services.**

(a)   *Eligible organizations*.   An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (3) of this section.

(1)   The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 2590.715-2713(a)(1)(iv) on account of religious objections.

(2)(i)   The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii)   The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs.

(3)   The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section.   The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies.   The self-certification or notice

must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4)   A closely held for-profit entity is an entity that—

(i)   Is not a nonprofit entity;

(ii)   Has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

(iii)   Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv)   For the purpose of the calculation in paragraph (a)(4)(iii) of this section, the following rules apply:

(A)   Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries.   Ownership interests owned by a nonprofit entity are considered owned by a single owner.

(B)   An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family.   Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

26a

(C)   If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

(v)   A for-profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services.   An entity must submit the letter in the manner described by the Department of Health and Human Services.   If the entity does not receive a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (a)(4)(iii) of this section.

(b)   *Contraceptive coverage—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 2590.715-2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

(i)   The eligible organization or its plan contracts with one or more third party administrators.

(ii)   The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

27a

(A)  When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in § 2510.3-16 of this chapter and this section.

(B)  When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.  If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services.  The Department of Labor (working with the Department of Health and Human Services), shall send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under § 2510.3-16 of this chapter and this section.

(2)  If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter

28a

into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i)   Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii)   Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3)   If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4)   A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

29a

(c)   *Contraceptive coverage—insured group health plans*—(1) *General rule.*  A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 2590.715-2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i)   When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 2590.715-2713.  An issuer may not require any further documentation from the eligible organization regarding its status as such.

(ii)   When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.  If there is a change in any of the information

30a

required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 2590.715-2713(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the

31a

monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 715 of ERISA. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d) *Notice of availability of separate payments for contraceptive services—self-insured and insured group health plans.* For each plan year to which the accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model lan-

32a

guage, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 2590.715-2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 2590.715-2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

33a

13.   45 C.F.R. 147.130 provides in pertinent part:

**Coverage of preventive health services.**

(a)   *Services*—(1) *In general.*   Beginning at the time described in paragraph (b) of this section and subject to § 147.131, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

(i)   Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii)   Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been adopted by the Director of the Centers for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii)   With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

34a

(iv) With respect to women, to the extent not de-
scribed in paragraph (a)(1)(i) of this section, evidence-
informed preventive care and screenings provided for in
binding comprehensive health plan coverage guidelines
supported by the Health Resources and Services Admin-
istration.

\*   \*   \*   \*   \*

14.   45 C.F.R. 147.131 provides:

**Exemption and accommodations in connection with cov-
erage of preventive health services.**

(a) *Religious employers.*   In issuing guidelines
under § 147.130(a)(1)(iv), the Health Resources and Ser-
vices Administration may establish an exemption from
such guidelines with respect to a group health plan estab-
lished or maintained by a religious employer (and health
insurance coverage provided in connection with a group
health plan established or maintained by a religious em-
ployer) with respect to any requirement to cover contra-
ceptive services under such guidelines.   For purposes of
this paragraph (a), a "religious employer" is an organiza-
tion that is organized and operates as a nonprofit entity
and is referred to in section 6033(a)(3)(A)(i) or (iii) of the
Internal Revenue Code of 1986, as amended.

(b) *Eligible organizations.*   An eligible organization
is an organization that meets the criteria of paragraphs
(b)(1) through (3) of this section.

(1)   The organization opposes providing coverage for
some or all of any contraceptive items or services re-
quired to be covered under § 147.130(a)(1)(iv) on account
of religious objections.

35a

(2)(i)  The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii)  The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs.

(3)  The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Secretary of Health and Human Services as described in paragraph (c) of this section.  The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies.  The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4)  A closely held for-profit entity is an entity that—

(i)  Is not a nonprofit entity;

(ii)  Has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

36a

(iii)  Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv)  For the purpose of the calculation in paragraph (b)(4)(iii) of this section, the following rules apply:

(A)  Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries.  Ownership interests owned by a nonprofit entity are considered owned by a single owner.

(B)  An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family.  Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

(C)  If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

(v)  A for-profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services.  An entity must submit the letter in the manner described by the Department of Health and Human Services.  If the entity does not receive a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be con-

37a

sidered to meet the requirement set forth in paragraph (b)(4)(iii) of this section.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule*.   A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i)   When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 147.130.   An issuer may not require any further documentation from the eligible organization regarding its status as such.

(ii)   When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of § 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.

38a

If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 147.130(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 147.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive ser-

39a

vices.   The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act.   If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 147.130(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage.   However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d)   *Notice of availability of separate payments for contraceptive services—insured group health plans and student health insurance coverage.*   For each plan year to which the accommodation in paragraph (c) of this section is to apply, an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year.   The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services, and must provide contact information for questions and complaints.   The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your [employer/institution of higher education] has certified that your [group health plan/student health insurance coverage] qualifies for an accommodation with re-

40a

spect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your [employer/institution of higher education] will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of health insurance issuer] will provide separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your [group health plan/student health insurance coverage]. Your [employer/institution of higher education] will not administer or fund these payments. If you have any questions about this notice, contact [contact information for health insurance issuer]."

(e) *Reliance*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

(f) *Application to student health insurance coverage*. The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education as defined in 20 U.S.C. 1002 in a manner comparable to that in which

41a

they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer.   In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.