United States District Court
District of Massachusetts

```
─────────────────────────  )
Commonwealth of Massachusetts,  )
                           )
        Plaintiff,         )
                           )
        v.                 )      Civil Action No.
                           )      17-11930-NMG
United States Department of )
Health and Human Services; Alex )
M. Azar II, in his official )
capacity as Secretary of Health )
and Human Services; United )
States Department of the   )
Treasury; Steven T. Mnuchin, in )
his official capacity as   )
Secretary of the Treasury; )
United States Department of )
Labor; and R. Alexander Acosta, )
in his official capacity as )
Secretary of Labor,        )
                           )
        Defendants.        )
─────────────────────────  )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case involves a dispute about the validity of two Interim Final Rules ("IFRs") issued by the United States Department of Health and Human Services, the United States Department of the Treasury and the United States Department of Labor (collectively "defendants" or "the Departments") on October 6, 2017. The IFRs expand the religious exemption to the

contraceptive mandate of the Affordable Care Act ("ACA") and create a new moral exemption to that mandate.

The Commonwealth of Massachusetts ("plaintiff" or "the Commonwealth") alleges that 1) the Departments did not engage in notice and comment rulemaking before issuing the IFRs in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, 2) the IFRs are not in accordance with law and exceed the defendants authority in violation of the APA, 5 U.S.C. § 706, 3) the IFRs violate the Establishment Clause of the First Amendment of the United States Constitution and 4) the IFRs violate the equal protection guarantee of the Due Process Clause of the Fifth Amendment of the United States Constitution. The Commonwealth requests that this Court declare the IFRs unlawful and permanently enjoin their implementation on a nationwide, universal basis.

Pending before the Court are plaintiff's motion for summary judgment and defendants' cross-motion to dismiss or for summary judgment. Because the Commonwealth has failed to set forth specific facts establishing that it will likely suffer future injury from the defendants' conduct, it lacks standing to prosecute this action and defendants' motion for summary judgment will therefore be allowed and plaintiff's motion for summary judgment will be denied.

I.  **Background**

   **A. The contraceptive mandate**

   The Patient Protection and Affordable Care Act generally requires that employer-sponsored healthcare plans include a range of preventive care services on a no-cost basis ("the preventive services requirement"). <u>See</u> 42 U.S.C. §§ 18022 & 300gg-13. That requirement mandates no-cost coverage

   > with respect to women, . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"].

S. Amdt. 2791, 111th Congress (2009-2010).

   Thus, instead of including specific preventive care services, Congress delegated authority to HRSA, an agency within the Department of Health and Human Services ("HHS"). HRSA and HHS enlisted the Institute of Medicine ("IOM"), which convened a committee to assess what preventive services should be included. The IOM recommended that the services include

   > the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity.

IOM Report at 104.

   Accordingly, when the HRSA promulgated its Women's Preventive Services Guidelines in August 2011, non-exempt employers were required to provide

   > coverage, without cost sharing, [for] [a]ll Food and Drug Administration-approved contraceptive methods,

sterilization procedures, and patient education and counseling

("the contraceptive mandate").  Those guidelines went into effect in August, 2012.  The HRSA updated the Women's Preventive Services Guidelines in December 2016, reaffirming that the Guidelines should continue to require full coverage for contraceptive care and services.

## B. Accommodations for religious objections to the contraceptive mandate

In 2011 and 2012, the Departments issued regulations automatically exempting churches and their integrated auxiliaries, conventions and associations of churches and the exclusively religious activities of religious orders from the contraceptive mandate.  This "Church Exemption" corresponds to a category of employers defined in the Internal Revenue Code. See 77 Fed. Reg. 8725, 8726 (citing 26 U.S.C. §§ 6033(a)(3)(A)(i) and (iii)).  The Departments recognized that "certain non-exempted, non-profit organizations" also had religious objections to covering contraceptive services but determined that exempting such employers was not required by RFRA and was inconsistent with the ACA. 77 Fed. Reg. 8725, 8728.  Internal church decisions, the Departments explained in later regulations, are afforded a "particular sphere of autonomy" that does not extend to other religious employers. 80 Fed. Reg. 41,318, 41,325.

In 2013, the Departments issued regulations providing an accommodation for objecting religious, non-profit organizations and institutions of higher education. The accommodation created a system whereby insurers and third parties paid the full cost of contraceptive care and employees received seamless coverage ("the accommodation process"). That process was expanded to cover closely held, for-profit companies in response to Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014), in which the Supreme Court held that the contraceptive mandate violated the Religious Freedom Restoration Act ("RFRA") for certain closely-held, for-profit employers. The Court held that the "HHS contraceptive mandate substantially burden[ed] the exercise of religion." Id. at 2775 (internal quotation omitted) (citing 42 U.S.C. § 2000bb-1(a)). The accommodation process, the Court explained, was a "less restrictive means" of furthering the government interest and thus RFRA required that the accommodation be expanded to include certain closely held corporations. Id. at 2780-82.

In a separate series of cases, religious organizations such as universities and healthcare providers that did not perform "exclusively religious activities" challenged the legality of the accommodation process itself. See Zubik v. Burwell, 136 S. Ct. 1557 (2016). In May, 2016, those cases were remanded to their respective circuit courts for further consideration of

whether the accommodation process could be altered to address the religious employers' concerns while still providing seamless contraceptive coverage.  In January, 2017, after reviewing more than 50,000 comments, the Departments announced that the answer was "No".  No alternative, the Departments explained, would pose a lesser burden on religious exercise while ensuring contraceptive coverage.

**C. The Interim Final Rules**

On May 4, 2017, the President issued an "Executive Order Promoting Free Speech and Religious Liberty." Exec. Order No. 13,798, 92 Fed. Reg. 21,674 (May 4, 2017).  That order instructed agencies

> [to] consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4).

Id.

The Departments of the Treasury, Labor and HHS issued the two Interim Final Rules ("IFRs") at issue in this case on October 6, 2017. See 82 Fed. Reg. 47,799 ("Religious Exemption Rule"); 82 Fed. Reg. 47,838 ("Moral Exemption Rule").

The IFRs create an expanded religious exemption.  The HRSA exempts objecting entities "from any guidelines' requirements that relate to the provision of contraceptive services." 45 C.F.R. § 147.132(a).  The Religious Exemption Rule expands

objecting entities to include any non-governmental plan sponsor that objects to

> establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

45 C.F.R. § 147.132(a)(2).

The religious exemption also applies to institutions of higher education in their arrangement of student health insurance coverage to the extent of that institution's sincerely held religious beliefs. 45 C.F.R. § 147.132(a)(ii). It exempts all employers with a religious objection, as opposed to the prior Church Exemption covering churches, associations of churches and the exclusively religious activities of religious orders. It also affects religious non-profit organizations in that objecting organizations formerly subject to the accommodation process may now seek the exemption.

Under the preceding Administration, no moral exemption to the contraceptive mandate existed in any form. The Moral Exemption Rule provides an exemption for nonprofit organizations and for-profit entities with no publicly traded ownership interests that object to

> establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.

45 C.F.R. § 147.133(a)(2).

**D. Estimated Impact of the IFRs**

The Departments provided two estimates for the number of women who will likely be affected by the IFRs nationwide. The first, lower, estimate is derived largely from the Departments' experience litigating the contraceptive mandate, the Church Exemption and the accommodation.

The Departments begin their estimate by excluding certain categories of employers as unlikely to avail themselves of the expanded exemptions. The Religious IFR estimates that, for certain categories of employers, no women of child bearing age that use contraception and had access to no-cost contraceptive care through their employer before the Religious IFR was put into effect would lose coverage because of the employer's availment of the Religious IFR. Although these employers would be transitioning from the accommodation to the exemption, the Departments estimated that the Religious IFR would have no effect on those employers' employees. That is because

> the Departments continue to assume that such plans are similar to other objecting entities using self-insured church plans with respect to their third party administrators being unlikely to provide contraceptive coverage to plan participants and beneficiaries under the previous rule.

82 Fed. Reg. 47792, 47816.

The Departments excluded certain categories of employers from their estimates because the Departments deemed those employers unlikely to avail themselves of the exemption. For instance, the Departments state that

> although publicly traded entities could make use of exempt status under these interim final rules, the Departments do not expect that very many will do so.

82 Fed. Reg. 47792, 47816; see also 82 Fed. Reg. 47792, 47816 ("No publicly traded for-profit entities have filed lawsuits challenging the mandate.").

The Departments estimate that 209 entities will make use of the expanded religious exemption nationwide. This number was originally put forth in August 2014 and July 2015 as HHS's estimate of how many entities would avail themselves of the accommodation process. See 82 Fed. Reg. 47792, 47817. The figure was based on

> 122 eligible entities that had filed litigation challenging the accommodation process, and 87 closely held for-profit entities that had filed suit challenging the Mandate in general.

Id. (citing 79 Fed. Reg. 51096; 80 Fed. Reg. 41336).

Overall, the Departments estimate that of the 209 previously accommodated litigating entities, 109 "will make use of their exempt status, and 100 will continue using the accommodation." See id. In addition, the Departments assume

that nine entities newly eligible for the accommodation "will use the voluntary accommodation moving forward." See id.

Assuming that some of the previously accommodated litigating entities will continue using the accommodation while others will use the exemption, the Departments estimate that

> 109 entities will use the voluntary accommodation moving forward, 100 of which were already using the previous accommodation, and that 109 entities that have been using the previous accommodation will use the expanded exemption instead.

See id.

The Departments "expect approximately 23,000 women that use contraception covered by the guidelines to be affected" by those previously accommodated entities switching to the expanded religious exemption. Id.

The Departments estimate that those 209 litigating entities that were neither exempt nor likely using self-insured church plans "employed approximately 65,000 persons, male and female." See 82 Fed. Reg. 47792, 47819. The Departments estimate that the 65,000 figure includes

> approximately 7,221 women of childbearing age that use contraception covered by the Guidelines are covered by employer sponsored plans of entities that have filed lawsuits challenging the Mandate, where those plans are neither exempt under the prior rule nor are self-insured church plans.

See id.

In addition, the agencies estimate that an additional 1,462
women who obtained student plans from "educational institutions
objecting to the mandate as applied to student coverage" would
be affected by the IFRs nationwide.

Putting the figures together, the Departments estimate that
approximately 31,700 women throughout the country who are of
child-bearing age and use FDA-approved contraception will be
affected.  Of those, 1,462 come from objecting educational
institutions, 7,221 come from entities that challenged the
mandate and were not exempt under the prior rule and 23,000 come
from formerly accommodated entities that now will use the
exemption.  The estimate was produced by relying on these
different groups of employers, although the Departments conceded
that there may be overlap between groups.

Finally, the Departments estimate that the only non-profit
entities that will use the expanded Moral Exemption will be
entities "whose employees also oppose the coverage".  Similarly,
the Departments estimate that "no entities with non-religious
moral objections to the mandate will be institutions of higher
education" that provide student coverage.  The Departments
estimate 15 women employed by for-profit entities that are not
publicly traded and have non-religious moral objections to the
contraception mandate will lose coverage because of the expanded
moral exemption. Id.

**E. Upper Bound Estimated Impact**

The Departments' "upper bound" estimate extrapolates from the number of women of child bearing age using FDA-approved contraception who were covered by plans that omitted contraception before the ACA's contraception mandate came into effect.[1]  The Departments conclude that approximately 574,000 women of childbearing age who use contraceptives covered by the guidelines were covered by plans that omitted contraceptive coverage prior to the ACA. 82 Fed. Reg. 47792, 47822 (citation omitted).

That number was then reduced to account for publicly traded employers and houses of worship, integrated auxiliaries and self-insured church plans which would not provide contraception before the new interim rules and would continue not to do so thereafter. See id.

The Departments conclude that 362,100 women of childbearing age who use contraceptives covered by the guidelines were employed by private, non-publicly traded companies that denied contraceptive coverage in 2010. Id.  Hence, the Departments

---

[1] Both parties note that the Departments excluded the 31% of employer respondents which did not know whether they offered such coverage.  The Commonwealth asserts that this drastically underestimates the correct number but Defendants respond that the employers most likely to hold a religious or moral objection to contraception would also be likely to know whether they provided contraception.

estimate that 362,100 affected women is the "upper bound"
nationwide impact of the IFRs.

### F. Massachusetts state legislation

The Commonwealth of Massachusetts has addressed the issue
of contraceptive access through state legislation.  In 2002, the
Commonwealth enacted the Contraceptive Equity Law. See Mass. St.
2002, ch. 49, §§ 1-4.  That statute requires employer-sponsored
health plans that cover outpatient services, prescriptions or
devices to provide the same level of coverage for all FDA-
approved contraceptive services, prescriptions and devices. See
M.G.L. c. 175, § 47W; M.G.L. c. 176A, § 8W; M.G.L. c. 176B, §
4W; M.G.L. c. 176G, § 4O.  The law does not mandate that those
benefits be provided at no cost.  Instead, covered citizens are
still responsible for deductibles, copays and other cost-sharing
payments.

In November, 2017, Massachusetts enacted "an Act Relative
to Advancing Contraceptive Coverage and Economic Security in Our
State," otherwise known as the "ACCESS Act". See Mass. St. 2017,
ch. 120.  The bill was reported out of the House Committee on
Financial Services on November 6, 2017, enacted on November 14,
2017, and signed into law on November 20, 2017.  The statute has
been described as "codifying the Affordable Care Act's guarantee
of no copay birth control coverage into state law." See "With
Governor's Signature, Massachusetts protects birth control

-13-

access", Planned Parenthood Action Fund, Nov. 20, 2017,

available online at https://perma.cc/44NZ-9RMC.

The statute prohibits certain employer-sponsored health
plans from imposing cost-sharing fees (such as co-pays and
deductibles) in connection with the provision of contraceptives.
See, e.g., Mass. St. 2017, ch. 120, § 4 (providing that
insurance contracts between a subscriber and corporations that
provide benefits for outpatient services shall offer "at least 1
drug, device or other product . . . [for all] FDA approved
contraceptive drugs, devices and other products [excluding male
condoms and certain oral contraceptives] . . . without cost-
sharing").

The ACCESS Act includes no moral exemption.  Churches and
"qualified church-controlled organization[s]" are exempted from
certain provisions of the Act, provided that they

> provide written notice to prospective enrollees prior to
> enrollment with the plan and such notice shall list the
> contraceptive health care methods and services for which
> the employer will not provide coverage for religious
> reasons.

See, e.g., Mass. St. 2017, ch. 120, § 3.  The exemption does not
extend farther than those organizations and mirrors the
Departments' previous Church Exemption.  As such, some employers
that are able to invoke an exemption from the ACA mandate under

-14-

the expanded exemptions of the IFRs are unable to invoke an exemption under the ACCESS Act mandate.

Neither the ACCESS Act nor the Contraceptive Equity Law apply to self-insured employer plans.  Rather, such plans are governed by the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §§ 1144(a), (b)(2)(A).

**G. Massachusetts' system of contraceptive care**

The Commonwealth of Massachusetts "supports access to contraceptive care and services through an interrelated system" that includes direct coverage and reimbursements.  In Massachusetts, Medicaid and the Children's Health Insurance Program ("CHIP") are combined into one program called MassHealth.  Almost two million Massachusetts residents are enrolled members of the program.  Contraceptive services are a federally-mandated Medicaid benefit for eligible enrollees.

In addition, MassHealth serves as a secondary payer for approximately 150,000 residents who have commercial coverage, including employer-sponsored insurance and student health insurance.  This means that MassHealth provides "wrap around" coverage for certain services not provided by the resident's commercial insurance, including federally mandated Medicaid benefits such as contraceptive services.  Should an employer avail itself of the religious or moral exemption in the IFRs, "wrap around" enrollees will be entitled to receive replacement

-15-

coverage through MassHealth.  Under federal law, the
Commonwealth is responsible for paying 10% of all sums expended
on the "offering, arranging, and furnishing . . . of family
planning services and supplies." See 42 U.S.C. § 1396b(a)(5).

The Sexual and Reproductive Health Program ("SRHP") of the
Massachusetts Department of Public Health ("DPH") reimburses a
network of family planning program providers offering
contraception in the Commonwealth.  Approximately three-quarters
of SRHP's funding emanates from state appropriation.  The SRHP
funds plans that offer low or no-cost contraceptive services to
low-income Massachusetts residents, including all FDA-approved
contraceptives.  Those services are available to 1) uninsured
Massachusetts residents whose income is less than 300% of the
federal poverty level, 2) Massachusetts residents whose income
is less than 300% of the federal poverty level with a health
plan that does not cover all contraception methods and services
and 3) Massachusetts residents of any insurance status who
desire confidential care.

## II. Analysis

The role of summary judgment is "to pierce the pleadings
and to assess the proof in order to see whether there is a
genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d
816, 822 (1st Cir. 1991).  The burden is on the moving party to
show, through the pleadings, discovery and affidavits, "that

-16-

there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

If the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

In the administrative law context, the summary judgment rubric has a "special twist". <u>Assoc'd Fisheries of Me., Inc.</u> v. <u>Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997).  In this context, a court reviews "an agency action not to determine whether a dispute of fact remains but, rather, to determine" whether the

-17-

agency acted lawfully.  Boston Redevelopment Auth. v. Nat'l Park
Serv., 838 F.3d 42, 47 (1st Cir. 2016) (citing Mass. Dep't of
Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 526 (1st Cir.
1993)).  Where the parties treat the matter as a petition for
judicial review of agency action, the district court should
"follow[] the parties' lead and adjudicate[] the case in that
manner."  Boston Redevelopment Auth. v. Nat'l Park Serv., 838
F.3d 42, 47 (1st Cir. 2016).  Here, the Commonwealth urges this
Court to treat its motion for summary judgment as "a vehicle to
tee up [the] case for judicial review" and defendants do not
dispute that characterization.  Accordingly, the Court will
"follow the parties' lead".  Id.

**Standing**

While the judicial review standard applies to the merits of
the Commonwealth's claims, "[t]he party invoking federal
jurisdiction bears the burden of establishing" standing.  Lujan
v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  Because the
elements of standing are

> an indispensable part of the plaintiff's case, each element
> must be supported in the same way as any other matter on
> which the plaintiff bears the burden of proof, i.e., with
> the manner and degree of evidence required at the
> successive stages of the litigation.

Id.

General and hypothetical allegations of injury cannot
succeed at the summary judgment stage, where "plaintiffs must do

-18-

more than merely allege legal injury." Penobscot Nation v. Mills, 861 F.3d 324, 337 (1st Cir. 2017).  At this stage, plaintiff must set forth by affidavit or other evidence "specific facts" to establish standing. Defs. of Wildlife, 504 U.S. at 551 (quoting Fed. R. Civ. P. 56(e)) (internal quotation marks omitted).

Article III confines the jurisdiction of a federal court to actual "cases" or "controversies". Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982).  The "irreducible constitutional minimum of standing" requires that a plaintiff 1) suffered an injury in fact, 2) fairly traceable to the actions of the defendant that is 3) likely to be redressed by a favorable judicial decision. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  To establish Article III standing, a plaintiff must demonstrate that the injury in fact is "concrete, particularized, and actual or imminent". Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (citing Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 148 (2010)).  The Supreme Court has emphasized that concreteness requires that the alleged injury "actually exist" and amount to more than an "abstract" injury. Spokeo, 136 S.Ct. at 1548. Particularity reflects the notion that an injury "must affect the plaintiff in a personal and individual way". Defs. of Wildlife, 504 U.S. at 560 n.1.

The standing inquiry is affected here by the fact that the plaintiff is the Commonwealth of Massachusetts. "States are not normal litigants for the purposes of invoking federal jurisdiction." Massachusetts v. E.P.A., 549 U.S. 497, 518 (2007).

The Supreme Court has articulated a variety of theories by which a state may attempt to invoke federal jurisdiction. It may sue to vindicate its sovereign interests, its quasi-sovereign interests or its non-sovereign interests. See generally Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 600-602 (1982). Sovereign interests and certain non-sovereign interests, such as proprietary interests, reflect a direct injury to the state itself. See id. Under the parens patriae doctrine, in contrast, states "represent the interests of their citizens." Id. at 603 (citing North Dakota v. Minnesota, 263 U.S. 365 (1923)) (additional citations omitted). The injury the state asserts in such a case is "an injury to what has been characterized as a quasi-sovereign interest." Id. at 601 (internal quotation omitted). A quasi-sovereign interest is "a judicial construct that does not lend itself to a simple or exact definition. Id. It is clear, however, that if a state is "only a nominal party without a real interest of its own then it will not have standing under the parens patriae doctrine."

Id. at 600 (citing <u>Pennsylvania</u> v. <u>New Jersey</u>, 426 U.S. 660 (1976)) (additional citations omitted).

Massachusetts proffers three injuries to establish standing: an injury to the state fisc, an injury to the health and well-being of its residents and a procedural injury under the APA. The Court will consider the three theories of the Commonwealth <u>seriatim</u>.

### Fiscal Injury

A state may sue to protect an injury to its sovereign interests, such as "the power to create and enforce a legal code" or the demand that other sovereigns recognize its borders. <u>See</u>, <u>e.g.</u>, <u>New York</u> v. <u>United States</u>, 505 U.S. 144 (1992) (holding that portions of the Low-Level Radioactive Waste Policy Amendments Act of 1985 unconstitutionally commandeered state legislative policy in violation of the Tenth Amendment). A state may also incur an injury to its proprietary interests. <u>See</u> <u>Snapp</u>, 458 U.S. at 601. For example, a state may "own land or participate in a business venture." <u>Id.</u> When pursuing such a nonsovereign interest, the state "is likely to have the same interests as other similarly situated proprietors." <u>Id.</u> The Commonwealth does not explain whether it considers the injury alleged in this case to implicate a sovereign interest or a non-sovereign interest and the Court takes no position in that regard.

The Commonwealth asserts that in the short and long term, the IFRs will

> inflict significant financial harm on the Commonwealth, which will be legally obligated to assume the costs of contraceptive, prenatal and postnatal care for many women who lose coverage.

Specifically, the Commonwealth explains that

> the IFRs will result in thousands of Massachusetts women losing coverage for contraceptive care and services.

The Departments insist that such a theory fails as a matter of law because "a state cannot establish standing based on a claim of injury from such alleged indirect effects." Contra Texas v. United States, 809 F.3d 134 (5th Cir. 2015), aff'd by an evenly divided Court, 136 S. Ct. 2271 (2016) (per curiam). Assuming, without deciding, that the Commonwealth's theory succeeds as a matter of law, plaintiff has not made the requisite demonstration of specific facts.

### Proportional theory

The Court will refer to the Commonwealth's first theory of standing as its "proportional theory". The Commonwealth bases its opinion upon the Departments' estimate and then makes a back-of-the-envelope reckoning.

The Commonwealth alleges that "the Departments likely underestimate" the number of people who will lose coverage because of the IFRs and the percentage of those people who are

women of childbearing age who use contraception.  On the other

hand, it denies that the estimates render the IFRs "arbitrary

and capricious" in violation of the Administrative Procedure

Act.  Accordingly, although the parties quibble about whether

various figures over (or under) estimate the number of affected

women, the Court will assume that the Departments' figures

comprise an accurate estimation.

The Commonwealth adds the Departments' moral and religious

exemption estimates together to reach a total of between 31,715

and 120,015 women of child-bearing age who are currently using

contraception who will be affected by the IFRs nationwide.  The

Commonwealth then multiplies the Departments' nationwide

estimate by the appropriate population percentage (2.1%) to

conclude that "between 666 and 2,520 Massachusetts women" who

are currently using contraception will likely lose comprehensive

employer-sponsored contraceptive coverage.

The Departments determined that the average financial

transfer effect attributed to a woman's loss of contraception

would be approximately $584 per year.  Multiplying that $584

figure by the Commonwealth's affected employee estimates yields

an increased annual out-of-pocket cost of contraceptives of

between $388,944 and $1,471,680.   The Commonwealth claims it

"will be responsible for a significant share of these costs."

In a motion for summary judgment challenging a plaintiff's standing to sue, the burden is on the plaintiff to demonstrate standing with "specific facts." Defs. of Wildlife, 504 U.S. at 561. Inference and speculation do not suffice. See Rathbun v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004) (citation omitted)). The Commonwealth's proportional theory is unsupported by facts sufficient to satisfy its burden.[2]

The Commonwealth contends that the proportional theory suffices because

> the Departments have provided no reason to doubt that a proportionate number of [affected] women will reside in Massachusetts.

The Commonwealth, however, misapprehends its burden. See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 412 n. 4 (2013) ("[I]t is [plaintiffs'] burden to prove their standing by pointing to specific facts, not the Government's burden to disprove standing . . . .") (citing Defs. of Wildlife, 504 U.S. at 561). This Court has "an independent obligation to assure that standing exists, regardless of whether it is challenged" by the parties. Id. at 499 (citing Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986)). That requires, "at the

---

[2] Other courts have expressed doubt about such an approach. Cf. Summers v. Earth Island Inst., 555 U.S. 488, 497 (2009) (rejecting theory of organizational standing whereby an organization may demonstrate injury in fact if "there is a statistical probability that some of those members are threatened with concrete injury").

summary judgment stage, a factual showing of perceptible harm."
<u>Defs. of Wildlife,</u> 504 U.S. at 566; <u>cf.</u> <u>Summers</u>, 555 U.S. at 499
("While it is certainly possible — perhaps even likely — that
one individual will meet all of these criteria, that speculation
does not suffice.").

The unsupported assumption of the Commonwealth that it will
be proportionally affected by the IFRs is also tenuous.  Most
importantly, the Commonwealth does not address the "ACCESS Act",
which was enacted after the filing of this lawsuit.  That state
statute was reported out of the House Committee on Financial
Services exactly one month after the IFRs were promulgated and
was signed into law two weeks later.  In its amended complaint
and motion for summary judgment, the Commonwealth states that
the statute was enacted to "remedy [the] gap" of the
Contraceptive Equity Law, which, "unlike the ACA . . . does not
mandate no-cost contraceptive coverage."  At oral argument,
counsel for the Commonwealth explained that the statute requires
essentially the same coverage as the ACA mandate.

The ACCESS Act does not protect all Massachusetts
employees.  It does not apply to self-insured employer plans,
for instance, which are governed solely by federal law, <u>see</u> 29
U.S.C. §§ 1144(a), (b)(2)(A).  Nevertheless, the Act will almost
certainly compel some employers that would otherwise avail

themselves of the expanded exemptions to provide their employees no-cost contraceptive coverage.

Unlike the expanded religious exemption and the new moral exemption of the IFRs, the ACCESS Act includes a church exemption that mirrors the Church Exemption found in the Departments' previous regulations. Compare M.G.L. c. 175, § 47W(c) (providing an exemption if the employer is a "church or qualified church-controlled organization") with 77 Fed. Reg. 8725, 8726 (providing an exemption for "churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order").  Thus, certain Massachusetts employers that were ineligible for the exemption under previous federal regulations and became eligible under the new IFRs, are not eligible for an exemption under the ACCESS Act.

At oral argument, plaintiff's counsel emphasized that 60% of the State's workforce will not be covered by the protection afforded by the ACCESS Act.  When the Court inquired about what kinds of employers the Commonwealth expects to use the expanded exemptions but not to be covered by the ACCESS Act, however, counsel responded that the relevant inquiry involves statistical probabilities and not individual employers.  That approach produces further uncertainty.  For instance, it is unclear how 60% of the Massachusetts workface overlaps with the 31% of

employees in the private sector employed by publicly traded companies who the Departments estimate will not be affected.

Without further information about the 60% of employers referred to, the Court cannot determine whether it is likely that the Commonwealth will incur a fiscal injury.  It is clear that, given the new ACCESS Act, Massachusetts will be affected differently by the IFRs than other states but it is not at all clear how the coverage of the ACCESS Act will impact employers who may have intended to utilize the expanded exemptions.  The Commonwealth, as well as this Court, is left to surmise.

The Commonwealth has not established that it is likely that any Massachusetts employers will avail themselves of the IFRs' expanded exemptions.  The enactment of the ACCESS Act renders suspect the Commonwealth's assumption that the IFRs would affect women proportionally throughout the country.  To the extent the ACCESS Act affects the "metes and bounds" of the Commonwealth's injury, see Massachusetts v. E.P.A., 549 U.S. 497, 523 n. 21 (2007), its impact is irrelevant.  To the extent the Act affects the likelihood that the Commonwealth will be injured, however, plaintiff's failure to address its impact highlights the risk of turning "a live, concrete dispute", see Warth v. Seldin, 422 U.S. 490, 517 (1975), into a "generalized grievance[]". See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 97 (1998)

(quoting Schlesinger v. Reservists Comm. to Stop the War, 418
U.S. 208, 217 (1974)).

The State protests that the Departments have made it
"nearly impossible to identify whether specific employers have
claimed (or will claim) an exemption."  As a matter of law, to
the extent that it is "nearly impossible" to identify employers
availing themselves of an exemption, the Commonwealth's burden
to demonstrate standing is not abated. Cf. Clapper v. Amnesty
Int'l USA, 568 U.S. 398, 420 (2013) (rejecting plaintiffs'
suggestion "that they should be held to have standing because
otherwise the constitutionality of [the provision] could not be
challenged"); see also Valley Forge Christian Coll. v. Americans
United for Separation of Church & State, Inc., 454 U.S. 464, 489
(1982) ("[T]he assumption that if [plaintiffs] have no standing
to sue, no one would have standing, is not a reason to find
standing.") (quoting Schlesinger v. Reservists Committee to Stop
the War, 418 U.S. 208, 227 (1974)).

Relying on the Departments' approximation methodology,
however, certain employers are easily identifiable.  The
Departments rely on the number of employers that litigated the
contraception mandate or accommodation.  The Departments
identified 209 such institutions: 122 that challenged the
accommodation process and 87 for-profit employers that
challenged the mandate.  At oral argument, the Commonwealth

noted that at least two such entities have locations in Massachusetts: Hobby Lobby and the Little Sisters of the Poor but it conceded that it is unaware whether any such entities intend to make use of the expanded exemptions.

In this respect, Massachusetts stands in sharp contrast to Pennsylvania and California, two states that have also challenged the IFRs under the APA and the Constitution. See Pennsylvania v. Trump, No. 2:17-cv-04540-WB (E.D. Pa. filed Oct. 11, 2017); California v. HHS, No. 2:17-cv-04540-WB (N.D. Cal. filed Oct. 11, 2017)[3]. There is no doubt that employers in Pennsylvania and California intend to use the IFR's expanded exemptions, a prerequisite to a state incurring an injury to its state fisc or to the health and well-being of its residents. As to whether any Massachusetts employers intend to use the expanded exemptions, the record is uniquely obscure.

In Pennsylvania, Little Sisters of the Poor Saints Peter and Paul Home filed an emergency motion to intervene. See Emergency Motion to Intervene, Pennsylvania, ECF No. 19. That organization, a religious, nonprofit corporation operated by an order of Roman Catholic nuns, is located in Pittsburgh, Pennsylvania. In its motion, the Little Sisters stated that

---

[3] Delaware, Virginia, Maryland and New York joined the suit as plaintiffs after the filing thereof. See First Amended Complaint, California v. HHS, No. 2:17-cv-04540-WB (N.D. Cal. Nov. 1, 2017), ECF No. 24.

they intend to use the expanded religious exemption granted by the IFR. See Memorandum in Support of Emergency Motion to Intervene, Pennsylvania, ECF No. 19-1 at 10.  Similarly, in the California case, Little Sisters of the Poor Jeanne Jugan Residence, located in San Pedro, California, moved to intervene. See Motion to Intervene, California, ECF No. 38.  The California intervenors also expressed their intention to use the expanded religious exemption. See id. at 1.  In this case, by contrast, the Little Sisters of the Poor Jeanne Jugan Residence in Somerville is profoundly absent.

The Commonwealth contends that a proportionate number of affected women will reside in Massachusetts.  Instead of supporting that assumption, it relies on the fact that "the Departments have provided no reason to doubt that" proportionate figure.  Such an approach risks disposing of "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." Massachusetts v. E.P.A., 549 U.S. 497, 517 (2007) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).  To dispense with this requirement would be to allow an Article III court to "serve as a forum for generalized grievances." See Hollingsworth v. Perry, 133 S. Ct. 2652, 2662, 186 L. Ed. 2d 768 (2013) (quoting Lance v. Coffman, 549 U.S. 437, 439 (2007) (per curiam); cf. Massachusetts v. Mellon, 262 U.S. 447, 488 (1923) ("The party who invokes the

power must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury . . . and not merely that he suffers in some indefinite way in common with people generally."). As the Court has outlined above, the Massachusetts ACCESS Act provides good reason to believe that Massachusetts women are less likely to be affected.

## Metes and bounds

The State maintains that "[t]he Commonwealth need not" identify any Massachusetts employer that is likely to avail itself of the new exemptions. According to the Commonwealth, a plaintiff need not "allege an injury with exactitude, but must only establish the likelihood that an injury will occur." Relying on Massachusetts v. EPA, the Commonwealth correctly submits that it need not lay out "the metes and bounds" of its injury. See Massachusetts v. EPA, 549 U.S. 497, 523 n. 21 (2007). In that decision, the Supreme Court explained that the plaintiffs did not need to "quantify Massachusetts' land loss with the exactitude [the dissent] would prefer." Id. The Court noted that

> the likelihood that Massachusetts' coastline will recede
> has nothing to do with whether petitioners have determined
> the precise metes and bounds of their soon-to-be-flooded
> land.

Id.

Thus, the Court required plaintiffs to demonstrate that some of the land owned by Massachusetts would likely be flooded but did not require the Commonwealth to estimate just how much of its land would be lost. Applying that lesson to this case, Massachusetts need not present a precise estimate of how much money the state will spend or how many women will no longer have access to no-cost contraceptive coverage ("the metes and bounds" of the injury). It must, however, demonstrate that it is likely that some funds will be expended and some women will lose that coverage ("the likelihood").

In the EPA case, the Supreme Court relied on the Commonwealth's affidavit that explained that it "owns, operates and maintains approximately 53 coastal state parks, beaches, reservations, and wildlife sanctuaries" along with other identifiable properties and facilities. See Massachusetts, 549 U.S. at 522 n. 19; see also id. at 522 ("Because the Commonwealth owns a substantial portion of the state's coastal property, it has alleged a particularized injury in its capacity as a landowner.") (internal quotation omitted). Thus, the Commonwealth identified many properties that were likely to be injured but was not asked to specify which property or how many properties would be injured.

In the case at bar, by contrast, the Commonwealth does not identify any employers that are likely to avail themselves of

the expanded exemptions, much less identify employees who will
cause the Commonwealth the alleged "significant financial harm".
A more accurate analogue to Massachusetts v. EPA would be
presented if the Commonwealth identified a number of "litigating
entities" that employed residents of Massachusetts or identified
entities currently using the accommodation that are likely to
use the expanded exemption, and then explained that it is
unknown which or how many of those employers would claim the
expanded exemptions, thereby eventually causing the Commonwealth
financial harm.

### The Commonwealth's affidavits

As an alternative to its proportional theory, the
Commonwealth relies on affidavits it has filed and made part of
the record.  For instance, Massachusetts offers the declaration
of Caryn Dutton, M.D., M.S., the Medical Director of the
Gynecology Practice Brigham & Women's Hospital in Boston,
Massachusetts, who testifies, based on her personal knowledge,
that

> [i]f the IFRs are permitted to go into effect, I anticipate
> that some women in Massachusetts will lose coverage for
> contraceptive services as a result of their employer's
> exercise of one of the IFRs' exemptions.

The declaration does not provide the methodology that led
Dr. Dutton to her supposition.  Cf. SMS Sys. Maint. Servs., Inc.
v. Digital Equip. Corp., 188 F.3d 11, 25 (1st Cir. 1999)

("Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point.") (citation omitted). Nor does Dr. Dutton state that her belief arises from patients informing her that they will lose contraceptive coverage due to their employers' exemption. Cf. Fed. R. Evid. 803(4) (excluding from the rule against hearsay "statements made for medical diagnosis or treatment"). At the summary judgment stage, the party invoking federal jurisdiction "can no longer rest on mere allegations but must set forth by affidavit or other evidence specific facts." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 412 (2013) (quoting Defenders of Wildlife, 504 U.S. at 561). Specific facts, not "general averments", are required. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Dr. Dutton's affidavit does not proffer specific facts.

Similarly, the Commonwealth's declaration from financial investigator Colleen Frost does not demonstrate that the IFRs will cause injury to the Commonwealth. Frost estimates that between 365,000 and 380,000 Massachusetts residents, or roughly 25% of the women residents, are between the ages of 15 and 45 with employer or union provided health insurance and in household insurance units with income less than or equal to 300%

-34-

of the Federal Poverty Level.  That estimate does not alone
demonstrate that the Commonwealth will incur a significant
financial burden.  The declaration is intended to establish that
"a significant percentage of Massachusetts women who lose
employer-sponsored coverage will be eligible" to receive care
through Massachusetts programs.

To the extent the estimated number of women includes
government employees and employees protected by Massachusetts'
ACCESS Act who could not be affected by the expanded exemptions,
the estimate is meaningless.  More importantly, however, because
the plaintiff has not demonstrated that any particular women in
Massachusetts will likely lose contraceptive coverage because of
the expanded exemptions, the estimate does not demonstrate that
the Commonwealth will incur an injury to the state fisc.  It is
the Commonwealth's burden to set forth specific facts sufficient
to support standing and it has not satisfied that burden.  See
United States v. AVX Corp., 962 F.2d 108, 120 (1st Cir. 1992).

Article III standing is a threshold issue in every case.
McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 67 (1st Cir.
2003).  It "is upon the litigant whose standing is challenged"
to demonstrate that the case is properly justiciable.  Town of
Norwood v. F.E.R.C., 202 F.3d 392, 405 (1st Cir. 2000)
(citations omitted).  At the summary judgment stage, a party
"cannot rest on mere allegations, but must set forth by

affidavit or other evidence specific facts" which the Court will accept as true. Libertad v. Welch, 53 F.3d 428, 436 (1st Cir. 1995) (citing Defs. of Wildlife, 504 U.S. at 561-62). Here, the record is devoid of necessary specific facts.

In Libertad, for instance, the First Circuit held that an association failed to demonstrate standing because the court

> combed through the voluminous record and [was] unable to find any evidence, or even any specific allegation, that the [association] ha[d] sustained any injury to business or property as a result of Appellees' conduct.

See id. at 437; cf. id. at 437 n.4 (explaining that the association "could have standing to sue . . . [but that] [t]he record before us, . . . does not sufficiently establish" the required element of injury).

In contrast to that association, clinics and directors demonstrated standing because the record was

> replete with evidence of the extensive property damage caused by Appellees' blockades at the clinics: broken locks, damages gates, vandalism, strewn litter on the grounds, to give examples.

Id. at 437-38.

The Commonwealth does not need a record "replete with evidence", but it does need specific facts demonstrating that it is "likely to suffer future injury" from the defendants' conduct. See City of Los Angeles v. Lyons, 461 U.S. 95, 105, (1983). Plaintiff, "as the party invoking federal jurisdiction, bears the burden of establishing" standing. Spokeo, Inc. v.

Robins, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016).

Where the nonmoving party bears the burden of proof on an issue,

it "must point to specific facts to defeat summary judgment."

Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection

Techs. GmbH, 781 F.3d 510, 518 (1st Cir. 2015) (citing Ahern v.

Shinseki, 629 F.3d 49, 54 (1st Cir. 2010)).

### Quasi-sovereign interests

The Commonwealth asserts that the IFRs will inflict an

injury to its quasi-sovereign interests in the health and well-

being of its residents and in securing its residents from the

harmful effects of discrimination.  Massachusetts has, however,

failed to set forth facts demonstrating such a claim.

Quasi-sovereign interests, which are distinct from

sovereign, proprietary and sovereign interests, consist of a

"set of interests that a state has in the well-being of its

populace." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel.,

Barez, 458 U.S. 592, 602 (1982).  Two general categories of

quasi-sovereign interests are well accepted:

> First, a State has a quasi-sovereign interest in the health
> and well-being-both physical and economic-of its residents
> in general. Second, a State has a quasi-sovereign interest
> in not being discriminatorily denied its rightful status
> within the federal system.

Id. at 607.

In such a case, the state does not allege a direct injury

or sue on its own behalf. See, e.g., State of Ga. v. Tennessee

Copper Co., 206 U.S. 230, 237 (1907) (finding that Georgia has standing to bring injunctive action against out-of-state corporation because it "has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain"). Rather, a state sues in a representative capacity as parens patriae of its citizens. See Wyoming v. Oklahoma, 502 U.S. 437, 448–449, 451 (1992).

The Commonwealth argues that, as a state asserting a quasi-sovereign interest, it is "entitled to special solicitude in the standing analysis." Although a state may not "protect her citizens from the operation of federal statutes," a state may "assert its rights under federal law." Massachusetts v. EPA, 549 U.S. at 520 n. 10. Accordingly, where a state has a procedural right and a stake in protecting its "quasi-sovereign interests," it is "entitled to special solicitude in [the court's] standing analysis." Massachusetts, 549 U.S. at 520. The Departments dispute whether the Commonwealth can assert an interest that is separate from the personal interest of the affected women, such that it cannot assert an injury to a quasi-sovereign interest.

This Court need not determine whether Massachusetts is entitled to special solicitude in this case because, even if it is, the Commonwealth cannot overcome the lack of specific facts in the record. The Supreme Court held in the Massachusetts opinion that

-38-

> Because the Commonwealth owns a substantial portion of the
> state's coastal property, . . . it has alleged a
> particularized injury in its capacity as a landowner.

Id. at 522 (internal citation omitted) (footnote omitted).

Nothing in the majority's opinion indicates that "but for" the
special solicitude accorded the Commonwealth, it would not have
satisfied the injury-in-fact element of standing.

Plaintiff's quasi-sovereign interest theory of standing is
wanting for the same reason as its financial harm theory: lack
of specific facts demonstrating that the Commonwealth will
likely be injured.  The Commonwealth does not identify any
particular woman who is likely to lose contraceptive coverage
because of the IFRs.  It does not identify any Massachusetts
employer that is likely to avail itself of the expanded
exemptions.  The proportional estimate relies on conjecture and
speculation.  The Commonwealth's affidavits with respect to
whether women in the state will be affected are conclusory and
bereft of substance.

To satisfy the injury-in-fact requirement, plaintiffs
"need only show that they were directly affected by the conduct
complained of, and therefore have a personal stake in the suit."
Libertad, 53 F.3d at 439.  "[I]t does not suffice for plaintiffs
to show merely that they bring a justiciable issue before the
court." Becker v. Fed. Election Comm'n, 230 F.3d 381, 385 (1st
Cir. 2000).  The Commonwealth must demonstrate standing "in the

-39-

same way as any other matter on which the plaintiff bears the burden of proof." Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  Just as plaintiff fails to demonstrate that its fisc will be injured by the expanded exemptions, it has not demonstrated that the health and well-being of its citizens will be adversely affected by the IFRs. Cf. United States v. AVX Corp., 962 F.2d 108, 117 (1st Cir. 1992) ("[S]peculative argumentation . . . cannot pass muster where standing is contested").

### Procedural Injury

The Commonwealth contends that defendants' failure to engage in notice and comment rulemaking in violation of the APA creates a procedural injury sufficient to create Article III standing.

To establish injury-in-fact in the procedural injury setting, a plaintiff must show that the government action at issue "will cause a distinct risk to a particularized interest of the plaintiff." Town Of Winthrop v. F.A.A., 535 F.3d 1, 6 (1st Cir. 2008) (citations omitted).  The Commonwealth proposes that "the IFRs will directly harm Massachusetts' economic and quasi-sovereign interests."  The State has failed, however, to demonstrate that an actual injury to its economic or quasi-

sovereign interests is likely to occur.  Accordingly, its procedural injury theory is lacking as well.

**Merits**

"Standing is a threshold question in every case", <u>Summers</u> v. <u>Fin. Freedom Acquisition LLC</u>, 807 F.3d 351, 355 (1st Cir. 2015) (citing <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 498, (1975)) and this Court finds that plaintiff has failed to set forth specific facts demonstrating that it is likely to incur an injury caused by defendants' conduct. <u>Cf.</u> <u>Defs. of Wildlife</u>, 504 U.S. at 561. Accordingly, the Court declines, at this time, to address the merits of the Commonwealth's statutory or constitutional claims.

**ORDER**

For the foregoing reasons, plaintiff's motion for summary judgment (Docket No. 21) is **DENIED** and defendants' motion for summary judgment (Docket No. 32) is **ALLOWED**.

**So ordered.**

/s/ Nathaniel M. Gorton\_\_\_\_
Nathaniel M. Gorton
United States District Judge

Dated March 12, 2018