# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

———————————————————————————
                                   :

COMMONWEALTH OF MASSACHUSETTS,  :    Case No. 17-cv-11930-NMG
                                   :

          *Plaintiff*,            :    SECOND AMENDED
                                   :    COMPLAINT FOR
          v.                :    DECLARATORY AND
                                   :    INJUNCTIVE RELIEF

UNITED STATES DEPARTMENT OF       :
HEALTH AND HUMAN SERVICES;       :    Leave to File Granted on
ALEX M. AZAR II, in his official capacity as :    July 8, 2019
Secretary of Health and Human Services;  :
UNITED STATES DEPARTMENT OF THE  :
TREASURY; STEVEN T. MNUCHIN, in his  :
official capacity as Secretary of the Treasury;  :
UNITED STATES DEPARTMENT OF     :
LABOR; and R. ALEXANDER ACOSTA, in his :
official capacity as Secretary of Labor,    :
                                   :
          *Defendants*.          :
———————————————————————————:

## INTRODUCTION

1.      The Commonwealth of Massachusetts ("Commonwealth") files this action to protect itself, and thousands of Massachusetts women, from the substantial harms that will result from the Defendants' attempt to nullify the provisions of the Affordable Care Act that guarantee women equal access to preventive medical care—specifically contraceptive care and services. The Defendants have issued two Final Rules ("the Rules") authorizing employers with religious or moral objections to contraception to block their employees, and their employees' dependents, from receiving health insurance coverage for contraceptive care and services. *See* 83 Fed. Reg. 57536 (Nov. 15, 2018); 83 Fed. Reg. 57592 (Nov. 15, 2018). In issuing the Rules, the Departments have ignored the required administrative rulemaking process and have disregarded

a wealth of medical research and evidence demonstrating the critical importance of contraceptive coverage for women's health.

2.      The Rules jeopardize the health care of women in Massachusetts and nationwide, promote the religious freedom of corporations over the autonomy and health of women, and leave the States to bear additional health care costs both with regard to contraceptive and prenatal care as well as other services associated with unintended pregnancies and related negative health outcomes for both women and their children.

3.      The Defendants have violated the procedural and substantive components of the Administrative Procedure Act, the Establishment Clause of the First Amendment to the Constitution, and the Equal Protection guarantee implicit in the Fifth Amendment to the Constitution.  The Commonwealth seeks to enjoin implementation of, and invalidate, the Rules so that no individual or family in Massachusetts, or across the country, is harmed.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action under 28 U.S.C § 1331 and may enter declaratory relief under 28 U.S.C § 2201(a).

5.      The District of Massachusetts is a proper venue for this action under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(C).

## PARTIES

3.      The Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign State of the United States.

4.      Defendant United States Department of Health and Human Services ("HHS") is an executive agency of the United States government.  HHS's principal address is 200 Independence Avenue, SW, Washington, DC 20201.

5.     Defendant Alex M. Azar II is the Secretary of the Department of Health and Human Services.  He is named in his official capacity. His principal address is 200 Independence Avenue, SW, Washington, DC 20201.

6.     Defendant United States Department of the Treasury ("Treasury") is an executive agency of the United States government. Treasury's principal address is 1500 Pennsylvania Avenue, NW, Washington, DC 20220.

7.     Defendant Steven T. Mnuchin is named in his official capacity as Secretary of the Treasury. His principal address is 1500 Pennsylvania Avenue, NW, Washington, DC 20220.

8.     Defendant United States Department of Labor ("DOL") is an executive agency of the United States government. DOL's principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

9.     Defendant R. Alexander Acosta is named in his official capacity as Secretary of DOL. His principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

10.    HHS, Treasury, and DOL (collectively the "Departments") are responsible for implementing various provisions of the Patient Protection and Affordable Care Act ("ACA"). The ACA amends certain provisions of the Public Health Service Act ("PHS Act") concerning group health plans and health insurance issuers in the group and individual markets, and incorporates them into the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code.  HHS regulates and enforces provisions of the ACA applicable to group health plans and health insurance issuers in the group and individual markets; DOL regulates and enforces provisions of the ACA incorporated into ERISA and applicable to employer self-insured health plans; and Treasury regulates and enforces the tax-related provisions of the ACA.

## BACKGROUND

**I.      The Affordable Care Act and Implementation of the Contraceptive Mandate**

**A.      Preventive Services Requirement**

13.      The ACA transformed the health care system by expanding coverage to millions of previously uninsured Americans, protecting individuals against the denial of coverage for pre-existing conditions, and requiring health plans to guarantee certain types of coverage to all insured.

14.      The ACA also included new civil rights protections that prohibited discrimination on the basis of sex and other protected categories in most health care programs and activities.[1] These protections added to existing federal anti-discrimination provisions, including Title VII of the Civil Rights Act of 1964, which prohibits discrimination in the provision of employer-sponsored health care plans.[2]

15.      The ACA generally[3] requires that employer-sponsored health insurance plans include coverage for certain minimum essential benefits, including a range of preventive care services ("preventive services requirement").  Preventive services coverage must be provided on a no-cost basis—that is, without cost-sharing requirements for employees and their dependents who are covered by the plans.[4]

16.      The ACA was the first law to set minimum coverage requirements across all health markets.  At the time the ACA was passed, many States had laws and regulations

_____

[1] 42 U.S.C. § 18116.

[2] 42 U.S.C. § 2000e *et seq.*

[3] The preventive services requirement does not apply to "grandfathered health plans." *See* 42 U.S.C. § 18011.

[4] 42 U.S.C. §§ 18022 & 300gg-13.

4

concerning coverage requirements for health plans issued by health insurers. However, States are generally preempted from regulating self-insured employer plans, which are governed by ERISA. As of 2010, approximately 80% of large employers (over 1000 employees), and 50% of mid-sized employers (200-1000 employees), offered self-insured plans.[5]

17.     As originally drafted, the preventive services requirement mandated that health plans cover three categories of care at no added cost to plan participants: (a) evidence based items or services recommended by the U.S. Preventive Services Task Force; (b) immunizations recommended by an advisory committee of the Centers for Disease Control and Prevention; and (3) preventive care and screenings for infants, children, and adolescents provided for in guidelines issued by the Health Resources and Services Administration ("HRSA").[6]

18.     These three categories did not adequately cover medically necessary preventive care services for women. Gender-based disparities in health insurance coverage, and health care markets in general, made it more difficult and expensive for women, relative to men, to access a range of medically necessary preventive care services.

19.     To redress these disparities, and guarantee women equal access to preventive medicine, Congress passed the Women's Health Amendment. The Amendment added a fourth category to the preventive services requirement mandating no-cost coverage for "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."[7]

---

[5] Rand Corp., "Employer Self-Insurance Decisions," at 17-18 (Mar. 2011) (prepared for DOL and HHS).

[6] 42 U.S.C. § 300gg-13(a)(1)–(3).

[7] S. Amdt. 2791, 111th Congress (2009-2010), codified at 42 U.S.C. § 300gg-13(a)(4).

20.     Congress did not mandate coverage for specific preventive care services.  Instead, Congress delegated authority to the HRSA to determine the services that must be covered. HRSA is an agency within HHS.

21.     HHS and HRSA enlisted the Institute of Medicine ("IOM") to convene a committee of experts to assess what preventive services were necessary to protect women's health and well-being.  The committee convened by the IOM included specialists in disease prevention, women's health issues, and evidence-based guidelines.[8]

22.     The IOM recommended that the HRSA Guidelines on preventative care services for women include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  The IOM noted that this recommendation was consistent with the position of many professional health care organizations, including the American Congress of Obstetricians and Gynecologists, the American Academy of Family Physicians, the American Academy of Pediatrics, the Society of Adolescent Medicine, the American Medical Association, and many others.  The IOM also noted that coverage of contraceptive care and family planning services was "standard practice" for most private and federally-funded insurance programs, and was required by Medicaid.[9]

23.     The IOM found that access to contraception reduced unintended pregnancies, adverse pregnancy outcomes, and other negative health consequences for women and children. It recognized that there were many different methods of FDA approved contraception, the effectiveness and appropriateness of which varied depending on age, sexual practices, and health

---

[8] Institute of Medicine, "Clinical Preventive Services for Women: Closing the Gaps," at v-vi, 1-2 (2011) ("IOM Report").

[9] *Id.* at 104, 109-10.

conditions.  And it determined that even small cost-sharing requirements could significantly reduce the use of contraception, particularly more effective, long-lasting methods.[10]

24.     The IOM identified unintended pregnancy as a significant problem in the United States.  In 2001, for example, 49% of pregnancies nationwide were unintended.  Women experiencing unintended pregnancies are more likely than women with intended pregnancies to receive late or no prenatal care, to smoke or consume alcohol during pregnancy, and to be depressed during pregnancy.  Children born as the result of unintended pregnancy have significantly increased odds of preterm birth and low birth weight compared with children born of intended pregnancies, and are less likely to be breastfed.[11]

25.     The IOM also found that contraception provides women with important health benefits apart from avoiding unwanted pregnancies, including decreasing the risk of certain cancers, treating menstrual disorders, and protecting against pelvic inflammatory disease and some benign breast diseases.[12]

26.     In accordance with the IOM's recommendation, HRSA's Women's Preventive Services Guidelines, promulgated in August 2011, required employers to provide "coverage, without cost sharing," for "[a]ll Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling" ("contraceptive care requirement").[13]

_____

[10] *Id.* at 102-10.

[11] *Id.* at 102-04.

[12] *Id.* at 107.

[13] *See* HRSA, "Women's Preventive Services Guidelines," (https://www.hrsa.gov/womensguidelines/).

27. The contraceptive care requirement (together with the balance of the HRSA Guidelines) went into effect beginning in August 2012.

28. HRSA updated the Women's Preventive Services Guidelines in December 2016. After reviewing the available medical research and evidence, HRSA determined that the Guidelines should continue to require full coverage for contraceptive care and services.

**B.  Accommodations for Religious Objections to Contraceptive Coverage**

29. Significant numbers of Americans have religious-based objections to a range of medical services and procedures, and to medical care in general.

30. Nevertheless, Congress declined to include a "conscience amendment" in the ACA that would have permitted employers, insurers, and others to deny coverage based upon religious beliefs or moral convictions.

31. Between 2011 and 2015, however, the Departments took regulatory action to accommodate religious objections targeting women's contraceptive care to the extent required by federal law, particularly the Religious Freedom Restoration Act.[14] The Departments undertook several rounds of rulemaking to produce regulations that balanced employees' statutory right to receive contraceptive coverage with employers' religious objections to providing that coverage.

32. Throughout this process, the Departments vigorously defended the government's compelling interest in enforcing the contraceptive care requirement.[15]

33. In 2011, the Departments issued regulations that exempted churches and their integrated auxiliaries, conventions and associations of churches, and the exclusively religious

---

[14] *See, e.g.*, 75 Fed. Reg. 41,726 (July 19, 2010); 76 Fed. Reg. 46,621 (Aug. 3, 2011); 77 Fed. Reg. 8,725 (Feb. 15, 2012); 78 Fed. Reg. 39,870 (July 2, 2013); 79 Fed. Reg. 51,092 (Aug. 27, 2014); 80 Fed. Reg. 41,318 (July 14, 2015).

[15] *Id.*

activities of religious orders from the contraceptive care requirement ("Church Exemption"). The Departments later explained that the Church Exemption was necessary to respect the special "sphere of autonomy for houses of worship," and was consistent with exemptions provided in state contraceptive coverage laws.[16]

34.    The Departments declined to extend the exemption to cover a broader range of employers, because doing so would have undermined the contraceptive care requirement and improperly empowered non-church employers to impose their religious beliefs on their employees.  The Departments did, however, pledge to work with non-profit organizations with religious objections to contraception to develop an alternative mechanism for providing contraceptive coverage to their employees.[17]

35.    In 2013, the Departments issued regulations that provided an accommodation for religious non-profit organizations that objected to providing contraceptive coverage on religious grounds ("Accommodation").  The regulations exempted eligible employers from the contraceptive care requirement, but also set up a separate system through which insurers (and other third parties) paid the full cost of contraceptive care for employees.  Employees who obtained care through the Accommodation continued to receive seamless coverage for contraceptive care notwithstanding the accommodation provided for their employers.[18]

36.    The Departments subsequently expanded the Accommodation to cover closely held, for-profit companies in response to the Supreme Court's holding in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).[19]  *Hobby Lobby* involved for-profit employers who

---

[16] *See* 76 Fed. Reg. at 46,623; 80 Fed. Reg. at 41,325.

[17] *See* 77 Fed. Reg. at 8,728.

[18] *See* 78 Fed. Reg. at 39,871, 39,892-39,897.

[19] 80 Fed. Reg. at 41,323.

contended that the contraceptive care requirement violated their rights to religious liberty under the Religious Freedom Restoration Act. The Supreme Court upheld the employers' challenge on the ground that the Accommodation provided an alternative, less burdensome method for providing contraceptive coverage to employees of employers with religious objections.

37.     In a separate group of cases, consolidated for review by the Supreme Court as *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), religious non-profit employers challenged the validity of the Accommodation itself. The employers contended that the Accommodation made them complicit in the provision of contraception to their employees, in violation of their religious beliefs, and demanded that the Departments provide them with the same exemption extended to houses of worship. In May 2016, the consolidated cases were remanded for further consideration of whether the Accommodation could be altered to address employers' concerns while still providing employees with full, seamless contraceptive coverage.

38.      In July 2016, the Departments published a Request for Information ("RFI"), seeking input from interested parties as to whether the regulations could be modified to "resolve the objections asserted by the plaintiffs in [*Zubik*], while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." [20]

39.     In January 2017, after review of the more than 54,000 comments submitted in response to the RFI, the Departments announced that they had been unable to identify a feasible, less burdensome alternative that would satisfy employers' religious objections while still

_____

[20] DOL, *FAQs About the Affordable Care Act Implementation Part 36* (Jan. 9, 2017), available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

ensuring that "women receive full and equal health coverage, including contraceptive coverage."[21]

### C.     The Interim Final Rules

40.     On May 4, 2017, President Trump issued an Executive Order[22] that directed the Departments to consider amending the contraceptive coverage regulations in order to "vigorously promote religious liberty."[23]  Specifically, the Executive Order instructed the Departments to "consider issuing amended regulations . . . to address conscience-based objections to the preventative-care mandate."  In remarks explaining the Order, the President indicated that the Departments would amend the contraceptive services regulations to satisfy the objections raised by the plaintiffs in the *Zubik* cases—that the new regulations would expand exemptions for employers with objections to contraception and weaken the Accommodation.

41.     On October 6, 2017, the Departments issued two Interim Final Rules ("IFRs")— referred to herein as the "Religious IFR" and the "Moral IFR"—in order to fulfill this directive. The same day, the Departments began stipulating to dismiss the *Zubik* cases, and to resolve additional litigation challenging the contraceptive mandate, based upon the IFRs.

42.     The IFRs created new "expanded exemptions" to the contraceptive care requirement. The Religious IFR automatically exempted all employers—non-profit and for-profit organizations alike—with religious objections to contraception from complying with the contraceptive care requirement.  The Moral IFR exempted all non-profit employers and non-

---

[21] *Id.*

[22] Executive Order Promoting Free Speech and Religious Liberty (May 4, 2017).

[23] White House Press Release, May 3, 2017.

publicly traded for-profit employers with moral objections to contraception from complying with the contraceptive care requirement.

43.     The IFRs also gave exempted employers the authority to decide whether their employees receive independent contraceptive care coverage through the Accommodation.

44.     The exemptions in the IFRs applied only to the contraceptive care requirement. The IFRs did not provide any exemption or accommodation for employers with religious or moral objections to other medical services covered by the ACA in general, or the preventive services requirement in particular.

45.     The Departments' decision to create these expanded exemptions was not justified by any change in the medical research or evidence underlying the contraceptive care requirement.

46.     Instead, the Departments wrote in the IFRs that, for the last seven years, they misinterpreted the evidence supporting the contraceptive care requirement and misunderstood the government's interest in ensuring that women have access to contraceptive care and services.

47.     In the IFRs, the Departments rejected the evidence-based studies that they previously relied upon, and the expert recommendations that led to the creation of the contraceptive care requirement.

48.     The IFRs created or modified four regulations that codify the expanded exemptions. *See* 45 CFR §§ 147.130 through 147.133.

49.     In relevant part, the regulations in the Religious IFR state that the HRSA "will exempt from any guidelines' requirements that relate to the provision of contraceptive services" any "objecting entities" based on those entities' "sincerely held religious beliefs." 45 CFR 147.132(a)(1), (2). Objecting entities include "(A) A church, an integrated auxiliary of a church,

a convention or association of churches, or a religious order[;] (B) A nonprofit organization[;] (C) A closely held for-profit entity[;] (D) A for-profit entity that is not closely held[;] (E) Any other non-governmental employer," as well "An institution of higher education as defined in 20 U.S.C. 1002" and "A health insurance issuer offering group or individual insurance coverage." *Id.* § 147.132(a)(i)–(iii).

50.　　In relevant part, the regulations in the Moral IFR state that the HRSA "will exempt from any guidelines' requirements that relate to the provision of contraceptive services" any "objecting entities" based on those entities' "sincerely held moral convictions." 45 CFR 147.133(a)(1), (2). Objecting entities include "(A) A nonprofit organization; . . . (B) A for-profit entity that has no publicly traded ownership interests," as well as "An institution of higher education as defined in 20 U.S.C. 1002," and "A health insurance issuer offering group or individual insurance coverage." *Id.* § 147.133(a)(i)–(iii).

### D.　　The Final Rules

51.　　On November 15, 2018, the Departments issued Final Rules that codified the IFRs. *See* 83 Fed. Reg. 57536 (Nov. 15, 2018) ("Religious Final Rule"); 83 Fed. Reg. 57592 (Nov. 15, 2018) ("Moral Final Rule").

52.　　The Final Rules, which were scheduled to become effective on January 14, 2019, finalize the expanded exemptions set forth in the IFRs in the same form. The Final Rules, and the regulations finalized as part of those rules, maintain all the expanded exemptions adopted in the IFRs. They continue to give employers with religious or moral objections to contraception a choice between using an expanded exemption or participating in the Accommodation.

E.    **Impact of the Rules**

53.    The Rules selectively exempt employers from the provisions of the ACA added by Congress to guarantee women equal access to preventive medical care.  The new exemptions created by the Rules will impose significant harms on employees, their families, and the Commonwealth.

54.    The Departments anticipate that the Rules will cause hundreds of thousands of policy holders plus their dependents to lose comprehensive, no-cost contraceptive coverage under the ACA.

55.    The Departments calculate that, as a direct result of the Rules, between 70,515 and 126,400 women of childbearing age who are currently using an FDA-approved method of contraception will lose employer-based coverage for their chosen method of contraception.

56.    The Departments expect that the direct, out-of-pocket cost of contraceptive care for women who lose coverage will be between $41.2 and $67.3 million annually.

57.    Many women who lose coverage will be forced to seek contraceptive care from sources other than their usual health care providers.  Others will forgo contraception altogether, leading to an increase in unintended pregnancies and negative health consequences for women and children.  An increase in negative health consequences will impose additional costs and burdens on women, their families, and the States in which they live.

58.    The Departments likely underestimate the impact of the Rules.  For example, the Departments assume, based upon what they acknowledge is insufficient evidence, that employers with moral and religious objections to contraception will make limited use of the new exemptions created by the Rules.  The Departments claim that no significant number of new employers—meaning employers that did not already qualify for the Accommodation or Church

Exemption under the prior regulations—will make use of the new exemptions, and that the vast majority of employees who work for employers that have moral or religious objections to contraception will continue to receive contraceptive coverage despite the Rules.

## II.     Massachusetts' Commitment to Ensuring Access to Contraception

59.     Massachusetts has long recognized the critical role that access to contraceptive care and services plays in the health and wellbeing of women, children, and families across the State.

60.     The Commonwealth supports access to contraceptive care and services through an interrelated system composed of: (a) direct coverage of family planning services for individuals eligible for the Commonwealth's Medicaid program, called MassHealth; (b) a network of family planning program providers that receive reimbursement from the Massachusetts Department of Public Health's ("DPH") Sexual and Reproductive Health Program ("SRHP"); and (c) a contraceptive coverage law that requires health plans to cover contraception on the same terms as other outpatient medical care.

61.     This system works to reduce the number of unintended pregnancies, the rate of sexually transmitted infections, and negative health consequence for women and children across the State.

62.     The economic costs of unintended pregnancies are a particular concern for the Commonwealth.  A majority of unintended births in Massachusetts are publicly funded.  Publicly funded care for unintended pregnancies, including births, miscarriages, abortions, and essential infant care costs Massachusetts in excess of $100 million per year.

### A. MassHealth Program

63.    The Commonwealth's Medicaid program, MassHealth, provides access to integrated health care services that promote health, well-being, and quality of life for almost two million Massachusetts residents. As part of that mission, MassHealth guarantees its members access to contraceptive care and services.

64.    MassHealth provides coverage for approximately 150,000 residents who have commercial coverage, including employer-sponsored insurance and student health insurance. MassHealth serves as a secondary payer for these residents for services not otherwise covered by their commercial insurance.

65.    Eligibility for MassHealth is determined by a combination of income, household composition, age, and medical status.

66.    Eligible women who lose all or part of their employer-sponsored coverage under the Rules are entitled to receive coverage for contraceptive care and services through MassHealth.

67.    Under Medicaid rules, Massachusetts is responsible for paying 10% of all family planning services covered by MassHealth.

### B. Department of Public Health-Funded Clinics

68.     Women may also access contraceptive care through DPH's SRHP-funded family planning programs.

69.    SRHP funds health care services, including contraceptive care and services, through reimbursement for services provided by a statewide network of family planning program providers.  Funded services include complete gynecological and breast exams, diagnosis and treatment of sexually transmitted diseases, emergency contraception, and birth control.

70.     Persons eligible for services funded by SRHP include (a) uninsured

Massachusetts residents who make less than 300% of the federal poverty level,

(b) Massachusetts residents of any insurance status who need confidential care, and

(c) Massachusetts residents who make less than 300% of the federal poverty level and have a

health plan that does not cover all contraception methods and services.

### C.     Contraceptive Equity Law and ACCESS Act

71.     In 2002, Massachusetts enacted legislation, titled "An Act providing equitable

coverage of services under health plans," to expand coverage for contraceptive services, drugs

and devices ("Contraceptive Equity Law").[24]

72.     The Contraceptive Equity Law requires that certain employer-sponsored health

plans that provide coverage for outpatient services, prescriptions, or devices provide the same

level of coverage for FDA-approved contraceptive services, prescriptions, and devices.[25]

73.     Unlike the ACA, the Contraceptive Equity Law did not mandate no-cost

contraceptive coverage.  Women covered by the law would still be responsible for significant

cost-sharing payments to access contraceptive care.

74.     To remedy that gap, the Legislature passed an "Act relative to advancing

contraceptive coverage and economic security in our state," or the "ACCESS Act," in 2017. The

ACCESS Act prohibited the same employer-sponsored health plans from imposing cost-sharing

requirements, like deductibles and copayments, in connection with the provision of

contraception.

---

[24] *See* Mass. St. 2002, c. 49, §§ 1–4.

[25] M.G.L. c. § 175, § 47W; M.G.L. c. 176A, § 8W; M.G.L. c. 176B, § 4W; M.G.L. c. 176G, § 4O.

75.     The ACCESS Act and Contraceptive Equity Law do not apply to self-insured employer plans, which are governed by ERISA.  Approximately 56% of Massachusetts residents who have private commercial health insurance receive coverage through a self-insured plan.[26]

**D.      Harm to Massachusetts from the Rules**

76.     As a result of the Rules, the number of Massachusetts residents with employer-sponsored insurance that provides comprehensive coverage for contraceptive care and services will decrease.  This will cause concrete harm to the Commonwealth.

77.     Based upon the Departments' calculations in the Rules—and after accounting for Massachusetts' share of the national population, as well as the fact that approximately 56% of Massachusetts residents with private commercial insurance are covered by a self-funded plan—between 829 and 1,486 Massachusetts women of childbearing age who are currently using contraception will lose contraceptive coverage under the ACA.

78.     The Departments acknowledge that some of these women who lose coverage will seek and receive state-subsidized contraceptive care.

79.     Some Massachusetts women who lose coverage will qualify for MassHealth and will utilize that coverage as a secondary payer for contraceptive care and services. Massachusetts will be required to pay a portion of the costs for this care.

80.     Some women will be eligible for, and likely receive, contraceptive care and services through SRHP-funded programs.

81.     Some Massachusetts women will forgo contraceptive services altogether, because the loss of their employer-sponsored coverage will make care unaffordable or inaccessible. As a

---

[26] Center for Health Information and Analysis, *Enrollment Trends* 3 (Feb. 2018), *available at* http://www.chiamass.gov/assets/Uploads/enrollment/2018-feb/Enrollment-Trends-Feb-2018-Report.pdf.

result, Massachusetts will see an increase in unintended pregnancies and other negative health outcomes which will impose direct costs on the Commonwealth. MassHealth will cover the medical care associated with some of the unintended pregnancies and other preventable conditions attributable to the Rules.

82.     Finally, the Rules will cause significant harm to the Commonwealth's sovereign interest in protecting the health, safety, and well-being of its residents, and in ensuring that they are not improperly excluded from the benefits that flow from participation in the federal system, including the rights and privileges secured by the U.S. Constitution and federal law.

83.     On May 2, 2019, the U.S. Court of Appeals for the First Circuit held that the Commonwealth has Article III standing to challenge the Rules because the Commonwealth faces an imminent risk of fiscal injury that is fairly traceable to the Rules and likely to be redressed by a decision in its favor. *See Massachusetts v. U.S. Dept. of Health & Human Servs.*, 923 F.3d 209, 221-28 (1st Cir. 2019). Specifically, the First Circuit ruled that there is a substantial risk that women in Massachusetts will lose contraceptive coverage because of the Rules, and a substantial likelihood that the Commonwealth will incur costs providing replacement contraceptive care and services or prenatal and postnatal care to some of those women. *Id.* at 221-27.

## CLAIMS

### COUNT ONE
### Procedural Violation of the Administrative Procedure Act

84.     The Commonwealth realleges and incorporates by reference each of the paragraphs of this Second Amended Complaint.

85.     The Administrative Procedure Act ("APA") provides a cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. §§ 702–704.

19

86.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

87.     The APA requires an agency to give a "general notice of proposed rulemaking" and provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation" before regulations are implemented.  5 U.S.C. §§ 553(b), (c).

88.     The Departments did not engage in notice and comment rulemaking as required by the APA.

89.     The Departments implemented the expanded exemptions through IFRs that were issued without prior notice and became effective immediately upon their release on October 6, 2017.

90.     In the IFRs, the Departments solicited post-implementation comments on whether the expanded exemptions should be finalized.

91.     During the post-implementation comment period, the Departments engaged in conduct—including resolving the *Zubik* cases and other litigation—which demonstrated that they had already decided to finalize the expanded exemptions.

92.     The Final Rules codify the expanded exemptions implemented through the IFRs without material change.

93.     The post-implementation comment period provided by the Departments did not satisfy the procedural requirements of 5 U.S.C. §§ 553(b), (c).  The Departments did not have authority to disregard the APA's rulemaking requirements.  None of the limited exceptions to the notice and comment requirements are applicable to the Rules.  In particular, the Departments did

not have good cause to forgo notice and comment rulemaking because it would not have been "impracticable, unnecessary, or contrary to the public interest" to provide the public with notice and accept public comments before promulgating the rules.  5 U.S.C. § 553(b)(B).

## COUNT TWO
### Violation of the Administrative Procedure Act – Arbitrary, Capricious, Not in Accordance with the Law, and In Excess of Statutory Authority

94.     The Commonwealth realleges and incorporates by reference each of the paragraphs of this Second Amended Complaint.

95.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A) and (C).

96.     The expanded exemptions created by the Rules are arbitrary, capricious, not in accordance with the law, and exceed the Defendants' authority under the ACA.

97.     The ACA requires that group health plans and health insurance issuers offering group or individual health insurance cover the preventative care services identified in the HRSA's Women's Preventative Service Guidelines.  42 U.S.C. § 300gg-13(a)(4).  Among the preventative care services identified in HRSA's Guidelines are all FDA-approved contraceptives and family planning counseling.  The ACA and the HRSA Guidelines therefore require that all group health plans cover contraception.

98.     The ACA does not authorize the Departments to exempt regulated employers, universities, and insurers from the contraceptive care mandate.

99.     The expanded exemptions are not required by the Religious Freedom Restoration Act or any other provision of federal law.

100.    The Rules are inconsistent with the ACA' anti-discrimination provisions and other federal anti-discrimination laws, including Title VII of the Civil Rights Act of 1964.  The expanded exemptions selectively target women by nullifying provisions of the ACA intended by Congress to guarantee women equal access to preventive medicine.  The expanded exemptions will have the effect of denying women access to medically necessary care while leaving coverage for men unchanged.

101.    The Rules are invalid and must be set aside.

## COUNT THREE
### Violation of the Establishment Clause

102.    The Commonwealth realleges and incorporates by reference each of the paragraphs of this Second Amended Complaint.

103.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

104.    The new exemptions created by the Religious Final Rule violate the Establishment Clause of the First Amendment to the U.S. Constitution.  The Departments have used their rulemaking authority for the primary purpose, and with the principal effect, of advancing and endorsing religious interests.

105.    The Departments have acted to promote employers' religious beliefs over the autonomy of women—and other employees—who do not share those beliefs.

106.    Through the Rules, the Departments have empowered employers to impose their religious beliefs on their employees and their employees' dependents.  The new exemptions grant employers veto power over whether employees receive separate contraceptive coverage

through the Accommodation.  Employers have no legitimate interest injecting their religious beliefs into this independent method for providing contraceptive coverage.

107.    The Rules advance employers' religious beliefs by imposing constitutionally impermissible harm on employees.  In addition to effectively depriving some women of needed care entirely, the new exemptions will impose significant financial, logistical, informational, and administrative burdens on the thousands of employees who lose contraceptive coverage.

### COUNT FOUR
### Violations of Equal Protection

108.    The Commonwealth realleges and incorporates by reference each of the foregoing paragraphs of this Second Amended Complaint.

109.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

110.    The Departments have violated the equal protection guarantee implicit in the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  The new exemptions created by the Rules impermissibly target women for adverse treatment.

111.    The Rules insert a gender-based classification into the ACA's preventive care provisions by selectively authorizing employers to use their religious and moral beliefs to deny critical health insurance coverage for women.

112.    The new exemptions undermine protections inserted into the ACA by Congress for the explicit purpose of guaranteeing women equal access to preventive medicine.

113.    The new exemptions will result in women losing access to medically necessary contraceptive care and services while leaving coverage for men unchanged.

114.    The new exemptions do not serve an important governmental objective sufficient to justify the gender-based discrimination.

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth of Massachusetts requests that this Court grant the following relief:

(1)    Enter a judgment declaring that the Rules, as well as the relevant portions of the regulations adopted in the Rules, 45 CFR 147.130 to 147.133; 26 CFR Part 54; and 29 CFR Part 2590, violate the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)–(D), and must be set aside, and the First and Fifth Amendments to the U.S. Constitution;

(2)    Issue a permanent injunction barring the Defendants from implementing or enforcing the Rules; and

(3)    Grant any other or additional relief that this Court may determine is necessary or appropriate.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS,

MAURA HEALEY
ATTORNEY GENERAL

_/s/ Julia E. Kobick_
Jonathan B. Miller, BBO # 663012
Jon Burke, BBO # 673472
Julia E. Kobick, BBO # 680194
Elizabeth Carnes Flynn, BBO # 687708
Assistant Attorneys General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2559
Dated: July 8, 2019                Julia.Kobick@state.ma.us

**CERTIFICATE OF SERVICE**

       I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 8, 2019.

/s/ Julia Kobick
Julia Kobick
Assistant Attorney General