IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

COMMONWEALTH OF MASSACHUSETTS,    :
    :
        Plaintiff,    :    Case No. 1:17-cv-11930-NMG
    :
    v.    :
    :
UNITED STATES DEPARTMENT OF    :
HEALTH AND HUMAN SERVICES *et al.*,    :
    :
        Defendants.    :

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' COMBINED
MOTION TO DISMISS, CROSS-MOTION FOR SUMMARY JUDGMENT, AND
<u>OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

I.     The Affordable Care Act and the Contraceptive-Coverage Mandate................................ 2

II.    Challenges to the Contraceptive-Coverage Mandate and Accommodation ...................... 5

III.   The Interim Final Rules ................................................................................................ 6

IV.   Plaintiffs' Challenge to the IFRs and the Court's Opinion................................................. 8

V.    The Final Rules ............................................................................................................. 8

VI.   The First Circuit's Decision and Plaintiff's Second Amended Complaint....................... 10

ARGUMENT ................................................................................................................... 11

I.     The Final Rules Comply With the APA's Procedural Requirement. ................................ 11

      A.    The Final Rules Are Procedurally Proper ................................................................ 12

      B.    The IFRs Were Procedurally Proper........................................................................ 14

      C.    The Agencies Had Statutory Authority to Enact the Final Rules,
          and Plaintiff's Arguments to the Contrary are Unavailing ................................... 17

II.    RFRA Authorizes and Compels the Religious Exemption Rule. ...................................... 21

      A.    Entities are Substantially Burdened in the Absence of the Religious
          Exemption Rule. .................................................................................................... 23

      B.    There Is No Compelling Government Interest in Forcing the Objectors
          Covered by the Religious Exemption Rule to Provide Contraceptive
          Coverage. .............................................................................................................. 27

      C.    Alleged Third Party Harm Is Not a Reason to Neglect RFRA's
          Requirements. ....................................................................................................... 29

      D.    RFRA Does Not Require Agencies to Select the Least Restrictive Means of
          Addressing Objections. .......................................................................................... 31

      E.    Plaintiff's Logic would Doom the Exemption for Churches and Their
          Integrated Auxiliaries and the Accommodation. .................................................. 33

III.   The Rules Do Not Violate the Establishment Clause. ..................................................... 34

A.      The Rules Have a Secular Purpose. ..................................................................... 36

B.      The Effect of the Rules Is Neither to Advance Nor Inhibit Religion. .................. 37

IV.    The Rules Do Not Violate the Fifth Amendment's Equal Protection Principle. .............. 40

V.     Even if Plaintiff Were to Prevail, A Set-Aside Is the Only Appropriate Remedy............. 44

CONCLUSION ....................................................................................................................... 45

**INTRODUCTION**

As part of the Patient Protection and Affordable Care Act (ACA), Congress required

employers to cover some recommended preventive services without cost sharing.  That law does

not mention contraceptive coverage.  But the Health Resources and Services Administration

(HRSA), an agency within the Department of Health and Human Services (HHS), issued

guidelines mandating coverage of all FDA-approved contraceptives for women. At the same

time, the government recognized that some employers hold sincere religious objections to

providing insurance coverage for some or all forms of contraception, but decided to exempt only

a fraction of those employers—churches and their integrated auxiliaries—from the requirement.

Other entities were not required to provide contraceptive coverage because their plans were

grandfathered by the ACA.  The Departments of HHS, Labor, and the Treasury (the Agencies)

ultimately recognized that the contraceptive-coverage mandate (Mandate) imposed a substantial

burden on the exercise of religion of certain entities, and attempted to alleviate that burden

through an "accommodation."  But the accommodation still substantially burdened the religious

exercise of some objecting entities, and years of litigation ensued.

To address these serious religious objections and to resolve the litigation, the Agencies

promulgated final rules that expand the prior religious exemption and also provide for a moral

exemption from the contraceptive-coverage mandate.  Religious Exemptions and

Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg.

57,536 (Nov. 15, 2018) (the Religious Exemption Rule); Moral Exemptions and

Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg.

57,592 (Nov. 15, 2018) (the Moral Exemption Rule) (collectively, the Rules).  The same

provision of the ACA that authorized the Agencies to issue the prior exemption for churches and

their integrated auxiliaries equally authorizes the expanded exemptions.  Moreover, the Religious

Freedom Restoration Act (RFRA) independently authorizes, and indeed requires, the religious

exemption as a means of eliminating the substantial burden on religious exercise that *Burwell v.*

*Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014), held was imposed by the contraceptive-coverage

mandate.

Both RFRA and the ACA authorize the government to satisfy its obligations under RFRA

by using the straightforward exemption provided by the Rules rather than attempting to rely only

on the novel accommodation previously created by the government.  This is especially true

because the accommodation itself violates RFRA as to certain entities or is, at a minimum,

subject to significant legal doubt.  The Agencies concluded the accommodation imposes a

substantial burden on some employers by using the plans they sponsor to provide contraceptive

coverage that they object to on religious grounds, which some employers sincerely believe

makes them complicit in the provision of such coverage, and several courts have held the same.

Furthermore, the Rules comply with the procedural requirements of the APA, as they

were promulgated after notice and an opportunity for comment.  They also comport with both the

Establishment and Equal Protection Clauses, as they neither establish religion nor discriminate

against women.  The Court, therefore, should deny Plaintiff's motion for summary judgment and

grant Defendants' motion for summary judgment.

## BACKGROUND

## I.      The Affordable Care Act and the Contraceptive-Coverage Mandate

The ACA requires most group health plans and health-insurance issuers that offer group

or individual health coverage to provide coverage for certain preventive services without "any

cost sharing requirements."  42 U.S.C. § 300gg-13(a).  The Act does not specify the types of

2

women's preventive care that must be covered. Instead, as relevant here, the Act requires coverage, "with respect to women," of such "additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"]." *Id.* § 300gg-13(a)(4).

In August 2011, HRSA adopted the recommendation of the Institute of Medicine, a part of the National Academy of Sciences, to issue guidelines requiring coverage of, among other things, the full range of FDA-approved contraceptive methods for women, including oral contraceptives, diaphragms, injections and implants, emergency contraceptive drugs, and intrauterine devices. *See* 77 Fed. Reg. 8,725, 8,725 (Feb. 15, 2012). As a result, coverage for such contraceptive methods was required for plan years beginning on or after August 1, 2012. *See* 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011).

At the same time, the Agencies, invoking their statutory authority under 42 U.S.C. § 300gg-13(a)(4), promulgated interim final rules authorizing HRSA to exempt churches and their integrated auxiliaries from the contraceptive-coverage mandate. *See* 76 Fed. Reg. 46,623; 77 Fed. Reg. 8,725. Various religious groups urged the Agencies to expand the exemption to all religious not-for-profit organizations and other organizations with religious or moral objections to providing contraceptive coverage. *See* 78 Fed. Reg. 8,456, 8,459 (Feb. 6, 2013). Instead, in a subsequent rulemaking, the Agencies offered only what they termed an "accommodation" for religious not-for-profit organizations with religious objections to providing contraceptive coverage. *See* 78 Fed. Reg. 39,870, 39,874-82 (July 2, 2013). The accommodation allowed a group health plan established or maintained by an eligible objecting employer to opt out of any requirement to directly "contract, arrange, pay, or refer for contraceptive coverage," *id.* at 39,874, by providing notice of its objection. The regulations then generally required the

employer's health insurer or third-party administrator to provide or arrange contraceptive coverage for plan participants. *See id.* at 39,875-80.

In the case of self-insured church plans, however, coverage by the plan's third-party administrator under the accommodation was voluntary.[1] Church plans are exempt from the Employee Retirement Income Security Act of 1974 (ERISA) under section 4(b)(2) of that Act, and the authority to enforce a third-party administrator's obligation to provide separate contraceptive coverage derives solely from ERISA. The Agencies thus could not require the third-party administrators of church plans—and, by extension, many nonprofit religious organizations participating in those plans—to provide or arrange for such coverage or impose fines or penalties for failing to provide such coverage. *See* 79 Fed. Reg. 51,092, 51,095 n.8 (Aug. 27, 2014).

Even apart from the exemption for churches and their integrated auxiliaries, the contraceptive-coverage mandate did not apply to many employers. The ACA itself exempts from the preventive-services requirement, and therefore from any contraceptive-coverage mandate imposed as part of that requirement, "grandfathered" health plans (generally, those plans that have not made specified changes since the Act's enactment), *see* 42 U.S.C. § 18011, which cover tens of millions of people, *see* 83 Fed. Reg. 57,541 (Nov. 15, 2018) (estimating over 25 million individuals enrolled in such plans). And employers with fewer than fifty employees are not subject to the tax imposed on employers that fail to offer health coverage, *see* 26 U.S.C. § 4980H(c)(2), although such small employers that provide non-grandfathered coverage must comply with the preventive-services requirement.

---

[1] A church plan can include a plan maintained by a "principal purpose" organization regardless of who established it. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1655-63 (2017); *see also* 29 U.S.C. § 1002(33).

4

**II.     Challenges to the Contraceptive-Coverage Mandate and Accommodation**

Many employers objected to the contraceptive-coverage mandate.  In *Hobby Lobby*, the Supreme Court held that RFRA prohibited the government from applying the Mandate to closely held for-profit companies with religious objections to providing contraceptive coverage.  The Court held that the Mandate "impose[d] a substantial burden on the exercise of religion" for employers with religious objections, 573 U.S. at 726, and that even assuming a compelling governmental interest, application of the Mandate to such employers was not the least restrictive means of furthering that interest, *id*. at 728. The Court observed that, at a minimum, the less-restrictive accommodation made available to not-for-profit employers by the Agencies could be extended to closely held for-profit companies like Hobby Lobby with religious objections to the Mandate but not the accommodation.  *Id*. at 731-32.  The Court did not decide, however, "whether an approach of this type complies with RFRA for purposes of all religious claims."  *Id*. at 731.

In response to *Hobby Lobby*, the Agencies promulgated rules extending the accommodation to closely held for-profit entities with religious objections to providing contraceptive coverage.  *See* 80 Fed. Reg. 41,323-28 (July 14, 2015).  But numerous entities continued to challenge the Mandate and the accommodation.  They argued that the accommodation burdened their exercise of religion because they sincerely believed that the required notice and the provision of contraceptive coverage in connection with their health plans made them complicit in providing such coverage, in contravention of their faith.

A circuit split developed,[2] and the Supreme Court granted certiorari in several of the cases.  The Court vacated the judgments and remanded the cases to the respective courts of

---

[2] *Compare, e.g.*, *Priests for Life v. HHS*, 772 F.3d 229 (D.C. Cir. 2014) (accommodation does

appeals. *See Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (per curiam).  The Court "d[id] not decide whether [the plaintiffs'] religious exercise ha[d] been substantially burdened, whether the Government ha[d] a compelling interest, or whether the current regulations [we]re the least restrictive means of serving that interest."  *Id*. at 1560.  Instead, the Court held that, on remand, the Courts of Appeals should afford the parties an opportunity to resolve the dispute.  In the meantime, the Court precluded the government from "impos[ing] taxes or penalties on [the plaintiffs] for failure to provide the [notice required under the accommodation]."  *Id*. at 1561.

In response to the Supreme Court's *Zubik* order, the Agencies requested public comment to determine whether further modifications to the accommodation could resolve the religious objections asserted by various organizations while providing a mechanism for coverage for their employees.  *See* 81 Fed. Reg. 47,741 (July 22, 2016). The Agencies received over 54,000 comments, but they could not find a way to amend the accommodation to both account for employers' religious objections and provide seamless coverage to their employees.  *See* FAQs About Affordable Care Act Implementation Part 36, at 4 (Jan. 9, 2017).[3]  The pending litigation—more than three dozen cases brought by more than 100 separate plaintiffs—thus remained unresolved.

## III.    The Interim Final Rules

In an effort "to resolve the pending litigation and prevent future litigation from similar plaintiffs," the Agencies concluded that it was "appropriate to reexamine" the Mandate's

---

not substantially burden religious exercise), *vacated and remanded*, 136 S. Ct. 1557 (2016), *with Sharpe Holdings, Inc. v. HHS*, 801 F.3d 927 (8th Cir. 2015) (accommodation violates RFRA), *vacated by HHS v. CNS Int'l Ministries*, 136 S. Ct. 2006 (2016).

[3] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

exemption and accommodation.  82 Fed. Reg. 47,792, 47,799 (Oct. 13. 2017).  Following that

reexamination, in October 2017, the Agencies issued two interim final rules, or IFRs, that

requested public comments and expanded the exemption while continuing to offer the existing

accommodation as an optional alternative.  The first rule expanded the religious exemption to all

nongovernmental plan sponsors, as well as institutions of higher education in their arrangement

of student health plans, to the extent that those entities have sincere religious objections to

providing contraceptive coverage.  *See id*. at 47,806.  The Agencies relied in part on their

consistent interpretation of the preventive-services provision to convey "broad discretion to

decide the extent to which HRSA will provide for and support the coverage of additional

women's preventive care and screenings in the Guidelines."  *Id*. at 47,794.

The Agencies acknowledged that contraceptive coverage is "an important and highly

sensitive issue, implicating many different views."  82 Fed. Reg. 47,799.  But "[a]fter

reconsidering the interests served by the [m]andate," the "objections raised," and "the applicable

Federal law," the Agencies "determined that an expanded exemption, rather than the existing

accommodation, [wa]s the most appropriate administrative response to the religious objections

raised by certain entities and organizations."  *Id*.  The Agencies also explained that the new

approach was necessary because "[d]espite multiple rounds of rulemaking," and even more

litigation, they "ha[d] not assuaged the sincere religious objections to contraceptive coverage of

numerous organizations" or resolved the pending legal challenges that had divided the courts.

*Id*.

The second rule created a similar exemption for entities with sincerely held moral

objections to providing contraceptive coverage; unlike the religious exemption, though, this rule

did not apply to publicly traded companies.  *See* 82 Fed. Reg. 47,838 (Oct. 13, 2017).  This rule

was issued "in part to bring the Mandate into conformity with Congress's long history of providing or supporting conscience protections in the regulation of sensitive health-care issues," *id*. at 47,844, as well as similar efforts by states, including Plaintiff, *id*. at 47,847.  The IFR further reflected the Agencies' attempts to resolve legal challenges by moral objectors that had given rise to conflicting court decisions.  *Id*. at 47,843.

Invoking agency-specific statutory authority to issue interim final rules, 26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92, the Agencies' use of interim final rules on three prior occasions with respect to the preventive service requirements, and the APA's general "good cause" exception, 5 U.S.C. § 553(b), the Agencies issued the IFRs without prior notice and comment.  The Agencies also solicited public comments for 60 days post-promulgation in anticipation of final rulemaking.  *See* 82 Fed. Reg. 47,792; 82 Fed. Reg. 47,838.

## IV.    Plaintiff's Challenge to the IFRs and the Court's Opinion

Massachusetts brought the instant action by challenging the IFRs.  Plaintiff claimed that the IFRs (1) failed to comply with the APA's notice-and-comment requirements; (2) were not in accordance with law and in excess of the Agencies' statutory authority; (3) violated the Establishment Clause; and (4) violated the Equal Protection Clause.  Am. Compl., Nov. 16, 2017, ECF No. 17, ¶¶ 80-106.  Plaintiff moved for summary judgment, and the Agencies cross-moved to dismiss or for summary judgment.  ECF Nos. 21, 32, 55, 56, 67, 74.  Following oral argument on March 3, 2018, the Court dismissed Plaintiff's complaint for lack of standing.  Mem. & Order, Mar. 12, 2018, ECF No. 89.  Plaintiff appealed the Court's decision to the First Circuit.  ECF No. 91.

## V.    The Final Rules

After considering, for over 11 months, the more than 110,000 comments on the IFRs, on

November 15, 2018, the Agencies issued final versions of the Religious Exemption and the Moral Exemption Rules.  The final rules address the significant comments received by the Agencies.  Changes were made in response to questions and concerns raised in various comments, while the fundamental substance of the exemptions was finalized as set forth in the IFRs.

As was true of the IFR expanding the religious exemption, the final Religious Exemption Rule is "necessary to expand the protections for the sincerely held religious objections of certain entities."  83 Fed. Reg. 57,537.  It "minimize[s] the burdens imposed on their exercise of religious beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing."  *Id*.  The rule "do[es] not remove the contraceptive coverage requirement generally from HRSA's Guidelines."  *Id*.  What it does do is "finalize exemptions [for] the same types of organizations and individuals for which exemptions were provided in the Religious [IFR]: Non-governmental plan sponsors including a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order; a nonprofit organization; for-profit entities; an institution of higher education in arranging student health insurance coverage; and, in certain circumstances, issuers and individuals."  *Id*.  "In addition, the [religious exemption] maintain[s] a previously created accommodation process that permits entities with certain religious objections voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their health insurance issuers or third party administrators."  *Id*.

In response to comments on the religious IFR, the Agencies made numerous clarifying or technical changes in the final Religious Exemption Rule.  For example, the final rule clarified the prefatory language to the exemptions "to ensure exemptions apply to a group health plan

established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections." *Id.*; *see also id.* (listing modifications). The Agencies also "revise[d] the exemption applicable to health insurance issuers to make clear that the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under §147.130(a)(1)(iv) unless it is also exempt from that requirement." *Id.*

The final Moral Exemption Rule also continues to fulfill the purpose that it did in interim form: to "protect sincerely held moral objections of certain entities and individuals." 83 Fed. Reg. 57,592. The Agencies considered public comments asking for the moral exemption to be expanded to publicly traded or government entities, but declined to do so. *Id.* at 57,616-19. Importantly, like the Religious Exemption Rule, the Moral Exemption Rule "do[es] not remove the contraceptive coverage requirement generally from HRSA's guidelines." *Id.* at 57,593. But the Department made changes to the rule to "ensure clarity in implementation of the moral exemptions so that proper respect is afforded to sincerely held moral convictions in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage." *Id.*

## VI.   The First Circuit's Decision and Plaintiff's Second Amended Complaint

On May 2, 2019, the First Circuit, in agreement with the position of the United States, determined that Massachusetts' substantive challenges had not been mooted by the promulgation of the Final Rules, but that its procedural challenge to the IFRs had been mooted. *Massachusetts v. HHS*, 823 F.3d 209, 220-21 (1st Cir. 2019). The First Circuit also concluded that Plaintiff had established Article III standing to challenge the substance of the Final Rules, and vacated and

remanded to this Court.  *Id*. at 221-28.[4]  Plaintiff has filed a second amended complaint raising

claims under the APA, the Establishment Clause, and the Equal Protection Clause.  Second Am.

Compl., ¶¶ 84-114, ECF No. 106.

## ARGUMENT

### I.      The Final Rules Comply With the APA's Procedural Requirements.

Plaintiff alleges that because the IFRs creating religious and moral exemptions to

contraceptive coverage did not comply with the APA's notice and comment requirement when

promulgated in 2017, the Final Rules at issue in this case are also procedurally invalid.  Mem. in

Supp. of Commonwealth of Massachusetts' Mot. for Summ. J. at 13-16, (Pl.'s MSJ), ECF No.

116.  The Agencies maintain that they had independent statutory authority to issue the IFRs, and

had good cause to do so as well.  *See* Defs.' First Mem. Supp. Mot. to Dismiss and Cross-Mot.

for Summ. J. at 14-18, ECF No. 33.  But by focusing on the IFRs, which were enjoined

nationwide not long after their promulgation and were not in effect by the time the Final Rules

were promulgated, Plaintiff misses the mark.  The Final Rules respond to thousands of comments

from a wide spectrum of commentators, including Plaintiff, submitted during a notice-and-

comment period that followed issuance of the IFRs.  Even if the Agencies lacked justification for

proceeding with IFRs instead of a notice of proposed rulemaking (they did not), the period of

notice and comment preceding the Final Rules provided Plaintiff with all of the process to which

it was entitled under the APA.  Plaintiff cannot use the APA's procedural requirement as a

---

[4] The First Circuit utilized a traditional standing analysis and determined that Plaintiff had
sufficiently demonstrated imminent fiscal injury; it therefore did not reach Plaintiff's alternative
*parens patriae* standing argument.  *Id*.

roadblock to rulemaking with which it disagrees.  Accordingly, the Court should reject Plaintiff's procedural APA claim.

### A.      The Final Rules Are Procedurally Proper.

5 U.S.C. § 553 requires that an agency provide notice, an opportunity to be heard, and publication of a final rule no less than 30 days before it is to go into effect.  *Id.*  Plaintiff has now had that full and timely notice and ample opportunity for comment with respect to the Final Rules, and it participated in that process.  Indeed, the Agencies received and considered around 110,000 public comment submissions, and they detailed their consideration of those submissions in their final rulemaking.  *See* 83 Fed. Reg. 57,540 (religious rule); 83 Fed. Reg. 57,596 (moral rule).  The Agencies also made changes in response to those comments, *see* 83 Fed. Reg. 57,556-73; 83 Fed. Reg. 57,613-26 (highlighting comments, responses, and changes).

Plaintiff does not dispute these facts.  Instead, it argues that the agency "had already decided to finalize the expanded exemptions without change" prior to receiving comments, as evidenced by the substantive similarity of the Final Rules and the IFRs, as well as the Agencies' decision to settle litigation with entities that had challenged the contraceptive mandate under RFRA.  Pl.'s MSJ at 16.  In so arguing, Plaintiff relies heavily on the Third Circuit's case law, which that court recently addressed in *Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019).  Relying on *NRDC v. EPA*, 683 F.2d 752 (3d Cir. 1982), and *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979), the Third Circuit held that the Agencies' actions did "not reflect any real open-mindedness toward the position set forth in the IFRs" because the government did not change the "fundamental substance of the exemptions" and relied on the same reasons for issuing that Final Rules that it used to issue the IFRs.  *Pennsylvania*, 930 F.3d at 568-69.

But these arguments run counter to basic principles of administrative law.  "While changes and revisions are indicative of an open mind" during a notice and comment period, the inverse is not true; "an agency's failure to make any [changes] does not mean its mind is closed." *Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994).  Indeed, "[a]n agency is not required to adopt a rule that conforms in any way to the comments presented to it. So long as it explains its reasons, it may adopt a rule that all commentators think is stupid or unnecessary."  *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992).  Plaintiff may disagree with the Agencies' policy views, but it is not the place of Plaintiff, or this Court, to substitute its judgment for that of the Agencies.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

*Levesque v. Block*, 723 F.2d 175, 188 (1st Cir. 1983), affirms these principles.  In that case, the First Circuit concluded an agency had improperly issued an interim rule regarding eligibility for food stamps without engaging in notice-and-comment rulemaking pursuant to section 553.  723 F.2d at 185.  Nonetheless, the Court held that final rules based on those interim rules, promulgated after a period of notice and comment, were compliant with the APA.  The Court explained that "the Secretary made a number of changes in the rules and gave reasonable responses when rules were not changed" in light of the comments it received, which was sufficient to assuage its concerns about the agency's open-mindedness.  *Id.* at 188.  So too here.  By receiving comments, making some changes to the Rules in light of those comments, and providing responses to those comments propounding changes the Agencies did not adopt, the Agencies have laid any lingering procedural concerns about the Final Rules to rest.  Moreover, the *Levesque* court was concerned about notice and comment taking place "before a rule takes effect" because, at that point, the agency "has no stake in any particular rule; it will not have to

13

worry about the costs of upsetting the status quo by amending a rule only recently implemented."
*Id.* at 187.  But the IFRs were enjoined nationwide shortly after their issuance, and were not in effect when the Final Rules were promulgated.  Hence, with respect to the Final Rules, there is no functional difference between the IFRs and a notice of proposed rulemaking.

### B.    The IFRs Were Procedurally Proper.

Plaintiff's notice and comment claim is premised on the theory that any procedural deficiencies in the IFRs continue to infect the Final Rules.  As explained above, the Final Rules, which were promulgated after notice and comment, are valid even if the IFRs were unlawfully promulgated.  But Plaintiff's premise is wrong, too.  The Agencies had independent statutory authority, and good cause, to issue the IFRs.

The Agencies promulgated the IFRs pursuant to the ACA's preventive-services provision, 42 U.S.C. § 300gg-13.  Section 2792 of the Public Health Service Act authorizes the Secretary of HHS to promulgate "such regulations as may be necessary or appropriate to carry out the provisions of [title XXVII of the Act]," along with "any interim final rules as the Secretary determines are appropriate to carry out [title XXVII]." 42 U.S.C. § 300gg-92. Corresponding provisions in ERISA (section 734, 29 U.S.C. § 1191c) and the Internal Revenue Code (section 9833, 26 U.S.C. § 9833) likewise authorize the Secretary of Labor and the Secretary of the Treasury, respectively, to promulgate not only "such regulations as may be necessary or appropriate" but also "any interim final rules as the Secretary determines are appropriate to carry out [part 7 of subtitle B of title I of ERISA (requirements for group health plans) and chapter 100 of subtitle K of the Internal Revenue Code (requirements related to health-insurance coverage)]."  Congress placed the ACA's preventive services provision in title

14

XXVII of the Public Health Service Act, part 7 of subtitle B of title I of ERISA, and chapter 100 of subtitle K of the Internal Revenue Code.

These provisions granted the Agencies discretion to depart from normal notice-and-comment requirements in promulgating the IFRs, as the Agencies had previously done in promulgating different iterations of the contraceptive mandate.  *See, e.g.*, 76 Fed. Reg. 46,621 (interim final rules authorizing HRSA to exempt churches and their integrated auxiliaries from the contraceptive-coverage mandate).  While Congress must act "expressly" to authorize departure from the APA's notice-and-comment requirement, 5 U.S.C. § 559, Congress need not "employ magical passwords," *Marcello v. Bonds*, 349 U.S. 302, 310 (1955).  Congressional intent to dispense with notice and comment thus can be gleaned from "the text, context, and relevant historical treatment of the provision at issue."  *Musacchio v. United States*, 136 S. Ct. 709, 717 (2016) (citation omitted).  Here, the statutes' references to "interim final rules" manifests Congress's clear intent to confer discretion on the Agencies to depart from the APA's notice-and-comment requirement.  *See Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.D.C. 1998) (finding express congressional intent to allow departure from APA's notice-and-comment requirement where statute authorized "not a proposed rule, but an 'interim final rule'"); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994) (statute authorizing issuance of IFRs followed by opportunity for comment expressed Congress's "clear intent" that APA's notice-and-comment procedures "need not be followed").

Regardless, the Agencies also had good cause under the APA to issue the Rules before notice and comment.  The APA authorizes an agency to dispense with notice and comment rulemaking when such procedures are "impracticable, unnecessary, or contrary to the public

interest."  5 U.S.C. § 553(b)(3)(B).  The IFRs identified two independent rationales for "good cause," both of which are sufficient to satisfy § 553(b)(3)(B).

First, the Agencies found that notice and comment would be "impracticable," 82 Fed. Reg. 47,813, in light of the importance of the religious liberty interests at stake, the pendency of court deadlines, and the need to provide assurance to entities that desired to extend health coverage to their employees but had been deterred from doing so as a result of the Mandate.  *See id.* at 47,813-15.  A rulemaking is "impracticable 'when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required.'"  *Long Term Care Pharm. All. v. Ferguson*, 362 F.3d 50, 54 n.3 (1st Cir. 2004) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001)).  Impracticability alone therefore justified the Agencies' decision to issue these Rules as IFRs, just as the agencies did in 2010, 2011, and 2014 respecting the contraceptive coverage mandate.

Second, the public interest also justified issuance of the IFRs.  Here, consistent with the ordinary understanding of "public interest" and the legislative history, the Agencies determined that the public interest in curing ongoing violations of RFRA, accommodating sincere religious and moral objectors, and resolving pressure from ongoing litigation over the Mandate justified issuance of the Rules on an interim final basis.  *See* 82 Fed. Reg. 47,813-15; *Levesque*, 723 F.2d at 185 n.5 (recognizing that good cause may exist to dispense with notice and comment where the agency is in violation of an immediately effective statutory mandate).  Deference is owed to the Agencies' assessment of the public interest as a statutory factor.  *See, e.g., Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1454 (1st Cir. 1992).  Deference is also owed to the Agencies' consideration of additional factors in finding good cause, including their willingness to consider public comment before and after issuing the Rules, the Rules' interim nature, and the

combined effect of these factors.  *See, e.g.*, *Conservation Law Found. v. Evans*, 360 F.3d 21, 29-

30 (1st Cir. 2004); *Priests for Life*, 772 F.3d at 276; *Petry v. Block*, 737 F.2d 1193, 1203 (D.C.

Cir. 1984); *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.* 416 F.

Supp. 2d 92, 107 (D.D.C. 2006); *Mid-Tex Elec. Co-op., Inc. v. FERC*, 822 F. 2d 1123, 1132

(D.C. Cir. 1987).

### C.  The Agencies Had Statutory Authority to Enact the Final Rules, and Plaintiff's Arguments to the Contrary are Unavailing

Plaintiff's argument that the Rules violate the Women's Health Amendment, 42 U.S.C.

§ 300gg-13(a)(4), fails because the ACA grants HRSA, and in turn the Agencies, significant

discretion to shape the content and scope of any preventive-services guidelines adopted pursuant

to § 300gg-13(a)(4).[5]  The ACA does not specify the types of preventive services that must be

included in such guidelines.  Instead, as relevant here, it provides only that, "with respect to

women," coverage must include "such additional preventive care and screenings . . . as provided

for in comprehensive guidelines supported by [HRSA]."  42 U.S.C. § 300gg-13(a)(4).  Several

textual features of § 300gg-13(a) demonstrate that this provision grants HRSA broad

discretionary authority, authority that the Agencies have recognized since HRSA first announced

the contraceptive mandate and its accompanying church exemption.

First, unlike the other paragraphs of the statute, which require preventive-services

coverage based on, *inter alia*, "current recommendations of the United States Preventive

Services Task Force," recommendations "in effect . . . from the Advisory Committee on

---

[5] In its recent ruling affirming the preliminary injunction from the Eastern District of Pennsylvania, the Third Circuit noted, as Plaintiff does, that "[t]he term 'shall' denotes a requirement." *Pennsylvania v. President United States*, 930 F.3d at 970.  Defendants do not disagree that "shall" denotes a requirement, but dispute the scope of that requirement along the lines described above.

Immunization Practices of the Centers for Disease Control and Prevention," or "the comprehensive guidelines" that HRSA had already issued with respect to preventive care for children, the paragraph concerning preventive care for women refers to "comprehensive guidelines" that did not exist at the time of the ACA's enactment. *Compare id.* § 300gg-13(a)(1), (2), (3), *with id.* § 300gg-13(a)(4). That paragraph thus necessarily delegated the content of the guidelines to HRSA.

Second, nothing in the statute mandates that the guidelines include contraception at all, let alone all types of contraception for all types of employers with covered plans. On the contrary, the statute provides only for coverage of preventive services "as provided for in comprehensive guidelines supported by [HRSA] for purposes of this paragraph." *Id.* § 300gg-13(a)(4). The use of the phrase "for purposes of this paragraph" makes clear that HRSA should consider the particular context of the employer mandate in creating the guidelines, and the use of the phrase "as provided for" indicates that HRSA has discretion to define not only the services to be covered, but also the manner or reach of that coverage. *See also* 83 Fed. Reg. 57,540 n.10; 57,541 (discussing the Agencies' interpretation of the word "as" to confer discretion on the Agencies). The broad discretion granted to HRSA is further reinforced by the absence of the words "evidence-based" or "evidence-informed" in this subsection, as compared with § 300gg-13(a)(1), (3), which confirms, contrary to Plaintiff's assertion, *see* Pl.'s MSJ at 23-24, that Congress authorized HRSA to consider factors beyond the scientific evidence in deciding whether to support a coverage mandate for particular preventive services.

Accordingly, § 300gg-13(a)(4) must be understood as a positive grant of authority for HRSA to develop the women's preventive-services guidelines and for the Agencies, as the administering Agencies of the applicable statute, to shape that development. *See* 26 U.S.C.

§ 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92.  That is especially true for HHS, as HRSA is

a component of HHS that HHS created and that is subject to the HHS Secretary's general

supervision.  *See* HRSA, Statement of Organization, Functions, and Delegations of Authority, 47

Fed. Reg. 38,409 (Aug. 31, 1982).  The text of § 300gg-13(a)(4) thus authorized HRSA to adopt

guidelines for coverage that include an exemption for certain employers, and nothing in the ACA

prevents HHS from supervising HRSA in the development of those guidelines.  Indeed, since

their first rulemaking on this subject in 2011, the Agencies have consistently interpreted the

broad delegation to HRSA in § 300gg-13(a)(4) to include the authority to reconcile the ACA's

preventive-services requirement with sincerely held views of conscience on the sensitive subject

of contraceptive coverage by exempting churches and their integrated auxiliaries from the

contraceptive-coverage mandate.  *See* 76 Fed. Reg. 46,623.  Plaintiff does not challenge that

exemption, and because it was not limited in any way to those with sincerely held religious

beliefs in opposition to contraception, it could be authorized only under § 300gg-13(a)(4).

Plaintiff's arguments to the contrary are unavailing.  It argues that the word "additional"

in the statute makes it clear that the statute refers only to *types* of preventive care and screenings,

not the scope of coverage.  But Congress did not say "types;" it said "such additional preventive

care and screenings . . . as provided for in comprehensive guidelines supported by [HRSA]."  *See*

§ 300gg-13(a)(4).  This language clearly gives HHS discretion to fashion the types of

exemptions contemplated by the Final Rules.  Certainly, there is no indication that the word

"additional" bears the meaning that Plaintiff would assign to it.

Plaintiff further argues that Congress's exemption of certain employers with

grandfathered plans, and its rejection of a conscience amendment, mean that the statute should be

read to preclude the creation of religious or moral exemptions.  *See* Pls.' MSJ at 19, 24.  With

19

respect to grandfathered plans, they are significant, but not for the reasons Plaintiff asserts.  The grandfathering exemption demonstrates that Congress did not intend uniform coverage of preventive services across all employers, which is consistent with the Agencies' interpretation of the statute: although grandfathered plans are required to comply with numerous provisions of the ACA, they are exempt from the law's requirement to provide coverage for preventive services. *See* 83 Fed. Reg. 57,541.  And no federal law requires phasing out of the exemption for grandfathered plans.  *See Hobby Lobby*, 573 U.S. at 700 n.10.  In light of Congress' decision to provide exemptions from all preventive services coverage for grandfathered plans, it is not unreasonable to interpret the statute to also provide the Agencies with discretion to create exemptions for certain preventive services for religious and moral objectors.

Nor should the rejection of a conscience amendment bear on this Court's assessment of the meaning of § 300gg-13(a)(4).  "Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute."  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (citation omitted).  Congress may decline to adopt a proposal for any number of reasons, including "that the existing legislation already incorporated the offered change." *Id.*; *see also* 158 Cong. Rec. S485 (Feb. 9, 2012) (statement of Sen. Reid) ("They are talking about first amendment rights, the Constitution. I appreciate that.  But that is so senseless.  This debate that is going on dealing with this issue, dealing with contraception, is a rule that has not been made final yet.  There is no final rule. Let's wait until there is at least a rule we can talk about.").

At the very least, the Agencies' exercise of authority to expand the exemption is a reasonable construction of the statute entitled to deference.  *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Under Step Two of the *Chevron* doctrine, a

court must defer to an agency's reasonable interpretation of an ambiguous statute.  *Id.* at 843

("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the

court is whether the agency's answer is based on a permissible construction of the statute").  An

agency is entitled to *Chevron* deference not only with regard to interpretations of substantive

law, but also with regard to the scope of that agency's authority.  *City of Arlington v. FCC*, 569

U.S. 290 (2013).  Hence, if this Court concludes that the statute is ambiguous as to whether it

provides the Agencies with discretion to create or modify contraceptive coverage exemptions,

the Agencies' construction must prevail because it is a reasonable one.

## II.    RFRA Authorizes and Compels the Religious Exemption Rule.

RFRA independently authorizes the religious exemption.  RFRA prohibits the

government from "substantially burden[ing] a person's exercise of religion" unless the

application of the burden to that person is "the least restrictive means" of furthering a

"compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  RFRA thus requires the

government to eliminate any substantial burdens imposed by the contraceptive-coverage

mandate, including the substantial burden recognized by the Supreme Court in *Hobby Lobby*.

RFRA also requires agencies to proactively create exemptions to avoid substantially burdening

religious exercise, just as the Agencies here did with the original exemption and accommodation,

which are not challenged by Plaintiff.  And Plaintiff does not dispute that RFRA permits

agencies to affirmatively create such exemptions as necessary to avoid substantial burdens.[6]

---

[6] Indeed, the alternative, in which agencies could only react to RFRA lawsuits, would lead to
perverse results.  Here, for example, the Agencies would not have been able to create and
provide the accommodation to employers that would not have objected to it, and thus the
Agencies would have been forced to provide even those employers a total exemption when they
inevitably invoked RFRA as "a claim or defense" against enforcement of the contraceptive
coverage mandate.  *See* 42 U.S.C. § 2000bb-1(c).

Thus, the expanded religious exemption is a *required* response to the substantial burden on the religious exercise of objecting employers who object to the accommodation.  And the expanded religious exemption is a *permissible* response to the various objections to the contraceptive mandate—including the specific substantial burden identified by the Supreme Court in *Hobby Lobby*—because RFRA does not require agencies to select the least restrictive means of removing a burden.  In other words, the Agencies need not attempt to find the singular solution of an accommodation that would be *least* protective of the objector's religious exercise while still prevailing in a RFRA lawsuit brought by the objector, because to require the government to precisely hit the bullseye would lead to the protracted litigation that has thus far been the hallmark of the contraceptive mandate.

Plaintiff does not dispute that agencies have the authority under RFRA to affirmatively create exemptions as necessary to relieve substantial burdens on religious exercise.  Instead, Plaintiff argues that because (in its view) the prior administrative accommodation was all that RFRA required, the Agencies cannot enact the Rule.  Pl.'s MSJ at 27-28.  But Plaintiff identifies no legal authority precluding the Agencies from responding to the substantial burden identified in *Hobby Lobby* with a broader exemption.  No such authority exists.  "RFRA does not . . . prescribe the accommodation that the government must adopt" in response to a substantial burden; instead, it leaves agencies with a measure of "discretion to fashion an appropriate and administrable response to respect religious liberty interests implicated by their own regulations." 82 Fed. Reg. 47,806.  And allowing agencies to choose to respond to a substantial burden on religious exercise with an exemption rather than an accommodation is particularly appropriate here, where the Agencies have already attempted several accommodations, and those accommodations were the subject of widespread legal challenges that divided the courts and (at

22

an absolute minimum) raised serious questions about their sufficiency.  This approach is also consistent with the Supreme Court's recognition in analogous contexts that an entity faced with potentially conflicting legal obligations should be afforded some leeway.  For example, the Court has held that, under Title VII, an employer may "engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact" if the employer has "a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action."  *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009).  Critically, the Court did not require the employer to prove that it actually would "be subject to disparate-impact liability."  The Court explained that the more flexible standard it adopted "appropriately constrains employers' discretion in making race-based decisions" but was not "so restrictive that it allows employers to act only when there is a provable, actual violation"—a standard that would have left employers in an untenable position.  *Id.* at 583.  So too here.

Particularly where, as in this case, the Agencies are faced with substantial claims that RFRA compels an exemption—claims that have been accepted by many courts—the Agencies should be permitted to adopt that exemption even if the courts might ultimately have concluded that some form of accommodation would have been consistent with RFRA.  *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (when a statutory scheme contains "a fundamental ambiguity" arising from "the differing mandates" of two provisions, "it is appropriate to look to the implementing agency's expert interpretation" to determine which "must give way").

### A.  Entities and Individuals Substantially Burdened in the Absence of the Religious Exemption Rule.

The Religious Exemption Rule is necessary as to at least some employers to alleviate the substantial burden that they would otherwise face under the accommodation.  Covered

employers have "a sincere religious belief that their participation in the accommodation process makes them morally and spiritually complicit" in providing contraceptive coverage, because their "self-certification" triggers "the provision of objectionable coverage through their group health plans." *Sharpe*, 801 F.3d at 942; *see also* 82 Fed. Reg. 47,798, 47,800.   In light of that sincere religious belief, forcing objecting employers to use the accommodation plainly imposes a substantial burden under *Hobby Lobby* and violates RFRA.   *See Sharpe*, 801 F.3d at 939-43; *Priests for Life*, 808 F.3d at 16-21 (Kavanaugh, J., dissenting from denial of rehearing en banc). Indeed, after extensive study, the previous administration determined that it could identify no means short of an exemption that would resolve all religious objections, and on further examination the Agencies determined that denying the exemption was not narrowly tailored to achieving any compelling interest.[7]   *See supra* Background at II-III.   Similarly, because the contraceptive mandate generally prohibits insurance plans from omitting contraceptive coverage unless an exemption applies, an individual with religious opposition to buying a policy that covers contraception must choose between violating his or her beliefs or going without health insurance. Where such an individual, under the Rules, has an employer and issuer, as applicable,

---

[7] Although Plaintiff suggests that the Agencies wrongfully changed their position regarding whether the accommodation imposes a substantial burden, Pl.'s MSJ. at 27-28, the Agencies clearly explained their good reasons for reaching their new conclusion, and the new policy is permissible under the statute, which is all that is required.   *FCC v. Fox Television Studios,* 556 U.S. 502, 515 (2009).   As the Agencies explained: "We believe that the Court's analysis in *Hobby Lobby* extends, for the purposes of analyzing a substantial burden, to the burdens that an entity faces when it religiously opposes participating in the accommodation process or the straightforward Mandate, and is subject to penalties or disadvantages that apply in this context if it chooses neither."   82 Fed. Reg. 47,800.   And the Agencies concluded that this decision was not only better, but legally required: "[T]here is not a way to satisfy all religious objections by amending the accommodation.   Accordingly, the [Agencies] have decided it is necessary and appropriate to provide the expanded exemptions."   *Id.*

willing to offer a plan that complies with his or her beliefs concerning contraceptive coverage, the Rules relieve the substantial burden caused by the mandate.

First, Plaintiff suggests that religious practice is substantially burdened only if a regulation targets religion with hostility.  Pl.'s MSJ. at 28 (quoting *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78 (1st Cir. 2013)).  But that is not the law. Plaintiff's First Circuit case, identifying factors for use in Religious Land Use and Institutionalized Persons Act cases, is inapposite here.  Instead, the Supreme Court's recent determination in *Hobby Lobby* that the contraceptive mandate substantially burdened for-profit objectors under RFRA, which considered no such factors, is directly on point.

Plaintiff's remaining arguments that the accommodation does not substantially burden religious practice, Pl.'s MSJ. at 28-30, invite precisely what RFRA does not allow and what the Supreme Court has prohibited: "it is not for [a court] to say that [an objector's] religious beliefs are mistaken."  *Hobby Lobby*, 573 U.S. at 724.  Here, entities with sincere religious objections face coercion to act contrary to their beliefs or crippling financial penalties.  Under the accommodation, the objecting employers are inextricably intertwined with the provision of contraceptive coverage to their employees—if an employer eliminated its health plan or terminated an employee, that employee would no longer receive contraceptive coverage through the employer's insurer or third-party administrator.  Entities with sincere religious objections to being part of that inextricable link face penalties identified in *Hobby Lobby*.  Plaintiff's facile conclusion that "sending a single sheet of paper" "imposes no serious burden on religious exercise," Pl.'s MSJ. at 28-29, is precisely the type of second-guessing of religious belief that the Supreme Court has counseled against.  As *Hobby Lobby* established, a court's "narrow function in this context is to determine whether the line drawn reflects an honest conviction," as opposed

to "in effect tell[ing] the plaintiffs that their beliefs are flawed."  134 S. Ct. at 2778, 2779

(cleaned up).  And Plaintiff's argument that it is ultimately health-care insurers and third-party

administers that provide coverage for contraceptives under the accommodation, rather than

objectors, Pl.'s MSJ. at 29, likewise does not address the burden placed on those who object to

*triggering* the contraception-provision process through their self-certification.  And because the

accommodation does not apply to individuals, it is irrelevant to whether the mandate

substantially burdens them.

Plaintiff incorrectly analogizes to the draft context, arguing that replacing religious

objectors with alternative draftees would still substantially burden the religious objectors. Pl.'s

MSJ. at 29-30. But that hypothetical is doubly inapposite.  The military's drafting of a

replacement neither depends on the form of the objector's notification nor involves the objector's

own contracts, and it is unsurprising that the government is unaware of individuals with sincere

religious objections to the process of asserting their conscience objection.  Regardless, the

government's need to conscript citizens to fight a war, unlike its purported need to conscript

employers to subsidize employees' contraception, would likely satisfy strict scrutiny, *see, e.g.*,

*Eternal Word Television Network, Inc. v. Secretary of HHS*, 818 F.3d 1122, 1188 n.32 (11th Cir.

2016) (Tjoflat, J., dissenting) (rejecting the draft hypothetical), *vacated*, 2016 WL 11503064.

Finally, Plaintiff does not dispute the *substantiality* of the burden at issue here—an

independent inquiry that turns on the severity of the pressure the government's action imposes on

the objector's religious exercise.  *See* 573 U.S. at 719-20; *see also Sharpe*, 801 F.3d at 938.

Here, of course, the analysis is straightforward because the substantial burden resulting from the

accommodation is the significant financial penalty imposed for failure to comply with the

Mandate or accommodation.  That is the same penalty the plaintiffs faced in *Hobby Lobby*,

where the Court had "little trouble" concluding that the Mandate imposed a substantial burden.

134 S. Ct. at 2775; *see also Priests for Life*, 808 F.3d at 16 (Kavanaugh, J., dissenting from

denial of rehearing en banc).

> **B.**     **There Is No Compelling Government Interest in Forcing the Objectors Covered by the Religious Exemption Rule to Provide Contraceptive Coverage.**

Contrary to Plaintiff's position, Pl.'s MSJ. 30-33, the Agencies reasonably concluded that

there is no compelling interest that justifies the imposition of this substantial burden on the

exercise of religion, and thus the accommodation cannot be the least restrictive means of

achieving this interest.  The existence of a compelling interest is measured not by the

governmental interests served by the Mandate in general, but the governmental interests served

by applying the Mandate to the small percentage of employers with sincere religious objections

to it. *Hobby Lobby*, 573 U.S. at 725-26.  In the Rule, the Agencies provided multiple reasons for

their conclusion that application of the Mandate to objecting entities neither serves a compelling

governmental interest nor is narrowly tailored to any such interest:

1. Congress has a history of providing flexibility in what contraceptives must be
   covered.  83 Fed. Reg. 57,546-47.

2. Many other excepted groups that are not required to provide contraception existed
   prior to the Rules or IFRs, including grandfathered plans, exempted churches and
   their auxiliaries, and plans subject to the accommodation that participated in self-
   insured church plans.  *Id.* at 57,547; *cf. Advocate Health Care Network*, 137 S. Ct. at
   1658-59.  The Agencies previously concluded that the exemption for churches and
   integrated auxiliaries "does not undermine the governmental interests furthered by the
   contraceptive coverage requirement." 78 Fed. Reg. 39,874.

3. The Agencies' reached the expert determination that the administrative record does not contain adequate evidence to meet the high standard of demonstrating a compelling interest, 83 Fed. Reg. 57,547.

4. Contraceptives are available from alternative sources, including from government programs for low-income women and from objecting entities that are willing to cover some but not all contraceptives. *Id.* at 57,548. The Agencies considered research analyzing the effect of ACA implementation on contraceptive use. *Id.* (citing M.L. Kavanaugh *et al.*, *Contraceptive Method Use in the United States: Trends and Characteristics Between 2008, 2012 and 2014*, 97 Contraception 14, 14–21 (2018), AR 00804227). That research concluded that: "The role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA (most or moderately effective methods) during the most recent time period (2012-2014) excepting small increases in implant use," perhaps because "many women were able to access contraceptive methods at low or no cost through publicly funded family planning centers and Medicaid" prior to implementation of the ACA. AR at 00804231.

In addition, the Agencies concluded there is little or no government interest in refusing to extend the exemption to certain types of entities or individuals. The Agencies had previously concluded that the exemption for churches and integrated auxiliaries "does not undermine the governmental interests furthered by the contraceptive coverage requirement." 78 Fed. Reg. 39,874. They logically extended that conclusion to other religious nonprofits that choose the expanded exemption, because they are often outwardly devout in their beliefs, and because there

is little evidence to show exempting them will lead to a greater impact to the government's interests than did the exemption for churches and integrated auxiliaries.  83 Fed. Reg. 57,561. Moreover, the accommodation's ineffectiveness towards self-insured church plans leaves a large swath of non-church religious nonprofit groups effectively exempt already, and the Agencies wished to "avoid inconsistency" in treating otherwise similarly situated religious nonprofit groups differently.  *Id.* at 57,542.  In addition, with respect to individuals who use the individual exemption because they oppose contraceptive coverage, and who have a willing employer or issuer offering them a plan consistent with their beliefs, the Agencies concluded the government has even less interest in requiring contraceptive coverage in their plans than it had in requiring the coverage in the plans of persons who work for churches or integrated auxiliaries, since those individuals will not use the coverage.  83 Fed. Reg. 57,568–69.

Plaintiff does not substantially dispute the Agencies' conclusion that many women will be able to access contraception through alternative means, or the Agencies' ultimate conclusion that the administrative record did not contain adequate evidence to demonstrate a compelling interest.  And, although the existence of exceptions is by no means dispositive, "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (cleaned up).

Nor does Plaintiff cite any case law supporting the proposition that it, and not the Agencies, is the arbiter of the *Government's* interest, and, in any event, the Government is unaware of any case in which a court has held that the Government has a compelling interest when the Government itself has not asserted such an interest.

### C.     Alleged Third Party Harm Is Not a Reason to Neglect RFRA's Requirements.

Plaintiff argues that the Rule would cause harm to third parties. Pl.'s MSJ at 33-35. RFRA contains no separate limitation on exemptions which would affect third-parties, and indeed, nearly all exemptions will have some effect on third parties—including the exemption for churches and their integrated auxiliaries, which Plaintiff appears to accept. And, here, the Agencies reasonably concluded that the application of the Mandate to the objecting entities neither serves a compelling interest nor is narrowly tailored to such an interest, so RFRA required or at least authorized the exemption. *Cf. Benning v. Georgia*, 391 F.3d 1299, 1312-13 (11th Cir. 2004) (holding that the RLUIPA religious exemption does not facially burden third party interests unduly, because it allows States to satisfy compelling interests). To the extent that Plaintiff seeks to reiterate its argument that the Rule violates the Establishment Clause[8]—an argument that would equally apply to the existing exemption for churches and their integrated auxiliaries, as well as to the accommodation to the extent that it is taken by church plans—those arguments fail for the reasons discussed *infra* part III because the Rules do not "burden" third parties by ceasing to require employers to provide a benefit to those third parties.

In any event, the Religious Exemption Rule addressed the effect of the expanded exemption on women in the context of considering whether the government has a compelling interest. 82 Fed. Reg. 47,803-06. For example, the Agencies considered at length evidence regarding whether enacting a broader exemption would meaningfully alter access to

---

[8] Plaintiff cites the language in *Hobby Lobby* that "in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.'" Pl.'s MSJ at 34 (quoting *Hobby Lobby*, 573 at 729 n.37). This language quotes *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005), which relies on *Estate of Thornton v. Caldor*, Inc., 472 U.S. 703 (1985), an Establishment Clause case pre-dating RFRA's enactment. Defendants understand the language in *Hobby Lobby* as saying nothing more than that accommodations under RFRA are not permitted to violate the Establishment Clause, which is not the case here.

contraception or the number of unwanted pregnancies, as well as evidence regarding the health effects of contraceptives. *Id.* at 47,803-05. Ultimately, they found that the limited impact on a small number of women was warranted by the comparatively large intrusion on religious liberty and freedom of conscience.

### D. RFRA Does Not Require Agencies to Select the Least Restrictive Means of Addressing Objections.

Although RFRA prohibits the government from substantially burdening a person's religious exercise where doing so is not the least restrictive means of furthering a compelling interest—as is the case with the contraceptive coverage mandate, per *Hobby Lobby*—RFRA does not prescribe the precise remedy by which the government must eliminate that burden.[9] There may be a range of permissible approaches which the government may take to alleviate the burden, and RFRA does not require the government to inch forward one quantum of exemption at a time—all the while defending against RFRA lawsuits by objectors—until it stumbles upon the most restrictive accommodation that withstands the objector's legal objections. This principle is demonstrated by the history of religious exemptions to the contraceptive mandate.

In *Hobby Lobby*, the Supreme Court held that the contraceptive coverage mandate, standing alone, "imposes a substantial burden" on objecting employers. 134 S. Ct. at 2779. The Court further held that application of the mandate to objecting employers was not the least restrictive means of furthering any compelling governmental interest, because, at a minimum, the

---

[9] Plaintiff's arguments that the accommodation is the "least restrictive means" of alleviating the substantial burden on religious exercise, Pl.'s MSJ at 30-33, are meaningless, because, for the reasons discussed above, there is no compelling government interest to be furthered, and the government does not argue that such a compelling interest prevents it from alleviating the burdens on religious exercise. Plaintiff appears to suggest that the reverse would also apply—that the approach taken to alleviating the burdens must be the least restrictive means of doing so. But this is a requirement that does not arise anywhere in the text of RFRA, and, for the reasons given in this section, such an approach would be ill-advised.

accommodation was a less restrictive alternative that could be extended to the objecting employers in that case. *See id.* at 2780-83. After that decision, the Agencies reasonably decided to adopt the religious exemption rule to satisfy their RFRA obligation to eliminate the substantial burden imposed by the mandate, because "many religious entities have objections to complying with the accommodation based on their sincerely held religious beliefs." 82 Fed. Reg. 47,806, 57,544-48. This was entirely in keeping with the *Hobby Lobby* decision—the Court did not decide whether the accommodation would satisfy RFRA for all religious claimants; nor did it suggest that the accommodation is the only permissible way for the government to comply with RFRA and the ACA, even assuming the existence of a compelling governmental interest.

Nothing in RFRA compelled the Agencies to stick with the complex accommodation process or prohibited them from employing the more straightforward choice of an exemption— much like the existing and unchallenged exemption for churches. Indeed, if the Agencies had simply adopted an exemption from the outset—as they did for churches—no one could reasonably have argued that doing so was improper because the Agencies should have invented the accommodation instead. Neither RFRA nor the ACA compels a different result here based merely on path dependence.

The Agencies' choice to adopt an exemption in addition to the accommodation is particularly reasonable given the litigation over whether the accommodation violates RFRA. 82 Fed. Reg. 47,798; *cf. Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970) (recognizing "room for play in the joints" when accommodating exercise of religion). Here, where the accommodation still imposed a substantial burden on some entities, the Agencies acted reasonably and permissibly in choosing to enact the religious exemption rather than attempting to iterate a

different version of the accommodation and proceeding with decades of litigation over whether that updated accommodation sufficiently removed the substantial burden.

For these reasons, Plaintiff's argument that the Rule is overbroad, Pl.'s MSJ at 29 n.28, fails because the Agencies need not select the least restrictive response to a substantial burden on religious exercise.  In any event, the Rule is not overbroad because it only exempts entities with sincere objections to complying with the contraceptive mandate, and the Agencies have maintained the accommodation for entities that opt to use it.  As a practical matter, for the reasons discussed in the Rule, the Agencies do not expect that entities would attempt to use the Rule pretextually, because providing contraceptive coverage is generally cost-neutral.

Nor do Defendants maintain that the Agencies could create "unfettered" exemptions under RFRA.  Pl.'s MSJ at 25.  The Agencies' exercise of their authority to shape the content and scope of any preventive-services guidelines is subject to "arbitrary and capricious" review under the APA, and the religious exemption rule at issue here is tailored because it applies only to the category of persons who have a valid RFRA claim against the contraceptive-coverage mandate, *e.g.*, those employers with a sincere religious objection to the mandate.

### E.   Plaintiff's Logic Would Doom the Exemption for Churches and Their Integrated Auxiliaries and the Accommodation.

Finally, the logic of Plaintiff's position would sweep away the longstanding exemption for churches and their integrated auxiliaries and the accommodation.  Plaintiff argues that the church exemption is permitted by RFRA, but that the broader exemption in the new Rule is not because "[c]hurches are simply different than other employers."  Pl.'s MSJ at 26 n. 25.  But there is no principled basis in RFRA to tailor the exemption to churches rather than sincere religious beliefs.  *See* 42 U.S.C. § 2000bb-1 (protecting "a person's exercise of religion"); 1 U.S.C. § 1 (defining "person" broadly).  Indeed, the Supreme Court in *Hobby Lobby* established that RFRA

required an accommodation for the contraceptive coverage mandate as applied to *for-profit*

corporations.  *See Hobby Lobby*, 134 S. Ct. at 2785.  If the church exemption is required under

RFRA, as Plaintiff concedes, then so too are the new Rule's exemptions.

## III.     The Rules Do Not Violate the Establishment Clause.

Plaintiff alleges that the Rules violate the Establishment Clause.  Pl.'s MSJ at 35-59.

Specifically, Plaintiff alleges that the Rules intend to and do have the effect of advancing

religious interests.  *Id*. at 36.  This allegation has no merit.  The Rules' protections of religious

exercise for entities and individuals with objections to contraceptive coverage do not run afoul of

the Establishment Clause.  The Rules do not themselves promote or subsidize a religious belief

or message, as demonstrated most clearly by the fact that the exemptions expressly include

nonreligious entities and persons.  Instead of establishing religion, the Rules free entities and

individuals with objections to the provision of contraceptive coverage to act as they otherwise

would in the absence of government-imposed regulations.  The Rules represent a constitutional

exercise of executive authority to alleviate unjustified substantial burdens on the exercise of

religious liberty and freedom of conscience.

When the government relieves such burdens, it does not violate the Establishment

Clause; rather, "it follows the best of our traditions."  *Zorach v. Clauson*, 343 U.S. 306, 314

(1952).  "[I]n commanding neutrality the Religion Clauses do not require the government to be

oblivious to impositions that legitimate exercises of state power may place on religious belief

and practice."  *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994).

Rather, the "government may (and sometimes must) accommodate religious practices."  *Corp. of*

*the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327,

334 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45

34

(1987)). And "'there is room for play in the joints between' the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter*, 544 U.S. at 713. Thus, the Supreme Court has upheld a broad range of accommodations against Establishment Clause challenges, including the exemption of religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion, *see Amos*, 483 U.S. at 335-39; a state property tax exemption for religious organizations, *see Walz*, 397 U.S. at 672-80; and a state program releasing public school children during the school day to receive religious instruction at religious centers, *see Zorach*, 343 U.S. at 315.

The Supreme Court and the First Circuit continue to apply the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to evaluate Establishment Clause challenges to government acts seeking to accommodate the practice of religious beliefs. *See Amos*, 483 U.S. at 335; *Boyajian v. Gatzunis*, 212 F.3d 1, 4 (1st Cir. 2000). As relevant here, under *Lemon*, a government act is consistent with the Establishment Clause if "(1) it has a secular legislative purpose, [and] (2) its principal or primary effect neither advances nor inhibits religion[.]" *Boyajian*, 212 F.3d at 4 (citations omitted).[10] The Rules easily satisfy this test.[11]

---

[10] *Lemon* also requires that a government act "not foster excessive government entanglement with religion." *Id*. at 4 (citations omitted). Plaintiff does not challenge the Rules under this prong of *Lemon* except for a footnoted argument relying solely on *Larkin v. Grendel's Den, Inc*., 459 U.S. 116 (1982). *See* Pl.'s MSJ at 37 n.36. In *Larkin*, a state statute delegated "a power ordinarily vested in agencies of government"—the ability to veto applications for liquor licenses within a prescribed radius—to churches and schools. 459 U.S. at 122; *see also id*. at 117-18. Because the Rules do not vest governmental functions in any entity, *Larkin* is inapposite.

[11] The First Circuit has also occasionally applied an alternative "endorsement analysis" in Establishment Clause cases, under which a court "must consider whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion." *Freedom From Religion Found. v. Hanover Sch. Dist*., 626 F.3d 1, 10 (1st Cir. 2010) (citing *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 593-94 (1989)). As demonstrated herein, the Rules satisfy

### A.      The Rules Have a Secular Purpose.

With respect to *Lemon*'s first prong – that the government act serves a secular legislative purpose – the Supreme Court has recognized that it is a permissible governmental purpose to alleviate significant governmental interference with the exercise of religion.  *Amos*, 483 U.S. at 335.  This was the precise aim of the Agencies in promulgating the Religious Exemption Rule. *See* 82 Fed. Reg. 47,793 (purpose of the Rules is "to better balance the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the Government's interests, including as reflected throughout Federal law, to provide conscience protections for individuals and entities with sincerely held religious beliefs in certain health care contexts, and to minimize burdens in our regulation of the health insurance market").  And the aim of the Agencies in promulgating the Moral Exemption Rule was patently secular: the accommodation of moral convictions not based in religion.  *Id*. at 47,844.

The first prong of the *Lemon* test "does not mean that the law's purpose must be unrelated to religion – that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted." *Boyajian*, 212 F.3d at 5 (quoting *Amos*, 483 U.S. at 335).  Rather, a law fails this prong "only if it is motivated *wholly* by an impermissible purpose."  *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988) (emphasis added).  Here, nothing in the Rules shows any intent to advance any particular faith or to promote religion in general.  *See Rojas v. Fitch*, 928 F. Supp. 155, 162 (D.R.I. 1996), *aff'd*, 127 F.3d 184 (1st Cir. 1997) ("The purpose of the Establishment Clause is to ensure that government will not sponsor or promote any particular religion.") (citing *Walz*, 397 U.S. at 669).

---

the endorsement analysis, regardless of whether it is understood to be a separate factor or merely part of the inquiry into the Rules' purpose and effect.

Instead, the Rules merely seek to alleviate certain substantial hardships faced by entities and individuals in the provision of health insurance.  Indeed, the fact that the Rules apply to entities and individuals with secular, non-religious moral beliefs regarding the provision of contraceptive coverage confirms that the Rules possess a secular purpose.

### B.      The Effect of the Rules Is Neither to Advance Nor Inhibit Religion.

The second prong of the *Lemon* test requires that a law's "principal or primary effect . . . neither advance[] nor inhibit[] religion."  *Lemon*, 403 U.S. at 612.  Removing barriers to the exercise of religious freedom does not advance religion; to the contrary, "there is ample room for accommodation of religion under the Establishment Clause."  *Amos*, 483 U.S. at 338.  The Rules do not promote or subsidize a religious belief or message; they merely free entities and individuals with religious or moral objections to contraception coverage to practice those beliefs and convictions as they otherwise would in the absence of certain government-imposed regulations.

Neither of Plaintiff's two theories as to why the Rules impermissibly advance religion possesses merit.  First, Plaintiff errs in contending that the Agencies ran afoul of the Establishment Clause by replacing an accommodation that Plaintiff believes "imposed no cognizable burden on the exercise of religion" with the Rules.  Pl.'s MSJ at 37 (citation and internal punctuation omitted).  Here, the government's secular purpose—to alleviate significant governmental interference with the exercise of religious and moral convictions—is not fully served by the accommodation.  *See* 83 Fed. Reg. 57,546-48 (explaining that requiring entities to choose between compliance with the accommodation or paying financial penalties violated RFRA in many instances).  Some entities have sincere religious objections to the role that the accommodation forces them to play in the provision of contraceptive coverage.  Plaintiff's

attempt to minimize these religious objections invites just what RFRA does not allow and what the Supreme Court has prohibited: "it is not for [a court] to say that [an objector's] religious beliefs are mistaken." *Hobby Lobby*, 573 U.S. at 725.

Moreover, Plaintiff's characterization of the loss of compelled contraceptive coverage as a governmental burden rests on the "incorrect presumption" that "the government has an obligation to force private parties to benefit those third parties and that the third parties have a right to those benefits."  83 Fed. Reg. 57,549. "If some third parties do not receive contraceptive coverage from private parties who the government chose not to coerce [into providing such coverage], that result exists in the absence of governmental action—it is not a result the government has imposed."  *Id.*  Before the Mandate, women had no entitlement to contraceptive coverage without cost-sharing.  If the same agencies that created and enforce the Mandate also create a limited exemption to accommodate sincere religious objections, the women affected are not "burdened" in any meaningful sense, because they are no worse off than before the Agencies chose to act in the first place.

Second, from the fact that Plaintiff disagrees with the Rules' outcome on policy grounds, it does not follow that the Rules "advance employers' religious interests over all other interests." Pl.'s MSJ at 36. (citation and internal punctuation omitted)  As explained above, the Agencies provided reasoned explanations for the promulgation of the Rules, and responded meaningfully to comments regarding the impact of the Rules.  Plaintiff relies on inapposite cases to support its contrary arguments.  A state law prohibiting the teaching of evolution in the public-school curriculum unless accompanied by lessons on creationism, at issue in *Edwards v. Aguillard*, 482 U.S. 578 (1987), is far afield from an exemption to a regulatory mandate regarding employer-provided contraceptive coverage.  *United States v. Lee*, 455 U.S. 252 (1982), which rejected a

claimed exception by an Amish employer to his obligation to pay Social Security taxes, merely stands for the principle that "the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 435 (2006). *Lee* is inapposite because no such compelling interest in uniform application of the mandate is present here given, among other things, the contraceptive mandate's numerous other exemptions. Nor does *Bowen v. Roy*, 476 U.S. 693 (1986), cited by Plaintiff, involve the Establishment Clause.

Plaintiff incorrectly suggests that the religious exemption constitutes the kind of "absolute and unqualified" exception the Supreme Court held unconstitutional in *Thornton*. Pl. MSJ at 36-39. The statute at issue in *Thornton* did not lift any governmental burden on religion, but instead intruded on private relationships by imposing on employers an "absolute duty" to allow employees to be excused from work on "the Sabbath [day] the employee unilaterally designate[d]." *Thornton*, 472 U.S. at 709. By contrast, the Rules neither compel nor encourage any action on a private employer's part. Instead, they *lift* a burden on the free exercise of religion—that employers are required to provide contraceptive coverage to their employees regardless of their contrary religious beliefs or moral convictions—that the government itself imposed, *see Amos*, 483 U.S. at 338. The lifting of a *government-imposed* burden on religious exercise is permitted under the accommodation doctrine referenced in *Amos*. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (explaining that "the application of Title VII's exemption for religious organizations that we approved in [*Amos*], though it had some adverse effect on those holding or seeking employment with those organizations (if not on taxpayers generally), prevented potentially serious encroachments on protected religious freedoms")

(emphasis added).  In addition, *Thornton* involved government interference with private

contracts.  By contrast, the Rules involve a benefit that the government need not have required at

all.  The Establishment Clause should not be interpreted to require the government to broadly

withdraw benefits where a more targeted exemption would accommodate religious objectors.

IV.     **The Rules Do Not Violate the Fifth Amendment's Equal Protection Principle.**

Plaintiff also argues that the Rules violate the equal protection component of the Fifth

Amendment's Due Process Clause.  Pl.'s MSJ at 39-42.  This argument is meritless.  When faced

with a claim of discrimination on the basis of sex, courts assess (i) whether the classification is

facially based upon sex and, if not, (ii) whether there are other factors—such as the purpose of

the law or the existence of a disparate impact—that demonstrate an invidious intent to

discriminate on the basis of sex.  *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979).

With regard to "this second inquiry, [that] impact provides an important starting point, but

purposeful discrimination is the condition that offends the Constitution."  *Id.*  (citations omitted).

Sex-based distinctions are subject to intermediate scrutiny, meaning that such distinctions must

be substantially related to an important governmental interest.  *Wengler v. Druggists Mut. Ins.*

*Co.*, 446 U.S. 142, 150 (1980).  Distinctions that do not target a protected class or burden a

fundamental right are subject to rational-basis review.  *Heller v. Doe*, 509 U.S. 312, 319-20

(1993).  Under this standard, "a classification must be upheld . . . if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification," regardless of

the actual basis for the distinction.  *Id.* at 320 (citation omitted).

The Rules do not discriminate against women on the basis of sex, facially or otherwise.

The Rules and HRSA Guidelines generally require coverage for female contraceptives without

cost-sharing, while providing an exemption for those with religious and conscience objections.

40

The Rules and Guidelines do not require any coverage of male contraceptives.  *See* 78 Fed. Reg. 8,458 n.3.  Nor could they: The statutory provision requiring coverage for additional preventive services supported by HRSA pertains only to such services for "women."  42 U.S.C. § 300gg-13(a)(4).  Thus, the Rules do not treat men more favorably, and any sex-based distinctions flow from the statute requiring preventive services for women only, not from the Agencies improperly "singl[ing] out women."   Pl.'s MSJ at 40.  Moreover, any distinctions in coverage among women are not premised on sex, but on the existence of a religious or moral objection to facilitating the provision of contraceptives.

No other factor reflects any invidious intent to discriminate on the basis of sex.  Consider first the Rules' purpose.  Their stated purpose is sex-neutral: to "better balance the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the Government's interests, including as reflected throughout Federal law, [in] provid[ing] conscience protections for individuals and entities with sincerely held religious beliefs [or moral convictions] in certain health care contexts, and [in] minimiz[ing] burdens in our regulation of the health insurance market."  82 Fed. Reg. 47,793, 47,839.  This purpose finds support in the history of the Rules.  The Rules were not written on a blank slate, but against the backdrop of years of litigation and negotiation between the Agencies and religious and moral objectors, who, prior to these Rules, struggled to find common ground with the government.  *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2764 n.10; *Zubik*, 136 S. Ct. at 1560.

Notably, Plaintiff fails to cite any authority suggesting that declining to subsidize contraception constitutes a sex-based equal protection violation.  Instead, Massachusetts argues that the Rules have a discriminatory impact on women, in violation of the Fifth Amendment, because they "creat[e] exemptions specific to the Women's Health Amendment . . . while

leaving coverage for male employees untouched."  Pl.'s  MSJ at 39.  This argument is flawed

because "[t]he equal protection component of the Fifth Amendment prohibits only purposeful

discrimination" rather than disparate impact.  *Harris v. McRae*, 448 U.S. 297, 323 n.26 (1980)

(citing *Washington v. Davis*, 446 U.S. 229 (1976)).  And distilled to its essence, Plaintiff's claim

is that despite the fact that the Rules do not draw any sex-based distinction, an exemption to

subsidizing contraception disparately affects women.  That claim is meritless because it does not

state a cognizable equal protection claim on the basis of sex.

Moreover, the Agencies did not arbitrarily target the Mandate; rather, they focused on the

Mandate because it was the source of scores of lawsuits that (correctly) alleged that the Mandate

imposed substantial burdens on religious and moral objectors.  *See* 82 Fed. Reg. 47,793, 47,807,

47,839.  And while male coverage is "untouched," that is because 42 U.S.C. § 300gg-13(a)(4)

does not authorize a male contraceptive services mandate in the first place, not because the Rules

chose to afford different treatment to male and female contraceptives.  78 Fed. Reg. 8,458 n.3.

Plaintiff's argument, in short, does not highlight any invidious discrimination.

Because the Rules do not create sex-based distinctions, they are subject to rational basis

review.  They satisfy this "lenient" test, *Walker v. Exeter Region Co-op. Sch. Dist.*, 284 F.3d 42,

46 (1st Cir. 2002), because they are rationally related to legitimate government interests, *Lyng v.

Int'l Union,* 485 U.S. 360, 370 (1988).  The Religious Exemption Rule accommodates religion

by "expand[ing] exemptions to protect religious beliefs for certain entities and individuals with

religious objections to contraception."  83 Fed. Reg. 57,540.  And the accommodation of

religious beliefs is an important government interest, as the Supreme Court recognized in *Cutter,*

544 U.S. at 720.  (It would, therefore, satisfy intermediate scrutiny, if that standard applied.)

The Moral Exemption Rule also has a rational basis (and would satisfy intermediate scrutiny, if that standard applied).  It is designed to protect "sincerely held moral convictions" by exempting those with such convictions from facilitating the provision of contraceptive services. 83 Fed. Reg. 57,593.  The government may permissibly accommodate deeply-held moral, but not religious, convictions; the accommodation of such beliefs is, in fact, an important interest that the government has long pursued.  *See Welsh v. United States*, 398 U.S. 333, 340 (1970) (plurality opinion); *United States v. Seeger*, 380 U.S. 163, 169-70 (1965); *Doe v. Bolton*, 410 U.S. 179, 197-98 (1973).  Congress has repeatedly legislated conscience protections in sensitive health contexts, including the provision of contraceptive services.  Indeed, Plaintiff has repeatedly recognized, in both legislation and regulations, that it is legitimate to protect non-religious moral beliefs in the context of healthcare.  *See* Mass. Gen. Laws ch. 112, § 12I; *id*. ch. 272, § 21B; 130 Mass. Code Regs. § 484.003.[12]

---

[12] In the course of arguing that the Rules do not satisfy intermediate scrutiny—a standard that does not apply—Plaintiff makes several points that warrant a response.  First, it argues that the Agencies should have created exemptions to other services, such as immunizations, for which coverage is mandated because those services too could be subject to religious objections.  Pl.'s MSJ at 41.  This insistence on more expansive religious exemptions is odd given Plaintiff's complaints about the Agencies advancing religion at the expense of non-adherents.  In any case, the Agencies have not been subjected to a spate of lawsuits regarding these other services. Second, Massachusetts suggests that the Agencies have no interest in protecting the religious and moral beliefs of objectors because Congress declined to adopt an exemption to the Mandate.  *Id.* at 42.  But RFRA and precedent such as *Welsh, Seeger*, and *Doe* demonstrate otherwise. Congress can decline to adopt a proposal for any number of reasons, including "that the existing legislation already incorporated the offered change."  *Cent. Bank of Denver*, 511 U.S. at 187 (citation omitted).  In that vein, a floor statement by the then-Senate Majority Leader indicates that the exemption may have been rejected because Congress thought that the Agencies would enact an exemption if necessary.  *See supra* I.B.  Finally, Plaintiff questions the validity of the Agencies' desire to resolve litigation, because the new Rules are now the subject of litigation. Pl.'s MSJ at 42.  Resolution of litigation was not the only reason for the Rules—they also alleviate substantial burdens on religion and conscience.  That the Rules have spawned several new cases does not demonstrate that the Agencies' desire to resolve the more than fifty cases that then existed was not genuine.

**V.      Even if Plaintiff Were to Prevail, A Set-Aside Is the Only Appropriate Remedy.**

Should the Court rule in Plaintiff's favor on the merits, the APA dictates the appropriate remedy: the "set[ting] aside" of the agency action deemed unlawful by the Court as to the Plaintiff.  5 U.S.C. § 706(2)(A) & (D).[13]  The matter should then be "remand[ed] to the [A]genc[ies] for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Plaintiff suggests that the Court should enter further relief in the form of a declaratory judgment or permanent injunction against the Agencies.  Pl.'s MSJ at 42.  But its motion does not articulate why the Court needs to go beyond the relief afforded under § 706.  If the Rules are set aside as to Plaintiff, the responsibility falls to the Agencies, not on Plaintiff or this Court, to reconsider how best to address the tension between contraceptive coverage and religious freedom interests that the Supreme Court asked the Agencies to navigate in *Zubik*.

The scope of this "set aside"—or, indeed, any form of relief the Court may enter—also must be limited to the parties before this Court.  Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation omitted); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) (a "plaintiff's remedy must be limited to the inadequacy that produced his injury in fact" because "the Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").  In litigation parallel to this case, the Ninth Circuit vacated a nationwide preliminary injunction against the IFRs to the extent that it applied beyond the plaintiff-states.  *California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018).  Similarly, here, any

---

[13] The Court should not set aside portions of the Rules that permit issuers and plan sponsors to offer plans to individuals that account for sincerely-held objections the individual may have; Plaintiff does not demonstrate any harm from that aspect of the Rules.  Also, the Rules have severability provisions, to which the Court should conform any ruling.  *See, e.g.*, 83 Fed. Reg. 57,589.

relief "must be narrowed to redress only the injury shown as to the plaintiff state[]" because an

order "that applies only to [it] would provide complete relief."  *Id*. at 584 (footnote omitted).

Particularly in light of concerns that parallel litigation in the Third and Ninth Circuits could lead

to direct legal conflicts between a ruling by this Court and others, Plaintiff has failed to meet the

high threshold for nationwide relief.  Plaintiff adduces no evidence in its summary judgment

motion to support a contrary conclusion.  As such, should the Court rule in Plaintiff's favor on

the merits, at most, the Rules should be "set aside" with respect to Plaintiff only.

Finally, the scope of such set aside should be limited to injury the Rules actually impose

on the Plaintiffs. As discussed above, with respect to religious nonprofit organizations, the

Agencies concluded that the exemption does not undermine the government's interests.  In

addition, the religious and moral exemptions for individuals pose even less of a threat to

government interests than the church exemption and accommodation.  And the Agencies

concluded that the exemption for nonprofit organizations in the moral rule "does not advance any

governmental interest" because the groups who have used that exemption typically hire persons

who share their principled opposition to contraceptives.  83 Fed. Reg. at 57,602.  Plaintiff has not

raised any genuine issue of material fact to contradict these conclusions. Because Plaintiff cannot

show injury from these provisions, any ruling in Plaintiff's favor should not set them aside.

## CONCLUSION

Defendants respectfully request the Court to enter summary judgment for Defendants,

and to deny Plaintiff's motion for summary judgment.

DATED: August 30, 2019                          Respectfully submitted,


                                                JOSEPH H. HUNT
                                                Assistant Attorney General

ETHAN P. DAVIS
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Director, Federal Programs Branch

  /s/ *Daniel Riess*
DANIEL RIESS (Texas Bar # 24037359)
Trial Attorney
U.S. Department of Justice
Civil Division
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on August 30, 2019, I caused a copy of the foregoing to be filed electronically and that the document is available for viewing and downloading from the ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  If any counsel of record requires a paper copy, I will cause a paper copy to be served upon them by U.S. mail.

/s/ *Daniel Riess*