## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

———————————————————————

COMMONWEALTH OF MASSACHUSETTS,

       *Plaintiff,*

       v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ALEX M. AZAR II, in his official capacity as
Secretary of Health and Human Services;
UNITED STATES DEPARTMENT OF THE
TREASURY; STEVEN T. MNUCHIN, in his
official capacity as Secretary of the Treasury;
UNITED STATES DEPARTMENT OF
LABOR; and PATRICK PIZZELLA, in his
official capacity as Acting Secretary of Labor,

       *Defendants.*

———————————————————————

Case No. 17-cv-11930-NMG
Leave to File Granted
September 25, 2019

**COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS OR CROSS-MOTION FOR SUMMARY JUDGMENT,
AND REPLY BRIEF IN SUPPORT OF THE COMMONWEALTH OF
MASSACHUSETTS' MOTION FOR SUMMARY JUDGMENT**

MAURA HEALEY
ATTORNEY GENERAL

Jon Burke, BBO # 673472
Julia E. Kobick, BBO # 680194
Jonathan B. Miller, BBO # 663012
Elizabeth Carnes Flynn, BBO # 687708
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108

Date: September 26, 2019

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... ii

ARGUMENT ........................................................................................................ 1

I.  The Departments Violated the Administrative Procedure Act by Issuing the Rules Without Providing the Public Prior Notice and an Opportunity to Comment. ........................................ 1

II.  The Departments Had No Authority to Exempt all Employers from the Affordable Care Act's Contraceptive Mandate ............................................................................................ 5

    A.  The ACA Gives the Departments No Discretion to Create Exemptions from the Contraceptive Mandate. ......... 5

    B.  The Religious Exemption Rule Is Not Required or Authorized by RFRA. ........................................................ 8

        1.  The Departments Do Not Have Discretion Under RFRA to Issue the Religious Exemption Rule. ........................................................... 8

        2.  The Religious Exemption Rule Is Not Required By RFRA. ................................................................ 12

        3.  The Religious Exemption Rule Goes Beyond Even the Broadest Reading of RFRA. ........................ 17

III.  The Religious Exemption Rule Violates the Establishment Clause ........................................................................................... 19

IV.  The Final Rules Violate the Equal Protection Guarantee of the Fifth Amendment. ........................................................................ 24

V.  This Court Should Vacate the Final Rules. .................................. 28

CONCLUSION .................................................................................................... 30

## TABLE OF AUTHORITIES

### Cases

*Asiana Airlines v. FAA*,
  134 F.3d 393 (D.C. Cir. 1998) ....................................................................2

*Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*,
  512 U.S. 687 (1994).................................................................................21

*Boston & Maine Corp. v. Mass. Bay Transp. Auth.*,
  587 F.3d 89 (1st Cir. 2009)........................................................................9

*Bowen v. Roy*,
  476 U.S. 693 (1986).................................................................................21

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)........................................................................ *passim*

*Caban v. Mohammed*,
  411 U.S. 380 (1979).................................................................................25

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) .....................................................................2

*California v. Health & Human Servs.*,
  281 F. Supp. 3d 806 (N.D. Cal. 2017) ........................................................4

*California v. Health & Human Servs.*,
  351 F. Supp. 3d 1267 (N.D. Cal. 2019) ...........................................6, 11, 14

*Castaneda v. Souza*,
  810 F.3d 15 (1st Cir. 2015) (en banc) .........................................................8

*Chevron, USA, Inc. v. Natural Resource Defense Council, Inc.*,
  467 U.S. 837 (1984)...................................................................................8

*Coalition for Parity, Inc. v. Sebelius*,
  709 F. Supp. 2d 10 (D.D.C. 2010) ..............................................................2

*Cohen v. Brown Univ.*,
  101 F.3d 155 (1st Cir. 1996).....................................................................29

*Corp. of the Presiding Bishop of the Church of Jesus Christ of
   Latter-Day Saints v. Amos*,
      483 U.S. 327 (1987)...............................................................................20, 22

*Cutter v. Wilkinson*,
      544 U.S. 709 (2005).................................................................................11, 21

*E. Tex. Baptist Univ. v. Burwell*,
      793 F.3d 449 (5th Cir. 2015) .........................................................................13

*Edwards v. Aguillard*,
      482 U.S. 578 (1987).........................................................................................24

*Encino Motorcars, LLC v. Navarro*,
      136 S. Ct. 2117 (2016)......................................................................................15

*Epic Systems Corp. v. Lewis*,
      138 S. Ct. 1612 (2018).............................................................................9, 10, 11, 12

*Eternal Word Television Network, Inc. v. Sec'y of HHS*,
      818 F.3d 1122 (11th Cir. 2016) .............................................................13, 15

*FCC v. Fox Television Stations, Inc.*,
      556 U.S. 502 (2009)..........................................................................................15

*Geneva Coll. v. Sec'y of HHS*,
      778 F.3d 422 (3d Cir. 2015).............................................................................4

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
      546 U.S. 418 (2006)...............................................................................10, 14

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
      565 U.S. 171 (2012)..........................................................................................14

*Joyce v. Town of Dennis*,
      705 F. Supp. 2d 74 (D. Mass. 2010) ..........................................................27

*Kollett v. Harris*,
      619 F.2d 134 (1st Cir. 1980).............................................................................3

*Lake Carriers' Ass'n v. EPA*,
      652 F.3d 1 (D.C. Cir. 2011).............................................................................2

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982)..............................................................20, 21, 22, 23

*Lee v. Weisman*,
    505 U.S. 577 (1992)...............................................................................20

*Levesque v. Block*,
    723 F.2d 175 (1st Cir. 1983).............................................................3, 4, 5

*Massachusetts v. Sebelius*,
    638 F.3d 24 (1st Cir. 2011).......................................................................9

*Massachusetts v. U.S. Dept. of Health & Human Servs.*,
    923 F.3d 209 (1st Cir. 2019)...................................................12, 15, 20, 29

*Methodist Hospital of Sacramento v. Shalala*,
    38 F.3d 1225 (D.C. Cir. 1994)..................................................................2

*Mich. Catholic Conf. & Catholic Family Servs. v. Burwell*,
    755 F.3d 372 (6th Cir. 2014) ..................................................................18

*Morton v. Mancari*,
    417 U.S. 535 (1974)............................................................................9, 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 43 (1983)...........................................................................15

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998)...............................................................28

*Pennsylvania v. President United States*,
    930 F.3d 543 (3d Cir. 2019)............................................................ *passim*

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
    772 F.3d 229 (D.C. Cir. 2014)...........................................4, 13, 15, 16, 25

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
    808 F.3d 1 (D.C. Cir. 2015) (Mem.)....................................... 17-18, 19, 23

*Ricci v. Destafano*,
    557 U.S. 557 (2009)...............................................................................11

*Roman Catholic Archbishop of Washington v. Burwell,*
    Nos. 13-5371 & 14-5021 (D.C. Cir. Oct. 16, 2017) ...................................4

*Roman Catholic Bishop of Springfield v. City of Springfield,*
    724 F.3d 78 (1st Cir. 2013).......................................................................13

*Sessions v. Morales-Santana,*
    137 S. Ct. 1678 (2017)................................................................24, 25, 27

*Sharpe Holdings, Inc. v. HHS,*
    801 F.3d 927 (8th Cir. 2015) ....................................................................17

*Southern Nazarene University v. Burwell,*
    No. 14-6026 (10th Cir. Oct. 6, 2017)..........................................................4

*Succar v. Ashcroft,*
    394 F.3d 8 (1st Cir. 2005) ...........................................................................8

*Texas Monthly Inc. v. Bullock,*
    489 U.S. 1 (1989).......................................................................................22

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017)...............................................................................28

*Town of Norfolk v. U.S. Army Corps of Engineers,*
    968 F.2d 1438 (1st Cir. 1992) .....................................................................3

*UAW v. Johnson Controls, Inc.,*
    499 U.S. 187 (1991)...................................................................................27

*United States v. Johnson,*
    529 U.S. 53 (2000)...................................................................................6-7

*United States v. Lee,*
    455 U.S. 252 (1982)...................................................................................21

*United States v. Oakland Cannabis Buyers' Co-op,*
    532 U.S. 483 (2001)...................................................................................28

*Univ. of Notre Dame v. Burwell,*
    786 F.3d 606 (7th Cir. 2015) ....................................................................13

*Univ. of Notre Dame v. Sebelius,*
    743 F.3d 547 (7th Cir. 2014) ....................................................................13

*Util. Solid Waste Grp. v. EPA,*
    236 F.3d 749 (D.C. Cir. 2001) ...................................................................3

*Vimar Seguros y Reaseguros, S. A. v. M/V Sky Reefer,*
    515 U. S. 528 (1995)..........................................................................9, 11

*Wallace v. Jaffree,*
    472 U.S. 38 (1985)............................................................................23, 24

*Weisman v. Lee,*
    908 F.2d 1090 (1st Cir. 1990) ..................................................................24

*Zubik v. Burwell,*
    136 S. Ct. 1557 (2016).........................................................................1, 4

## **Statutes**

5 U.S.C. § 553..................................................................................................1

5 U.S.C. § 553(b)(B).........................................................................................2

5 U.S.C. § 559..................................................................................................2

5 U.S.C. § 706 ................................................................................................28

5 U.S.C. § 706(2) ...........................................................................................19

42 U.S.C. § 300gg-13(a) .................................................................................18

42 U.S.C. § 300gg-13(a)(1) ............................................................................25

42 U.S.C. § 300gg-13(a)(4) ....................................................................... *passim*

42 U.S.C. § 18011(e) ........................................................................................6

42 U.S.C. § 2000bb-1 .......................................................................................8

42 U.S.C. § 2000bb-1(a) .................................................................................12

Health Insurance Portability and Accountability Act of 1996,
   Pub. L. No. 104-191, 110 Stat. 1936 ...........................................................2

**Regulations**

33 C.F.R. § 320.4(a) ..........................................................................................3

45 C.F.R. § 147.130(a)(1) ...............................................................................18

45 C.F.R. § 147.132 .........................................................................................26

45 C.F.R. § 147.132(a)(2) ...............................................................................17

45 C.F.R. § 147.133 .........................................................................................26

Coverage of Certain Preventive Services Under the Affordable Care Act,
   80 Fed. Reg. 41318 (July 14, 2015)............................................................14

Final Rule, Religious Exemptions and Accommodations for
   Coverage of Certain Preventive Services Under the
   Affordable Care Act, 83 Fed. Reg. 57536 (Nov. 15, 2018)............... *passim*

Final Rule, Moral Exemptions and Accommodations for
   Coverage of Certain Preventive Services Under the
   Affordable Care Act, 83 Fed. Reg. 57592 (Nov. 15, 2018)............... *passim*

**Congressional Record**

155 Cong. Rec. S12025 (Dec. 1, 2009) ......................................................25, 26

155 Cong. Rec. S12026 (Dec. 1, 2009) .............................................................26

155 Cong. Rec. S12027 (Dec. 1, 2009) .............................................................26

155 Cong. Rec. S12041 (Dec. 1, 2009) .............................................................25

155 Cong. Rec. S12114 (Dec. 2, 2009) .............................................................26

155 Cong. Rec. S12274 (Dec. 3, 2009) .............................................................26

155 Cong. Rec. S12277 (Dec. 3, 2009) .............................................................26

155 Cong. Rec. S12671 (Dec. 8, 2009) .............................................................25

## **Miscellaneous**

Appellees' Mot. to Govern Further Proceedings, *Massachusetts v. U.S. Dept. of Health & Human Servs.*, 923 F.3d 209 (1st Cir. 2019) (No. 18-1514) ................................................5

Br. of Appellees, *Massachusetts v. U.S. Dept. of Health & Human Servs.*, 923 F.3d 209 (1st Cir. 2019) (No. 18-1514) .............................................29

Br. of Respondents, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418) .....................................14, 15, 25, 26

Dept. of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., *Notice by Issuer or Third-Party Administrator for Employer/Plan Sponsor of Revocation of the Accommodation for Certain Preventive Services* (Nov. 30, 2017)............................................................4

H.R. 3590, § 1001 ..............................................................................................25

Until their promulgation of the rules challenged in this case, the Departments of Health and Human Services ("HHS"), Labor, and the Treasury (together, the "Departments") sought to balance the religious liberty rights of employers[1] with Congress's mandate in the Patient Protection and Affordable Care Act ("ACA") that employer-sponsored health plans cover contraceptive care for women. But in creating a host of broad new exemptions from the ACA's contraceptive mandate, the Departments abandoned that effort. The Departments' actions, embodied in the Final Rules, conflict with the plain text of the ACA, the Administrative Procedure Act ("APA"), the Establishment Clause and equal protection provisions of the Constitution, and the Supreme Court's instruction that the Departments must "accommodat[e] [employers'] religious exercise while at the same time ensuring that women covered by [employer-sponsored] health plans receive full and equal health coverage, including contraception coverage." *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotation marks omitted). The Final Rules lay bare the Departments' singular focus on employers' religious interests at the expense of women. Through this action, the Commonwealth seeks to vacate the Departments' unlawful actions and restore the lawful balance between women's statutory right to contraceptive care and employers' religious interests.

## ARGUMENT

### I. The Departments Violated the Administrative Procedure Act by Issuing the Rules Without Providing the Public Prior Notice and an Opportunity to Comment.

The Departments' promulgation of the Rules without prior notice-and-comment rulemaking violated the procedural requirements of the APA, 5 U.S.C. § 553. *See Pennsylvania v. President United States*, 930 F.3d 543, 565-69 (3d Cir. 2019) ("*Pennsylvania III*") (affirming preliminary injunction barring implementation of the Final Rules because the Departments lacked

---

[1] Here and throughout, the term "employers" refers to those entities covered by the Final Rules that have sincere religious and/or moral objections to contraception.

1

statutory authority or good cause to forgo notice and comment before issuing the interim final rules and the post-promulgation comment period did not cure the procedural defect).

No statute authorizes the Departments' noncompliance with the APA's notice-and-comment requirement. The provisions of the Health Insurance Portability and Accountability Act ("HIPPA") on which the Departments rely, *see* ECF Doc. No. 122 ("Defts' Br.") 14-15, do not contain evidence of "plai[n] . . . congressional intent to depart from normal APA procedures.'" *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011) (quoting *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998)); *see* 5 U.S.C. § 559. And the two D.C. Circuit cases cited by the Departments—*Asiana Airlines*, 134 F.3d at 397-98, and *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994)—only undermine the Departments' claim of authority. The statutory language at issue in both cases was mandatory, using the term "shall" and expressly directing agencies to issue interim final rules by prescribed deadlines. *See Asiana Airlines*, 134 F.3d at 397-98; *Methodist Hosp.*, 38 F.3d at 1237. In contrast, the HIPPA provisions, which use the word "may," are permissive and do not mandate "procedures so clearly different from those required by the APA that [Congress] must have intended to displace the norm." *Asiana Airlines*, 134 F.3d at 397; *see Pennsylvania III*, 930 F.3d at 566 (the HIPPA provisions are "permissive . . . ., wide-ranging . . . , and d[o] not contain any specific deadlines for agency action" (quoting *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 18-19 (D.D.C. 2010))); *California v. Azar*, 911 F.3d 558, 579 (9th Cir. 2018) ("*California II*") (the HIPPA provisions "neither contain express language exempting agencies from the APA nor provide alternative procedures that could reasonably be understood as departing from the APA").

Nor does the APA's good cause exception, 5 U.S.C. § 553(b)(B), excuse the Departments' noncompliance with notice-and-comment procedures. The Departments do not even recognize—

2

much less argue that they satisfy—the First Circuit's stringent standards for when the good cause exception may be invoked. *See Levesque v. Block*, 723 F.2d 175, 184-85 (1st Cir. 1983) (providing standards); *Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980) (good cause exception is "narrowly construed"). While the Departments claim that their interim final rules ("IFRs") satisfied the "impracticability" prong of the good cause exception, Defts' Br. 16, they provide no explanation why that is so. They have not explained—nor can they explain—why they could not "both follow [notice-and-comment rulemaking] and execute [their] statutory duties," *Levesque*, 723 F.2d at 184, or even why "due and timely execution of [their] functions" would have been impeded by notice-and-comment rulemaking, *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001). Quite clearly, they could have afforded the public notice and an opportunity to comment on the rules and simultaneously executed their statutory functions.

The Departments have not even attempted to argue that there were no "real interest from the public in the content of the proposed regulation"—a showing necessary to invoke the "public interest" prong of the good cause exception, unless prior notice and comment would have "prevent[ed] [them] from operating." *Levesque*, 723 F.2d at 184-85. The Departments claim that they are entitled to deference in assessing whether prior notice and comment is not in the public interest, *see* Defts' Br. 16-17, but the sole case they cite does not support that proposition. The case—*Town of Norfolk v. U.S. Army Corps of Engineers*—has nothing to do with the good cause exception to the APA's notice-and-comment requirement; rather, it involves a regulation promulgated under the Clean Water Act that involves a different assessment of public interest in an entirely different context. *See* 968 F.2d 1438, 1454 (1st Cir. 1992) (discussing deference owed to the Army Corps of Engineers' application of 33 C.F.R. § 320.4(a)).

The Departments did not cure the procedural defect tainting these rules by accepting post-

3

promulgation comments. The strong "presumption against a late comment period" can only be overcome when the agency's response suggests that it "has been open-minded" and demonstrates that "a real public reconsideration of the issued rule has taken place." *Levesque*, 723 F.2d at 187-88 (internal quotation marks omitted) (emphasizing the "general rule that frowns upon post-promulgation comment periods"). But the Departments' post-promulgation actions demonstrated a firm commitment to *close*-mindedness. One month after the IFRs became effective, HHS "issued guidance for the implementation of [the] IFRs." *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 829 (N.D. Cal. 2017) ("*California I*").[2] "[T]he issuance of this guidance, *before* the end of the post-promulgation comment period, suggests that" the Departments did not "expect public comment to inform implementation." *Id.* (internal quotation marks omitted) (emphasis in original). And the Departments then went further and stipulated to dismiss many of the cases remanded by *Zubik* in light of the IFRs.[3] Given this obvious bureaucratic commitment to the substance of the IFRs—namely, the exemptions for employers with religious and moral objections to contraception—there is no evidence, or basis to argue in this Court, that the Departments gave the rules any real public reconsideration. *See Levesque*, 723 F.2d at 188.

In an effort to claim that they were in fact open-minded, the Departments point to

---

[2] *See* Dept. of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., *Notice by Issuer or Third-Party Administrator for Employer/Plan Sponsor of Revocation of the Accommodation for Certain Preventive Services* (Nov. 30, 2017), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Notice-Issuer-Third-Party-Employer-Preventive.pdf (last visited Sept. 25, 2019).

[3] *See e.g.*, Motion for Voluntary Dismissal, *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015) (Nos. 13-3536 & 14-1374); Joint Stipulation of Dismissal of Appeal, *Priests For Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir. 2014) (No. 13-5368); Joint Stipulation of Dismissal of Appeal, *Roman Catholic Archbishop of Washington v. Burwell*, Nos. 13-5371 & 14-5021 (D.C. Cir. Oct. 16, 2017); Motion for Voluntary Dismissal, *Southern Nazarene University v. Burwell*, No. 14-6026 (10th Cir. Oct. 6, 2017); Joint Stipulation of Voluntary Dismissal in Nos. 14-1376 & 14-1377, *Zubik v. Burwell*, Nos. 14-1376 & 14-1377 (3d Cir. Oct. 6, 2017).

ministerial changes made by the Final Rules after the comment period. *See* Defts' Br. 9-10, 13. That argument rings hollow; the Departments previously represented to the First Circuit that, following the post-promulgation comment period, "the substance of the rules remains largely the same." Appellees' Mot. to Govern Further Proceedings at 4, *Massachusetts v. U.S. Dept. of Health & Human Servs.*, 923 F.3d 209 (1st Cir. 2019) (No. 18-1514). The Departments also contend that, because the IFRs were enjoined by two district courts two months after they were promulgated, the Departments "ha[d] no stake" in the substance of the rules until the rules were re-promulgated as Final Rules in November 2018. Defts' Br. 13-14. That argument is absurd—belied by the Departments' pre-promulgation guidance, voluntary dismissal of cases remanded for *Zubik*, and vigorous defense of the substance of the IFRs in courts across the country, all of which demonstrated an obvious "stake" in the substance of the IFRs. This case is a textbook example of one in which "pre-promulgation comment [wa]s possible," and one in which condoning the Department's noncompliance with the APA would "encourage the circumvention of section 553 by accepting post-promulgation procedures." *Levesque*, 723 F.3d at 188.

## II.     The Departments Had No Authority to Exempt All Employers from the Affordable Care Act's Contraceptive Mandate.

The Final Rules must also be set aside because they go well beyond the Departments' statutory authority under the ACA and are not compelled or authorized by the Religious Freedom Restoration Act ("RFRA").

### A.  The ACA Gives the Departments No Discretion to Create Exemptions from the Contraceptive Mandate.

The plain text of the Women's Health Amendment of the ACA, codified at 42 U.S.C. § 300gg-13(a)(4), unambiguously requires employer-sponsored health plans to provide coverage for the preventive care services, including contraceptive care, included in the Health Resources

and Services Administration's ("HRSA") Women's Preventive Services Guidelines. While the statute delegates HRSA authority to determine *what* preventive care services are covered, it *mandates* that employer health plans cover those services once they are included in the Guidelines. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 697 (2014) (the "ACA *requires* an employer's group health plan or group-health-insurance coverage to furnish [those] 'preventive care and screenings' for women without 'any cost sharing requirements'" (quoting 42 U.S.C. § 300gg-13(a)(4)) (emphasis added)).

The statute's text makes clear that the Departments lack the "significant discretion" they claim to exempt employers from the coverage requirements contained in the Guidelines. Defts' Br. 17. The ACA's use of the word "shall"—twice—alone confirms that Congress gave the Departments no discretion to create exemptions. *See Pennsylvania III*, 930 F.3d at 570 ("The term 'shall' denotes a requirement . . . and HRSA's authority to issue the guidelines does not empower it to ignore that requirement."); *California v. Health and Human Servs.*, 351 F. Supp. 3d 1267, 1286 (N.D. Cal. 2019) ("*California III*"), *appeal pending*, Nos. 19-15072, 19-15118, 19-15150 (the Departments' claim of discretion "is inconsistent with the ACA's mandate that women's contraceptive coverage 'shall' be provided by covered plans and issuers without cost sharing"). So, too, does Congress's decision to create only one statutory exception to the preventive services requirement—i.e., an exemption for grandfathered health plans. *See* 42 U.S.C. § 18011(e). The Departments argue that this exception "demonstrates that Congress did not intend uniform coverage of preventive services across all employers," Defts' Br. 20, but that is precisely the point. Congress did not intend grandfathered plans to be subject to the preventive services requirement and so explicitly exempted them. Thereafter, "the proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the on[e] set forth." *United States v.*

*Johnson*, 529 U.S. 53, 58 (2000). The Departments' contrary inference is supported by no precedent and is inconsistent with basic canons of statutory interpretation.

The Departments have no answer to the plain language of the ACA. They contend that because other guidelines existed when the ACA was enacted, but the Women's Guidelines did not, Congress delegated to them authority to exempt employers from the Women's Guidelines. *See* Defts' Br. 17-18. This argument makes no sense at all and is wholly unmoored from the statutory language. The Departments once again point to the word "as" in 42 U.S.C. § 300gg-13(a)(4), Defts' Br. 18, but have made no more progress in explaining how "as" confers discretion on them, or why "as" was not simply used because HRSA would be issuing guidelines for women in the future. *See Pennsylvania III*, 930 F.3d at 571 (the word "as" in 42 U.S.C. § 300gg-13(a)(4) has a "clear explanation"). Nor do the Departments have any explanation for how the lack of the words "evidence-based" or "evidence-informed" in 42 U.S.C. § 300gg-13(a)(4) constitutes a positive grant of authority to create new exemptions from the preventive services mandate. *See* Defts' Br. 18. Recognizing no basis in the ACA for their claimed authority, the Departments contend that because they have "consistently interpreted" § 300gg-13(a)(4) to give them authority to "reconcile the ACA's preventive-service requirement with sincerely held views of conscience," they must have authority to issue the Final Rules. Defts' Br. 19. But before these Final Rules, the Departments only exempted houses of worship from the coverage mandate via the Church Exemption. *See infra*, at 13-14 n. 5. The only basis for that exemption is RFRA or the First Amendment, not the ACA itself. *See id.* In any event, there is no adverse possession in administrative law; past assertions of agency authority cannot give rise to authority not otherwise delegated by Congress in a statute.

Because the text of the ACA is unambiguous, the Departments had no authority to create

the exemptions in the Final Rules, and their interpretation of 42 U.S.C. § 300gg-13(a)(4) is not entitled to any deference under *Chevron, USA, Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). Congress spoke "'to the precise question at issue'" when it mandated that employer-sponsored health plans provide coverage for the preventive care services, including contraceptive care, included in the Women's Preventive Services Guidelines. *Succar v. Ashcroft*, 394 F.3d 8, 22 (1st Cir. 2005) (quoting *Chevron*, 467 U.S. at 842). "[T]hat ends the matter." *Castaneda v. Souza*, 810 F.3d 15, 23 (1st Cir. 2015) (en banc) (opinion of Barron, J.).

**B.  The Religious Exemption Rule Is Not Required or Authorized by RFRA.**

Lacking statutory authority under the ACA to promulgate the Final Rules, the Departments invoke RFRA, 42 U.S.C. § 2000bb-1, as a potential source authority for the Religious Exemption Rule alone. *See* Defts' Br. 21-34. But the Departments' reliance on RFRA is precluded by two foundational errors: (1) first, RFRA does not *require* the exemptions adopted by the Religious Exemption Rule because the Accommodation already satisfied objecting employers' rights under RFRA; and (2) where, as here, a preexisting regulatory accommodation already satisfies RFRA, the Departments do not have *discretion* to fashion broader exemptions than RFRA requires when doing so conflicts directly with another federal statute, i.e., the ACA. Taking the Departments' errors in reverse order, it is plain that the Departments misunderstand the scope of their authority under RFRA and lack any justification under RFRA for the Religious Exemption Rule.

1.  <u>The Departments Do Not Have Discretion Under RFRA to Issue the Religious Exemption Rule.</u>

The Departments' principal defense of the Religious Exemption Rule depends on their assertion that, because the contraceptive mandate burdens religious exercise, there is "no legal authority precluding" them from crafting "broader exemption[s]" than the Accommodation. Defts' Br. 22. They contend that they "should be permitted to adopt th[e] [religious] exemption [rule]

8

even if the courts might ultimately have concluded that some form of accommodation would have been consistent with RFRA." Defs' Br. 23. Thus, the Departments insist that where there is an asserted conflict between the ACA's preventive services mandate for women, on the one hand, and RFRA's rights for religious exercise, on the other, they need not attempt to harmonize the two conflicting federal statutes, but instead have unbounded authority to prioritize RFRA over the ACA. *See id.*

That argument is flatly inconsistent with basic tenets of statutory interpretation. The First Circuit has held repeatedly that, when a court or agency construes the interaction between two allegedly conflicting federal statutes, it must "analy[ze] both, to see if they are indeed incompatible or if they can be harmonized." *Massachusetts v. Sebelius*, 638 F.3d 24, 32 (1st Cir. 2011) (quoting *Boston & Maine Corp. v. Mass. Bay Transp. Auth.*, 587 F.3d 89, 98 n. 1 (1st Cir. 2009)). And the Supreme Court has stressed that when a party, like the Departments here, "suggest[s] that two [federal] statutes cannot be harmonized, and that one displaces the other," that party "bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Vimar Seguros y Reaseguros, S. A. v. M/V Sky Reefer*, 515 U. S. 528, 533 (1995)). "The intention must be 'clear and manifest.'" *Epic Systems Corp.*, 138 S. Ct. at 1624 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Thus, "when two statutes are capable of co-existence, . . . it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton*, 417 U.S. at 551; *accord Vimar Seguros*, 515 U.S. at 533.

Under this settled precedent, it is the duty of this Court, as well as the duty of the Departments, to "harmonize" the ACA and RFRA in order to honor Congress's intent. *Sebelius*, 638 F.3d at 32; *Boston & Maine Corp.*, 587 F.3d at 98 n. 1. The Accommodation does just that: it

ensures that women continue to receive seamless, no-cost coverage for preventive services, as required by the ACA, without imposing a cognizable burden on employers' religious exercise. Because the Accommodation already satisfies RFRA, *see infra*, at 12-16, the Departments do not have authority to manufacture much broader exemptions that negate the rights Congress guaranteed to women through the ACA. *See* 42 U.S.C. § 300gg-13(a)(4). Through the Religious Exemption Rule, the Departments have put their thumb on the scale entirely in favor of employers' religious interests. They have not harmonized RFRA and the ACA, nor have they come close to meeting their "heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Systems Corp.*, 138 S. Ct. at 1624 (quotation marks omitted).

The Departments also argue that, because of the threat of protracted litigation, they must be afforded "some leeway" in interpreting an applying RFRA. Defts' Br. 22-23. This demand for leeway is really a demand for some amorphous form of deference: the Departments believe they should be permitted to implement the Religious Exemption Rule "even if the courts" disagree with their interpretation of RFRA. Defts' Br. 23. But courts owe no deference to an agency's interpretation of a statute it does not administer. *See Epic Systems Corp.*, 138 S. Ct. at 1629. This is particularly true for RFRA, because Congress expressly "deemed *the courts* the adjudicator" of rights under the statute. *Pennsylvania III*, 930 F.3d at 572 (emphasis added); *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006) ("it is the obligation of the courts," not agencies, "to consider whether exceptions are required" under RFRA). And the fact that the Religious Exemption Rule addresses the intersection of RFRA and the ACA does not change the situation, because "[r]econciliation of distinct statutory regimes is a matter for the

courts, not agencies." *Epic Systems Corp.*, 138 S. Ct. at 1629 (internal quotation marks omitted).[4]

To be clear, the Commonwealth does not contend, as the Departments suggest, that agencies must find a "singular solution" or "precisely hit the bullseye" when two federal statutes conflict. Defts' Br. 22. Nor does the Commonwealth contend that the Accommodation is the only means of harmonizing the ACA and RFRA. But in applying RFRA, agencies and courts "'must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.'" *Hobby Lobby*, 573 U.S. at 729 n. 37 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)). The Religious Exemption Rule does not do that. Instead, it effectively invalidates women's statutory right to preventive care services, including contraception, guaranteed by Congress in the ACA. Recognizing that the Accommodation harmonizes the ACA and RFRA does not represent "path dependence," as the Departments argue. Defts' Br. 32. It represents reality—a reality informed by years of experience balancing women's rights under the ACA and religious rights under RFRA. While the Accommodation may not be the only regulatory solution that strikes that balance, it does demonstrate that the ACA and RFRA "are capable of co-existence." *Vimar Seguros*, 515 U.S. at 533; *Morton*, 417 U.S. at 551. The Departments therefore have no authority to decide for themselves that the "two statutes cannot be harmonized, and that one displaces the

---

[4] The Departments' contention that *Ricci v. Destafano*, 557 U.S. 557 (2009), supports its position is meritless. Defts' Br. 23. *Ricci* is about liability under Title VII. Under Title VII's disparate-treatment provision, an entity that takes a race-based employment action is liable for discrimination "absent some valid defense." *Ricci*, 557 U.S. at 579. *Ricci* holds only that an employer that takes race-based action to comply with the statute's separate prohibition on disparate-impact discrimination has such a legitimate defense. *Id.* at 580. The balance of the case addresses the particular evidentiary standard an employer must meet in order prevail on this defense. The Court required an employer to show "a strong basis in evidence" that the challenged action was necessary to comply with the disparate-impact provision. The Court found that this standard was sufficiently flexible to promote voluntary compliance, as Congress intended, without being so loose as to "encourage race-based action at the slightest hint of disparate impact." *Id.* at 580-81. *Ricci* has nothing to say about agency authority or RFRA and has no application to this case. *See California III*, 351 F. Supp. 3d at 1292-93.

other." *Epic Systems Corp.*, 138 S. Ct. at 1624 (internal quotation marks omitted).

    2.  <u>The Religious Exemption Rule Is Not Required by RFRA.</u>

    The existence of the Accommodation—which fully satisfies RFRA's protections for employers' religious exercise without harming women—also prevents the Departments from insisting that the Religious Exemption Rule is *required by* RFRA.

    As eight courts of appeals have held, the Departments are wrong to argue that the Accommodation imposes a "substantia[l] burden" on employers with religious objections to contraception. 42 U.S.C. § 2000bb-1(a); *see Massachusetts v. U.S. Dept. of Health & Human Servs.*, 923 F.3d 209, 215 n. 6 (1st Cir. 2019) (collecting cases). The critical flaw in the Departments' argument is that they have misidentified the relevant "burden" for purposes of RFRA. The Departments point to the burden identified in *Hobby Lobby*—namely, the financial penalty that was imposed on employers that, based on their religious beliefs, objected to providing insurance coverage for contraceptive care. 573 U.S. at 720; *see* Defts' Br. 25-27. But, as the Court explained, the less restrictive means of avoiding this penalty was the Accommodation, which did "not impinge on the plaintiffs' religious belief" and at the same time ensured that "female employees would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives." *Hobby Lobby*, 573 U.S. at 731-32. Because of the existence of the Accommodation, an employer with a religious objection to providing contraceptive coverage does not have to pay a financial penalty at all, but instead needs only to "self-certify that it opposes providing coverage for particular contraceptive services." *Id.* at 731. From that point forward, the employer will have no role in or control over the actions of any health insurer, third-party administrator, employee, or employee's dependents. *See id.*

    Thus, the only question for the "substantial burden" inquiry under RFRA is whether

submitting the self-certification form constitutes a substantial burden. *See, e.g.*, *Priests for Life v. HHS*, 772 F.3d 229, 246-56 (D.C. Cir. 2014) ("*Priests for Life I*"). Put differently, the question is whether the act of opting out of a government program imposes a substantial burden on the religious exercise of objecting employers. *See id.* While this Court may accept that certain employers have a sincere religious objection to participating in the religious accommodation designed for them—that is, they have a sincere religious objection to submitting the self-certification form—it is for this Court alone to evaluate whether that asserted burden is "substantial." *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 93 (1st Cir. 2013) (the question whether a federal government action imposes a substantial burden is "a question of law" for courts to review "de novo"). And it is self-evident that, even accepting the sincerity of these employers' religious beliefs, the act of opting out of the contraceptive mandate by submitting the self-certification form is not a "substantial" burden. *See, e.g.*, *Eternal Word Television Network, Inc. v. Sec'y of HHS*, 818 F.3d 1122, 1148 (11th Cir. 2016); *Priests for Life I*, 772 F.3d at 249; *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 554 (7th Cir. 2014). Were it otherwise, every federal regulatory accommodation for entities with sincere religious objections to participation in government programs could turn into a RFRA violation. *See, e.g.*, *Eternal Word Television*, 818 F.3d at 1150; *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 461 (5th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 623 (7th Cir. 2015).[5]

---

[5] The Departments claim that this Court cannot set aside the Religious Exemption Rule without also "sweep[ing] away" the Church Exemption. Defts' Br. 33. But because the Commonwealth does not challenge the Church Exemption, the validity of that exemption is not at issue here. *See Pennsylvania III*, 930 F.3d at 570 n. 26 ("the Agencies' authority to issue the Church Exemption and Accommodation is not before us"). Thus, to the extent this Court concludes that the Religious Exemption Rule is inconsistent with the plain language of 42 U.S.C. § 300gg-13(a)(4), that ruling will not affect the Church Exemption. Nor does the logic of the Commonwealth's position threaten the validity of the Church Exemption. Houses of worship have always been regarded as different than other employers under RFRA and the First

The Accommodation is also the least restrictive means of furthering the government's compelling interest in ensuring women receive full and equal health coverage, including for contraception. The Departments defended this identical position through years of regulatory action and in litigation that reached the Supreme Court. *See, e.g.*, Br. of Respondents at 30, 54-57, 73-75, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418) ("*Zubik* Br."). Even though the Departments now deny the government has such a compelling interest,[6] their "complete reversal" is entitled to no deference and is meritless. *California III*, 351 F. Supp. 3d at 1295-96; *see also Pennsylvania III*, 930 F.3d at 572 (Departments are entitled to no deference under RFRA).

There is nothing new in the administrative record to support the Departments' change in position. *See California III*, 351 F. Supp. 3d at 1295-96 (the Final Rules contain "no new facts or meaningful discussion"). The Departments assert that they have reassessed the record and concluded it is insufficient to establish a compelling interest. *See* Defts' Br. 27; 83 Fed. Reg.

---

Amendment: they are entitled to a sphere of autonomy free from government regulation that simply does not extend to other entities—particularly for-profit, publicly owned corporations, which are subject to pervasive government regulation. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 556 U.S. 171, 132 199-200 (2012) (Alito, J., concurring) ("the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves . . . free from state interference" (cleaned up)); 80 Fed. Reg. 41318, 41325 (July 14, 2015). Both RFRA and the First Amendment are sensitive enough to take this difference into account. *See Pennsylvania III*, 930 F.3d at 570 n. 26; *see also Hosanna-Tabor*, 556 U.S. at 171 ("the First Amendment . . . gives special solicitude to the rights of religious organizations"); *Gonzales*, 546 U.S. at 431 ("context matters" under RFRA because its standard "does take relevant difference into account—indeed, that is the fundamental point" (internal quotations omitted)). The Departments' contrary position—that if it provides an exemption for churches it must also provide an exemption for every other employer in America—is "perverse[ly] and profoundly at odds with our Nation's traditions [and federal law]." *Zubik* Br. 67-68. Indeed, the cases cited by the Departments show that there is nothing unusual or unlawful about an exemption that applies to churches and affiliated organizations but does not extend to all other employers. *See* Defts' Br. 35 (identifying exemptions for "religious organizations"); *Pennsylvania III*, 930 F.3d at 570 n. 26.

[6] The Departments do not seriously dispute that the Accommodation is the least restrictive means of furthering the government's interests. Defts' Br. at 31 & n. 9.

57546-47. This is hardly the type of reasoned and detailed justification necessary to justify such a significant reversal. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It runs counter to the overwhelming evidence in the record demonstrating the importance and efficacy of contraceptive coverage and the contraceptive mandate. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And, given the unique and extensive history on this issue, the Departments' claim that they just misunderstood the evidence and interests at stake is simply "implausible." *Id.* Thus, to the extent the Rule relies upon the claim that the record is insufficient to support a compelling interest, it is arbitrary and capricious and must be set aside. *Id.*

The Departments' legal arguments fare no better. *See* ECF Doc. No. 116 ("Pltf's Br.") 30-33. In particular, the Departments' insistence that, in order to satisfy RFRA, the government must have a compelling interest in enforcing the Accommodation against objecting employers specifically, Defts' Br. 27, does nothing to advance their position. *See, e.g.*, *Eternal Word Television*, 818 F.3d at 1151 (government has a compelling interest in requiring objecting employers to comply with the Accommodation); *Priests for Life I*, 772 F.3d at 267 (same). Ensuring that women receive seamless, no-cost contraceptive coverage "specifically advances" the government's "overlapping and mutually reinforcing compelling interests" in promoting concrete public health and gender equity objectives. *Priests for Life I*, 772 F.3d at 263-64. The Religious Exemption Rule will deprive tens of thousands of women of coverage for their chosen method of contraception. *See Massachusetts*, 923 F.3d at 217. The government's interest in ensuring that these women receive full and equal coverage is not any less compelling simply because their employers object to contraception. *See Zubik* Br. 59. And the Departments' assertion that some women may have access to alternative sources of coverage, or may choose not to use

contraception, Defts' Br. 28-29, misses the point. There is no effective substitute for the seamless, no-cost coverage provided by the Accommodation. *Priests for Life I*, 772 F.3d at 259-62, 265 ("The evidence shows that contraceptive use is highly vulnerable to even seemingly minor obstacles."). And arguments concerning *some* women—even if accurate—do not diminish the government's interest is in ensuring that "all women" receive the full and equal coverage guaranteed by Congress through the ACA. *Id*. at 265.

The Religious Exemption Rule is also impermissible under RFRA because of the harm it will cause to non-beneficiaries, particularly women and their families. Contrary to the Departments' claim, the burdens imposed by the Rule must be considered as part of the RFRA statutory analysis. *Hobby Lobby*, 573 U.S. at 729 n. 37; *Pennsylvania III*, 930 F.3d at 573-74. The fact that replacing the Accommodation with a blanket exemption will harm thousands of women undermines the Departments' argument that Accommodation is not supported by a compelling interest. *See Hobby Lobby*, 573 U.S. at 729 n. 37. The existence of this harm also demonstrates that the Departments have failed in their obligation to "reconcile" employers' objections with the rights granted to women through the ACA. *Hobby Lobby*, 573 U.S. at 739 (Kennedy, J., concurring); *see also Priests for Life I*, 772 F.3d at 266 ("When the interests of religious adherents collide with an individual's access to a government program supported by a compelling interest, RFRA calls on the government to reconcile the competing interests."). This is particularly true given that the exemptions created by the Rule are concededly broader than necessary to address any alleged substantial burden on employers' religious exercise. *See infra*, at 17-19. Because the Rule goes beyond what is required by RFRA, by definition it unduly burdens women and their families. *See Pennsylvania III*, 930 F.3d at 574.

### 3.   The Religious Exemption Rule Goes Beyond Even the Broadest Reading of RFRA.

The Religious Exemption Rule cannot be justified by RFRA for another, independent reason: it goes beyond what even the broadest reading of RFRA would allow. Under that reading— embraced by the Eighth Circuit in *Sharpe Holdings, Inc. v. U.S. Dept. of Health & Human Servs.*, 801 F.3d 927, 940-43 (8th Cir. 2015)—the Accommodation substantially burdens the religious exercise of employers with sincere objections to opting out of the contraceptive mandate via the self-certification form. But the Religious Exemption Rule is not restricted to only those employers. Instead, it creates a blanket exemption for any employer with "sincerely held religious beliefs opposed to coverage of some or all contraceptive or sterilization methods encompassed by HRSA's Guidelines." 83 Fed. Reg. 57537; *see* 45 C.F.R. 147.132(a)(2). That is a broader class of employers than the class of employers that challenged the Accommodation through lawsuits advancing the same reading of RFRA as the *Zubik* plaintiffs. Thus, the Departments admit, as they must, that only "some" of the employers covered by the Religious Exemption Rule will be substantially burdened by the Accommodation under their reading of RFRA. Defts' Br. 23, 32, 37. RFRA obviously does not require replacing the Accommodation with an exemption for employers that are concededly not burdened by the Accommodation.

Moreover, even those who believe the Accommodation imposes a substantial burden on certain employers' religious exercise do not read RFRA to require an *exemption* from the contraceptive mandate like that created by the Rule. In his dissent from denial of rehearing en banc in *Priests for Life*, for example, then-Judge Kavanaugh argued that submission of an opt-out notice that "requires a religious organization to, in effect, raise its hand to opt out," was a less restrictive alternative to the Accommodation, which "requires a religious organization both to raise its hand *and* to point to its insurer." *See Priests for Life v. U.S. Dept. of Health & Human Servs.*, 808 F.3d

1, 23-25 & n. 11 (D.C. Cir. 2015) ("*Priests for Life II*") (Kavanaugh, J., dissenting from the denial of rehearing en banc). Submission of an opt-out form to HHS was an acceptable alternative under RFRA, in Judge Kavanaugh's view, because it guaranteed that "the religious organizations' employees would still receive the *same* insurance coverage from the *same* insurer for contraceptives." *Id.* at 24 (emphasis in original). That was essential, Judge Kavanaugh explained, because RFRA requires consideration of burdens on third parties—i.e., women. *Id.* But unlike the alternative favored by Judge Kavanaugh, the Religious Exemption Rule does *not* guarantee that employees receive the same insurance coverage from the same insurer for contraceptives. Instead, by creating a blanket exemption, it guarantees that some women will lose contraceptive coverage altogether. *See, e.g.*, 83 Fed. Reg. 57548 (discussing how the Religious Exemption Rule will cause women to lose contraceptive coverage from their insurance companies).

The blanket exemption created by the Religious Exemption Rule goes well beyond RFRA in still another way: it not only exempts employers, but it also effectively cancels insurers' legal obligations to provide contraceptive coverage. In addition to requirements for employers, the ACA imposes an independent legal obligation on insurers and third-party administrators to provide contraceptive coverage to their insureds and customers. *See* 42 U.S.C. §§ 300gg-13(a), (a)(4); 45 C.F.R. § 147.130(a)(1); *see also Mich. Cath. Conf. & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 377 (6th Cir. 2014). Unlike the Accommodation, which requires insurers and third-party administrators to provide seamless contraceptive coverage for employees of objecting employers, the Religious Exemption Rule in effect compels insurers and third-party administrators to stop providing contraceptive coverage to their insureds and customers. That is, when employers claim the exemption provided by the Religious Exemption Rule, the Rule does not provide a mechanism by which insurers and third-party administrators can provide coverage to affected employees, or

18

through which the government can enforce the obligation of insurers and third-party administrators to provide that coverage. In short, if an employer claims an exemption for itself, that exemption is also effective against insurers and third-party administrators. RFRA obviously does not require or authorize this result. If an employer is substantially burdened by providing contraceptive coverage, that justifies making the Accommodation available to the employer, *Hobby Lobby*, 573 U.S. 739; if an employer is substantially burdened by the Accommodation's notice requirements—and the Commonwealth does not concede that any employer is so burdened—at most that justifies altering the notice requirements, *Priests for Life II*, 808 F.3d at 23-25 (Kavanaugh, J., dissenting from the denial of rehearing en banc). But, even under the broadest reading of RFRA, an *employer's* objections provide no basis for altering or eliminating the independent legal obligations of insurers and third-party administrators. *See Priests for Life II*, 808 F.3d at 26 (Kavanaugh, J., dissenting from the denial of rehearing en banc) (the government must "continue to require the religious organizations' *insurers* to provide contraceptive coverage to the religious organizations' employees, even if the religious organizations object" (emphasis in original)).

*     *     *

For all of these reasons, the Final Rules are not required or authorized by RFRA or by the ACA. They must be vacated and set aside under the APA. 5 U.S.C. § 706(2).

## III.    The Religious Exemption Rule Violates the Establishment Clause.

The Religious Exemption Rule also violates the "fundamental limitations" the Establishment Clause places on the Departments' ability to create exemptions not required by the Free Exercise Clause. *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Far from following the best of our traditions, *see* Defts' Br. 34-35, the Rule is an unprecedented attempt by a regulatory agency to promote religious interests at the expense of the "very persons" protected by the statute they are

charged with administering. *Pennsylvania III*, 930 F.3d at 574. A blanket regulatory exemption—extending to all employers, including for-profit, publicly traded corporations—is simply not comparable to the limited statutory exemptions for "religious organizations" that have survived Establishment Clause challenges. *See* Defts' Br. 35 (providing example); *see also Corp. of Pres. Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 331, 336 (1987) (exemption for religious organizations under Title VII was constitutional as applied to the non-profit activities of a church-affiliated organization); *id.* at 347-49 (1987) (Brennan, J., concurring) (extending exemption beyond religious organizations entitled to "autonomy in ordering their internal affairs"—and particularly to for-profit corporations—would likely violate Establishment Clause). The existence of the Accommodation as an alternative means of addressing employers' objections to the contraceptive mandate makes the Rule uniquely problematic. *See Larkin v. Grendel's Den Inc.*, 459 U.S. 116, 123-24 (1982) (finding Establishment Clause violation where the government's "valid secular objectives can be readily accomplished by other means"). And the absolute nature and overbroad scope of the exemptions created by the Rule—together with the resulting harm to women—confirm that the Departments have transgressed constitutional limits to endorse religious objections to contraception. In sum, what began as a lawful attempt lift a substantial burden on religious exercise, through the Church Exemption and Accommodation, has now "devolve[d] into an unlawful fostering of religion." *Amos*, 483 U.S. at 334-35.

Analysis of the Religious Exemption Rule begins not with the contraceptive mandate but with the contraceptive mandate as modified by the Accommodation. *See Larkin*, 459 U.S. at 123-24 (Establishment Clause analysis must consider alternative means of addressing asserted religious burden). The Accommodation already eliminates any burden imposed by the mandate, *see Massachusetts*, 923 F.3d at 215 & n. 6 (collecting cases), and it does so with "precisely zero"

effect on women, *Hobby Lobby*, 573 U.S. at 693. Replacing the Accommodation with a blanket exemption that will harm thousands of women[7] serves no valid secular purpose. *See Larkin*, 459 U.S. at 123-24 (government action lacks a constitutional purpose if "valid secular objectives can be readily accomplished by other means"). Instead, it has the impermissible purpose and effect of advancing employers' religious interests over the health and wellbeing of female employees. *See Hobby Lobby*, 573 U.S. at 739 (Kennedy, J., concurring) (a religious exemption cannot "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling"); *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 722 (1994) (Kennedy, J., concurring in the judgement) (government action taken to relieve a burden on religious exercise is still subjected to "careful scrutiny to ensure that it does not so burden nonadherents . . . as to become an establishment").

The Departments respond that "some" employers have sincere religious objections to the Accommodation. Defts' Br. 37. But that is no answer. First, there is a significant difference between a "sincere religious objection" and a burden on religious exercise cognizable under the First Amendment. *Bowen v. Roy*, 476 U.S. 693, 695, 699-700 (1986) (First Amendment provides no protection for a "sincere religious objection" to the "statutory requirements that a Social

---

[7] The Departments deny that this harm is relevant, arguing that the Religious Exemption Rule does not impose any "meaningful burden" on women because it simply returns them to the position they were in before Congress enacted the ACA. Defts' Br. 38. This striking claim, offered without a single citation to relevant case law, is simply incorrect. To comply with the Establishment Clause, an exemption "must be measured so that it does not override other significant interests." *Cutter*, 544 U.S. at 722. *Hobby Lobby* makes perfectly clear that women have just such an interest in receiving the full and equal health coverage guaranteed to them by Congress through the ACA. *See* 573 U.S. at 739 (Kennedy, J., concurring); *see also United States v. Lee*, 455 U.S. 252, 260-61 (1982) (religious exemption that would result in employees being denied social security benefits was constitutionally impermissible because it would "operate to impose the employer's religious faith on the employee[s]"). Put simply, the Departments cannot replace the Accommodation with a blanket exemption "no matter the impact . . . on thousands of women." *Hobby Lobby*, 573 U.S. at 693.

Security number be provided by an applicant seeking to receive certain welfare benefits"). And the Accommodation simply does not cause the type of "grave imposition on religious activity sheltered by the Free Exercise Clause" that might justify replacing it with a blanket exemption that severely harms women. *Texas Monthly Inc. v. Bullock*, 489 U.S. 1, 17 n. 8 (1989) (explaining when an exemption that imposes burdens on third parties may be justified under the Establishment Clause).

Moreover, even if *some* employers are burdened by the Accommodation, the blanket exemption created by the Religious Exemption Rule is not a constitutional response. The Departments do not dispute that many, if not most, of the employers covered by the Rule have no cognizable objection to the Accommodation.[8] For these employers, the Accommodation satisfies the government's stated secular objective: it eliminates any "significant interference" with religious exercise. *Id*. The Departments' decision to go further—to flatly exempt these employers and give them unchecked authority to decide whether to "opt in" to the Accommodation—is clearly impermissible. *See Amos*, 483 U.S. at 348 (O'Connor, J., concurring) ("In order to perceive the government action as a permissible accommodation of religion, there must in fact be an identifiable burden on the exercise of religion that can be said to be lifted by the government action."). Far from lifting a burden on religious exercise, the Rule instead gives these employers "standardless" control over their employees' access to contraceptive coverage (through the Accommodation). *Larkin*, 459 U.S. at 125. The Departments do not contest that an objecting employer could, for example, decline to "opt in" to the Accommodation simply to deter its

---

[8] In the Rule, the Departments conclude that most women will lose contraceptive coverage because their employer will switch from the Accommodation to an exemption. 83 Fed. Reg. 57578 (estimating this number at 64,000). Given that these employers were previously using the Accommodation, it seems fair to assume that many—if not most—were not "substantially burdened" by the same.

employees from accessing treatments and services—contraception—that it believes to be sinful. The mere fact that the Departments doubt employers will use the Rule to advance "explicitly religious goals," does not change the fact it is unconstitutional to grant them the power to do so in the first instance. *See id.*

This problem is only exacerbated by the fact the Rule also unnecessarily sweeps in insurers and third-party administrators. Even if the Accommodation imposed a narrow "burden" on *some* employers, the exemption extends to *all* employers and effectively eliminates insurers' separate legal obligation to provide contraceptive coverage. *See supra*, at 18-19. This approach not only imposes gratuitous harm on women and their families, it does so by empowering employers to impose their religious beliefs on insurers and third-party administrators. *See Priests for Life II*, 808 F.3d at 26 (Kavanaugh, J., dissenting from the denial of rehearing en banc) (employers have no right to "dictate the independent actions of third-parties, even if the [employer] sincerely disagrees with them. . . . Th[is] is true whether the third-party is the government, an insurer, . . . or some other actor." (internal quotation marks omitted)). The Departments' use of rulemaking to grant employers a religious veto over access to statutorily mandated benefits in this way violates all three prongs of the *Lemon* test. *See Larkin*, 459 U.S. at 125-27 (granting churches control over access to liquor licenses has the purpose and effect of advancing religion and improperly "enmeshes churches in the process of government").

Finally, the Departments cannot salvage the Religious Exemption Rule by pointing to the Moral Exemption Rule. The Establishment Clause prohibits the Departments from advancing religious interests regardless of whether they also confer benefits on secular entities. *See id.* at 123-24 (law granting churches and schools identical control over liquor license applications violated the Establishment Clause); *Wallace v. Jaffree*, 472 U.S. 38, 59 (1985) (law authorizing

"period of silence for mediation or voluntary prayer" violated the Establishment Clause). The Departments contend that the existence of the Moral Rule at least shows that the Religious Rule has a secular purpose. Defts' Br. 37. Not so. To pass constitutional scrutiny, a religious exemption must itself actually serve a "valid secular purpose." *Edwards v. Aguillard*, 482 U.S. 578, 598 (1987) (Powell, J., concurring); *see also Weisman v. Lee*, 908 F.2d 1090, 1094 (1st Cir. 1990), *aff'd*, 505 U.S. 577 (Bownes, J., concurring) ("The question is not whether there is or could be any secular purpose, but whether the actual predominant purpose is to endorse religion."). But as discussed, the Departments' stated secular purpose—to alleviate government interference with the exercise of religion—is already served by the Accommodation. The Rule therefore fails both the *Lemon* and endorsement tests. *See Edwards*, 472 U.S. at 587-88 (no valid secular purpose if alleged purpose is already served by existing law); *Wallace*, 472 U.S. at 59 (accord).

## IV.    **The Final Rules Violate the Equal Protection Guarantee of the Fifth Amendment.**

Finally, both Rules violate the Fifth Amendment's equal protection guarantee. Properly understood, the Rules introduce a "gender-based or gender-biased disparity," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (cleaned up), into the regulations that implement the ACA's preventive services requirement. *See generally* 45 C.F.R. §§ 147.130-33. Employer-based health plans must generally cover all qualifying preventive services; the Rules create exemptions applicable only to women's preventive services under the Women's Health Amendment. *Id.* This type of regulatory scheme, in which women are singled out for differential treatment,[9] is

---

[9] The Departments' attempts to re-characterize this as a disparate-impact claim is unavailing. Defts' Br. 41-42. If a gender-neutral "conscience" exemption resulted in women being disproportionately denied coverage (e.g. for contraceptive services), that would be a disparate impact problem. Here, the Departments created exemptions that, on their face, apply only to women. That is a disparate treatment problem. Similarly, the Commonwealth has not cited any cases concerning "subsidizing contraception" because that is not what is at issue. Defts' Br. 42; *see also id.* at 38. The preventive services requirement under the ACA is a subsidy in the same

presumptively unconstitutional. *See Morales-Santana*, 137 S. Ct. at 1686-87 ("statutory scheme" governing immigration and citizenship that provided an exception applicable only to unwed mothers is unconstitutional); *see also Caban v. Mohammed*, 441 U.S. 380, 386-87 (1979) (statute providing only unwed mothers the right to object to an adoption is unconstitutional).

The Rules create a unique equal protection problem because of the express remedial purpose of the Women's Health Amendment. *See Zubik* Br. 7-8, 29. Congress enacted the Women's Health Amendment "to ensure that women receive *equal* health coverage" on the same terms as men. *Id*. at 29 (emphasis in original). As originally drafted, coverage for adult preventive services under the ACA would have been based primarily upon recommendations from the United States Preventive Services Task Force ("USPSTF"). *See* H.R. 3590, § 1001 (codified at 42 U.S.C. § 300gg-13(a)(1)). But Congress recognized that structuring coverage in this way would leave women significantly underinsured. Although the USPSTF's recommendations were "evidence based," they were also "modeled on men's health needs." *Priests for Life I*, 772 F.3d at 235; *see also* 155 Cong. Rec. S12041 (Dec. 1, 2009) (Sen. Harkin) (discussing longstanding concerns "that the task force has not spent enough time studying preventive services that are unique to women"). As a result, the recommendations excluded coverage for services that are "critically important" for women and were generally "inadequate to meet the unique health needs of women." 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer). The Women's Health Amendment fixed this problem by requiring coverage for "additional services" for women to be set out in HRSA's "comprehensive guidelines."[10] *See* 42 U.S.C. § 300gg-13-(a)(4) (codifying the Women's Health

---

way that the minimum wage requirement under the Fair Labor Standards Act is a subsidy—not in any sense relevant here.

[10] Congress understood and intended that *comprehensive* coverage for women's preventive services would include contraception. *See, e.g.*, 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (the Amendment will guarantee coverage for "affordable birth control and

Amendment). The result is not, as the Departments now suggest, that women receive a level of coverage that is superior to men, Defts' Br. 40-41, but rather that women receive the same "comprehensive" level of coverage as men. 155 Cong. Rec. S12026 (Dec. 1, 2009) (Sen. Murray). Creating exemptions specific to the Women's Health Amendment defeats this purpose and denies women "the full and equal coverage mandated by Congress." *Zubik* Br. 29.

The Departments respond that, because the ACA does not require coverage for male contraceptives, exemptions that deny women coverage cannot be discriminatory. This is a faulty comparison. As discussed, the ACA requires coverage for preventive services, not contraception. *See* Pltf's Br. 40-41; *see also* 45 C.F.R. §§ 147.132, 133 (creating exemptions for "coverage of certain preventive health services"). "Contraceptives are an essential component of women's [preventive] health care"—that is why contraceptive coverage is required for women under the ACA. *Zubik* Br. 27. Contraceptives are *not* an essential component of men's preventive health care—that is why contraceptive coverage is not required for men under the ACA.[11] The Women's Health Amendment ended the discriminatory practice of using men's medical needs to set limits on health coverage for women. The Departments' embrace of that discredited approach to justify exemptions to the Amendment represents significant backsliding in Congress's effort to promote women's equality.

The Departments next fault the Commonwealth for failing to produce evidence that they intended to invidiously discriminate against women. *See* Defts' Br. 41-42. The Departments

---

contraceptives"); *see also* 155 Cong. Rec. S12025 (Sen. Boxer) (preventive services "include…family planning services); *id.* at S12027 (Sen. Shaheen) (same); *id.* (Sen. Gillibrand) (same); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) (same); 155 Cong. Rec. S12274 (Dec. 3, 2009) (Sen. Murray) (same); *id.* at S12277 (Sen. Nelson) (same).

[11] There is nothing in the ACA that precludes coverage for male contraceptives. If there was a medical basis for such coverage it would be required through the USPSTF's recommendations, which already include services that apply only to men. *See* Pltf's Br. 40 & n. 37.

misunderstand the relevant standard. The Commonwealth does not need to prove that the Final Rules serve an invidious discriminatory purpose or are the result of an intent to discriminate against women. *See Joyce v. Town of Dennis*, 705 F. Supp. 2d 74, 79 (D. Mass. 2010) (Gorton, J.), *remanded on other grounds*, 720 F.3d 12 (1st Cir. 2013). The Rules are subject to heightened scrutiny because they are not "facially neutral." *Id.* The Departments' contention that that there are legitimate, non-discriminatory reasons for why the Rules apply only to women's preventive services, Defts' Br. 41-42, does not change the fact that they do. The Departments' explanations are relevant only to the subsidiary question of whether there is an "exceedingly persuasive justification" for the Rules. *Morales-Santana*, 137 S. Ct. at 1690; *see also Town of Dennis*, 705 F. Supp. 2d at 79-80 (once a facial disparity is identified the court "proceeds to analyze the defendants' justifications" under heightened scrutiny); *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (in a Title VII case, explaining that "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect").

The Departments have not carried their burden of proving that the Rules "substantially serve an important government interest." *Morales-Santana*, 137 S. Ct. at 1690. The Rules are not required by RFRA.[12] *See supra*, at 12-16. The Departments' interest in voluntarily "protect[ing]" objecting employers is displaced by the overriding importance Congress attached to providing women "full and equal" coverage through the Women's Health Amendment. Pltf's Br. 42. And the Departments' desire to resolve litigation—though apparently only litigation challenging the contraceptive mandate, Defts' Br. 43 n. 12—is not sufficiently important to justify discrimination.

---

[12] Even if the mandate as modified by the Accommodation burdened employers—and it does not—the fact that the exemptions created by the Rule go well beyond what is necessary to relieve this burden, *see supra*, at 17-19, forecloses any argument that the Rules satisfy the "close means-end fit required to survive heightened scrutiny." *Morales-Santana*, 137 S. Ct. at 1696-97.

**V**.     **This Court Should Vacate the Final Rules.**

For the reasons above, the Final Rules should be declared unlawful and vacated.[13] Vacatur

is the remedy required by the APA, which provides that courts "shall . . . hold unlawful and set

aside agency action" found to be "arbitrary and capricious. . . not in accordance with the law . . .

[or] contrary to constitutional right." 5 U.S.C. § 706. "Set aside" means vacated—and agency

action that is vacated has no application anywhere. *See Nat'l Mining Ass'n v. U.S. Army Corps of

Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). The nationwide scope of this remedy raises no

Article III problems. Article III requires a plaintiff to demonstrate standing for the "form" not the

scope of relief. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).[14] Moreover,

because vacatur is a statutory remedy prescribed by Congress, the prudential concerns the

Departments raise concerning the propriety of nationwide (preliminary) injunctions, Defts' Br. 44-

45, are inapposite. *See Nat'l Mining Ass'n*, 145 F.3d at 1409 (under the APA, courts must

"invalidate" an unlawful regulation rather than "simply . . . forbid[ing] its application to a particular

individual").

Finally, the Departments' demand that the Court set aside only those parts of the Rules that

"actually impose" harm on the Commonwealth is simply an attempt to relitigate the standing issues

that have been settled by the First Circuit. Defts' Br. 45. More particularly, the Departments' claim

that Massachusetts "cannot show injury" from certain provisions of the Rules is clearly a

jurisdictional argument that the Departments could have—and in fact did—raise on appeal.

---

[13] The Departments mistakenly assert that the Commonwealth is seeking additional
permanent injunctive relief against the agencies. It is not.

[14] For example, while a plaintiff must establish Article III standing to pursue injunctive relief,
*see Town of Chester*, 137 S. Ct. at 1650, the scope of the injunction is a matter left to the
equitable discretion of the court, *see United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S.
483, 496 (2001).

*Compare* Defts' Br. 45 (Rules will have a limited impact because some employees "share their [employers'] principled opposition to contraceptives"), *with* Br. of Appellees at 52, *Massachusetts v. U.S. Dept. of Health & Human Servs.*, 923 F.3d 209 (1st Cir. 2019) (No. 18-1514) (Rules will have a limited impact because "some employees may share their employers' objections to contraceptive coverage"). The First Circuit held that the Commonwealth has standing to challenge the Religious and Moral Exemption Rules without qualification. *Massachusetts*, 923 F.3d at 224-25. The Departments are effectively asking this Court to revisit that issue on remand. The Court must decline the invitation. *See Cohen v. Brown Univ.*, 101 F.3d 155, 168 (1st Cir. 1996) (the law of the case "doctrine requires a trial court on remand to dispose of the case in accordance with the appellate court's mandate by implementing both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces").

## **CONCLUSION**

For the foregoing reasons, and for the reasons stated in the Memorandum in Support of the Commonwealth's Motion for Summary Judgment, the Commonwealth's Motion for Summary Judgment should be granted and the Defendants' Motion to Dismiss or Cross-Motion for Summary Judgment should be denied.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Julia E. Kobick*

Jon Burke, BBO # 673472
Julia E. Kobick, BBO # 680194
Jonathan B. Miller, BBO # 663012
Elizabeth Carnes Flynn, BBO # 687708
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559
Dated: September 26, 2019                          Julia.Kobick@state.ma.us

## **CERTIFICATE OF SERVICE**

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 26, 2019.

                                 */s/ Julia Kobick*
                                Julia Kobick
                                Assistant Attorney General