IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————————
COMMONWEALTH OF MASSACHUSETTS,     :
             :
           Plaintiff,            :       Case No. 1:17-cv-11930-NMG
             :
      v.                 :
             :
UNITED STATES DEPARTMENT OF      :
HEALTH AND HUMAN SERVICES *et al*.,    :
             :
          Defendants.        :
———————————————————————————:

## **REPLY BRIEF IN SUPPORT OF DEFENDANTS' COMBINED MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    The Final Rules Comply with the APA's Procedural Requirements.........................2

    A.    The Rules Were Properly Promulgated as IFRs .............................................3

    B.    The Final Rules Are Procedurally Proper ......................................................4

    C.    The Final Rules Are Authorized by the Affordable Care Act ........................7

II.    The Religious Freedom Restoration Act Authorizes and Compels the Religious Exemption Rule. ...................................................................................................8

    A.    Plaintiff Cannot at Once Contend That RFRA Authorizes the Accommodation, But Deny RFRA's Authorization of the Religious Exemption Rule .........................................................................................8

    B.    RFRA Authorizes the Government to Affirmatively Avoid Unduly Burdening Religious Exercise, Which Includes the Authority to Grant Exemptions. ..............................................................................................10

    C.    Entities Are Substantially Burdened in the Absence of the Religious Exemption Rule .......................................................................................12

    D.    There Is No Compelling Government Interest in Forcing the Objectors Covered by the Religious Exemption Rule to Provide Contraceptive Coverage ............................................................................................15

    E.    Alleged Third Party Harm Is Not a Reason to Neglect RFRA's Requirements ...................................................................................18

III.    The Rules Do Not Violate the Establishment Clause .............................................18

IV.    The Rules Do Not Violate the Fifth Amendment's Equal Protection Principle .......21

V.    Even If Plaintiff Were to Prevail, a Set-Aside as to Plaintiff Is the Only Appropriate Remedy ...........................................................................................24

CONCLUSION .....................................................................................................................26

# INTRODUCTION

After years of litigation, multiple rounds of public comment, and tens of thousands of individual comments on different iterations of the exemption and accommodation at issue here, the U.S. Departments of Health and Human Services ("HHS"), Labor, and the Treasury (collectively, "the Agencies") could not find a way to resolve the litigation simply by amending the existing contraceptive coverage accommodation for employers with religious and moral objections. *See* FAQs About ACA Implementation Part 36 (Jan. 9, 2017). Accordingly, they chose to resolve that litigation and safeguard conscience and religious liberty by making the accommodation process optional and expanding the existing exemption from the contraceptive coverage mandate. The expanded exemption, in the form of the Religious Exemption Rule and the Moral Exemption Rule ("the Rules"), shields a narrow class of sincere religious and moral objectors from government-compelled facilitation of contraceptive coverage in conflict with their religious beliefs or moral convictions.

Plaintiff's challenge to these Rules has no merit. Because the Rules were promulgated after providing public notice and an opportunity for comment, they comply with the procedural requirements of the Administrative Procedure Act ("APA"). Additionally, the Agencies reasonably exercised their rulemaking authority to guide the discretion of the Health Resources and Services Administration ("HRSA") to support preventive services guidelines and to craft a response to the problems that had been caused by the contraceptive coverage mandate ("mandate"). The Rules neither run afoul of the Establishment Clause nor discriminate on the basis of sex. Indeed, the Rules place religious and moral objections on similar footing. Defendants therefore respectfully request that the Court enter summary judgment in their favor.

# ARGUMENT

## I.    The Final Rules Comply With the APA's Procedural Requirements.

Plaintiff yet again takes aim at the Agencies' decision to promulgate the Rules as interim final rules that requested public comment ("IFRs"), arguing that because there was purportedly no legal basis for proceeding with IFRs, the Final Rules that superseded them must also be invalid.  Combined Mem. in Opp. to Defs.' Mot. to Dismiss or Cross-Mot. for Summ. J., and Reply Br. in Supp. of Massachusetts' Mot. for Summ. J. at 1-5, ECF No. 127 ("Pl. Opp.").  To be sure, the IFRs were properly issued.  But even if they had not been, that would not affect the procedural validity of the Final Rules.  Plaintiff argues otherwise only by discounting the efforts the Agencies made to consider the tens of thousands of comments submitted by the public in response to the IFRs, to respond to those comments with changes to those IFRs in promulgating the Final Rules in response to those comments, and to explain their reasoning to commenters who disagreed with the Agencies' proposal.  The process that preceded issuance of the Final Rules involved "a level of public participation and a degree of agency receptivity that demonstrate[s] that a real 'public reconsideration of the issued rule' has taken place." *Levesque v. Block*, 723 F.2d 175, 188 (1st Cir. 1983).  As such, the Final Rules fully comply with the APA's procedural strictures.[1]

---

[1] Plaintiff cites *Pennsylvania v. Trump*, 930 F.3d 543, 565-69 (3d Cir. 2019), where the Third Circuit sustained the district court's conclusion that the Final Rules were procedurally improper.  Applying Third Circuit precedent, the *Pennsylvania* court focused on the absence of substantive changes between the IFRs and the Final Rules and the manner in which the IFRs supposedly changed the "status quo" of the rulemaking despite not being in force when the Final Rules were promulgated.  *Id.*  As explained below, these arguments are not consistent with basic principles of administrative law or the First Circuit's decision in *Levesque*, and this Court should reject them.

## A.      The Rules Were Properly Promulgated As IFRs.

The Agencies have maintained throughout this litigation that they possessed the legal authority to issue IFRs under the circumstances of this case.  *See* Defs.' First Cross-Mot. for Summ. J. and Opp. to Pl. Mot. for Summ. J. at 14-18, ECF No. 33.  Plaintiff's latest brief continues to object to the Agencies' exercise of this authority, Pl. Opp. at 2-3, but none of these objections has merit.

First, the use of IFRs by the Agencies was authorized by Congress, which provided that the Agencies "may promulgate *any* interim final rules as the Secretar[ies] determine[] are appropriate" in this area.  26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92 (emphasis added).  Plaintiff asserts that because this language is permissive, not mandatory, it is not sufficient to justify a deviation from notice and comment procedures under the precedent the Agencies rely upon.  Pl. Opp. at 2.  But Plaintiff's reading of *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.D.C. 1998), and *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994), would render the statutory provisions the Agencies relied upon superfluous, which would be contrary to the canons of statutory interpretation.  There would be no reason for Congress to enact provisions such as Sections 9833, 1191c, and 300gg-92 if all they did was reaffirm the APA.  *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (courts "'must give effect, if possible, to every clause and word of a statute'").  The Agencies correctly relied on these statutory authorities to issue interim final rules in 2010, 2011, and 2014 regarding the preventive services mandate and its exemptions, and they permissibly relied on the same authorities to promulgate the IFRs at issue here.

Second, the Agencies' conclusion that notice and comment rulemaking would be "impracticable," 82 Fed. Reg. 47,792, 47,813 (Oct. 13, 2017), provided the "good cause"

required by the APA to proceed with interim final rules.  Plaintiff asserts that the Agencies "have

not explained" why this is the case, Pl. Opp. at 3, but Plaintiff ignores the Agencies' findings in

the IFRs on the importance of the religious liberty interests at stake, the pendency of court

deadlines, and the need to provide assurance to entities that desired to extend health coverage to

their employees but had been deterred from doing so as a result of the Mandate.  *See* 82 Fed.

Reg. at 47,813-15.  Therefore, impracticability alone justified the Agencies' decision to issue the

IFRs, just as they did in 2010, 2011, and 2014 without any procedural objection from Plaintiff.

*See Long Term Care Pharm. All. v. Ferguson*, 362 F.3d 50, 54 n.3 (1st Cir. 2004) (rulemaking is

"impracticable 'when an agency finds that due and timely execution of its functions would be

impeded by the notice otherwise required'") (quoting *Util. Solid Waste Activities Grp. v. EPA*,

236 F.3d 749, 754 (D.C. Cir. 2001)).

**B.**     **The Final Rules Are Procedurally Proper.**

Although a finding that the IFRs were properly issued would resolve Plaintiff's

procedural APA claim, that claim should fail regardless.  The Final Rules, not the IFRs, are now

at issue.  And the Final Rules are the product of a robust notice and comment period in which the

Agencies received tens of thousands of public comments, "made a number of changes in the

rules and gave reasonable responses when [the] rules were not changed."  *Levesque*, 723 F.2d at

188.  Because "a real 'public reconsideration of the issued rule' has taken place[,]" the Final

Rules should not be vacated because they were initially promulgated as IFRs, even if the Court

were to agree that the IFRs were procedurally unlawful and pre-promulgation comment were

possible.  *Id.*

Plaintiff asserts that the Agencies' "post-promulgation actions" to implement the IFRs

represent "a firm commitment to close-mindedness" that belied "real public reconsideration" of

4

the Rules.  Pl. Opp. at 4 (emphasis omitted).  But, at most, the Agencies demonstrated a commitment to implementing the IFRs, which were necessarily temporary and designed to be implemented prior to receiving public comment (and which the Agencies could no longer implement after various district courts enjoined them from doing so).  Such actions do not nullify the effect of a post-promulgation notice and comment period.  Indeed, under Plaintiff's theory, it seems doubtful that a federal agency could ever cure a defect in an IFR, because agencies will presumably implement the IFRs they have promulgated, given that the underlying purpose of an IFR is to govern in the intervening period before a final rule can be promulgated.

Indeed, the facts at issue here are virtually indistinguishable from *Levesque*, which Plaintiff makes no effort to distinguish.  In *Levesque*, the Secretary of Agriculture issued interim final rules redefining the concept of a "household" for purposes of food stamp eligibility that were made effective immediately upon promulgation "and were to be implemented fully by the states" less than a month after issuance.  723 F.2d at 178.  The First Circuit nonetheless deemed the post-promulgation comments sufficient for purposes of sustaining the final rules that were ultimately issued, even though "the household definition challenged [there] was changed only minimally" in the final rules.  *Id.* at 178, 187.  Likewise, the evidence of implementation relied upon by Plaintiff and the court in *California v. HHS*, 281 F. Supp. 3d 806, 829 (N.D. Cal. 2017), *aff'd in part, vacated in part*, 911 F.3d 558 (9th Cir. 2018), is not sufficient to vacate the Final Rules on procedural grounds.

Plaintiff makes light of the changes the Agencies made to the Final Rules because they do not go to the substance of the rules.  Pl. Opp. at 4-5.  This proves nothing.  Even though "changes and revisions are indicative of an open mind" (and the Agencies made many such changes), the inverse is not true; "an agency's failure to make any [changes] does not mean its

mind is closed." *Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994). The "open mind" test does not require Agencies to accede to comments they disagree with, or to possess the sort of neutrality towards proposed regulations that Plaintiff now argues is necessary for APA rulemaking to be procedurally valid. Agencies almost always have some level of "bureaucratic commitment to the substance" of the regulations they propose, Pl. Opp. at 4, otherwise they would not have proposed them. That does not make all rulemaking procedurally unlawful. Indeed, "[a]n agency is not required to adopt a rule that conforms in *any* way to the comments presented to it" during notice and comment, and "[s]o long as it explains its reasons, [the agency] may adopt a rule that all commentators think is stupid or unnecessary." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992) (emphasis added).

Finally, Plaintiff misunderstands the Agencies' argument that this case does not raise concerns about "upsetting the status quo by amending a rule only recently implemented." *Levesque*, 723 F.2d at 187. *Levesque* was concerned with the unwillingness of an agency to depart from a set of rules it was already implementing, not with an agency official having a "'stake' in the substance" of particular rules. Pl. Opp. at 5 (quoting *Levesque*, 723 F.2d at 187). This case does not raise concerns about inertia. The Agencies did not have to consider the costs of "amending a rule only recently implemented" when promulgating the Final Rules because the IFRs were enjoined at that time. *Levesque*, 723 F.2d at 187.

Taken to its logical conclusion, Plaintiff's position would prevent agencies from ever issuing rules substantively similar to those tainted by an initial procedural error. The Court should reject Plaintiff's attempt to turn the APA's procedural requirements into a permanent roadblock to rulemaking, and grant the Agencies' motion for summary judgment on this claim.

**C.     The Final Rules Are Authorized by the Affordable Care Act.**

As Defendants have previously explained, the Rules are authorized by the Affordable

Care Act's ("ACA") delegation of authority to HRSA (a component of HHS).  *See* 42 U.S.C. §

300gg-13(a)(4) (requiring that certain health plans and health insurance issuers cover "with

respect to women" such "additional preventive care and screenings . . . as provided for in

comprehensive guidelines supported by [HRSA]"); Mem. in Supp. of Defs.' Combined Mot. to

Dismiss, Cross-Mot. for Summ. J., and Opp. to Pl. Mot. for Summ. J. at 14-15, ECF No. 122

("Defs.' SJ Mem.").  Plaintiff's contrary interpretation of the ACA suffers from a glaring error—

if it were correct, it would doom not only the Rules, but also the prior exemption for churches

and their integrated auxiliaries, and the prior accommodation, which also removed the

requirement of contraceptive coverage for employees of many religious organizations that are

not churches or integrated auxiliaries.  Plaintiff leaves this point entirely unaddressed.  *See* Pl.

Opp. at 5-8.

Plaintiff continues to misinterpret the statute's plain meaning.  *Id*. at 6. The term "shall"

imposes a mandatory obligation on covered plans to cover the preventive services *as provided*

*for* and *supported by* HRSA, but it does not limit *HRSA's* authority (that is, HHS's) to decide the

extent to which it will provide for and support a requirement of preventive services, both

regarding what services must be covered and by what categories of regulated entities.  Any

contrary conclusion would mean that the Agencies lacked (and continue to lack) the statutory

authority to create the exemption for churches and their integrated auxiliaries, or the

accommodation to the extent that it leaves employees of non-church organizations without the

benefit of an enforceable contraceptive coverage requirement.  Plaintiff gives insufficient weight

to the statutory text stating that the preventive-services requirement applies only "as provided

for" and "supported by" HRSA's guidelines.  *Id*. at 5-8.  Plaintiff's reiteration of its opening

arguments does not negate the fact that what, and to what extent, those guidelines provide for

and support particular coverage by particular entities is clearly left to HHS's discretion by

Congress.  *Id*.  At a minimum, the statute is ambiguous when read as a whole, and the Agencies'

construction is a reasonable one (dating back to 2011) and is entitled to deference.

## II.     The Religious Freedom Restoration Act Authorizes and Compels the Religious Exemption Rule.

Even if the Rules are not authorized by the ACA, they are authorized (and indeed

compelled) by the Religious Freedom Restoration Act ("RFRA").  Again, Plaintiff cannot

overcome the central flaw in its argument—if it were acceptable for the Agencies to use their

authority under RFRA to create the accommodation process, then the Agencies' use of that same

authority to implement the Religious Exemption Rule should be no different.

As Defendants have previously explained, Defs.' SJ Mem. at 21-34, the Religious

Exemption Rule is the Agencies' solution to alleviate the substantial burden remaining on some

employers after the accommodation (as compelled by RFRA) and to alleviate the substantial

burden identified by the Supreme Court in *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682

(2014) (as permitted by RFRA, because RFRA does not require that the Agencies take any

particular response to remove a substantial burden).

### A.     Plaintiff Cannot at Once Contend That RFRA Authorizes the Accommodation, But Deny RFRA's Authorization of the Religious Exemption Rule.

Unable to deny that the Supreme Court has identified the contraceptive mandate as

imposing a substantial burden within the meaning of RFRA, Plaintiff posits that the

accommodation is the single acceptable path forward.  Plaintiff suggests that the accommodation

is acceptable because it satisfies both RFRA and the ACA's purported requirement to provide

coverage of contraceptive services in all contexts.  Pl. Opp. at 9-10.  But both halves of this argument are legally flawed: the accommodation does not satisfy RFRA because it does not alleviate the substantial burden on the religious exercise of some entities, as described below; and the ACA does not require the blanket coverage of preventive services, instead delegating to HRSA the ability to identify and determine the scope of preventative services to be provided, as described *supra* I.C.  Plaintiff's concession that the accommodation satisfies RFRA further undermines its challenge because the accommodation also results in many women—who do not work for churches or their integrated auxiliaries—not receiving coverage for cost-free contraceptives through their health plan, and thus cannot be distinguished from the Religious Exemption Rule on that basis.  *See* 83 Fed. Reg. 57,536, 57,541 (Nov. 15, 2018) ("[T]he accommodation process itself, in some cases, failed to require contraceptive coverage for many women, because—as the Departments acknowledged at the time—the enforcement mechanism for [accommodation], section 3(16) of ERISA, does not provide a means to impose an obligation to provide contraceptive coverage on the third party administrators of self-insured church plans.").  In other words, Plaintiff hails the accommodation despite the fact that it does what Plaintiff insists the Agencies have no authority to do: take religious nonprofit organizations that are neither churches nor integrated auxiliaries, and remove from them a requirement that would otherwise have ensured their employees receive contraceptive coverage.  Yet Plaintiff illogically insists the Agencies cannot give those same types of religious organizations a simple exemption from the mandate.

Plaintiff also errs by attempting to import an analysis of conflicting statutes into the RFRA analysis.  Pl. Opp. at 9-11.  RFRA mandates respect for religious liberty across all government initiatives.  It applies "to all Federal law, and the implementation of that law,

whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42

U.S.C. § 2000bb-3(a).  Indeed, Congress expressly rejected Plaintiff's theory that courts should

endeavor to harmonize RFRA with other statutes.  Congress provided that "Federal statutory law

adopted after November 16, 1993, is subject to [RFRA] unless such law explicitly excludes such

application by reference to [RFRA]."  *Id*. § 2000bb-3(b).  Nothing in the ACA or its preventive

services provision explicitly states that Congress intended RFRA not to apply to the ACA's

requirements.  *See also id*. § 18023(c)(2)(A)(i) (providing that nothing in the ACA "shall be

construed to have any effect on Federal laws regarding . . . conscience protection").

### B.      RFRA Authorizes the Government to Affirmatively Avoid Unduly Burdening Religious Exercise, Which Includes the Authority to Grant Exemptions.

Plaintiff does not dispute that RFRA requires the government to act to eliminate

substantial burdens on the exercise of religion unless the burden is the least restrictive means of

furthering a compelling government interest.  RFRA's text is clear: "Government shall not

substantially burden a person's exercise of religion even if the burden results from a rule of

general applicability, except as provided in subsection (b)."  42 U.S.C. § 2000bb-1(a).

Plaintiff agrees that the Agencies have the authority under RFRA to create exemptions to

relieve substantial burdens on religious exercise, as the Agencies did in creating the

accommodation.  Plaintiff's disagreement is limited to whether the Religious Exemption Rule is

a permissible RFRA exemption.  According to Plaintiff, the prior administrative accommodation

was all that RFRA required, and thus, the Agencies cannot issue the Rule.  Pl. Opp. at 9-10, 12.

But Plaintiff identifies no legal authority precluding the Agencies from responding to the

substantial burden identified in *Hobby Lobby* with a broader exemption, likely because no such

authority exists.  Indeed, Plaintiff agrees that the Agencies need not "precisely hit the bullseye"

and that there is no reason to think that the accommodation is the only acceptable response to the substantial religious burden imposed by the contraceptive mandate. *Id.* at 11.[2]  "RFRA does not . . . prescribe the accommodation that the government must adopt" in response to a substantial burden; instead, it leaves agencies with a measure of "discretion to fashion an appropriate and administrable response to respect religious liberty interests implicated by their own regulations." 82 Fed. Reg. at 47,806.  And allowing agencies to choose to respond to a substantial burden on religious exercise with an exemption rather than an accommodation is particularly appropriate here, where the Agencies have already attempted several accommodations, and those accommodations were the subject of widespread legal challenges that divided the courts and (at an absolute minimum) were subject to serious questions about their sufficiency.

This approach is also consistent with the Supreme Court's recognition in analogous contexts that an entity faced with potentially conflicting legal obligations should be afforded some leeway.  For example, the Court has held that, under Title VII, an employer may "engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact" if the employer has "a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009).  Critically, the Court did not require the employer to prove that it actually would "be subject to disparate-impact liability."  The Court explained that the

---

[2] To the extent that Plaintiff objects to the Rules merely because their exemption extends to insurers and third-party administrators that provide contraceptive coverage to employees of the objecting employer, *see* Pl. Opp. at 18-19, such an objection merely restates Plaintiff's argument that employers are not being substantially burdened because coverage is provided by insurers or third-party administrators.  The Rules' exemption is not being provided to remove a substantial burden on such insurers or administrators, but instead to remove the burden on employers that object on complicity grounds to the accommodation's use of their relationship with insurers or administrators to provide coverage that the employers deem immoral.  *See infra* II.C.

more flexible standard it adopted "appropriately constrains employers' discretion in making race-based decisions" but was not "so restrictive that it allows employers to act only when there is a provable, actual violation"—a standard that would have left employers in an untenable position. *Id.* at 583. So too here. Thus, it is irrelevant whether "[t]he Accommodation is . . . the least restrictive means" to alleviate the substantial burden on religious exercise identified in *Hobby Lobby*. Pl. Opp. at 14; *see also id.* at 17-19.

Particularly where, as in this case, the Agencies are faced with substantial claims that RFRA compels an exemption—claims that have been accepted by many courts—the Agencies should be permitted to adopt that exemption even if the courts might ultimately have concluded that some form of accommodation would have been consistent with RFRA.

### C.   Entities Are Substantially Burdened in the Absence of the Religious Exemption Rule.

The Rule is not only authorized by RFRA, but is a required response to the substantial burden imposed by the contraceptive mandate and not alleviated for many entities by the accommodation. Plaintiff argues that the accommodation process avoids substantial burdens on religious exercise, and thus removes the necessity for the Agencies to act further under RFRA. Pl. Opp. at 12-15. But as Defendants previously explained, the Religious Exemption Rule is necessary to alleviate the substantial burden on employers with "a sincere religious belief that their participation in the accommodation process makes them morally and spiritually complicit" in providing contraceptive coverage, because their "self-certification" triggers "the provision of objectionable coverage through their group health plans." *Sharpe Holdings, Inc. v. HHS*, 801 F.3d 927, 942 (8th Cir. 2015), *judgment vacated sub nom. HHS v. CNS Int'l Ministries*, __ S. Ct. __, 2016 WL 2842448 (2016); *see also* 82 Fed. Reg. at 47,798, 47,800; Defs.' SJ Mem. at 22-25.

Plaintiff does not contend that agencies must wait to act under RFRA until a *court* has identified a substantial burden.

The Religious Exemption Rule is the Agencies' response to the precise substantial burden already identified by the Supreme Court in *Hobby Lobby* and not alleviated by the accommodation for objectors who believe that self-certifying through the accommodation process triggers the provision of contraceptive coverage in violation of their religious beliefs. Defs.' SJ Mem. at 32.  As Defendants previously noted, *id.* at 31-33, RFRA does not prescribe the precise remedy by which the government must eliminate a substantial burden, once one has been identified.  To conclude otherwise would trap the Agencies in protracted litigation until the Agencies discovered the single accommodation that would be *least* protective of the objector's religious exercise while still prevailing in a RFRA lawsuit brought by the objector.  RFRA therefore did not require the Agencies to select the accommodation—with all of its idiosyncratic features—as the one correct response to the substantial burden identified in *Hobby Lobby*. Instead, the Agencies, at that time, could have simply offered a straightforward exemption to objectors, as the Religious Exemption Rule does, and nothing prevents the Agencies from doing the same now.

Plaintiff's argument that the accommodation does not substantially burden religious exercise invites precisely what RFRA does not allow and what the Supreme Court has prohibited: "it is not for [a court] to say that [an objector's] religious beliefs are mistaken." *Hobby Lobby*, 573 U.S. at 725.  Here, entities with sincere religious objections to the accommodation must choose between acting contrary to their beliefs and facing crippling financial penalties.  Plaintiff cannot deny the existence of those financial penalties, nor that some religious entities sincerely object to the accommodation because it inextricably intertwines them

13

with the provision of contraceptive coverage to their employees—if an employer eliminated its health plan or terminated an employee, that employee would no longer receive contraceptive coverage through the employer's insurer or third-party administrator.  Plaintiff's facile conclusion that objecting employers will have "no role in" the provision of contraceptive coverage after they self-certify, Pl. Opp. at 12, and that it is "self-evident" that self-certification cannot be a substantial burden, *id*. at 13, ignores the fact that objecting employers believe that, by using their health plans, the accommodation makes them complicit in the provision of contraceptive coverage.  That is why dozens of plaintiffs challenged the accommodation under RFRA as requiring them to engage in conduct that would make them complicit in the provision of contraceptive coverage in violation of their religious beliefs, thereby substantially burdening their exercise of religion.  *See Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (reviewing four sets of cases).  Plaintiff's argument hinges on precisely the type of second-guessing of religious belief that the Supreme Court has said is prohibited.  As *Hobby Lobby* established, a court's "narrow function in this context is to determine whether the line drawn reflects an honest conviction," as opposed to "in effect tell[ing] the plaintiffs that their beliefs are flawed."  573 U.S. at 724, 725 (cleaned up).

Plaintiff expresses concern that "every federal regulatory accommodation for entities with sincere religious objections to participation in government programs could turn into a RFRA violation."  Pl. Opp. at 13.  But there is no magic inherent in the word "accommodation" that prevents an "accommodation" from substantially burdening religious exercise, as this case illustrates.  There is thus no blanket rule removing accommodations from RFRA scrutiny.  The contrary conclusion would undermine RFRA's intent to protect religious liberty.  That said, to the extent that Plaintiff is concerned that this case will open the floodgates to RFRA objections

to other accommodations, Plaintiff offers no reason to expect such a flood of objections to occur, especially given that accommodations are generally designed to eliminate burdens on religious exercise.

Plaintiff also loses focus on the *substantiality* of the burden at issue here—an independent inquiry that turns on the severity of the pressure the government's action imposes on the objector's religious exercise. *See Hobby Lobby*, 573 U.S. at 718-20; *see also Sharpe*, 801 F.3d at 938. Here, of course, the analysis is straightforward because the substantial burden resulting from the accommodation is the significant financial penalty imposed for failure to comply with the mandate or accommodation. That is the same penalty the plaintiffs faced in *Hobby Lobby*, where the Court had "little trouble" concluding that the mandate imposed a substantial burden. 573 U.S. at 719; *see also Priests for Life v. HHS*, 808 F.3d 1, 16 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc). In circular logic, Plaintiff argues that the hefty financial penalty is irrelevant because entities can take the accommodation instead of paying, Pl. Opp. at 12, but of course that ignores the entities with religious objections to the accommodation—precisely those entities that matter here.

> **D.     There Is No Compelling Government Interest in Forcing the Objectors Covered by the Religious Exemption Rule to Provide Contraceptive Coverage.**

As discussed above, although RFRA requires the government to alleviate substantial burdens on religious exercise unless applying that burden to an objector is the least restrictive means of serving a compelling government interest, RFRA does not require the means of alleviating such burden to satisfy those requirements in reverse. In other words, an exemption or accommodation under RFRA need not itself be the least restrictive approach to achieving a

compelling government interest.  In any event, Plaintiff is incorrect in arguing that the status quo,

sans Rule, is the least restrictive means of serving a compelling government interest.

Plaintiff appears to concede that the question for analysis is whether a compelling

governmental interest exists in requiring the *small percentage of employers with sincere*

*religious objections* to the mandate or accommodation to violate their religious beliefs, although

Plaintiff perplexingly argues that such a requirement has no effect.  Pl. Opp. at 15.  As the

Agencies reasonably concluded,[3] there is no such compelling interest.  The mandate itself is

already replete with exceptions.  These exceptions include the exemption for churches and their

integrated auxiliaries, the exemption for grandfathered plans, and the accommodation when used

by a self-insured church plan, all of which may result in women not receiving cost-free

contraceptive coverage that would otherwise be required by the mandate.  Moreover, when the

mandate was in place prior to the Religious Exemption Rule, a significant study showed there

was no significant increase in the proportion of women at risk for unintended pregnancy who

used contraception, and no significant increase in the use of most effective or moderately

effective methods of contraception (except for a small increase in implant use).  Defs.' SJ Mem.

at 28.  This is one reason that the Agencies concluded there was no compelling interest in

coercing the relatively small number of employers who qualify for the expanded religious

exemption.  *Id*.; *see* 83 Fed. Reg. at 57,548.  Plaintiff also appears to acknowledge that many of

the women who might lose coverage through their employers could obtain contraceptives

---

[3] Although Plaintiff suggests that the Agencies wrongfully changed their position regarding compelling interest, Pl. Opp. at 14-15, the Agencies clearly explained their good reasons for reaching their new conclusion, and the new policy is permissible under the statute, which is all that is required.  *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009); *see also* 83 Fed. Reg. at 57,546-68 (explaining the Agencies' views).

through other programs, Pl. Opp. at 15-16, and thus the only interest at stake here is in the "seamlessness" of access for those women.

Plaintiff nevertheless second-guesses the judgment of the federal government as to its own interests, arguing that, even if "some women" still receive contraceptive coverage, that "do[es] not diminish the government's interest is in ensuring that 'all women'" receive contraceptive coverage. *Id.* at 16. But this demonstrates two fundamental misunderstandings— first, as to the entity charged with defining the federal government's compelling interests and second, as to the scope of RFRA's protections. RFRA's requirement that the government not substantially burden religious exercise unless doing so is the least restrictive means of achieving a compelling government interest means that if the government can achieve the vast majority of its goals without substantially burdening religious exercise, then it must do so.

As Defendants previously explained, the administrative record does not contain adequate evidence to meet the high standard of demonstrating a compelling interest. Defs.' SJ Mem. at 27-28 (citing 83 Fed. Reg. at 57,547). Plaintiff suggests that there must be something "new" in the administrative record to permit the Agencies to reach this conclusion, but provides no support for that position. Pl. Opp. at 14. In any event, as discussed above, the Agencies relied in part on research regarding the effect of the contraceptive mandate on contraception use. Plaintiff's challenges amount to an attempt to second-guess the Agencies' expertise in judging the material in the administrative record, an approach that is at odds with the principles of APA review. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

**E.      Alleged Third Party Harm Is Not a Reason to Neglect RFRA's Requirements.**

Plaintiff also returns to its argument that RFRA contains a separate requirement barring effects on third parties.  Pl. Opp. at 16.  Not so.  Plaintiff cannot refute that RFRA's text includes no such requirement.  Nor can Plaintiff refute that nearly all exemptions will affect third parties, including the exemption for churches and their integrated auxiliaries (and the accommodation when used by self-insured church plans) that Plaintiff does not challenge, because both of these existing exemptions can result in women not receiving contraceptive coverage.  Plaintiff cites the language of *Hobby Lobby*, *id.* (citing *Hobby Lobby*, 573 U.S. at 730 n.37), but, as Defendants have already explained, Defs.' SJ Mem. at 30 n.8, this language is referring to the Establishment Clause analysis as explained in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), not any additional requirement added by RFRA.  The Religious Exemption Rule does not violate the Establishment Clause, as demonstrated *infra* at III.  The Agencies have been attempting to harmonize religious liberty interests with access to contraceptive coverage for years, but have been unable to completely satisfy both considerations.  *See, e.g.*, FAQs About ACA Implementation Part 36 (Jan. 9, 2017) (noting that, after soliciting public comments post-*Zubik*, the Agencies were unable to find a way to amend the accommodation to both satisfy all objectors and all policy goals).  The Rule thus represents precisely what Plaintiff claims to want—the Agencies' best attempt to "reconcile," Pl. Opp. at 16, religious liberty concerns and access to contraceptive coverage.

**III.      The Rules Do Not Violate the Establishment Clause.**

The Rules are consistent with the Establishment Clause because they promote the permissible secular purpose of alleviating significant governmental interference with the exercise of religious and moral convictions; moreover, the Rules do not advance religion, but only free

entities and persons with such convictions to practice as they would in the absence of government-imposed regulations. Defs.' SJ Mem. at 34-40. Most notably, the Rules are not limited to religious entities, but include exemptions for non-religious employers and individuals. This significantly undercuts Plaintiff's attempt to depict the Rules as advancing no secular purpose.

Plaintiff's attempt to conflate the Rules' accommodation of religious exercise with an impermissible promotion of religion cannot be squared with *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987), which recognized that alleviating significant governmental interference with religious exercise is a permissible legislative purpose. Plaintiff implies that *Amos* is inapposite because it concerned the institutional autonomy of religious congregations and religious not-for-profits to control their own leadership and membership. *See* Pl. Opp. at 20. That cramped view of the permissibility of accommodating religious beliefs finds no support in *Amos*, which spoke broadly of the government's authority to alleviate governmental interference with the ability of religious organizations to "define and carry out their religious missions." 483 U.S. at 335. That is precisely what the Religious Exemption Rule seeks to accomplish.

Plaintiff further errs in contending that the Agencies ran afoul of the Establishment Clause by replacing with an exemption the accommodation that Plaintiff appears to acknowledge at least "*some* employers [are] burdened by." Pl. Opp. at 22. Here, the government's secular purpose—to alleviate significant governmental interference with the exercise of religious and moral convictions—is not fully served by the accommodation. *See* 83 Fed. Reg. at 57,546-48 (explaining that requiring entities to choose between compliance with the accommodation or paying financial penalties violated RFRA in many instances). Some entities have sincere

religious objections to the role that the accommodation forces them to play in the provision of contraceptive coverage. Plaintiff's attempt to minimize these religious objections again invites what the Supreme Court has prohibited: "it is not for [a court] to say that [an objector's] religious beliefs are mistaken." *Hobby Lobby*, 573 U.S. at 725. Plaintiff also misplaces its reliance on the caselaw it cites in support of its arguments. *Bowen v. Roy*, 476 U.S. 693 (1986), cited by Plaintiff, did not involve the Establishment Clause. And *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989), supports Defendants' position. In that case, the Court noted that "the application of Title VII's exemption for religious organizations that we approved in [*Amos*], though it had some adverse effect on those holding or seeking employment with those organizations (if not on taxpayers generally), prevented *potentially serious encroachments* on protected religious freedoms"). *Id*. at 18 n.8 (emphasis added). The same is true here—the promulgation of the Rules is necessary to prevent potentially serious encroachments on the exercise of religious (and moral) convictions by objecting employers.

Second, from the fact that Plaintiff disagrees with the Rules' outcome on policy grounds, it does not follow that the Agencies have "advance[d] employers' religious interests over the health and wellbeing of female employees." Pl. Opp. at 21. As explained above, the Agencies provided reasoned explanations for the promulgation of the Rules, and responded meaningfully to comments regarding the impact of the Rules. Plaintiff relies on inapposite cases to support its contrary arguments. In *Larkin v. Grendel's Den*, 459 U.S. 116 (1982), a state statute delegated "a power ordinarily vested in agencies of government"—the ability to veto applications for liquor licenses within a prescribed radius—to churches and schools. *Id*. at 122; *see also id*. at 117-18. The Rules do not vest governmental functions in any entity.

20

As Defendants' opening brief explained, before the mandate, women had no entitlement to contraceptive coverage without cost-sharing; thus, if the same Agencies that created and enforce the mandate also create a limited exemption to accommodate sincere religious objections, the women affected are not "burdened" in a meaningful sense, because they are no worse off than before the Agencies chose to act in the first instance. Defs.' SJ Mem. at 38. Contrary to Plaintiff's suggestion that there is little support for this conclusion, Pl. Opp. at 21 n.7, it is supported by *Amos*, which explained that although the plaintiff was "[u]ndoubtedly" adversely affected by the termination of his employment, "it was the [Mormon] Church[,] not the Government, who put him to the choice of changing his religious practices or losing his job." 483 U.S. at 337 n.15. Instead of burdening the Church's employees, the religious exemption simply left them where they were before Title VII's general prohibition and exemption had been enacted. The same is true of the Rules.

Finally, Plaintiff misses the mark in relying on cases such as *Wallace v. Jaffree*, 472 U.S. 38 (1985), and *Edwards v. Aguillard*, 482 U.S. 578 (1987), to advance its contention that the Rules have no secular purpose because their purpose is allegedly fully served by existing law. *See* Pl. Opp. at 23-24. Here, the secular purpose—to alleviate significant governmental interference with the exercise of religious and moral convictions—was not fully served by the accommodation, given that the Agencies were unable to find any way to satisfy religious and moral objections short of expanding the exemption. *See* Defs.' SJ Mem. at 6.

## IV.	The Rules Do Not Violate the Fifth Amendment's Equal Protection Principle.

The Rules are consistent with principles of equal protection. Plaintiff's equal protection challenge, Pl. Opp. at 24-27, fails because only rational basis review applies and the Rules easily satisfy it. Furthermore, the Rules also would satisfy intermediate scrutiny if it applied.

Rational basis review applies because the Rules do not draw a sex-based distinction. As Defendants' opening brief explained, the ACA's provision requiring coverage for additional preventive services supported by HRSA pertains only to such services for "women." Defs.' SJ Mem. at 41 (citing 42 U.S.C. § 300gg-13(a)(4)). Accordingly, the Rules and HRSA Guidelines generally give benefits to women that they do not give to men, because they require coverage for female contraceptives—while providing an exemption for entities with religious and conscience objections—but do not require any coverage of male contraceptives. *See id*. The Rules expand the previously available exemptions for churches and their integrated auxiliaries to the mandated coverage of female contraceptives. Therefore, the Agencies' preventive services coverage requirements do not make any sex distinction to the detriment of women as alleged by Plaintiff. (Plaintiff does not appear to challenge § 300gg-13(a)(4)'s distinction in allowing for preventive services guidelines specifically for women.)

The Rules thus allow for distinctions in coverage not on the basis of the sex of recipients of the coverage, but on the basis of the religious or moral objections of the employer, plan sponsor, institution of higher education, or issuer. Distinctions specifying that these specific guidelines apply among women already existed before the Rules were issued. Therefore, if exemptions to the guidelines were deemed violations of equal protection, that violation would apply equally to the prior church exemption, the accommodation, and grandfathering under the ACA. The Rules do not treat men more favorably than women, and any sex-based distinctions flow from the statute itself, which requires coverage for preventive services for women only and which Plaintiff has not challenged.

Plaintiff resists this common-sense proposition by arguing that the contraceptive mandate for women was required to "*equal*" the coverage enjoyed by men. Pl. Opp. at 25. That position

is illogical and would lead to absurd results.  Prior to (and after) the issuance of the Rules, men and women were not "equally" covered as to contraceptives because there is no federal requirement that health plans cover male contraceptives at all.  *See* 42 U.S.C. § 300gg-13(a)(4) (requiring preventative services to be covered "with respect to women").  Such asymmetry is not unique to contraceptive coverage—Plaintiff itself notes that some non-contraceptive preventive services must be covered only for men.  *See* Pl. Opp. at 26 n.11.  Under Plaintiff's logic, those provisions could also violate equal protection.  But if that argument were accepted, any time Congress wished to require coverage of services specifically for women, it would be forced to provide those same services for men to maintain "equal" benefits, and vice versa.

Plaintiff states no equal-protection violation by alleging that the ACA provision requiring coverage for additional preventive services for women was motivated by a desire to remedy inequities in the provision of health care to men and women.  *Id.* at 25.  Even if correct, it remains the case that the ACA provision itself requires only coverage of female preventive services, including contraceptives. Consequently, the Rules neither create any sex-based distinction nor treat men more favorably than women.  The essence of Plaintiff's contention is that despite the fact that the Rules do not draw any sex-based distinction, the exemption to subsidizing contraceptive coverage disparately affects women.  Such a claim does not state a cognizable equal protection claim on the basis of sex, which can be based only on a showing of discriminatory intent not disparate impact.

Moreover, as Defendants' opening brief also explained, Plaintiff has cited no authority that declining to require subsidization of contraception constitutes a sex-based equal protection violation.  Defs.' SJ Mem. at 41-42.  Plaintiff's closing brief does not rectify this failure. *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), did not involve subsidization, but instead

concerned a sex-based distinction in the law governing acquisition of U.S. citizenship by a child born abroad.  Similarly, *Caban v. Mohammed*, 441 U.S. 380 (1979), involved a distinction between unwed mothers and unwed fathers in state domestic-relations law, rather than subsidization.

Facially neutral policies receive rational basis review absent a showing of purposeful discrimination.  *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979).  Plaintiff falls far short of establishing such purposeful discrimination.  Plaintiff professes suspicion of the Agencies' decision to promulgate exemptions concerning contraception, and not other provisions of the ACA, but the Rules themselves explain why this is so: there had been a flood of litigation from entities asserting their particular religious and moral objections to being coerced into providing contraceptive coverage.  *See* 83 Fed. Reg. at 57,540.  No similar flood of litigation has challenged coverage of any other services provided for in the Guidelines.

Furthermore, even if—as Plaintiff incorrectly contends—intermediate scrutiny were to apply, the Rules would satisfy intermediate scrutiny.  Plaintiff does not dispute in its opposition that the accommodation of religious beliefs is an important government interest.  *See* Defs.' SJ Mem. at 42.  Nor does it dispute that the accommodation of non-religious moral beliefs is an important government interest.  *See id*. at 43.  Because the Agencies acted for both of these reasons, as well as for other reasons, 83 Fed. Reg. at 57,540, 83 Fed. Reg. 57, 592, 57,593 (Nov. 15, 2018), the Rules are substantially related to important government interests.

## V.     Even if Plaintiff Were to Prevail, a Set-Aside as to Plaintiff Is the Only Appropriate Remedy.

As explained in Defendants' opening brief, even if the Court were to rule in Plaintiff's favor on the merits, the APA dictates that the appropriate remedy would be to set aside the agency action deemed unlawful by the Court as to Plaintiff, and remand to the Agencies for

additional investigation or explanation.  Defs.' SJ Mem. at 44-45.  Plaintiff's contrary contention that a remedy with nationwide scope would be appropriate in the event that it were to prevail ignores the Supreme Court's instruction that a "plaintiff's remedy must be 'limited to the inadequacy that produced [its] injury in fact'" because "the Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  *Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018).  And here, Plaintiff fails to articulate any reason why a decision setting aside the agency action deemed unlawful as to Plaintiff would not "provide complete relief to [it]."  *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor v. California*, 139 S. Ct. 2716 (2019).  Indeed, in parallel litigation, the Ninth Circuit concluded that a district court that had issued nationwide preliminary injunctive relief against the IFRs "had abused its discretion in that regard" and that the injunction "must be narrowed to redress only the injury shown as to the plaintiff states."  *Id*. at 584.

Nor does *National Mining Association v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998), require a different result.  That case "stands for the unremarkable, narrower proposition that an injunction issued by the district court in the case was valid against the agency on a national basis, not merely within the geographic jurisdiction of the court."  *Biggs v. Quicken Loans, Inc*., 990 F. Supp. 2d 780, 785 (E.D. Mich. 2014).  It does not follow that a district court must issue relief beyond setting aside the specific agency action deemed unlawful with respect to the specific plaintiff before it, regardless of whether such relief is necessary to remedy that plaintiff's alleged injury.

And as explained in Defendants' opening brief, the scope of any set-aside should be limited to addressing Article III injury actually imposed on Plaintiff, and not to provisions of the Rules as to which Plaintiff has not demonstrated such injury.  Defs.' SJ Mem. at 45.  Plaintiff

incorrectly contends that because the First Circuit determined that Plaintiff possessed standing to sue, that court necessarily determined that Plaintiff *must* have been injured by *all* provisions of the Rules.  Pl. Opp. at 28-29.  But "the issue on appeal" before the First Circuit was "narrow: whether the Commonwealth has Article III standing to challenge the rules."  *Massachusetts v. HHS*, 923 F.3d 209, 213 (1st Cir. 2019).  Plaintiff thus vastly overreads the First Circuit's decision, which said nothing about whether Plaintiff had shown injury with respect to each of the provisions of the Rules creating particular exemptions (for example, whether Plaintiff has shown injury from the exemptions for religious nonprofits, or moral nonprofits, or individuals).  Because the First Circuit did not reach such issues in its decision, nothing prevents this Court from addressing such issues in determining the scope of appropriate relief.

## CONCLUSION

For the reasons stated above and in Defendants' opening brief, the Court should dismiss Plaintiff's complaint or enter summary judgment for Defendants, and deny Plaintiff's motion for summary judgment.

DATED: October 21, 2019                              Respectfully submitted,


                                                     JOSEPH H. HUNT
                                                     Assistant Attorney General

                                                     MICHELLE R. BENNETT
                                                     Assistant Director, Federal Programs Branch

                                                      /s/ *Daniel Riess*
                                                     DANIEL RIESS (Texas Bar # 24037359)
                                                     Trial Attorney
                                                     U.S. Department of Justice
                                                     Civil Division
                                                     1100 L Street, NW
                                                     Washington, D.C. 20005
                                                     Telephone: (202) 353-3098

Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on October 21, 2019, I caused a copy of the foregoing to be filed electronically and that the document is available for viewing and downloading from the ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  If any counsel of record requires a paper copy, I will cause a paper copy to be served upon them by U.S. mail.

*/s/ Daniel Riess*