

# THE COMMONWEALTH OF MASSACHUSETTS
# OFFICE OF THE ATTORNEY GENERAL
## ONE ASHBURTON PLACE
## BOSTON, MASSACHUSETTS 02108

MAURA HEALEY
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

October 25, 2019

**By CM/ECF**

Christine Lima
Courtroom Clerk for Honorable Nathaniel Gorton
U.S. District Court – District of Massachusetts
1 Courthouse Way
Boston, Massachusetts 02210

      Re:    *Massachusetts v. U.S. Dept. of Health & Human Services* (1:17-cv-11930)

               Notice of Supplemental Authority

Dear Ms. Lima:

      This letter serves to provide the Court notice that, after the Commonwealth filed its summary judgment briefs in this case, the U.S. Court of Appeals for the Ninth Circuit issued a decision affirming a preliminary injunction barring enforcement of the Final Rules at issue. *California v. U.S. Dept. of Health & Hum. Servs.*, --- F.3d ---, 2019 WL 5382250 (9th Cir. Oct. 22, 2019) ("California IV") (affirming injunction applicable to plaintiffs). Following the Third Circuit's recent decision, the Ninth Circuit held that the Rules likely violate the Administrative Procedure Act because they are "not in accordance with the law" and are "in excess of statutory authority." *Id.* at *7; *see also Pennsylvania v. President United States*, 930 F.3d 543, 565-74 (3d Cir. 2019).

      In accord with what the Commonwealth has argued in this case, the Ninth Circuit concluded that the defendants likely did not have authority to issue the Rules. *See California IV*, 2019 WL 5382250, at * 7-13. The Ninth Circuit first held that, given "the text, purpose, and history of the Women's Health Amendment…the agencies likely lacked statutory authority under the [Affordable Care Act ("ACA")] to issue the final rules." *Id.* at *8. Second, the Ninth Circuit held that the Religious Exemption Rule is neither required nor authorized by the Religious Freedom Restoration Act. *Id.* at *9-12. The Rule is not required because the balanced regulatory system it replaces—specifically the Accommodation—did not impose a substantial burden on employers' religious exercise. *Id.* at *10-12. Thus, RFRA does not authorize the defendants to replace the Accommodation with an expanded exemption that "*contradicts* the…ACA's mandate." *Id.* at *10 (emphasis in original). Moreover, the scope of the Rule "far exceeds what RFRA in fact authorizes." *Id.* The Rule creates a "blanket exemption" that does not provide for careful, individualized review of the nature of the objection asserted by an employer, or the "detrimental effect [an exemption would have] on the employer's female employees." *Id.* at *10 & n. 3. The Ninth Circuit concluded that, for these reasons, the Rule

does not "take adequate account of the burdens...imposed on nonbeneficiaries," and "is not measured so that it does not override other significant interests." *Id.* at *10 n. 3 (internal quotations and citations omitted).

A copy of the decision is attached.

Respectfully submitted,

/s/ Jon Burke

Jon Burke
Assistant Attorney General

cc (by CM/ECF): Counsel of Record

## CERTIFICATE OF SERVICE

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filling (NEF) and paper copies will be sent to those indicated as non-registered participants on October 25, 2019.

Dated: October 25, 2019          /s/ Jon Burke_____
                                 Jon Burke

2019 WL 5382250
Only the Westlaw citation
is currently available.
United States Court of
Appeals, Ninth Circuit.

State of CALIFORNIA; State of
Delaware; Commonwealth of Virginia;
State of Maryland; State of New
York; State of Illinois; State of
Washington; State of Minnesota; State
of Connecticut; District of Columbia;
State of North Carolina; State of
Vermont; State of Rhode Island;
State of Hawaii, Plaintiffs-Appellees,
v.
U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES; U.S. Department
of Labor; R. Alexander Acosta, in
his official capacity as Secretary of
the U.S. Department of Labor; Alex
M. Azar II, Secretary of the United
States Department of Health and
Human Services; U.S. Department
of the Treasury; Steven Terner
Mnuchin, in his official capacity as
Secretary of the U.S. Department
of the Treasury, Defendants,
and
The Little Sisters of the Poor
Jeanne Jugan Residence,
Intervenor-Defendant-Appellant.
State of California; State of Delaware;
Commonwealth of Virginia; State of
Maryland; State of New York; State
of Illinois; State of Washington;
State of Minnesota; State of
Connecticut; District of Columbia;
State of North Carolina; State of

Vermont; State of Rhode Island;
State of Hawaii, Plaintiffs-Appellees,
v.
U.S. Department of Health & Human
Services; U.S. Department of Labor;
R. Alexander Acosta, in his official
capacity as Secretary of the U.S.
Department of Labor; Alex M. Azar
II, Secretary of the United States
Department of Health and Human
Services; U.S. Department of the
Treasury; Steven Terner Mnuchin,
in his official capacity as Secretary
of the U.S. Department of the
Treasury, Defendants-Appellants,
and
The Little Sisters of the Poor
Jeanne Jugan Residence,
Intervenor-Defendant.
State of California; State of Delaware;
Commonwealth of Virginia; State of
Maryland; State of New York; State
of Illinois; State of Washington;
State of Minnesota; State of
Connecticut; District of Columbia;
State of North Carolina; State of
Vermont; State of Rhode Island;
State of Hawaii, Plaintiffs-Appellees,
v.
U.S. Department of Health & Human
Services; U.S. Department of Labor;
R. Alexander Acosta, in his official
capacity as Secretary of the U.S.
Department of Labor; Alex M.
Azar II, Secretary of the United
States Department of Health and
Human Services; U.S. Department
of the Treasury; Steven Terner
Mnuchin, in his official capacity as

Secretary of the U.S. Department
of the Treasury, Defendants,
and
March for Life Education and Defense
Fund, Intervenor-Defendant-Appellant.

No. 19-15072, No.
19-15118, No. 19-15150
|
Argued and Submitted June 6,
2019 San Francisco, California
|
Filed October 22, 2019

**Synopsis**
**Background:** Thirteen States and District of
Columbia filed a petition for a preliminary
injunction that sought to prevent the
implementation of rules creating a religious
exemption and a moral exemption to the
contraceptive mandate contained within the
Affordable Care Act (ACA). The United States
District Court for the Northern District of
California, No. 4:17-cv-05783-HSG, Haywood
S. Gilliam, Jr., J., entered preliminary
injunction. Government appealed.

**Holdings:** The Court of Appeals, Wallace,
Circuit Judge, held that:

States and District of Columbia possessed
Article III standing to seek injunction;

issuance of nationwide injunction in similar
action did not moot appeal;

States and District were likely to succeed
on merits of claim, or at very least
raised serious questions going to merits of

claim, that implementation of rules violated
Administrative Procedure Act (APA), as
required for entry of preliminary injunction;

in matter of first impression, ACA's
contraceptive mandate did not violate
Religious Freedom Restoration Act (RFRA);
and

States and District were likely to suffer
irreparable harm absent entry of preliminary
injunction.

Affirmed.

Kleinfeld, Senior Circuit Judge, issued
dissenting opinion.

**Attorneys and Law Firms**

Brinton Lucas (argued), Sharon Swingle,
Lowell V. Sturgill Jr., and Karen Schoen,
Appellate Staff; David L. Anderson, United
States Attorney; Hashim M. Mooppan,
Deputy Assistant Attorney General; Joseph
H. Hunt, Assistant Attorney General; Civil
Division, United States Department of Justice,
Washington, D.C.; for Defendants-Appellants.

Mark Rienzi (argued), Eric C. Rassbach,
Lori H. Windham, Diana M. Vern, Chase T.
Harrington, and Chris Pagliarella, The Becket
Fund for Religious Liberty, Washington, D.C.,
for Intervenor-Defendant-Appellant The Little
Sisters of the Poor Jeanne Jugan Residence.

Kenneth J. Connelly (argued), David A.
Cortman, and Kevin H. Theriot, Alliance
Defending Freedom, Scottsdale, Arizona;

Gregory S. Baylor and Christen M. Price, Alliance Defending Freedom, Washington, D.C.; Brian R. Chavez-Ochoa, Chavez-Ochoa Law Offices Ins., Valley Springs, California; for Intervenor-Defendant-Appellant March for Life Education and Defense Fund.

Karli A. Eisenberg (argued) and Nimrod Pitsker Elias, Deputy Attorneys General; Kathleen Boergers, Supervising Deputy Attorney General; Michael L. Newman, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; William Tong, Attorney General; Maura Murphy Osborne, Assistant Attorney General; Office of the Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General; Ilona Kirshon, Deputy State Solicitor; Jessica M. Willey and David J. Lyons, Deputy Attorneys General; Delaware Department of Justice, Wilmington, Delaware; Karl A. Racine, Attorney General; Loren L. AliKhan, Solicitor General; Caroline S. Van Zile, Deputy Solicitor General; Graham E. Phillips, Assistant Attorney General; Office of the Attorney General, Washington, D.C.; Clare Connors, Attorney General; Erin Lau, Deputy Attorney General; Department of the Attorney General, Honolulu, Hawaii; Kwame Raoul, Attorney General; Elizabeth Morris, Assistant Attorney General; Office of the Attorney General, Chicago, Illinois; Brian E. Frosh, Attorney General; Steven M. Sullivan, Solicitor General; Kimberly S. Cammarata, Senior Assistant Attorney General; Attorney General's Office, Baltimore, Maryland; Keith Ellison, Attorney General; Jacob Campion, Assistant Attorney General; Office of the Attorney General, St. Paul, Minnesota; Letitia James, Attorney General;

Barbara D. Underwood, Solicitor General; Lisa Landau, Bureau Chief, Health Care Bureau; Steven C. Wu, Deputy Solicitor General; Ester Murdukhayeva, Assistant Solicitor General; Office of the Attorney General, New York, New York; Joshua H. Stein, Attorney General; Sripriya Narasimhan, Deputy General Counsel; Department of Justice, Raleigh, North Carolina; Peter F. Neronha, Attorney General; Michael W. Field, Assistant Attorney General; Office of the Attorney General, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General; Eleanor Spottswood, Assistant Attorney General; Attorney General's Office, Montpelier, Vermont; Mark R. Herring, Attorney General; Toby J. Heytens, Solicitor General; Samuel T. Towell, Deputy Attorney General; Office of the Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General; Jeffrey T. Sprung and Alicia O. Young, Assistant Attorneys General; Office of the Attorney General, Seattle, Washington; for Plaintiffs-Appellees.

Dwight G. Duncan, Colbe Mazzarella, North Dartmouth, Massachusetts, for Amici Curiae Residents and Families of Residents at Homes of the Little Sisters of the Poor.

Ken Paxton, Attorney General; Jeffrey C. Mateer, First Assistant Attorney General; Kyle D. Hawkins, Solicitor General; Jason R. LaFond, Assistant Solicitor General; Office of the Attorney General, Austin, Texas; Steve Marshall, Attorney General of Alabama; Leslie Rutledge, Attorney General of Arkansas; Christopher M. Garr, Attorney General of Idaho; Lawrence Wasden, Attorney General of Idaho; Jeff Landry, Attorney General of Louisiana; Eric Schmitt, Attorney General of Missouri; Tim Fox, Attorney General of

Montana; Doug Peterson, Attorney General of Nebraska; Mike Hunter, Attorney General of Oklahoma; Alan Wilson, Attorney General of South Carolina; Sean Reyes, Attorney General of Utah; Patrick Morrisey, Attorney General of West Virginia; for Amici Curiae States of Texas, Alabama, Arkansas, Georgia, Idaho, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Utah, and West Virginia.

Miles E. Coleman, Nelson Mullins Riley & Scarborough LLP, Greenville, South Carolina, for Amici Curiae Constitutional Law Scholars.

Stephanie N. Taub and Lea E. Patterson, First Liberty Institute, Plano, Texas, for Amicus Curiae First Liberty Institute.

Daniel L. Chen, Gibson Dunn & Crutcher LLP, San Francisco, California; Paul Collins and Robert E. Dunn, Gibson Dunn & Crutcher LLP, Palo Alto, California; for Amicus Curiae Religious Sisters of Mercy.

Elizabeth O. Gill, ACLU Foundation of Northern California, San Francisco, California; Minouche Kandel, ACLU Foundation of Southern California, Los Angeles, California; Brigitte Amiri, ACLU Foundation, New York, New York; David Loy, ACLU Foundation of San Diego & Imperial Counties, San Diego, California; for Amici Curiae American Civil Liberties Union, ACLU of Northern California, ACLU of Southern California, ACLU of San Diego and Imperial Counties, Anti-Defamation League, Leadership Conference on Civil and Human Rights, and National Urban League.

Priscilla Joyce Smith, Yale Law School, Brooklyn, New York, for Amicus Curiae

Program for the Study of Reproductive Justice at Yale Law School.

Jamie A. Levitt and Rhiannon N. Batchelder, Morrison & Foerster LLP, New York, New York, for Amici Curiae American Association of University Women, Service Employees International Union, and 16 Additional Professional, Labor, and Student Associations.

Diana Kasdan and Joel Dodge, Center for Reproductive Rights, New York, New York; Dariely Rodriguez, Dorian Spence, and Phylicia H. Hill, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; for Amici Curiae Center for Reproductive Rights, Lawyers' Committee for Civil Rights Under Law, California Women's Law Center, GLBTQ Legal Advocates & Defenders, Latinojustice PRLDEF, Lawyers for Civil Rights, Legal Momentum, Legal Voice, Mississippi Center for Justice, National Center for Lesbian Rights, Public Counsel, and Women's Law Project.

Maura Healey, Attorney General; Elizabeth N. Dewar, State Solicitor; Jonathan B. Miller, Jon Burke, and Julia E. Kobick, Assistant Attorneys General; Elizabeth Carnes Flynn, Special Assistant Attorney General; Office of the Attorney General, Boston, Massachusetts; Thomas J. Miller, Attorney General, Office of the Attorney General, Des Moines, Iowa; Aaron M. Frey, Attorney General, Office of the Attorney General, Augusta, Maine; Gurbir S. Grewal, Attorney General, Office of the Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General, Office of the Attorney General, Santa Fe, New Mexico; Josh Shapiro, Attorney General, Office of the Attorney General, Harrisburg, Pennsylvania;

for Amici Curiae Massachusetts, Iowa, Maine, New Jersey, New Mexico, and Pennsylvania.

Fatima Gross Graves, Gretchen Borchelt, Michelle Banker, and Sunu Chandy, National Women's Law Center, Washington, D.C.; Jane Liu, National Asian Pacific American Women's Forum, Washington, D.C.; Sequoia Ayala and Jill Heaviside, Sisterlove Inc., Atlanta, Georgia; Jeffrey Blumenfeld, Lowenstein Sandler LLP, Washington, D.C.; Naomi D. Barrowclough, Lowenstein Sandler LLP, Roseland, New Jersey; for Amici Curiae National Women's Law Center, National Latina Institute for Reproductive Health, Sisterlove Inc., and National Asian Pacific American Women's Forum.

Bruce H. Schneider, Michele L. Pahmer, and Giliana Keller, Stroock & Stroock & Lavan LLP, New York, New York, for Amici Curiae Brief of Health Professional Organizations, American Nurses Association, American College of Obstetricians and Gynecologists, American Academy of Nursing, American Academy of Pediatrics, Physicians for Reproductive Health, and California Medical Association.

Leah R. Bruno, Alan S. Gilbert, Cicely R. Miltich, and Jacqueline A. Giannini, Dentons US LLP, Chicago, Illinois; Joel D. Siegel, Dentons US LLP, Los Angeles, California; for Amici Curiae U.S. Women's Chamber of Commerce and National Association for Female Executives.

Cindy Nesbit, The Sikh Coalition, New York, New York; Sirine Shebaya, Nimra Azmi, Muslim Advocates, Washington, D.C.; Richard B. Katskee, Carmen N. Green, and Alison Tanner, Americans United for Separate of Church and State; for Amici Curiae Religious and Civil-Rights Organizations.

Barbara J. Parker, City Attorney; Maria Bee, Erin Bernstein, Malia McPherson, and Caroline Wilson; Office of the City Attorney, Oakland, California; James R. Williams, County Counsel; Greta S. Hansen, Laura S. Trice, and Lorraine Van Kirk, San Jose, California; Office of the County Counsel, San Jose, California; for Amici Curiae 14 Cities, Counties, and Local Agencies.

Appeals from the United States District Court for the Northern District of California, Haywood S. Gilliam, Jr., District Judge, Presiding, D.C. No. 4:17-cv-05783-HSG

Before: J. Clifford Wallace, Andrew J. Kleinfeld, and Susan P. Graber, Circuit Judges.

Dissent by Judge Kleinfeld

**OPINION**

WALLACE, Circuit Judge:

**\*1** The Affordable Care Act (ACA) and the regulations implementing it require group health plans to cover contraceptive care without cost sharing. Federal agencies issued final rules exempting employers with religious and moral objections from this requirement. The district court issued a preliminary injunction barring the enforcement of the rules in several states. We have jurisdiction under 28 U.S.C. § 1292, and we affirm.

I.

We recounted the relevant background in a prior opinion. *See California v. Azar*, 911 F.3d 558, 566–68 (9th Cir. 2018). We reiterate it here as necessary to resolve this appeal.

The ACA provides:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for ... with respect to women, such additional preventive care and screenings ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA] ....

42 U.S.C. § 300gg-13(a)(4) (also known as the Women's Health Amendment). HRSA established guidelines for women's preventive care that include any "[FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling." Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725-01, 8,725 (Feb. 15, 2012). The three agencies responsible for implementing the ACA—the Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (collectively, agencies)—issued regulations requiring coverage of all preventive care contained in HRSA's guidelines.[1] *See, e.g.*, 45 C.F.R. § 147.130(a)(1)(iv).

The agencies also recognized that religious organizations may object to the use of contraceptive care and to the requirement to offer insurance that covers such care. For those organizations, the agencies provide two avenues for alleviating those objections. First, group health plans of certain religious employers, such as churches, are categorically exempt from the contraceptive care requirement. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,874 (July 2, 2013). Second, nonprofit "eligible organizations" that are not categorically exempt can opt out of having to "contract, arrange, pay, or refer for contraceptive coverage." *Id.* To be eligible, the organization must file a self-certification form stating (1) that it "opposes providing coverage for some or all of any contraceptive services required to be covered under [the regulation] on account of religious objections," (2) that it "is organized and operates as a nonprofit entity," and (3) that it "holds itself out as a religious organization." *Id.* at 39,893. The organization sends a copy of the form to its insurance issuer or third-party administrator (TPA), which must then provide contraceptive care for the organization's employees without any further involvement by the organization. *Id.* at 39,875–76. The regulations refer to this second avenue

as the "accommodation," and it was designed to avoid imposing on organizations' beliefs that paying for or facilitating coverage for contraceptive care violates their religion. *Id.* at 39,874.

**\*3** The agencies later amended the accommodation process in response to legal challenges. First, certain closely-held for-profit organizations became eligible for the accommodation. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318-01, 41,343 (July 14, 2015); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 736, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). Second, instead of directly sending a copy of the self-certification form to the issuer or TPA, an eligible organization could simply notify the Department of Health and Human Services in writing, which then would inform the issuer or TPA of its regulatory obligations. 80 Fed. Reg. at 41,323; *see also Wheaton Coll. v. Burwell*, 573 U.S. 958, 134 S. Ct. 2806, 2807, 189 L.Ed.2d 856 (2014).

Various organizations then challenged the amended accommodation process as a violation of the Religious Freedom Restoration Act (RFRA). The actions reached the Supreme Court, and the Supreme Court vacated and remanded to afford the parties "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage." *Zubik v. Burwell*, ––– U.S. ––––, 136 S. Ct. 1557, 1560, 194 L.Ed.2d 696 (2016) (internal quotation marks and citation omitted). The Court "express[ed]

no view on the merits of the cases," and did not decide "whether petitioners' religious exercise has been substantially burdened, whether the [g]overnment has a compelling interest, or whether the current regulations are the least restrictive means of serving that interest." *Id.*

The agencies solicited comments on the accommodation process in light of *Zubik*, but ultimately declined to make further changes. *See* Dep't of Labor, FAQs About Affordable Care Act Implementation Part 36, at 4, www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf. The agencies concluded, in part, that "the existing accommodation regulations are consistent with RFRA" because "the contraceptive-coverage requirement [when viewed in light of the accommodation] does not substantially burden the[ ] exercise of religion." *Id.*

On May 4, 2017, the President issued an executive order directing the secretaries of the agencies to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to" the ACA's contraceptive care requirement. Promoting Free Speech and Religious Liberty, Exec. Order No. 13,798, 82 Fed. Reg. 21,675, 21,675 (May 4, 2017). Thereafter, effective October 6, 2017, the agencies effectuated two interim final rules (IFRs) which categorically exempted certain entities from the contraceptive care requirement. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,792 (Oct. 13, 2017); Moral Exemptions and Accommodations for

Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838-01, 47,838 (Oct. 13, 2017). The first exempted all entities "with sincerely held religious beliefs objecting to contraceptive or sterilization coverage" and made the accommodation optional for them. 82 Fed. Reg. at 47,808. The second exempted "additional entities and persons that object based on sincerely held moral convictions," "expand[ed] eligibility for the accommodation to include organizations with sincerely held moral convictions concerning contraceptive coverage," and made the accommodation optional for those entities. 82 Fed. Reg. at 47,849.

 *4  California, Delaware, Maryland, New York, and Virginia sued the agencies and their secretaries, seeking to enjoin the enforcement of the IFRs and alleging that they are invalid under the Administrative Procedure Act (APA). The district court, in relevant part, held that the plaintiff states had standing to challenge the IFRs and issued a nationwide preliminary injunction based on the states' likelihood of success on their procedural APA claim —that the IFRs were invalid for failing to follow notice and comment rulemaking. After issuing the injunction, the district court allowed Little Sisters of the Poor, Jeanne Jugan Residence (Little Sisters) and March for Life Education and Defense Fund (March for Life) to intervene.

We affirmed the district court except as to the nationwide scope of the injunction. See California, 911 F.3d at 585. We limited the geographic scope of the injunction to the states that were plaintiffs in the case.

See id. Shortly after the panel issued the opinion, the final rules became effective on January 14, 2019, superseding the IFRs. See Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536-01, 57,536 (Nov. 15, 2018); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,592-01, 57,592 (Nov. 15, 2018). The final rules made "various changes ... to clarify the intended scope of the language" in "response to public comments," 83 Fed. Reg. at 57,537, 57,593. However, the parties agree that the final rules are materially identical to the IFRs for the purposes of this appeal.

The plaintiff states then amended their complaint to enjoin the enforcement of the final rules. They alleged a number of claims, including that the rules are substantively invalid under the APA. The amended complaint joined as plaintiffs the states of Connecticut, Hawaii, Illinois, Minnesota, North Carolina, Rhode Island, Vermont, and Washington, and the District of Columbia. The district court determined that the final rules were likely invalid as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and issued a preliminary injunction. In light of the concerns articulated in our prior opinion, see California, 911 F.3d at 582–84, the geographic scope of the injunction was limited to the plaintiff states. The district court then proceeded to ready the case for trial. The agencies, Little Sisters, and March for Life appeal from the preliminary injunction.

## II.

We review standing de novo. *See Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017). We review a preliminary injunction for abuse of discretion. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011). "In deciding whether the district court has abused its discretion, we employ a two-part test: first, we 'determine de novo whether the trial court identified the correct legal rule to apply to the relief requested'; second, we determine 'if the district court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.' " *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1104 (9th Cir. 2010)). The review is highly deferential: we must "uphold a district court determination that falls within a broad range of permissible conclusions in the absence of an erroneous application of law," and we reverse "only when" we are "convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012) (first quoting *Grant v. City of Long Beach*, 315 F.3d 1081, 1091 (9th Cir. 2002); then quoting *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000)).

## III.

**\*5** We again hold that the plaintiff states have standing to sue. As the agencies properly recognize, our prior decision and its underlying reasoning foreclose any arguments otherwise. *See California*, 911 F.3d at 570–74; *Nordstrom v. Ryan*, 856 F.3d 1265, 1270–71 (9th Cir. 2017) (holding that, where a panel previously held in a published opinion that the plaintiff has standing, that ruling is binding under "both the law-of-the-case doctrine and our law-of-the-circuit rules"); *see also Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 951 (9th Cir. 2019) ("[L]aw of the case doctrine generally precludes reconsideration of an issue that has already been decided by the same court, or a higher court in the identical case"); *Miranda v. Selig*, 860 F.3d 1237, 1243 (9th Cir. 2017) ("[U]nder the law-of-the-circuit rule, we are bound by decisions of prior panels[ ] unless an en banc decision, Supreme Court decision, or subsequent legislation undermines those decisions" (internal quotation marks and alterations omitted)).

Little Sisters and March for Life have not identified any new factual or legal developments since our prior decision that require us to reconsider standing here. To the contrary, a recent decision by the Supreme Court strongly supports our previous holding that the plaintiff states have standing. In *Department of Commerce v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2566, 204 L.Ed.2d 978 (2019), the Supreme Court held that the plaintiff states had standing, even though their claims of harm depended on unlawful conduct of third parties, because their theory of standing "relies ... on the predictable effect of Government action on the decisions of third parties." *See also id.* ("Article III requires no more than *de facto* causality" (internal quotation marks omitted)). Here, the plaintiff

states' theory of causation depends on wholly lawful conduct and on the federal government's *own* prediction about the decisions of third parties. *See California*, 911 F.3d at 571–73.

IV.

The thoughtful dissent suggests that this appeal is moot because, the day after the district court issued its injunction of limited scope, covering the territory of the thirteen plaintiff states plus the District of Columbia, a district court in Pennsylvania issued a similar nationwide injunction. *See Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 835 (E.D. Pa.), *aff'd* 930 F.3d 543 (3d Cir.), *petition for cert. filed*, ––– U.S.L.W. ––– (U.S. Oct. 1, 2019) (No. 19-431). According to the dissent, the nationwide injunction prevents us from giving effective relief to the parties here and, accordingly, moots this appeal. We ordered supplemental briefing on whether this appeal is moot, and the parties unanimously agreed that this appeal is not moot despite the nationwide injunction from Pennsylvania. We agree.

As an initial matter, to our knowledge, no court has adopted the view that an injunction imposed by one district court against a defendant deprives every other federal court of subject matter jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the same defendant. Instead, "in practice, nationwide injunctions do not always foreclose percolation." Spencer E. Amdur & David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 Harv. L. Rev. F. 49, 53 (2017). For example, both this court and the Fourth Circuit recently "reviewed the travel

bans, despite nationwide injunctions in both." *Id.* at n.27.

The dissent appears to raise the "potentially serious problem" of "conflicting injunctions" that arise from the "forum shopping and decisionmaking effects of the national injunction." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 462–63 (2017). Although courts have addressed this problem in the past, no court has done so based on justiciability principles.

**\*6** For example, we have held that, "[w]hen an injunction sought in one proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases." *Bergh v. Washington*, 535 F.2d 505, 507 (9th Cir. 1976). Significantly, however, the attempt "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result" has always been a prudential concern, not a jurisdictional one. *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA*, 751 F.2d 721, 729 (5th Cir. 1985).

The dissent claims that the majority is "making the same mistake today that we made in *Yniguez v. Arizonans for Official English*, when in our zeal to correct what we thought was a wrong, we issued an injunction on behalf of an individual regarding her workplace." Dissent at —— (footnote omitted). *Yniguez* is inapposite.

There, the United States Supreme Court reversed our decision, holding that the plaintiff's "changed circumstances—her resignation from public sector employment to pursue work in the private sector—mooted the case stated in her complaint." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 72, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Here, by contrast, the facts and circumstances supporting the preliminary injunction have not materially changed such that we are unable to affirm the relief that the plaintiff states seek to have affirmed. This is therefore not a case in which "the activities sought to be enjoined already have occurred, and the appellate courts cannot undo what has already been done" such that "the action is moot, and must be dismissed." *Foster v. Carson*, 347 F.3d 742, 746 (9th Cir. 2003) (quoting *Bernhardt v. Cty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002)). Article III simply requires that our review provide redress for the asserted injuries, which the district court's preliminary injunction achieves.

The dissent's logic also proves too much. If a court lacks jurisdiction to consider the propriety of an injunction over territory that is already covered by a different injunction, then the Pennsylvania district court lacked jurisdiction to issue an injunction beyond the territory of the thirty-seven states not parties to this case. After all, when the Pennsylvania district court issued its injunction, the district court here had issued its injunction of limited geographic scope. We hesitate to apply a rule that means that the Pennsylvania district court plainly acted beyond its jurisdiction. At most, then, the dissent's reasoning would lead us to conclude that the Pennsylvania

injunction is limited in scope to the territory of those thirty-seven non-party states. Under that interpretation, the two injunctions complement each other and do not conflict.

In any event, even if the Pennsylvania injunction has a fully nationwide scope, we nevertheless retain jurisdiction under the exception to mootness for cases capable of repetition, yet evading review. "A dispute qualifies for that exception only if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *United States v. Sanchez-Gomez*, ––– U.S. ––––, 138 S. Ct. 1532, 1540, 200 L.Ed.2d 792 (2018) (internal quotation marks and citation omitted). The first part is indisputably met here because the interval between the limited injunction and the nationwide injunction was one day—clearly "too short [for the preliminary injunction] to be fully litigated prior to its cessation or expiration." *Id.* (quoting *Turner v. Rogers*, 564 U.S. 431, 439–40, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011)).

**\*7** The second part, too, is met because there is a reasonable expectation that the federal defendants will, again, be subjected to the injunction in this case. *See Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011) (applying the "capable of repetition" exception on appeal from a preliminary injunction and querying whether the defendant would again be subjected to a preliminary injunction). In the Pennsylvania case, a petition for certiorari challenges, among other things, the nationwide

scope of the Pennsylvania injunction. *See* Petition for Writ of Certiorari, *Little Sisters v. Pennsylvania*, at 31–33 (No. 19-431). Given the recent prominence of the issue of nationwide injunctions, the Supreme Court very well may vacate the nationwide scope of the injunction. *See* Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065, 1119 (2018) (collecting arguments for and against nationwide injunctions against the backdrop of "the recent surge in nationwide injunctions").

But no matter what action, if any, the Supreme Court takes, the preliminary injunction in the Pennsylvania case is, like all preliminary injunctions, of *limited duration*. Once the Pennsylvania district court rules on the merits of that case, the preliminary injunction will expire. At that point, the federal defendants will once again be subjected to the injunction in this case.

One possibility is to the contrary: the Pennsylvania district court could rule in favor of the plaintiffs, choose to exercise its discretion to issue a permanent injunction, *and* choose to exercise its discretion to give the permanent injunction nationwide effect despite the existence of an injunction in this case. That mere possibility does not, however, undermine our conclusion that, given the many other possible outcomes in the Pennsylvania case, there remains a "reasonable expectation" that the federal defendants will be subjected to the injunction in this case. A "reasonable expectation" does not demand certainty.

We acknowledge that we are in uncharted waters. The Supreme Court has yet to

address the effect of a nationwide preliminary injunction on an appeal involving a preliminary injunction of limited scope. Our approach to mootness in this case is consistent with the Supreme Court's interest in allowing the law to develop across multiple circuits. If, of course, our assessment of jurisdiction is incorrect such that, for example, we should stay this appeal pending the outcome in Pennsylvania, then we welcome guidance from the Supreme Court. Under existing precedent, however, we conclude that this appeal is not moot.

V.

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). "A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.' " *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365). Alternatively, an injunction may issue where the likelihood of success is such that "serious questions going to the merits" were raised and the balance of hardships "tips sharply toward the plaintiff," provided that the plaintiff can also demonstrate the other two *Winter* factors. *Alliance for the*

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

The district court issued its injunction after concluding that all four factors were met here. We address each factor in turn.

### A.

The APA requires that an agency action be held "unlawful and [be] set aside" where it is "arbitrary, capricious," "not in accordance with the law," or "in excess of statutory jurisdiction." 5 U.S.C. § 706(2). The district court concluded that the plaintiff states are likely to succeed on the merits of their APA claim or, at the very least, raised serious questions going to the merits. In particular, the district court determined that the agencies likely lacked the authority to issue the final rules and that the rules likely are arbitrary and capricious. The district court did not abuse its discretion in so concluding.

### 1.

**\*8** "[A]n agency literally has no power to act ... unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). In reviewing the scope of an agency's authority to act, "the question ... is always whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington v. FCC*, 569 U.S. 290, 297–98, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013). The agencies have determined that the ACA gives them

"significant discretion to shape the content, scope, and enforcement of any preventative-services guidelines adopted" pursuant to the Women's Health Amendment. Specifically, the agencies highlight that "nothing in the statute mandated that the guidelines include contraception, let alone for all types of employers with covered plans."

We examine the "plain terms" and "core purposes" of the Women's Health Amendment to determine whether the agencies have authority to issue the final rules. *FERC v. Elec. Power Supply Ass'n*, ––– U.S. ––––, 136 S. Ct. 760, 773, 193 L.Ed.2d 661 (2016). The statute requires that group health plans and insurance issuers "shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for ... with respect to women, such additional preventive care and screenings ... as provided for in the comprehensive guidelines supported by [HRSA]." 42 U.S.C. § 300gg-13(a)(4). First, "shall" is a mandatory term that "normally creates an obligation impervious to ... discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). By its plain language, the statute states that group health plans and insurance issuers must cover preventative care without cost sharing. *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91, 127 S.Ct. 638, 166 L.Ed.2d 494 (2006) ("[S]tatutory terms are generally interpreted in accordance with their ordinary meaning").

The statute grants HRSA the limited authority to determine which, among the different types of preventative care, are to be covered. *See Hobby Lobby*, 573 U.S. at 697, 134 S.Ct.

2751 ("Congress itself, however, did not specify what types of preventive care must be covered .... Congress authorized [HRSA] ... to make that important and sensitive decision"). But nothing in the statute permits the agencies to determine exemptions from the requirement. In other words, the statute delegates to HRSA the discretion to determine *which types of preventative care* are covered, but the statute does not delegate to HRSA or any other agency the discretion to exempt *who must meet the obligation*. To interpret the statute's limited delegation more broadly would contradict the plain language of the statute. *See Arlington*, 569 U.S. at 296, 133 S.Ct. 1863 ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion"). Although the agencies argue otherwise, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *MCI Telecomms Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

Our interpretation is consistent with the ACA's statutory scheme. When enacting the ACA, Congress did provide for religious and moral protections in certain contexts. *See, e.g.*, 42 U.S.C. § 18113 (assisted suicide procedures). It did not provide for similar protections regarding the preventative care requirement. Instead, Congress chose to provide for other exceptions to that requirement, such as for grandfathered plans. *See* 42 U.S.C. § 18011. "[W]hen Congress provides exceptions in a statute, ... [t]he proper inference ... is that Congress considered the issue of exceptions and, in the end, limited that statute to the

ones set forth." *United States v. Johnson*, 529 U.S. 53, 58, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000). In fact, after the ACA's passage, the Senate considered and rejected a "conscience amendment," 158 Cong. Rec. S538–39 (Feb. 9, 2012); *id.* at S1162–73 (Mar. 1, 2012), that would have allowed health plans to decline to provide contraceptive coverage contrary to asserted religious or moral convictions. *See Doe v. Chao*, 540 U.S. 614, 622, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004) (reversing award of damages, in part, because of "drafting history showing that Congress cut out the very language in the bill that would have authorized [them]"). While Congress's failure to adopt a proposal is often a "particularly dangerous ground on which to rest an interpretation" of a statute, *Interstate Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187, 114 S.Ct. 1439 (1994), the conscience amendment's failure combined with the existence of other exceptions suggests that Congress did not contemplate a conscience exception when it passed the ACA.

**\*9** The "core purpose[ ]" of the Women's Health Amendment further confirms our interpretation. *FERC*, 136 S. Ct. at 773; *see also Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 468 U.S. 137, 143, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) ("A reviewing court 'must reject administrative constructions of [a] statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement' " (quoting *FEC v. Democratic Senatorial Campaign Comm'n*, 454 U.S. 27, 32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981))). The legislative history indicates that the

Amendment sought to "requir[e] that all health plans cover comprehensive women's preventative care and screenings—and cover these recommended services at little or no cost to women." 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer); *id.* at S12028 (Sen. Murray highlighting that a "comprehensive list of women's preventive services will be covered"); *id.* at S12042 (Sen. Harkin stating that "[b]y voting for this amendment ... we can ensure that all women will have access to the same baseline set of comprehensive preventive benefits"). While legislators' individual comments do not necessarily prove intent of the majority of the legislature, here the Amendment's supporters and sponsors delineated that the types of "preventive services covered ... would be determined by [HRSA] to meet the unique preventative health needs of women." *Id.* at S12025 (Sen. Boxer); *see also id.* at S12027 (Sen. Gillibrand stating that "[t]his amendment will ensure that the coverage of women's preventive services is based on a set of guidelines developed by women's health experts"); *id.* at S12026 (Sen. Mikulski stating that "[i]n my amendment we expand the key preventive services for women, and we do it in a way that is based on recommendations ... from HRSA"). In this case, at the preliminary injunction stage, the evidence is sufficient for us to hold that providing free contraceptive services was a core purpose of the Women's Health Amendment.

In response, the appellants highlight that they have already issued rules exempting churches from the contraceptive care requirement, invoking the same statutory provision. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46621-01, 46,623 (Aug. 3, 2011). The legality of the church exemption rules is not before us, and we will not render an advisory opinion on that issue. *See Alameda Conservation Ass'n v. California*, 437 F.2d 1087, 1093 (9th Cir. 1971). Moreover, the existence of one exemption does not necessarily justify the authority to issue a different exemption or any other exemption that the agencies decide. *Cf. California*, 911 F.3d at 575–76 (stating that "prior invocations of good cause to justify different IFRs—the legality of which are not challenged here—have no relevance").

Given the text, purpose, and history of the Women's Health Amendment, the district court did not err in concluding that the agencies likely lacked statutory authority under the ACA to issue the final rules.

2.

Under RFRA, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). The appellants argue that the regulatory regime that existed before the rules' issuance—i.e., the accommodation process—violated RFRA. They argue that RFRA requires, or at least authorizes, them to eliminate the violation by issuing the religious

exemption [2] and "not simply wait for the inevitable lawsuit and judicial order to comply with RFRA."

As a threshold matter, we question whether RFRA delegates to any government agency the authority to determine violations and to issue rules addressing alleged violations. At the very least, RFRA does not make such authority explicit. *Compare* 42 U.S.C. § 2000bb-1, *with* 47 U.S.C. § 201(b) (delegating agency authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act"), *and* 15 U.S.C. § 77s(a) ("The Commission shall have authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this subchapter"). Instead, RFRA appears to charge the *courts* with determining violations. *See* 42 U.S.C. § 2000bb-1(c) (providing that a person whose religious exercise has been burdened "may assert that violation ... in a *judicial proceeding*" (emphasis added)); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) ("RFRA makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress").

**\*10** Moreover, even assuming that agencies are authorized to provide a mechanism for resolving perceived RFRA violations, RFRA likely does not authorize the religious exemption at issue in this case, for two independent reasons. First, the religious exemption *contradicts* congressional intent that all women have access to appropriate preventative care. The religious exemption is

thus notably distinct from the accommodation, which attempts to accommodate religious objectors *while still meeting* the ACA's mandate that women have access to preventative care. The religious exemption here chooses winners and losers between the competing interests of two groups, a quintessentially legislative task. Strikingly, Congress already chose a balance between those competing interests and chose both to mandate preventative care and to reject religious and moral exemptions. The agencies cannot *reverse* that legislatively chosen balance through rulemaking.

Second, the religious exemption operates in a manner fully at odds with the careful, individualized, and searching review mandate by RFRA. Federal courts accept neither self-certifications that a law substantially burdens a plaintiff's exercise of religion nor blanket assertions that a law furthers a compelling governmental interest. Instead, before reaching those conclusions, courts make individualized determinations dependent on the facts of the case, by "careful[ly]" considering the nature of the plaintiff's beliefs and "searchingly" examining the governmental interest. *Wisconsin v. Yoder*, 406 U.S. 205, 215, 221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). "[C]ontext matters." *Cutter v. Wilkinson*, 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005); *see O Centro*, 546 U.S. at 430–31, 126 S.Ct. 1211 ("RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened" (quoting 42 U.S.C. § 2000bb-1(b));

*Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1015–17 (9th Cir. 2016) (holding that, although plaintiffs in other cases had established that a prohibition on the use of certain drugs was a substantial burden on those plaintiffs' exercise of religion, the plaintiffs in this case had not met their burden of establishing that the prohibition on cannabis use imposed a substantial burden on the plaintiffs' exercise of religion). In sum, the agencies here claim an authority under RFRA —to impose a blanket exemption for self-certifying religious objectors—that far exceeds what RFRA in fact authorizes.[3] *See Hobby Lobby*, 573 U.S. at 719 n.30, 134 S.Ct. 2751 (noting that a proposed "blanket exemption" for religious objectors "extended more broadly than the ... protections of RFRA" because it "would not have subjected religious-based objections to the judicial scrutiny called for by RFRA, in which a court must consider not only the burden of a requirement on religious adherents, but also the government's interest and how narrowly tailored the requirement is").

Regardless of our questioning of the agencies' authority pursuant to RFRA, however, it is of no moment in this appeal because the accommodation process likely does not substantially burden the exercise of religion and hence does not violate RFRA. "[A] 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit ... or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008); *see also Kaemmerling v. Lappin*, 553 F.3d 669,

678 (D.C. Cir. 2008) ("An inconsequential or de minimis burden on religious practice" is not a substantial burden). Whether a government action imposes a substantial burden on sincerely-held religious beliefs is a question of law. *Guam v. Guerrero*, 290 F.3d 1210, 1222 n.20 (9th Cir. 2002).

**\*11** The Supreme Court has not yet decided whether the accommodation violates RFRA. In *Hobby Lobby*, the Court suggested that it did not. The Court described the accommodation as "effectively exempt[ing] certain religious nonprofit organizations ... from the contraceptive mandate." 573 U.S. at 698, 134 S.Ct. 2751. The Court characterized the accommodation as "an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs." *Id.* at 730, 134 S.Ct. 2751. It observed that, "[a]t a minimum, [the accommodation did] not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well." *Id.* at 731, 134 S.Ct. 2751. Specifically, it highlighted that, "[u]nder the accommodation, the plaintiffs' female employees would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to 'face minimal logistical and administrative obstacles ... because their employers' insurers would be responsible for providing information and coverage." *Id.* at 732, 134 S.Ct. 2751 (citing 45 CFR §§ 147.131(c)–(d)).

Indeed, before *Zubik*, eight courts of appeals (of the nine to have considered the issue) had

concluded that the accommodation process did not impose a substantial burden on religious exercise under RFRA.[4] The Supreme Court then vacated the nine circuit cases addressing the issue without discussing the merits. *See, e.g.*, *Zubik*, 136 S. Ct. at 1560. After *Zubik*, the Third Circuit has reiterated that the accommodation process did not impose a substantial burden under RFRA. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 356 n.18 (3d Cir. 2017) ("Although our judgment in *Geneva* was vacated by the Supreme Court, it nonetheless sets forth the view of our [c]ourt, which was based on Supreme Court precedent, that we continue to believe to be correct regarding ... our conclusion that the regulation at issue there did not impose a substantial burden").

We have not previously expressed any views on the matter, whether before or after *Zubik*. We now hold that the accommodation process likely does not substantially burden the exercise of religion. An organization with a sincere religious objection to arranging contraceptive coverage need only send a self-certification form to the insurance issuer or the TPA, or send a written notice to DHHS. *See* 29 C.F.R. § 2590.715-2713A(b)(1)(ii). Once the organization has taken the simple step of objecting, all actions taken to pay for or provide the organization's employees with contraceptive care is carried out by a third party, i.e., insurance issuer or TPA. *See, e.g.*, 45 C.F.R. § 147.131(d) (requiring that the issuer or third-party administrator notify the employees in separate mailing that that it will be providing contraceptive care separate from the employer, with the mailing specifying that employer is in no way "administer[ing]

or fund[ing]" the contraceptive care); 45 C.F.R. § 147.131(d) (prohibiting third parties from directly or indirectly charging objecting organizations for the cost of contraceptive coverage and obligating the third parties to pay for the contraceptive care).

**\*12** Once it has opted out, the organization's obligation to contract, arrange, pay, or refer for access to contraception is completely shifted to third parties. The organization may then freely express its opposition to contraceptive care. Viewed objectively, completing a form stating that one has a religious objection is not a substantial burden—it is at most a de minimis burden. The burden is simply a notification, after which the organization is relieved of any role whatsoever in providing objectionable care. By contrast, cases involving substantial burden under RFRA have involved more significant burdens on religious objectors. *See O Centro*, 546 U.S. at 425–26, 126 S.Ct. 1211 (substantial burden where the Controlled Substances Act prevented the religious objector plaintiffs from ever again engaging in a sacramental ritual); *Hobby Lobby*, 573 U.S. at 719–26, 134 S.Ct. 2751 (substantial burden, *in the absence of the accommodation*, where the contraceptive care requirement required for-profit corporations to pay out-of-pocket for the use of religiously-objectionable contraceptives by employees).

Appellants further argue that religious organizations are forced to be complicit in the provision of contraceptive care, even with the accommodation. But even in the context of a self-insured plan subject to ERISA, an objecting organization's only act—and the only act required by the government—is opting

out by form or notice. The objector need not separately contract to provide or fund contraceptive care. The accommodation, in fact, is designed to ensure such organizations are not complicit and to minimize their involvement. To the extent that appellants object to third parties acting in ways contrary to an organization's religious beliefs, they have no recourse. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (government action does not constitute a substantial burden, even if the challenged action "would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs," if the government action does not coerce the individuals to violate their religious beliefs or deny them "the rights, benefits, and privileges enjoyed by other citizens"). RFRA does not entitle organizations to control their employees' relationships with third parties that are willing and obligated to provide contraceptive care.

Because appellants likely have failed to demonstrate a substantial burden on religious exercise, we need not address whether the government has shown a compelling interest or whether it has adopted the least restrictive means of advancing that interest. *See Forest Serv.*, 535 F.3d at 1069. Because the accommodation process likely does not violate RFRA, the final rules are neither required by, nor authorized under, RFRA.[5] The district court did not err in so concluding.

3.

"Unexplained inconsistency" between an agency's actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). A rule change complies with the APA if the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (emphasis omitted); *see also Encino Motorcars, LLC v. Navarro*, ––– U.S. ––––, 136 S. Ct. 2117, 2124–26, 195 L.Ed.2d 382 (2016) (describing these principles).

**\*13** The district court held that the states are also likely to prevail on their claim that the agencies failed to provide "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy." We need not reach this issue, having already concluded that no statute likely authorized the agencies to issue the final rules and that the rules were thus impermissible. We will reach the full merits of this issue, if necessary, upon review of the district court's decision on the permanent injunction

## B.

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22, 129 S.Ct. 365 (emphasis omitted). The analysis focuses on irreparability, "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999).

The district court concluded that the states are likely to suffer irreparable harm absent an injunction. This decision was not an abuse of discretion. As discussed in our prior opinion, the plaintiff states will likely suffer economic harm from the final rules, and such harm is irreparable because the states will not be able to recover monetary damages flowing from the final rules. *California*, 911 F.3d at 581. This harm is not speculative; it is sufficiently concrete and supported by the record. *Id.*

## C.

Because the government is a party, we consider the balance of equities and the public interest together. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The district court concluded that the balance of equities tips sharply in favor of the plaintiff states and that the public interest tip in favor of granting the preliminary injunction. We have considered the district court's analysis carefully, and we hold there is no basis to conclude that its decision was illogical, implausible, or without support in the record. Finalizing that issue must await any appeal from the district court's permanent injunction.

## VI.

We affirm the preliminary injunction, but we emphasize that our review here is limited to abuse of discretion. Because of the limited scope of our review and "because the fully developed factual record may be materially different from that initially before the district court," our disposition is only preliminary. *Melendres v. Arpaio*, 695 F.3d 990, 1003 (9th Cir. 2012) (quoting *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982)). At this stage, "[m]ere disagreement with the district court's conclusions is not sufficient reason for us to reverse the district court's decision regarding a preliminary injunction." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005). The injunction only preserves the status quo until the district court renders judgment on the merits based on a fully developed record.

**AFFIRMED.**

KLEINFELD, Senior Circuit Judge, dissenting

I respectfully dissent. This case is moot, so we lack jurisdiction to address the merits.

The casual reader may imagine that the dispute is about provision of contraception and abortion services to women. It is not. No woman sued for an injunction in this case, and no affidavits have been submitted from any women establishing any question in this

case about whether they will be deprived of reproductive services or harmed in any way by the modification of the regulation.

This case is a claim by several states to prevent a modification of a regulation from going into effect, claiming that it will cost them money. Two federal statutes are at issue, the Affordable Care Act [1] and the Religious Freedom Restoration Act, [2] as well as the Trump Administration's modification of an Obama Administration regulation implementing the Affordable Care Act. But the injunction before us no longer matters, because a national injunction is already in effect, and has been since January 14 of this year, preventing the modification from going into effect. [3] Nothing we say or do in today's decision has any practical effect on the challenged regulation. We are racing to shut a door that has already been shut. We are precluded, by the case-or-controversy requirement of Article III, section 2, from opining on whether the door ought to be shut. We are making the same mistake today that we made in *Yniguez v. Arizonans for Official English*, [4] when in our zeal to correct what we thought was a wrong, we issued an injunction on behalf of an individual regarding her workplace. She no longer worked there, so the Supreme Court promptly corrected our error because the case was moot.

**\*14** The case arises from the difficulty of working out the relationship between the two statutes, the regulations under the Affordable Care Act, and a sequence of Supreme Court decisions bearing on how the tensions between the two statutes ought to be relieved. The Affordable Care Act does not say a word about contraceptive or sterilization services for women. Congress delegated to the executive branch the entire matter of "such additional preventive care and screenings" as the executive agencies might choose to provide for.

Executive branch agencies, within the Department of Health and Human Services, created from this wide-open congressional delegation what is called "the contraceptive mandate." Here is the statutory language:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for–
>
> ...
>
> with respect to women, such additional preventive care and screenings ... *as provided for* in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph. [5]

In 2011, the agencies (not Congress) issued the guideline applying the no-cost-sharing statutory provision to contraceptive and sterilization services. And since then, the public fervor and litigation has never stopped.

The agencies decided that an exemption ought to be created for certain religious organizations. An interim rule doing so was promulgated in 2011, after the agencies "received considerable feedback" from the public, [6] then in 2012, after hundreds of thousands more comments, the agencies modified the rule. The Supreme

Court weighed in on the ongoing controversy about the religious accommodation exemption to the contraceptives mandate three times, in *Burwell v. Hobby Lobby*,[7] *Wheaton College v. Burwell*,[8] *and Zubik v. Burwell*,[9] in 2014 and 2016. None of the decisions entirely resolved the tension between the Religious Freedom Restoration Act and the Affordable Care Act as extended by the contraceptive mandate regulations. The Court instead gave the parties "an opportunity to arrive at an approach going forward that accommodate petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage."[10] Thousands of comments kept coming to the agencies. After *Zubik*, the agencies basically said they could not do what the Supreme Court said to do: "no feasible approach ... would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage."[11] But in 2017, after an executive order directing the agencies to try again, the agencies did so, issuing the interim final rules at issue in our previous decision[12] and the final rule at issue now.

**\*15** The reason why the case before us is moot is that operation of the new modification to the regulation has itself already been enjoined. The District Court for the Eastern District of Pennsylvania issued a nationwide injunction on January 14 of this year, enjoining enforcement of the regulation before us.[13] The Third Circuit affirmed that nationwide injunction on July 12 of this year.[14] That nationwide injunction means that the preliminary injunction before

us is entirely without effect. If we affirm, as the majority does, nothing is stopped that the Pennsylvania injunction has not already stopped. Were we to reverse, and direct that the district court injunction be vacated, the rule would still not go into effect, because of the Pennsylvania injunction. Nothing the district court in our case did, or that we do, matters. We are talking to the air, without practical consequence. Whatever differences there may be in the reasoning for our decision and the Third Circuit's have no material significance, because they do not change the outcome at all; the new regulation cannot come into effect.

When an appeal becomes moot while pending, as ours has, the court in which it is being litigated must dismiss it.[15] The Supreme Court has repeatedly held that "[t]o qualify as a case for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.' "[16] "It is true, of course, that mootness can arise at any stage of litigation, ... that federal courts may not give opinions upon moot questions or abstract propositions."[17] "Many cases announce the basic rule that a case must remain alive throughout the course of appellate review."[18]

The states will not spend a penny more with the district court injunction before us now than they would spend without it, because the new regulation that they claim will cost them money cannot come into effect. Because of the Pennsylvania nationwide injunction, we have no case or controversy before us.

I disagree with the majority as well on standing and on the merits. The standing issue before us now is new. It is not the self-inflicted harm issue we resolved (incorrectly, as I explained in my previous dissent [19]), but the new question of whether there is any concrete injury affording standing to the states in light of the nationwide injunction. And on the merits, *Chevron* [20] deference ought to be applied, since Congress delegated the material issue, what "additional preventive care and screenings" for women ought to be without cost sharing requirements, to the Executive Branch, and that branch resolved it in a reasonable way not contrary to the statute. But it does not matter which of us is correct. Either view could prevail here, without any concrete consequence. The regulation we address cannot come into effect.

**\*16** Of course I agree with the majority that the circumstances that mooted the case in *Arizonans for Official English* differ from the circumstances that moot the case before us. I cited it because there, as here, in our zeal to correct what we thought was wrong, we acted without jurisdiction because the case had become moot. As for the proposition that

we ought to act under the exception for "cases capable of repetition, yet evading review," neither branch of the exception applies. Most obviously, the changes in the regulations, which are what matter, far from "evading review," have been reviewed to a fare-thee-well all over the country. [21] As for the likelihood of repetition, so far the hundreds of thousands of comments about the regulation, and the continual changes in the regulation, suggest a likelihood that if the case comes before us again in one form or another, it is fairly likely to be at least somewhat different. Nor do I think that comity is well-served by our presuming to review whether the Eastern District of Pennsylvania, as affirmed by the Third Circuit, had jurisdiction to issue an injunction covering the Ninth Circuit.

We need not and should not reach the merits of this preliminary injunction. This case is resolved by mootness.

**All Citations**

--- F.3d ----, 2019 WL 5382250

## Footnotes

1   Certain types of plans, called "grandfathered" plans, were statutorily exempt from the contraceptive care requirement. *See generally* Final Rules for Grandfathered Plans, Preexisting Condition Exclusions, Lifetime and Annual Limits, Rescissions, Dependent Coverage, Appeals, and Patient Protections Under the Affordable Care Act, 80 Fed. Reg. 72,192-01 (Nov. 18, 2015).

2   RFRA pertains only to the exercise of religion; it does not concern moral convictions. For that reason, the appellants' RFRA argument is limited to the religious exemption only. RFRA plainly does not authorize the moral exemption.

3   The religious exemption's automatic acceptance of a self-certification is particularly troublesome given that it has an immediate detrimental effect on the employer's female employees. The religious exemption fails to "take adequate account of the burdens ... impose[d] on nonbeneficiaries." *Cutter*, 544 U.S. at 720, 125 S.Ct. 2113. Similarly, the exemption is not "measured so that it does not override other significant interests." *Id.* at 722, 125 S.Ct. 2113; *see also Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709–10, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (invalidating a law that "arm[ed]" one type of religious objector "with an absolute and unqualified right" to violate otherwise applicable laws,

holding that "[t]his unyielding weighting in favor of [a religious objector] over all other interests" violates the Religion Clauses).

4    See *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir. 2014), *vacated*, *Zubik*, 136 S. Ct. at 1561; *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015), *vacated*, --- U.S. ----, 136 S. Ct. 2450, 195 L.Ed.2d 260 (2016); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015), *vacated*, *Zubik*, 136 S. Ct. at 1561; *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated*, *Zubik*, 136 S. Ct. at 1561; *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015), *vacated*, --- U.S. ----, 136 S. Ct. 2450, 195 L.Ed.2d 261 (2016); *Grace Schs. v. Burwell*, 801 F.3d 788 (7th Cir. 2015), *vacated*, --- U.S. ----, 136 S. Ct. 2011, 195 L.Ed.2d 211 (2016); *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. 2015), *vacated*, *Zubik*, 136 S. Ct. at 1561; *Eternal Word Television Network v. Sec'y of U.S. Dep't Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016), *vacated*, 2016 WL 11503064 (11th Cir. May 31, 2016) (No. 14-12696-CC), *as modified by* 2016 WL 11504187 (11th Cir. Oct. 3, 2016).
     Only the Eighth Circuit has concluded otherwise. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 945 (8th Cir. 2015) (affirming grant of preliminary injunction to religious objectors because "they [were] likely to succeed on the merits of their RFRA challenge to the contraceptive mandate and the accommodation regulations"), *vacated sub nom. Dep't of Health & Human Servs. v. CNS Int'l Ministries*, No. 15-775, --- U.S. ----, --- S.Ct. ----, --- L.Ed.2d ----, 2016 WL 2842448, at *1 (U.S. May 16, 2016).

5    Little Sisters also points to 42 U.S.C. § 2000bb-4, but that provision merely provides that exemptions that otherwise comply with the Establishment Clause "shall not constitute a violation" of RFRA. It does not address whether federal agencies have the authority affirmatively to create exemptions in the first instance.

1    42 U.S.C. §§ 18001 *et seq.*

2    42 U.S.C. §§ 2000bb *et seq.*

3    *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 835 (E.D. Pa.), *aff'd sub nom. Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019), *as amended* (July 18, 2019).

4    *Yniguez v. Arizonans for Official English*, 69 F.3d 920 (9th Cir. 1995), *vacated sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

5    42 U.S.C. § 300gg-13(a)(4) (emphasis added).

6    76 Fed. Reg. 46,623.

7    *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 735, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014).

8    *Wheaton Coll. v. Burwell*, 573 U.S. 958, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014).

9    *Zubik v. Burwell*, --- U.S. ----, 136 S. Ct. 1557, 1559, 194 L.Ed.2d 696 (2016) (per curiam).

10   *Id.* at 1560 (internal quotation marks omitted).

11   Dep't of Labor, FAQs About Affordable Care Act Implementation Part 36, at 4, *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

12   82 Fed. Reg. 47,792, 47,807–08 (Oct. 13, 2017); 82 Fed. Reg. 47,838, 47,849 (Oct. 13, 2017); *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, --- U.S. ----, 139 S. Ct. 2716, --- L.Ed.2d ---- (2019).

13   *Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa. 2019).

14   *Pennsylvania v. President United States*, 930 F.3d 543, 556 (3d Cir. 2019), *as amended* (July 18, 2019).

15   *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982).

16   *Arizonans for Official English*, 520 U.S. at 67, 117 S.Ct. 1055 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)).

17   *Calderon v. Moore*, 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996) (internal quotation marks omitted).

18   13C C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3533.10, pp. 555 (3d ed.); *see also U.S. v. Sanchez-Gomez*, --- U.S. ----, 138 S. Ct. 1532, 1537, 200 L.Ed.2d 792 (2018), *Kingdomware Technologies, Inc. v. U.S.*, --- U.S. ----, 136 S. Ct. 1969, 1975, 195 L.Ed.2d 334 (2016), *Campbell-Ewald Co. v. Gomez*, --- U.S. ----, 136 S. Ct. 663, 669, 193 L.Ed.2d 571 (2016), *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013), *Decker v. Northwest Environmental Defense Center*, 568 U.S. 597, 609, 133 S.Ct. 1326, 185 L.Ed.2d 447 (2013), *Chafin v. Chafin*, 568 U.S. 165, 171–72, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013), *Federal Election*

*Com'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 461, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007), *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), *Arizonans for Official English*, 520 U.S. at 67, 117 S.Ct. 1055, *Calderon*, 518 U.S. at 150, 116 S.Ct. 2066.

19   *California v. Azar*, 911 F.3d 558, 585 (9th Cir. 2018) (Kleinfeld, J., dissenting), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, ––– U.S. ––––, 139 S. Ct. 2716, ––– L.Ed.2d –––– (2019).

20   *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.").

21   *Pennsylvania v. President United States*, 930 F.3d 543, 555 (3d Cir. 2019), as amended (July 18, 2019); *Massachusetts v. United States Dep't of Health & Human Servs.*, 923 F.3d 209, 228 (1st Cir. 2019); *California v. Azar*, 911 F.3d 558, 566 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, ––– U.S. ––––, 139 S. Ct. 2716, ––– L.Ed.2d –––– (2019).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.