**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| HEALTH AND HUMAN SERVICES; | : | |
| ALEX M. AZAR II, in his official capacity as | : | Case No. 17-cv-11930-NMG |
| Secretary of Health and Human Services; | : | |
| UNITED STATES DEPARTMENT OF THE | : | |
| TREASURY; STEVEN T. MNUCHIN, in his | : | |
| official capacity as Secretary of the Treasury; | : | |
| UNITED STATES DEPARTMENT OF | : | |
| LABOR; and EUGENE SCALIA, in his | : | |
| official capacity as Secretary of Labor, | : | |
| | : | |
| *Defendants.* | : | |

## COMMONWEALTH'S SUPPLEMENTAL BRIEF

Since 2017, the Commonwealth of Massachusetts has sought to prevent the acknowledged harms to women that will result from the Final Religious and Moral Exemption Rules promulgated by the defendants, the Secretaries of the U.S. Departments of Health and Human Services ("HHS"), Labor, and the Treasury, as well as their respective Departments (hereinafter "Departments"). *See* 83 Fed. Reg. 57536 (Nov. 15, 2018) ("Religious Exemption Rule"); 83 Fed. Reg. 57592 (Nov. 15, 2018) ("Moral Exemption Rule"). Far from a tailored accommodation for certain organizations with religious or moral objections to the Affordable Care Act's ("ACA") contraceptive mandate, the Final Rules create an overbroad set of exemptions for employers and universities nationwide, while simultaneously eliminating the Departments' access to information necessary to enforce the contraceptive mandate. While the ACA affords the Departments

1

discretion to adopt accommodations for those with sincerely held religious or moral objections to contraception, *see Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020), it does not authorize the Departments to promulgate rules that are arbitrary or capricious or that violate the Constitution. The Final Rules must be set aside and declared invalid because they continue to violate the Establishment Clause of the First Amendment, the equal protection component of the Fifth Amendment, and the protections against arbitrary and capricious rulemaking guaranteed by the Administrative Procedure Act ("APA").

## ARGUMENT

### I.   <u>Three of the Commonwealth's Claims Remain After *Little Sisters*.</u>

In its Second Amended Complaint, the Commonwealth asserted that the Final Rules are unlawful in several distinct ways. *See* Docket No. 106 (hereinafter "Compl.") ¶¶ 84-114. Count 1 alleged that the Final Rules were not issued in accordance with the rulemaking provisions of the APA. *See* Compl. ¶¶ 84-93. Count II alleged that the Final Rules exceed the Departments' authority under the ACA, and that they are arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A). *See* Compl. ¶¶ 94-101. Count III alleged that the Final Rules violate the Establishment Clause of the First Amendment. *See* Compl. ¶¶ 102-07. And Count IV alleged that the Final Rules violate the equal protection guarantee implicit in the Due Process Clause of the Fifth Amendment. *See* Compl. ¶¶ 108-14.

In *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, issued in July, the Supreme Court addressed two of these claims—specifically, the claims that the Final Rules exceed the Departments' authority under the ACA and that they violate the rulemaking provisions of the APA. With respect to the former claim, the Court held the Women's Health Amendment of the ACA, 42 U.S.C. § 300gg-13(a)(4), "grants sweeping authority to [the Health Resources and

Services Administration ('HRSA')] to craft a set of standards defining the preventive care that applicable health plans must cover" for women, and at the same time authorizes HRSA "to identify and create exemptions from its own Guidelines." *Little Sisters*, 140 S. Ct. at 2380. Thus, the Court concluded that the Final Rules do not exceed the Departments' authority under the ACA. *Id.* at 2381-82. With respect to the latter claim, the Court held that the Final Rules were "free from procedural defects" because they "complied with the maximum procedural requirements that Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Id.* at 2386 (internal quotation marks and alterations omitted). The Court therefore reversed the judgment of the Court of Appeals for the Third Circuit and remanded for further proceedings consistent with its opinion. *Id.*

Justice Kagan, joined by Justice Breyer, concurred in the judgment but wrote separately to explain that she "question[s] whether the exemptions" in the Religious and Moral Exemption Rules "can survive administrative law's demand for reasoned decisionmaking." *Id.* at 2397 (Kagan, J., concurring in the judgment). "That issue," she explained, "remains open for the lower courts to address" on remand. *Id.*[1] In particular, she pointed out that there exists a "mismatch" between the scope of the exemptions in the rules "and the problem the agencies set out to address." *Id.* at 2398-2400. A "careful agency," Justice Kagan wrote, must weigh "the benefits of exempting more employers from the mandate against the harms of depriving more women of contraceptive coverage." *Id.* at 2400. And those harms are real: all parties to the case embraced the HRSA finding that the contraceptive "mandate is 'necessary for women's health and well-being,'" but, by the Departments' own calculations, the Final Rules will cause tens of thousands of women of

---

[1] Indeed, counsel for Little Sisters conceded at argument that a ruling in its favor would not "foreclose" a "separate APA challenge" "to the scope of the exemption." Tr. at 37, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania* (No. 19-431).

childbearing age to lose their contraceptive coverage. *Id.* at 2399 (quoting HRSA, *Women's Preventive Services Guidelines* (Dec. 2019), www.hrsa.gov/womens-guidelines-2019). Because the Departments did not make a meaningful effort to undertake that balancing, Justice Kagan wrote, "the exemptions HRSA and the Departments issued give every appearance of coming up short" under the APA's arbitrary and capricious standard. *Id.* at 2398 (Kagan, J., concurring in the judgment).

Consequently, following *Little Sisters*, three of the Commonwealth's claims in this case remain—the claims that the Final Rules (1) violate the APA because they are arbitrary and capricious, (2) violate the Establishment Clause, and (3) violate the Constitution's guarantee of equal protection under the law.

## II.    The Final Rules Must Be Set Aside as Arbitrary and Capricious.

"Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). To meet this requirement, an agency must always "articulate a satisfactory explanation for its action[s]." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (emphasis added). And where, as here, a policy change implicates serious reliance interests, the agency must provide an even "more substantial justification" for its actions. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015). An agency acts arbitrarily and capriciously when, among other factors, it "entirely fail[s] to consider an important aspect of the problem," or "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

Under these standards, the Religious and Moral Exemption Rules must be held unlawful and set aside. The Rules are neither "reasonable [nor] … reasonably explained." *Nat'l Telephone Co-op. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009). There is no "rational connection" between the scope of the exemptions adopted by the Rules and the problem the agencies set out to address. *Little Sisters*, 140 S. Ct. at 2383 (Kagan, J., concurring in the judgment). The Departments failed to provide a reasonable explanation for their refusal to pursue alternative policies that would have addressed religious and moral objections to the contraceptive mandate, as modified by the accommodation, while avoiding undue harm to women. *See City of Brookings Mun. Telephone Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) ("It is well settled that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives … The failure of an agency to consider obvious alternatives has led uniformly to reversal.") (quotations omitted). And, in so doing, the Departments also failed to give adequate consideration to the reliance interests of the tens of thousands of women who stand to lose contraceptive coverage because of the Rules. *See Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-15 (2020) (agencies must account for reliance interests and weigh them against competing policy priorities). Taken alone or in combination, these interrelated defects make the Rules arbitrary and capricious. *Id.*

A. The Departments Adopted Overbroad Exemptions that Are Not Tailored to the Scope of the Problem the Agencies Sought to Address.

An agency "flunks" the arbitrary and capricious test "when it has failed to draw a 'rational connection' between the problem it has identified and the solution it has chosen, or when its thought process reveals a 'clear error of judgment.'" *Little Sisters*, 140 S. Ct. at 2398 (Kagan, J.,

concurring in the judgment) (quoting *State Farm*, 463 U.S. at 43). That is precisely what the Departments have done in promulgating the Religious and Moral Exemption Rules. The Rules' sweeping exemptions go far beyond what "reasoned judgment" would support. *Id*. at 2399.

The Departments purported to adopt the Religious Exemption Rule in order to "avoid instances where the [contraceptive] Mandate [or accommodation] is applied in a way that violates … religious beliefs," and to "bring to a close the more than five years of litigation over [Religious Freedom Restoration Act ("RFRA")] challenges to" the mandate and accommodation. 83 Fed. Reg. 57542, 57545. Elaborating in this Court, the Departments explained that they issued the Rule to address the "serious religious objections" that "the accommodation still substantially burdened the religious exercise of some objecting entities" and to "resolve" the "years of litigation" brought by those entities. Defs.' Mem. in Support of Mot. to Dismiss & Cross-Mot. for Summ. J. (ECF Doc. No. 122), at 1 ("Defs.' Br."). But despite the narrow scope of the issue the Departments purportedly wished to address, the Departments did not craft rules that merely exempted employers that had a "religious objection to the status quo"—that is, those employers, like Little Sisters, that believed the accommodation rendered them complicit in the provision of contraceptive coverage. *Little Sisters*, 140 S. Ct. at 2398-99 (Kagan, J., concurring in the result). Instead, they "exempted *all* employers with objections to the mandate, even if the accommodation met their religious needs." *Id*. (emphasis added). Their rule thus creates an exemption for any nonprofit organization; any closely held for-profit entity; any for-profit entity that is not closely held, including any publicly traded corporation; any other non-governmental employer; any institution of higher education; and any health insurance issuer offering group or individual insurance coverage, so long as the entity has "sincerely held religious beliefs opposed to coverage of some or all contraceptive or sterilization methods encompassed by HRSA's Guidelines." 83 Fed. Reg. 57537, 57558-66.

The Moral Exemption Rule suffers from a similar mismatch between the scope of the problem, as stated by the Departments, and the scope of the rule they adopted. In the Rule, the Departments explained that they are "aware of" only three "small nonprofit organizations" that had, through litigation or public comment, voiced a moral objection to providing their employees with contraceptive coverage. 83 Fed. Reg. 57626-27.[2] They acknowledged that they were "not aware of" any institution of higher education that had asserted a non-religious, moral objection to provision of contraceptive coverage. *Id.* Nor were they aware of any for-profit entities that had done so. 83 Fed. Reg. 57626-27. But despite "reiterat[ing] the rareness of instances in which we are aware that employers assert nonreligious objections to contraceptive coverage based on sincerely held moral convictions," 83 Fed. Reg. 57628, the Departments chose to adopt sweeping exemptions—effectively risking the contraceptive coverage and health of women nationwide—based on the supposition that additional objecting employers "might come into existence," *id.* at 57626. In other words, to address objections raised by three non-profit organizations—one of which had already secured a permanent injunction and so would "not be affected by the … final rule," *id.*—the Departments created exemptions that cover any nonprofit organization; any for-profit entity that has no publicly traded ownership interests; any institution of higher education; and any health insurance issuer offering group or individual insurance coverage. 83 Fed. Reg. 57593, 57614-24. And as with the exemptions in the Religious Exemption Rule, the moral exemptions are not limited to employers with complicity-based objections to the accommodation,

---

[2] Those entities were March for Life, Americans United for Life, and Real Alternatives. Each is a nonprofit organization. *See* 83 Fed. Reg. 57626-27; Americans United for Life, Give, https://aul.org/give/.

but are instead available to any entity with an objection to the contraceptive mandate. *Id*.[3]

This is not reasoned decision making. *See Delaware Dep't of Nat. Resources & Envtl. Control v. EPA*, 785 F.3d 1, 17-18 (D.C. Cir. 2015) (regulation that was not tailored to address the identified problems was arbitrary and capricious). The Rules are, instead, an overbroad "solution in search of a problem." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 837 (D.C. Cir. 2006) (Kavanaugh, J.). And for that reason alone, the Rules should be declared unlawful and set aside.

B.   The Departments Failed to Give Meaningful Consideration to More Limited Rules and Disregarded the Serious Reliance Interests of Tens of Thousands of Women.

When an agency rescinds or revises existing regulations, it must provide a "reasoned analysis" justifying its change in position. *Regents of the Univ. of Calif.*, 140 S. Ct. at 1913. This analysis must explore significant alternatives to the agency's chosen course of action—including making "more limited" changes to existing policy—and provide a reasoned explanation for rejecting them. *See Nat'l Shooting Sports Foundation, Inc. v. Jones*, 716 F.3d 200, 216 (D.C. Cir. 2013); *see also Regents of the Univ. of Calif.*, 140 S. Ct. at 1913 ("reasoned analysis" must include consideration of more limited alternatives "within the ambit of the existing policy").

In promulgating the Religious and Moral Exemption Rules, the Departments had a particular responsibility to explore alternatives that would limit harm to women. The contraceptive mandate is premised upon overwhelming evidence demonstrating that contraception is an effective and necessary component of women's health care. *See Little Sisters*, 140 S. Ct. at 2399 (Kagan, J., concurring in the judgment). The Departments' decision to leave the mandate (and the findings that undergird it) in place "committed them … to minimizing the impact on contraceptive

---

[3] While the Departments assert that the three non-profit entities discussed above object to both the mandate and the accommodation, they acknowledge that not all entities covered by the Rule will do so. *See* 83 Fed. Reg. 57624.

coverage, even as they sought to protect employers with continuing religious objections." *Id.* Further, as the Departments went about revising the regulations, they were obliged to give detailed consideration to the reliance interests of women who stood to lose contraceptive coverage, and to "weigh" these interests against competing policy objectives. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (an agency must provide a "more detailed justification" for a change in policy that implicates serious reliance interests).

The Rules fall well short of these standards. The Departments effectively "sidestepped [their] responsibility to consider reasonable alternatives" and promulgated Rules that inflict undue, unreasonable, and gratuitous harm on women and their families. *Delaware Dep't of Natural Resources*, 785 F.3d at 18.

1.  <u>The Rules Implicate the Serious Reliance Interests of Tens of Thousands of Women.</u>

The expanded exemptions created by the Rules will cause "serious harm" to women who, for years, have relied upon the mandate for access to contraceptive care and services. *Little Sisters*, 140 S. Ct. at 2399 (Kagan, J., concurring in the judgment). The record establishes—and the Departments do not dispute—the critical importance of contraceptive coverage for women. *See id.* ("Rather than dispute HRSA's prior finding that the mandate is necessary for women's health and well-being, the Departments left that determination in place."); *see also California v. Health & Human Servs.*, 351 F. Supp. 3d 1267, 1296 (N.D. Cal. 2019) ("The Rules provide no new facts and no meaningful discussion that would discredit [the Department's] prior factual findings establishing the beneficial and essential nature of contraceptive healthcare for women."); 83 Fed. Reg. 57554 ("The Departments do not take a position on the scientific … [or] empirical question[s]" concerning contraception). According to the Departments' own analysis, however,

between approximately 70,500 and 126,400 women who were entitled to coverage under the prior regulations will lose that coverage as result of the Rules. *See* 83 Fed. Reg. 57578-581 (Religious Exemption Rule estimate); 83 Fed. Reg. 57627 (Moral Exemption Rule estimate).[4] Among other hardships, these women will suffer increased contraceptive costs, decreased contraceptive choice, loss of access to regular medical providers, and more unplanned and risky pregnancies. *See* 83 Fed. Reg. 57548, 57578, 57585 n. 123; 83 Fed. Reg. 57548 (discussing potential impacts and summarizing comments on Rules); *see also Priests for Life v. Dep't of Health & Hum. Servs.*, 772 F.3d 229, 235 (D.C. Cir. 2014) ("The medical evidence prompting the contraceptive coverage requirement showed that even minor obstacles to obtaining contraception led to more unplanned and risky pregnancies, with attendant adverse effects on women and their families.").

The Departments' attempts to dismiss these harms, and the corresponding reliance interests of women, are unavailing. The Departments argue that, because they were under no obligation to create the contraceptive mandate in the first place, the loss of contraceptive coverage does not

---

[4] As a mitigating factor, the Departments point to the fact that some women who lose coverage will be able to secure replacement coverage outside of their normal healthcare network through safety net programs, such as Title X clinics. *See* 83 Fed. Reg. 57548. But the Departments fail to meaningfully engage with evidence and comments demonstrating that these programs cannot meet existing needs and are poorly situated to replace coverage from employer-sponsored plans. *See, e.g.*, E. August et al., *Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act*, 106 Am. J. Pub. Health 334 (Feb. 2016), *available at* https://ajph.aphapublications.org/doi/pdfplus/10.2105/AJPH.2015.302928 (reductions in funding for Title X will limit the number of patients that Title X-funded providers can serve; Congress would have to increase funding for Title X by hundreds of millions of dollars to address the existing need for publicly funded family planning services); K. Hasstedt, *Why we cannot afford to undercut the Title X national family planning program*, 20 *Guttmacher Policy Review* 20-23 (2017), *available at* https://www.guttmacher.org/gpr/2017/01/why-we-cannot-afford-undercut-title-x-national-family-planning-program (with its current funding level, Title X can serve only one-fifth of the nationwide need for publicly funded contraceptive care); Comment of Essential Access Health (Administrative Record: Disk 10, Page 0207048) (hereinafter "D10, 0207048") (safety net providers "do not currently have the capacity to meet the needs of current enrollees and [women who lose coverage as a result of the Rules]").

constitute a "burden" that they are obligated to consider. *See, e.g.*, 83 Fed. Reg. 57548-49 ("If some third parties do not receive contraceptive coverage from private parties who the government cho[oses] … not to coerce, that result exists in the absence of government action—it is not a result the government has imposed."). As a matter of law, they are incorrect: the withdrawal of a benefit conferred by discretionary agency action implicates the reliance interests of those who stand to lose that benefit. *See Regents of the Univ. of Calif.*, 140 S. Ct. at 1913-14 (addressing reliance interests engendered by the Deferred Action for Childhood Arrivals program). The Departments also assert that any harm to women who lose coverage is inconsequential because these women "constitute less than .1% of all women in the United States." 83 Fed. Reg. 57550; *see also id.* at 57551 n. 26, 57578. This assertion misses the point entirely. To begin, their figure is grossly misleading. Only a fraction of "all the women in the United States" are women of childbearing age; and only a fraction of this population uses contraception covered by the ACA. *See* 83 Fed. Reg. 57575. By the Departments' own estimates, 27% to 48% of all women who use covered contraception and work for an objecting employer will lose the coverage they received under the prior regulations as a result of the Religious Exemption Rule.[5] In any case, the fact that there are large numbers of Americans who will be unaffected by the Departments' policy change is neither unique nor relevant. It does not eliminate the agency's obligation to "assess … and weigh" the reliance interests of those who will be affected. *Regents of the Univ. of Calif.*, 140 S. Ct. at 1913.

---

[5] The Rules indicate that there are approximately 262,425 women of childbearing age who use covered contraception, work for employers with a known religious objection to contraception, and received coverage under the prior regulations. *See* 83 Fed. Reg. 57575-76 (discussing "litigating entities"); *id.* at 57577-78 (discussing "accommodated entities"). As discussed above, the Departments estimate that between 70,500 and 126,400 women will lose coverage as a result of the Religious Exemption Rule. *See supra*, at 9-10.

2.  <u>The Departments Failed to Give Meaningful Consideration to Alternative Policies that Would Have Addressed Religious and Moral Objections, While Limiting Harm to Women.</u>

Even "by the Departments' own lights," the Rules inflict gratuitous harm. *See Little Sisters*, 140 S. Ct. at 2399 (Kagan, J., concurring in the judgment). Rather than adopt expansive religious and moral exemptions, the Departments could have pursued "significant and viable and obvious alternatives" that would have addressed religious and moral objections to the mandate and accommodation, while also limiting harm to women. *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015). The Departments failed to give these alternatives serious consideration and fell far short of providing a reasonable—much less substantial—justification for not pursuing them. *See City of Brookings Mun. Telephone Co.*, 822 F.2d at 1169 (agency must provide a "reasoned explanation" for rejecting "reasonable alternatives"); *Perez*, 575 U.S. at 106 ("the APA requires an agency to provide more substantial justification when its prior policy has engendered serious reliance interests that must be taken into account").

First, as Justice Kagan's concurrence notes, the Departments could have limited exemptions to employers with complicity-based objections to the accommodation.[6] Doing so

---

[6] The Departments could have implemented this alternative in several ways. They could have created exemptions for the particular entities that have asserted complicity-based objections to the accommodation. The Departments have detailed information about the identity of these entities. For example, with respect to religious objections, "[i]n their Regulatory Impact Report, the Departments … included spreadsheets listing either litigating employers or employers currently using the Accommodation that the Departments flagged could switch to the expanded exemption." *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 217 (1st Cir. 2019). These lists identified, with particularity, those employers with complicity-based objections to the accommodation. *See id.* at 224 (describing the "spreadsheet listing litigating entities likely to use the expanded exemptions"). Alternatively, the Departments could have exempted any employer that submitted a notice of its sincere religious or moral objection to the accommodation. *See* Tr. at 29, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania* (No. 19-431) (Little Sisters have no "objection to simply objecting" in order to acquire an exemption). Or, the Departments could have drafted the regulations to make exemptions available only "to the extent"

would have directly responded to the litigation that spawned the Rules.[7] *See Little Sisters*, 140 S. Ct. at 2376 (the expanded exemptions represent the Departments' most recent attempt to "comply with *Zubik*"); *see also* 83 Fed. Reg. 57561 (the expanded religious exemptions are the "appropriate administrative response … to the litigation challenging [the contraceptive mandate]"); 83 Fed. Reg. 57602 (discussing litigation by non-religious entities). Yet the Departments never squarely considered this alternative. Instead, they summarily dismissed any approach that did not provide uniform exemptions to all employers on the ground that they wanted to "avoid inconsistency in respecting religious objection in connection with the provision of contraceptive coverage." 83 Fed. Reg. 57542 (acknowledging and responding to public comments objecting that the expanded exemptions were "too broad"). But such a "vague desire for uniformity" is no substitute for reasoned analysis. *See Delaware Dep't of Nat. Resources*, 785 F.3d at 17. Moreover, treating employers with different objections differently is not inconsistent; it is "reasoned judgment." *Little Sisters*, 140 S. Ct. at 2399 (Kagan, J., concurring in the judgment).

Second, the Departments could have "expand[ed] or adjust[ed] the accommodation" to address employers' complicity-based objections. 83 Fed. Reg. 57542 (acknowledging comments to Religious Exemption Rule); 83 Fed. Reg. 57604 (acknowledging comments to Moral

---

an employer has a sincere religious or moral objection to the accommodation. *See* 83 Fed. Reg. 57558 (discussing the use of this limiting language elsewhere in the regulations).

[7] The Departments' own analysis suggest that this alternative would significantly reduce the number of women who will lose coverage. In the Rules, the Departments estimated that most women who lose contraceptive coverage will do so because their employers will switch from using the accommodation to an exemption. 83 Fed. Reg. 57578 (estimating this number at 64,000). Given that these employers were previously using the accommodation without objection, it seems likely that few had complicity-based objections to the process. *See id.* (explaining that "the Departments assume there is no overlap between" entities that are using the accommodation and entities that have been involved in litigation involving the mandate or accommodation); *see also* 82 Fed. Reg. 47819 (noting that there were few barriers to litigating objections to the accommodation including because "multiple public interest law firms public [offered to provide pro bono] … legal services for entities willing to challenge the Mandate").

Exemption Rule). The Departments rejected this alternative based upon their prior conclusion (from 2017) that is not possible to create an accommodation that provides "seamless" coverage for women and "eliminate[s] the … objections of all [employers]." 83 Fed. Reg. at 57544; *see also* 83 Fed. Reg. 57604 (addressing moral objections). But circumstances have changed, rendering this standard inapposite. The Departments have abandoned their earlier commitment to ensuring that women receive "seamless" coverage, *id.* at 57548; instead, they have promulgated Rules that will deprive tens of thousands of women of any coverage. *See supra*, at 9-10. The issue the Departments should have considered, then, is whether the accommodation can be altered in such a way as to satisfy *some* employers objections so that *some* women may retain coverage.[8] The Rules indicate that the answer to this question is yes, as does the evidence in the record and the history of litigation concerning the mandate. *See* 83 Fed. Reg. 57545-46 (alternatives to the accommodation "would likely violate some"—not all or even most— "entities' religious objections").

In *Priests for Life v. U.S. Dep't of Health & Human Servs.*, for example, then-Judge Kavanaugh suggested changes to the accommodation that would address many employers' objections. *See* 808 F.3d 1, 23-24 (D.C. Cir. 2015) (Kavanaugh, J., dissenting) (the accommodation can be altered in ways that "lessen" complicity objections). Under his proposal, an objecting entity could "submi[t] a simple notice to the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services … [From there], the Government can independently determine the identity of the organizations' insurers and thereby ensure that … [they] provide contraceptive coverage." *Id.* (Kavanaugh, J., dissenting) (arguing that, based on

---

[8] To be clear, the Departments could have combined this alternative with the one above, exempting any employers who continued to assert complicity-based objections to an altered accommodation.

*Wheaton College v. Burwell*, 573 U.S. 958 (2014), and *Little Sisters of the Poor Home for the Aged v. Sebelius*, 571 U.S. 1171 (2014), the simple notice option was a less restrictive alternative to the accommodation that would have satisfied RFRA). Judge Kavanaugh noted that, "to be sure, some religious organizations" might still object to this process, but he clearly understood (based on the plaintiffs' representations and the briefing) that the number would be reduced.[9] The oral argument in *Little Sisters* supports this understanding. Counsel for Little Sisters repeatedly confirmed that the organization had no "objection to simply objecting," or to the government independently arranging for insurers to provide coverage directly to their employees. Tr. at 29, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania* (No. 19-431) (explaining that the Little Sisters would have no objection to "just … an opt-out form, an objection form").

There were other options still. For example, some employers have acknowledged that their complicity-based objections to the accommodation would be eliminated if employees were required to affirmatively request coverage from insurers. *See, e.g.*, *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 612 (7th Cir. 2015) (the University would have "no problem" with a system in which "each of its female employers [and students] signed and mailed … a form [to its insurer or third party administrator] saying 'I have insurance through Notre Dame, but the university won't cover contraceptive services, so now you must cover them.'"). Similarly, in connection with the *Zubik* remand, the Departments determined that the use of "separate enrollment cards" for contraceptive coverage would resolve additional objections to the accommodation. *See* U.S. Dep't of Labor,

---

[9] Judge Kavanaugh also strongly suggested that any remaining objections would not rise to the level of a "substantial burden" under RFRA, such that no additional exemption would be necessary or appropriate. *See Priests for Life*, 808 F.3d at 26 (Kavanaugh, J., dissenting) ("The Government may of course continue to require the religious organizations *insurers* to provide contraceptive coverage to the religious organizations' employees, even if the religious organizations object … RFRA does not authorize religious organizations to dictate the independent actions of third-parties, even if the organization sincerely disagrees with them") (quotations omitted).

*FAQS About Affordable Care Act Implementation Part 36*, at 11 (Jan. 9, 2017) (D9, 2017 Moral IFR Supp. Docs., No. 8, 666657) ("Under this approach, women … would receive a separate enrollment card that would be automatically activated … [when a woman] attempts to obtain contraceptive benefits").[10]

Third, the Departments could have decoupled the Religious and Moral Exemption Rules and provided more limited exemptions, or just the accommodation, for entities with moral objections to the contraceptive mandate. *See* 83 Fed. Reg. 57603 (acknowledging public comments arguing that no moral exemptions should be provided; that the expanded moral exemptions are "too broad"; and that only an accommodation should be provided for moral objections). The Departments rejected this alternative in order to "avoid the stark disparity that may result from respecting religious objections … but not respecting parallel objections for moral convictions … at all." 83 Fed. Reg. 57603. The Departments dedicated an entire section of the Rule to discussing "statements of Congress … statutes … and Supreme Court precedent" that, they argued, support providing equal treatment for religious and moral objections. *Id.* at 57598-57602. But none of these statements, statutes, or precedents even arguably applies to the contraceptive mandate. The only law that does apply—RFRA—does not provide equal treatment for religious and moral convictions. *See Little Sisters*, 140 S. Ct. at 2400 (Kagan, J., concurring in the judgment). The Departments' argument, then, collapses back in on itself. Rather than simply duplicating the religious exemptions "in … [the moral] context," the Departments "should have weighed anew …

---

[10] Justice Alito appears to have picked up on this in his concurring opinion in *Little Sisters*, in which he identifies an option in which the government would send "a special card that could be presented at a pharmacy to fill a prescriptions for contraceptives without any out-of-pocket expense." *Little Sisters*, 140 S. Ct. at 2393; *see also* Tr. at 40-41, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania* (No. 19-431) (Little Sisters would have no objection to an approach in which insurance companies were required to reimburse employees for expenses).

the benefits of exempting more employers from the mandate against the harms of depriving more women of contraceptive coverage." *Id.*

When the Departments decided to dramatically expand the pre-existing exemptions to the contraceptive mandate, they were "not writing on a blank slate." *Regents of the Univ. of Calif.*, 140 S. Ct. at 1915. Rather, they were required to take into account the reliance interests of women who stood to lose coverage and give meaningful consideration to policy alternatives that would limit harm to these women. *See id.* at 1914-15 (noting that the agency had "considerable flexibility" and faulting the agency for failing to explore alternatives that were not "foreclosed or even addressed" by the agency's justification and would have "accommodat[ed] particular reliance interests"); *see also Little Sisters*, 140 S. Ct. at 2399 (Kagan, J., concurring in the judgment). The Departments' failure to take these steps, necessary as they are for reasoned decision-making, renders the Religious and Moral Exemption Rules arbitrary and capricious.

## III.    The Final Rules Violate the Establishment Clause.

The Religious Exemption Rule also violates the Establishment Clause. In *Little Sisters*, the Court held that the Departments have authority under the ACA to create exemptions to the contraceptive mandate. The majority did not address the separate question of whether the Departments have exercised that authority in a constitutional manner. *See Little Sisters*, 140 S. Ct. at 2382 n. 10. And indeed, the Departments have not. The Rule serves no valid secular purpose and has the impermissible effect of giving employers a religious veto over employees' access to health care. *See* ECF Doc. No. 116 ("Pl. Br.") 35-39; ECF Doc. No. 127 ("Pl. Reply Br.") 19-24. "In order to perceive government action as permissible [under the Establishment Clause] … there must in fact be an identifiable burden on the exercise of religion that can be said to be lifted by the government action." *Corp. of Pres. Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*,

483 U.S. 327, 348 (1987) (O'Connor, J., concurring in the judgment). But the Departments have conceded that many, if not most, of the employers eligible for the expanded exemptions created by the Rule have no cognizable religious objection to the prior regulations—and more specifically, the accommodation. *See Little Sisters*, 140 S. Ct. at 2398 (Kagan, J., concurring in the judgment).[11]

Rather than lifting a burden on religious exercise, the Religious Exemption Rule instead grants these employers license to "impose the[ir] … religious faith on the[ir] employee[s]." *United States v. Lee*, 455 U.S. 252, 260-61 (1982); *see also* 77 Fed. Reg. 8728 (exempting objecting employers would "subject … employees to the religious views of the[ir] employer"). For example, the record establishes that some religious employers oppose any program that has "the purpose or effect of providing access to or increasing the use of contraceptive services." U.S. Dept. of Labor, *FAQS About Affordable Care Act Implementation Part 36*, at 7 (Jan. 9, 2017) (D9, 2017 Moral IFR Supp. Docs., No. 8, 666653). Under the Rule, an objecting employer that held this position could decline to "opt in" to the accommodation, and claim an exemption, not because of any complicity-based burden on their own religious exercise, but simply to deter employees from using contraception. Whether or not any employer chooses to use the Rule to advance "explicitly religious goals" in this way, it is unconstitutional for the Departments to grant them the power to do so in the first instance. *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125 (1982).

## IV.    The Final Rules Violate the Equal Protection Clause.

The Religious and Moral Exemption Rules also violate the equal protection guarantee of the Fifth Amendment to the Constitution. *See* Pl. Br. 39-42; Pl. Reply Br. 24-27. Because the Rules insert a "gender-based or gender-biased disparity," *Sessions v. Morales-Santana*, 137 S. Ct. 1678,

---

[11] For this reason, this Court need not reach the question of whether the accommodation imposed a substantial burden or satisfied RFRA with respect to other employers. *See* Pl. Br. 27-35; Pl. Reply Br. 12-16.

1690 (2017) (cleaned up), into the ACA's preventive services requirement, they are subject to heightened scrutiny. *See Joyce v. Town of Dennis*, 705 F. Supp. 2d 74, 79-80 (D. Mass. 2010) (Gorton, J.), *remanded on other grounds*, 720 F.3d 12 (1st Cir. 2013) (once a facial disparity is identified, the court "proceeds to analyze the defendants' justifications" under heightened scrutiny). The fact that the Rules go well beyond what is necessary to relieve any alleged burden on religious or moral beliefs, *see supra*, at 12-17, forecloses any argument that the they satisfy the "close means-end fit required to survive heightened scrutiny." *Morales-Santana*, 137 S. Ct. at 1696-97.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Memorandum in Support of the Commonwealth's Motion for Summary Judgment, and Combined Memorandum in Opposition to Defendants' Motion to Dismiss or Cross-Motion for Summary Judgment, the Commonwealth's Motion for Summary Judgment should be granted with respect to the three claims addressed above.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS,

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

  /s/ Julia E. Kobick
Jon Burke, BBO # 673472
Julia E. Kobick, BBO # 680194
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
(774) 214-4416
(617) 963-2559
jonathan.burke@mass.gov
Date: September 29, 2020        julia.kobick@mass.gov

## <u>CERTIFICATE OF SERVICE</u>

      I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 29, 2020.

                          /s/ Julia E. Kobick
                          Julia E. Kobick
                          Assistant Attorney General