**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

| | | |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, | : | |
| | : | |
| Plaintiff, | : | Case No. 1:17-cv-11930-NMG |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| HEALTH AND HUMAN SERVICES *et al*., | : | |
| | : | |
| Defendants. | : | |

_____:

**DEFENDANTS' SUPPLEMENTAL BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

ARGUMENT......................................................................................................................2

    I.      The Supreme Court's Decision in *Little Sisters*.............................................2

    II.     The Final Rules Are Not Arbitrary and Capricious.....................................4

           A.     The Final Rules Are Sufficiently Tailored to the Concerns the Agencies Sought to Address ........................................................................6

           B.     The Agencies Adequately Considered Reliance Interests .............................9

           C.     The Agencies Adequately Considered Alternatives ....................................11

    III.    The Final Rules Are Consistent With the Establishment Clause............................14

    IV.    The Final Rules Are Consistent With Equal Protection Principles .........................16

CONCLUSION.................................................................................................................17

## INTRODUCTION

Earlier this year in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020), for the second time in six years, the Supreme Court sided with objectors to what is commonly called the contraceptive-coverage mandate.  The Court held that Congress's grant of "virtually unbridled discretion" in the Affordable Care Act ("ACA") to determine what counts as preventive care and screenings for purposes of the women's preventive service mandate, as well as possible exemptions to that mandate, authorized the federal agencies responsible for administering the ACA[1] ("the Agencies") to create religious and moral exemptions to any contraceptive-coverage mandate they might impose.  140 S. Ct. at 2379-82.  The Supreme Court further counseled that, in crafting the religious exemption, the Agencies were right to consider concerns that the mandate could violate the Religious Freedom Restoration Act ("RFRA").  *Id.* at 2382-84.  Accordingly, the Court vacated decisions enjoining the Agencies' 2018 rules (the "Final Rules")[2] providing exemptions accommodating sincere religious and moral objections to the contraceptive-coverage mandate.

*Little Sisters* further confirms that the Commonwealth of Massachusetts' claims have no merit, and must be dismissed or resolved in Defendants' favor.  As an initial matter, even if Plaintiff's operative complaint could be read to assert an "arbitrary and capricious" claim, Plaintiff waived the claim by failing to raise it in its motion for summary judgment (or reply).  Plaintiff

---

[1] The Department of Health and Human Services ("HHS"), the Department of Labor, and the Department of the Treasury.

[2] *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg. 57,536 (Nov. 15, 2018) (the "Religious Exemption Rule"); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (the "Moral Exemption Rule").

cannot sneak the claim back into the case under the guise of supplemental briefing.  In any event, the claim is meritless—which perhaps explains Plaintiff's failure to raise it in prior briefs.  The Agencies reasonably exercised their "virtually unbridled discretion" to craft religious and moral exemptions in light of RFRA, Congress's longstanding practice of protecting religious and moral conscience in the health care space, and the years of litigation they had experienced over the scope of the contraceptive coverage mandate ("mandate").

Plaintiff's constitutional claims also fail.  The Final Rules do not violate the Establishment Clause or discriminate on the basis of sex.  The Rules place religious and moral objections on similar footing, and the Supreme Court has long recognized that accommodating religious exercise does not violate the Establishment Clause.  Moreover, because the Final Rules do not draw a sex-based distinction, rational basis review governs Plaintiff's equal protection claim, and the Rules easily satisfy it.  Defendants therefore respectfully request that the Court enter summary judgment in their favor on all of Plaintiff's claims.[3]

## ARGUMENT

**I.      The Supreme Court's Decision in *Little Sisters.***

Before the Final Rules were set to go into effect, they were preliminarily enjoined by district courts in the Third and Ninth Circuits, which found the Final Rules substantively and procedurally invalid.  The respective courts of appeals affirmed these injunctions.  *See California v. HHS*, 941 F.3d 410 (9th Cir. 2019); *Pennsylvania v. President of United States,* 930 F.3d 543 (3d Cir. 2019).  The Supreme Court granted petitions for a writ of certiorari to the Third Circuit filed by the United States and the Little Sisters of the Poor, a religious non-profit that intervened

---

[3] Plaintiff concedes that Defendants are entitled to summary judgment on Counts I and II, to the extent they allege that the Agencies exceeded their authority under the ACA in issuing the Final Rules.  *See* Pl. Supp. at 2-3, ECF No. 135.

to defend the Rules.  The Supreme Court then reversed the court of appeals and remanded the case

for further proceedings consistent with its opinion.  *Little Sisters*, 140 S. Ct. at 2386.

In its decision, the Court rejected claims (also asserted by Plaintiff in this case) that the

Agencies lacked statutory authority to promulgate the exemptions and violated the notice-and-

comment requirements of the Administrative Procedure Act ("APA") by soliciting comments after

issuing the Interim Final Rules ("IFRs").  *See id*. at 2379-86.  The Court also addressed three issues

that are relevant to the claims Massachusetts continues to press here.

First, the Court recognized the Agencies' care in responding to comments on the IFRs and

the strength of the Agencies' analysis generally, noting that the Final Rules "responded to post-

promulgation comments," and "explain[ed] their reasons for neither narrowing nor expanding the

exemptions beyond what was provided for in the IFRs."  *Id*. at 2378.  The Court also observed that

the "final rule creating the religious exemption [] contained a lengthy analysis of the [Agencies']

changed position regarding whether the self-certification process violated RFRA" and that the

Agencies explained that "in the wake of the numerous lawsuits challenging the self-certification

accommodation and the failed attempt to identify alternative accommodations after the 2016

request for information, 'an expanded exemption rather than the existing accommodation is the

most appropriate administrative response to the substantial burden identified'" in *Burwell v. Hobby*

*Lobby Stores, Inc*., 573 U.S. 682, 719 (2014).  *Little Sisters*, 140 S. Ct. at 2378 (quoting 83 Fed.

Reg. at 57,544-45).

Second, the Court held that, "[u]nder a plain reading of [42 U.S.C. § 300gg-13(a)(4)] . . .

the ACA gives [the Health Resources & Services Administration ("HRSA")] broad discretion to

define preventive care and screenings and to create the religious and moral exemptions."  140 S.

Ct. at 2381.  The Court found that Congress made a "deliberate choice" to give an "extraordinarily

'broad general directiv[e]' to HRSA to craft the Guidelines, without any qualifications as to the substance of the Guidelines or whether exemptions were permissible." *Id.* at 2382 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). Hence, "HRSA has virtually unbridled discretion to decide what counts as preventive care and screenings," and that discretion "leaves [HRSA's] discretion equally unchecked in other areas, including the ability to identify and create exemptions from its own Guidelines." *Id.* at 2380.

Third, the Court rejected the plaintiffs' argument that the Agencies "could not even consider RFRA as they formulated the religious exemptions." *Id.* at 2382-83. To the contrary, the Court held that, given "the potential for conflict between the contraceptive mandate and RFRA" and the Court's prior opinions, it was "appropriate for the [Agencies] to consider RFRA" and "unsurprising that RFRA would feature prominently in the [Agencies'] discussion of exemptions." *Id.* at 2383. Indeed, the Court reasoned that, had the Agencies not considered RFRA, they "would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem." *Id.* at 2384. Thus, the Court concluded that, "[p]articularly in the context of these cases, it was appropriate for the [Agencies] to consider RFRA." *Id.* at 2383.

## II.      The Final Rules Are Not Arbitrary and Capricious.

As an initial matter, Plaintiff has already waived any arbitrary-and-capricious claim. To the extent that Plaintiff's amended complaint, ECF No. 106, could be construed to state an arbitrary-and-capricious claim, Plaintiff waived such a claim by failing to raise it during summary judgment briefing. The tables of contents of Plaintiff's briefs reveal that Plaintiff does not purport to assert an arbitrary-and-capricious claim. *See* Pl. MSJ at i-ii, ECF No. 116; Pl. MSJ Reply at i, ECF No. 127. Nor does Plaintiff advance such a claim in the body of either brief. Its summary judgment briefing also does not mention any purported failure by the Agencies to consider the

reliance interests of women, much less allege such a failure as a basis for considering the Final

Rules to be inconsistent with the APA.

"A litigant may not posit a theory for the first time in opposition to a summary judgment

motion." *Carrozza v. CVS Pharmacy, Inc*., 391 F. Supp. 3d 136, 149 (D. Mass. 2019) (citing

*Brooks v. AIG SunAmerica Life Assur. Co*., 480 F.3d 579, 589 (1st Cir. 2007)); *see also Minuteman*

*Health, Inc. v. HHS*, 291 F. Supp. 3d 174, 192 (D. Mass. 2018) (theory of recovery made for the

first time in summary judgment reply memorandum "is untimely," and "the Court need not

consider it").  Still less may a litigant present a new theory for the first time in a supplemental brief

after summary judgment briefing has already concluded.   The Court's Order regarding

supplemental briefing did not suggest that the parties could raise arguments they had not presented

in their summary judgment briefs.  *See* Order at 2, ECF No. 134 (granting the parties' request that

the Court order the parties to "submit supplemental briefs . . . on their pending dispositive

motions").   Consequently, Plaintiff should not now be heard to advance an arbitrary-and-

capricious claim that was neither presented in its complaint nor in the course of the parties'

summary judgment briefs.

This problem is particularly acute as to Plaintiff's argument, addressed *infra* Part II.A, that

the Final Rules are not sufficiently tailored to the problems that they seek to address.   This

argument appears nowhere in Plaintiff's complaint or motion for summary judgment, and is

therefore an improper attempt to inject entirely new theories and arguments into this case.  *Cf.*

*NYC C.L.A.S.H., Inc. v. Carson*, 442 F. Supp. 3d 200, 221 n.15 (D.D.C. 2020), *amended on denial*

*of reconsideration*, No. CV 18-1711 (ESH), 2020 WL 4286824 (D.D.C. July 25, 2020) (refusing

to consider new arbitrary and capricious arguments not raised in plaintiffs' complaint or summary

judgment motion).

In any event, Plaintiff's last ditch arbitrary-and-capricious claim is meritless—which might explain why Plaintiff did not raise it in prior briefing.  The arbitrary-and-capricious standard is highly deferential, and presumes the validity of agency action.  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159 (D.C. Cir. 1983).  A court may not substitute its judgment for that of the agency, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but must instead affirm an agency's decision if a rational basis for that decision has been provided, even if the court disagrees.  *See, e.g., Bowman Transp., Inc. v. Ark. Best Freight Sys*., 419 U.S. 281, 285 (1974) ("The agency must articulate a rational connection between the facts found and the choice made." (citation omitted)).  Agency action is not arbitrary or capricious if it "is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co*, 463 U.S. 29, 42 (1983); *see also Overton Park*, 401 U.S. at 416 (holding that an agency must consider relevant factors and reasonable alternatives).

Agency action is not subject to any more searching standard of review simply because it represents a change in administrative policy.  *FCC v. Fox Television Studios, Inc*., 556 U.S. 502, 515 (2009).  An agency that implements a change in policy "need not demonstrate, to a court's satisfaction, that the reasons for the new policy are better than the reasons for the old one."  *Id*. Instead, it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes the new policy to be better.  *Id*.

## A.     The Final Rules Are Sufficiently Tailored to the Concerns the Agencies Sought to Address.

Even if considered on their merits, Plaintiff's arbitrary-and-capricious claims about tailoring would fail.  Plaintiff asserts that the religious exemption is arbitrary and capricious because an entity whose religious objections to contraception could be satisfied through the

6

accommodation may nevertheless employ the religious exemption.  Pl. Supp. at 5-6.  But "[t]he APA does not . . . require agencies to tailor their regulations as narrowly as possible to the specific concerns that generated them."  *Assoc. Dog Clubs of N.Y., Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92 (D.D.C. 2014).  Rather, "[a]n agency has wide discretion in making line-drawing decisions" and "is not required to identify the optimal threshold with pinpoint precision."  *Nat'l Shooting Sports Found., Inc.* ("*NSSF*") *v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013) (quotation marks omitted); *see also Little Sisters*, 140 S. Ct. at 2380 (recognizing broad discretion of agencies to identify and create exemptions).  The line drawn need only be "within a zone of reasonableness."  *NSSF*, 716 F.3d at 214.

The Religious Exemption Rule easily satisfies this standard.  The Rule alleviates the burden on those with religious objections to the mandate, which it does by exempting such entities from the mandate.  *See* 83 Fed. Reg. at 57,556.  That *some* of these religious objections could have been addressed through the "accommodation" does not render the decision to provide a simple exemption for religious objectors unreasonable, and to hold otherwise would be to unduly limit the Agencies' "virtually unbridled discretion . . . to identify and create exemptions from its own guidelines," *Little Sisters*, 140 S. Ct. at 2380, and to demand the pinpoint precision that the APA does not require.  Indeed, because the Agencies retained the accommodation as an option for objecting employers, there is no reason to think that, in practice, the exemption will even be utilized by all objecting employers.  Providing coverage for contraceptives is cost neutral for an employer or school, *see* Coverage of Certain Preventive Services Under the ACA, 78 Fed. Reg. 39,870, 39,877 (July 2, 2013), and such coverage is a valuable benefit to some employees and students.  There is no reason that an employer or school that does not object to providing contraceptive coverage through the accommodation would nevertheless invoke the exemption,

since the accommodation would provide its employees or students a benefit that does not cost it anything. The line drawn by the Agencies, then, is well "within a zone of reasonableness": it is tailored to address sincere religious objections to the contraceptive coverage mandate, while leaving in place the optional accommodation for those religious objectors who elect to use it.

Plaintiff also argues that the Moral Exemption Rule is arbitrary and capricious because the Agencies were aware of only three "small nonprofit organizations," Pl. Supp. at 7-8 (quoting 83 Fed. Reg. at 57,626-27), in need of the moral exemption. But the scope of a problem need not exceed a particular threshold before an agency can take action to address it—particularly where Congress has given the agency "virtually unbridled discretion," *Little Sisters*, 140 S. Ct. at 2380. Moreover, it was not unreasonable for the Agencies to account for the possibility that there may be (either now or in the future) other entities with moral objections to providing contraceptive coverage that had not yet identified themselves by expending resources to sue the government or otherwise. *See* 83 Fed. Reg. at 57,602 (noting that although the Agencies "assume the number of entities and individuals that may seek exemption from the Mandate on the basis of moral convictions, as these two sets of litigants did, will be small, [they] know from the litigation that it will not be zero," and that "[a]s a result, [they] have taken these types of objections into consideration" and "consider it appropriate to issue the protections set forth in these final rules"). And contrary to Plaintiff's assertion, Pl. Supp. at 8, the Agencies devoted multiple pages to explaining why they made the moral exemption available to different types of entities with sincerely held moral objections to providing coverage for some or all contraceptives. 83 Fed. Reg. at 57,593. *See, e.g.*, *id*. at 57,617-19 (explaining the Agencies' reasons for including some for-profit organizations); *id.* at 57,619-20 (same for institutions of higher education); *id.* at 57,620-21 (same for health insurance issuers); *see also id*. at 57,603-05. For example, the Agencies decided

8

to include some, but not all, for-profit organizations in the scope of the Moral Exemption Rule based both on the breadth of other conscience-based protections provided by the federal and state governments, and on the Supreme Court's logic in *Hobby Lobby*, which concluded that corporate entities are capable of pursuing conscience-based goals. *Id*. at 57,617-19. Plaintiff offers no reasons to reject the Agencies' careful consideration, which certainly exceeded the arbitrary-and-capricious threshold.

In any event, Plaintiff does not explain how the purported overinclusiveness of the Moral Exemption Rule harms anyone. If additional entities with moral objections exist, then it would not be overinclusive or arbitrary and capricious for the exemption to cover those objectors. And conversely, if no additional entities with moral objections exist, then the exemption would not be available to any other entities, which means that neither Plaintiff nor anyone else can claim to be harmed by it. Unlike the cases Plaintiff cites where an agency imposed burdensome requirements on others in an attempt to fix a problem that might not exist, *see* Pl. Supp. at 8 (citing *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831 (D.C. Cir. 2006)), no one will be affected if there are, in fact, no additional entities with moral objections. And as discussed above, there is no reason to believe that, in practice, entities will falsely claim a moral objection.

### B.      The Agencies Adequately Considered Reliance Interests.

Plaintiff insists that the Agencies "dismiss[ed]" the reliance interests of women when they considered the Rules. Pl. Supp. at 10. This argument is based on a faulty premise and is incorrect in any event. As an initial matter, because RFRA required the religious exemption, *see* Defs.' MSJ at 21-22, ECF No. 122, the Agencies were not required to consider reliance interests, as they would have been if the decision were simply a matter of discretion. In any case, the Agencies, in fact, considered reliance interests. Specifically, they considered whether the contraceptive coverage

mandate has "led women to increase their use of contraception in general, or to change from less effective, less expensive contraceptive methods to more effective, more expensive, contraceptive methods." *See, e.g*., 83 Fed. Reg. at 57,556.  After reviewing comments on these issues, as well as the studies submitted by commenters, the Agencies concluded that it was "not clear that merely expanding exemptions as done in the[] rules w[ould] have a significant effect on contraceptive use and health, or workplace equality, for the vast majority of women benefitting from the Mandate." *Id*.  That is because "[t]here is conflicting evidence regarding whether the Mandate alone, as distinct from birth control access more generally, has caused increased contraceptive use, reduced unintended pregnancies, or eliminated workplace disparities, where all other women's preventive services were covered without cost sharing." *Id*.

While the Agencies ultimately concluded that they did not need to reach a conclusion on these issues, given the limited scope of the Rules and the strength of the religious liberty interests at stake, they were not blind to them. *See, e.g*., *id*. at 57,548-52, 57,556.  They also noted that HHS had proposed a regulation that would make clear that individuals eligible for free or low cost contraceptive services through the Title X program could include women who are unable to obtain contraceptive coverage due to their employers' religious or moral beliefs—a proposal that it noted "could further reduce any potential effect of these final rules on women's access to contraceptives." *Id*. at 57,551. In short, the Agencies considered the potential effects of the exemptions and concluded that "these final rules—which merely withdraw the Mandate's requirement from what appears to be a small group of newly exempt entities and plans—are not likely to have negative effects on the health or equality of women nationwide" and that "the

10

expanded exemptions are an appropriate policy choice left to the agencies under the relevant statutes."[4]  *Id.*

Plaintiff also quibbles with the Agencies' choice of how to present the number of women affected.  To be clear, Plaintiff does not dispute the Agencies' estimates of the number of women potentially affected, but rather disagrees with whether that number should be presented in comparison to the number of women in the United States or the number of women who receive insurance coverage from an objecting entity.  Pl. Supp. at 11.  This disagreement does not implicate any requirement imposed by the APA.  The APA requires only that the Agencies consider relevant factors, not that it present the results of its consideration in the manner a plaintiff prefers.  *See State Farm*, 463 U.S. at 43.

Accordingly, the Agencies did not "entirely fail[] to consider an important aspect of the problem," *id.*, and Plaintiff's claim fails.

### C.    The Agencies Adequately Considered Alternatives.

Plaintiff argues that the Final Rules "inflict gratuitous harm" because they failed to pursue purportedly "significant and viable and obvious alternatives," and Plaintiff lists a number of

---

[4] With respect to Plaintiff's arguments regarding Title X, Pl. Supp. at 10 n.4, it is simply incorrect that the Agencies failed to respond to comments regarding the interaction between the Final Rules and Title X.  *See* 83 Fed. Reg. at 57,551 ("some commenters said that, for lower income women, contraceptives can be available . . . through government programs [such as Title X] . . . . Other commenters contended that many women in employer-sponsored coverage might not qualify for those programs . . . because the programs were not intended to absorb privately insured individuals").  Moreover, the Agencies never stated that they believed Title X would be able to help all women at risk of losing contraceptive coverage; they simply stated that "contraceptives can be available at free or low cost through government programs (federal programs offering such services include, for example, Medicaid, Title X . . . )," and they explicitly recognized that these programs have limits, such as income restrictions.  *Id.*  And given the recognition of these limits, the Final Rules give no indication that they are premised on Title X recipients being able to assist all women who might be affected by them.  *Id.* ("The Departments do not believe that these general considerations make it inappropriate to issue the expanded exemptions set forth in these rules.").

alternative policies it believes the Agencies "could have implemented" instead.  Pl. Supp. at 12-17 & n.6.  Plaintiff's post-hoc policy brainstorming, *see id*., does not render the Final Rules arbitrary and capricious.  Indeed, Plaintiff offers no evidence that these ideas were "obvious alternatives" or that these ideas were even suggested to the Agencies (perhaps unsurprisingly, given that Plaintiff itself has only pressed this theory in its most recent round of briefing). There are myriad ways that the Agencies could have drawn lines, and they are not required to explicate and reject each potential option individually—an agency "need not consider every alternative proposed nor respond to every comment made." *NSSF*, 716 F.3d at 215; *see also Vermont Yankee Nuclear Power Corp. v. NRDC, Inc*., 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").  In any event, the Agencies did explain at length their choice in setting the scope of the religious exemption, noting that the language in the IFR had been restructured for clarity to make it plain that the religious exemption "encompasses objections to complying with either the Mandate or the accommodation."  83 Fed. Reg. at 57,567.

Plaintiff's first proposed alternative would require limiting exemptions only to employers with complicity-based objections to the accommodation, as discussed above. *See supra* II.A.  For the reasons already described, this argument fails because the Final Rules' exemptions easily fall "within a zone of reasonableness," *NSSF*, 716 F.3d at 214, especially considering the Agencies' "virtually unbridled discretion" to "identify and create exemptions from [HHS's] own Guidelines." *Little Sisters*, 140 S. Ct. at 2380.

Second, Plaintiff would require the agencies to "expand[] or adjust[] the accommodation" to address employers' complicity-based objections.  Plaintiff recognizes that the Agencies

responded to comments regarding such alternatives, *see* Pl. Supp. at 13, making it puzzling that it contends that such alternatives were not considered.  Nonetheless, Plaintiff contends that the Agencies inadequately considered then-Judge Kavanaugh's suggestion in 2015 to "submi[t] a simple notice" to HHS identifying an entity as one with a religious objection and "independently determine" the identity of the organization's insurer to ensure it provides contraceptive coverage, *id*. at 14; Plaintiff also contends that the Agencies should have considered using "separate enrollment cards" by which individuals could identify their need for contraceptive coverage to their insurers. *See id*. at 15-16 (citing, *inter alia*, *FAQs About Affordable Care Act Implementation Part 36*, at 4 (Jan. 9, 2017)).  Nowhere does Plaintiff identify any commenter who suggested that the Agencies adopt such alternatives.

In any event, the Agencies acted reasonably in rejecting such alternatives—the accommodation had been the subject of years of protracted litigation, which could not be resolved through adjustments to the accommodation in a way that satisfied everyone.  *See* 83 Fed. Reg. at 57,544.  It was reasonable—and not, as Plaintiff avers, an abdication of any commitment to provide "seamless" coverage—to expand the religious exemption to all those with sincere religious objections to the mandate. *See id*. at 14.  As the Agencies explained, although the various religious objections to the mandate could potentially be addressed "[i]f the accommodation could deliver contraceptive coverage independent and separate from the objecting employer's plan," the Agencies were not aware of any "authority" or "practical mechanism" that could be used "to require contraceptive coverage be provided specifically to persons covered by an objecting employer, other than by using the employer's plan, issuer, or third party administrator."  83 Fed. Reg. at 57,545-46.  Plaintiff's wish list of potential alternatives does not render the option the Agencies ultimately chose unreasonable—indeed, the very Fact Sheet that Plaintiff cites declined

to modify the accommodation because "no feasible approach" existed that "would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage." *FAQs About Affordable Care Act Implementation Part 36*, at 4; *see also* Pl. Supp. at 15 (acknowledging that "'to be sure, some religious organizations' might still object to [Plaintiff's alternative] process").

Moreover, Plaintiff takes issue with the Moral Exemption Rule, claiming that the Agencies unreasonably expanded that exemption to align closely with the Religious Exemption Rule. But Plaintiff itself recognizes that the Moral Exemption Rule "dedicated an entire section . . . to discussing" why it was reasonable to treat moral and religious objectors similarly. Plaintiff's only rationale for why the Moral Exemption Rule should be found unlawful is that no *statutory* basis for it purportedly exists. *See* Pl. Supp. at 16. But *Little Sisters* conclusively resolved this statutory question, holding that the ACA authorized the Moral Exemption Rule. *Little Sisters*, 140 S. Ct. at 2381 ("the ACA gives HRSA broad discretion to define preventive care and screenings and to create the religious and moral exemptions").

In sum, the Agencies did give meaningful consideration to alternatives, but ultimately determined that the Final Rules were the most appropriate response to the substantial burden on religious exercise identified in *Hobby Lobby* and to years of protracted litigation. That conclusion was neither arbitrary nor capricious.

## III.     The Final Rules Are Consistent With the Establishment Clause.

Defendants have previously explained that the Final Rules are consistent with the Establishment Clause. Defs.' MSJ at 34-40; Defs.' Reply MSJ at 18-21, ECF No. 128. Indeed, "there is no basis for an argument . . . that the [Final Rules] violate[] that Clause." *Little Sisters*, 140 S. Ct. at 2396 n.13 (Alito, J., with Gorsuch, J., concurring). Not only did the *Little Sisters*

14

two-Justice concurrence find no basis to challenge the Final Rules under the Establishment Clause, but also the majority opinion's RFRA discussion supports Defendants' arguments that no valid Establishment Clause claim lies here.  Although the Supreme Court declined to decide whether RFRA independently compelled the Agencies to adopt the Final Rules, it nonetheless made clear that the Agencies were required to consider RFRA's requirements in formulating the Final Rules. Indeed, the Supreme Court "made it abundantly clear that, under RFRA, the Departments must accept the sincerely held complicity-based objections of religious entities" and must "accommodat[e] the free exercise rights of those with complicity-based objections to the self-certification accommodation."  140 S. Ct. at 2383 (citation and internal punctuation omitted); *see also id.* at 2384 (explaining that if the Agencies "did not look to RFRA's requirements or discuss RFRA at all when formulating their solution, they would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem") (footnote omitted).  In short, the Supreme Court decided not only that the Agencies could consider and accommodate religious-based objections to the contraceptive-coverage mandate, but that they were obliged to do so.

Furthermore, to the extent that Plaintiff contends that the Religious Exemption Rule does not permit the government to determine whether any particular objector's religious exercise is substantially burdened before the objector avails itself of the exemption, *see* Pl. Supp. at 18, the financial penalty the ACA imposes for failure to comply with the mandate or accommodation constitutes a substantial burden on the religious exercise of employers with sincerely-held religious objections to contraceptive coverage.  That is the same penalty the plaintiffs faced in *Hobby Lobby*, where the Supreme Court had "little trouble" concluding that the mandate imposed a substantial burden.  573 U.S. at 719.  And insofar as Plaintiff is concerned that the Rules lack any mechanism

to distinguish between an objecting employer with a "complicity-based burden on [its] own religious exercise" and one who wishes "simply to deter employees from using contraception," Pl. Supp. at 18, the Agencies have explained that "[e]ntities that insincerely or otherwise improperly operate as if they are exempt would do so at the risk of enforcement under [mechanisms in the Public Health Service Act, the Internal Revenue Code, and ERISA]," 83 Fed. Reg. at 57,558.

As demonstrated in Defendants' prior briefs, the Final Rules permissibly accommodate religious beliefs and moral convictions consistent with the Establishment Clause. *See also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335 (1987).

**IV.     The Final Rules Are Consistent With Equal Protection Principles.**

The Final Rules are also consistent with principles of equal protection. *See* Defs.' MSJ at 40-43; Defs.' Reply MSJ at 21-24.  Plaintiff fails to state a valid equal protection claim because only rational basis review applies and the Final Rules easily satisfy it.

Rational basis review is the governing standard because the Final Rules do not draw any sex-based distinction.  As explained previously, the ACA's provision requiring coverage for additional preventive services supported by HRSA pertains only to such services for "women." Defs.' MSJ at 41 (citing 42 U.S.C. § 300gg-13(a)(4)).  Therefore, the HRSA Guidelines generally provide benefits to women that they do not provide to men, because they require coverage for female contraceptives—while the Final Rules provide an exemption for entities with religious and moral objections—but do not require any coverage of male contraceptives. *See id.*  The Final Rules expand the previously available exemptions to the mandated coverage of female contraceptives.  These exemptions apply based on the sincere religious or moral objections of the employer, plan sponsor, institute of higher education or issuer.  Therefore, the Agencies'

16

preventive services coverage requirements make no sex-based distinction to the detriment of women, as alleged by Plaintiff.[5]   Indeed, any sex-based distinctions relating to contraceptive coverage flow from the statute itself, which requires coverage for preventive services for women only and which Plaintiff has not challenged.

As to the distinctions that do exist under the Final Rules—those based on the sincere religious or moral objections of the employer, plan sponsor, institution of higher education, or issuer—those distinctions have existed from the inception of the contraceptive mandate.  That is because the Agencies have always accommodated at least some religious objections to the mandate—through the church exemption and subsequent modifications of it.  Consequently, if exemptions to the guidelines were deemed violations of equal protection, such a violation would apply equally to the prior church exemption and the accommodation.

But, of course, the government plainly has a rational basis for providing these exemptions. *See* Defs.' MSJ at 42-43.  As the Agencies explained at length in the Final Rules themselves, these exemptions relieve religious and moral burdens imposed by the contraceptive mandate.  In the case of the expanded religious exemption, the Rule ensures compliance with RFRA.  And in all cases, these expanded exemptions attempt to bring to an end the protracted litigation flowing from the failure to provide such exemptions in the first instance.

## CONCLUSION

For the reasons stated above and in Defendants' merits briefs, the Court should dismiss Plaintiff's complaint or enter summary judgment for Defendants, and deny Plaintiff's motion for summary judgment.

---

[5] Because the Final Rules do not make such a distinction, Plaintiff misplaces its reliance on *Joyce v. Town of Dennis*, 705 F. Supp. 2d 74 (D. Mass. 2010), in which a female golfer was not allowed to play in a male-only golf tournament.  *See id*. at 78.

Dated:  November 6, 2020                              Respectfully submitted,

                                                     JEFFREY B. CLARK
                                                     Acting Assistant Attorney General

                                                     MICHELLE R. BENNETT
                                                     Assistant Director, Federal Programs Branch


                                                      /s/ Daniel Riess
                                                     DANIEL RIESS (Texas Bar # 24037359)
                                                     Trial Attorney
                                                     U.S. Department of Justice
                                                     1100 L Street, N.W.
                                                     Washington, D.C. 20005
                                                     Telephone: (202) 353-3098
                                                     Fax: (202) 616-8460
                                                     Email: Daniel.Riess@usdoj.gov
                                                     *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I certify that on November 6, 2020, I caused a copy of the foregoing to be filed electronically and that the document is available for viewing and downloading from the ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  If any counsel of record requires a paper copy, I will cause a paper copy to be served upon them by U.S. mail.

                                                     /s/ Daniel Riess
                                                     Daniel Riess