**United States District Court**
**District of Massachusetts**

```
━━━━━━━━━━━━━━━━━━━━━━━━━━━
                          )
Commonwealth of Massachusetts,  )
                          )
        Plaintiff,        )
                          )
        v.                )      Civil Action No.
                          )      17-11930-NMG
United States Department of  )
Health and Human Services, et  )
al.,                      )
                          )
        Defendants.       )
                          )
━━━━━━━━━━━━━━━━━━━━━━━━━━━
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case involves a dispute about the validity of two interim final rules ("IFRs") and the subsequent final rules ("Final Rules") issued by the United States Department of Health and Human Services, the United States Department of the Treasury and the United States Department of Labor (collectively "defendants" or "the Departments"). The Final Rules adopt the IFRS, which expanded the religious exemption to the contraceptive mandate of the Affordable Care Act ("ACA") and created a new moral exemption to that mandate. The Commonwealth of Massachusetts ("plaintiff" or "the Commonwealth") filed the instant action seeking to enjoin the implementation of the rules and to declare them invalid.

Pending before the Court are plaintiff's motion for summary judgment and defendants' cross-motion to dismiss or for summary judgment.  Because the Commonwealth has not established that the Final Rules are statutorily or constitutionally invalid, defendants' motion for summary judgment will be allowed and plaintiff's motion will be denied.

## I.   <u>Background</u>

Many of the relevant facts are described in detail in the opinion of this Court allowing defendants' previous motion for summary judgment.  See <u>Massachusetts</u> v. <u>United States HHS</u>, 301 F. Supp. 3d 248 (D. Mass. 2018).  Because there have been important supervening developments since the issuance of that opinion and for the sake of completeness, the Court provides the following summary of facts relevant to the pending motions.

### A.   The Contraceptive Mandate

The Patient Protection and Affordable Care Act generally requires that employer-sponsored healthcare plans include a range of preventive care services on a no-cost basis.  See 42 U.S.C. §§ 18022 & 300gg-13.  That requirement mandates no-cost coverage

> with respect to women, . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"].

42 U.S.C. § 300gg-13(a)(4).

After soliciting recommendations from an expert panel at
the Institute of Medicine ("IOM"), HRSA promulgated its Women's
Preventive Services Guidelines in August, 2011.  Under those
guidelines, non-exempt employers were required to provide

> coverage, without cost sharing, [for] [a]ll Food and Drug
> Administration-approved contraceptive methods,
> sterilization procedures, and patient education and
> counseling for all women with reproductive capacity.

("the contraceptive mandate").  Those guidelines went into
effect in August, 2012.  The HRSA updated the Women's Preventive
Services Guidelines in December, 2016, reaffirming that the
Guidelines should continue to require full coverage for
contraceptive care and services.

### B. Accommodations for Religious Objections to the Contraceptive Mandate

In 2011 and 2012, the Departments issued regulations
automatically exempting churches and their integrated
auxiliaries, conventions and associations of churches and the
exclusively religious activities of religious orders from the
contraceptive mandate.  The "Church Exemption" corresponds to a
category of employers defined in the Internal Revenue Code. See
77 Fed. Reg. 8725, 8726 (citing 26 U.S.C. §§ 6033(a)(3)(A)(i)
and (iii)).  The Departments recognized that "certain non-
exempted, non-profit organizations" also had religious
objections to covering contraceptive services but determined
that exempting such employers was not required by the Religious

Freedom Restoration Act ("RFRA") and was inconsistent with the ACA. 77 Fed. Reg. 8725, 8728.  Internal church decisions are, as the Departments explained in later regulations, afforded a "particular sphere of autonomy" that does not extend to other religious employers. 80 Fed. Reg. 41,318, 41,325.

In 2013, the Departments issued regulations providing an accommodation for objecting religious, non-profit organizations and institutions of higher education.  The accommodation created a system whereby insurers and third parties paid the full cost of contraceptive care and employees received seamless coverage ("the accommodation process").  That process was expanded to cover closely-held, for-profit companies in response to the decision in Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014), in which the United States Supreme Court ("Supreme Court") ruled that the contraceptive mandate violated RFRA for certain closely-held, for-profit employers.  The Court held that the "HHS contraceptive mandate substantially burden[ed] the exercise of religion." Id. at 2775 (internal quotation omitted) (citing 42 U.S.C. § 2000bb-1(a)).  The accommodation process was purportedly a "less restrictive means" of furthering the government interest and thus RFRA required that the accommodation be expanded to include certain closely-held corporations. Id. at 2780-82.

In a separate series of cases, organizations such as religiously-affiliated universities and healthcare providers that did not perform "exclusively religious activities" challenged the legality of the accommodation process itself. See Zubik v. Burwell, 136 S. Ct. 1557 (2016). In May, 2016, those cases were remanded to their respective circuit courts for further consideration of whether the accommodation process could be amended to address the religious employers' concerns while still providing seamless contraceptive coverage. In January, 2017, after reviewing more than 50,000 comments, the Departments announced that the short answer to the comprehensive question was "No." No alternative, the Departments explained, would pose a lesser burden on religious exercise while ensuring contraceptive coverage.

### C. The Interim Final Rules and the Final Rules

In October, 2017, the Departments issued the two IFRs at issue in this case. See 82 Fed. Reg. 47,792 ("Religious Exemption IFR"); 82 Fed. Reg. 47,838 ("Moral Exemption IFR").

The IFRs created an expanded religious exemption, in part, to address the concerns of the managers of some entities who believed the accommodation rendered them complicit in the provision of contraceptive coverage. See 82 Fed. Reg. 47,792 ("We know . . . that many religious entities have objections to

-5-

complying with the accommodation based on their sincerely held religious beliefs."); Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 140 S. Ct. 2367, 2376-78 (2020). The HRSA exempts objecting entities "from any guidelines' requirements that relate to the provision of contraceptive services." 45 C.F.R. § 147.132(a). The Religious Exemption IFR expanded the definition of objecting entities to include any non-governmental plan sponsor that objects to

> establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

45 C.F.R. § 147.132(a)(2).

The religious exemption also applies to institutions of higher education in their arrangement of student health insurance coverage to the extent of that institution's sincerely held religious beliefs. 45 C.F.R. § 147.132(a)(ii). It exempts all employers with a religious objection, as opposed to the prior Church Exemption which covered churches, associations of churches and the exclusively religious activities of religious orders. It also affects religious non-profit organizations in that objecting organizations, formerly subject to the accommodation process, may now apply for the exemption.

Under the preceding Administration, no moral exemption to the contraceptive mandate existed in any form.  The Moral Exemption IFR provided an exemption for nonprofit organizations and for-profit entities with no publicly traded ownership interests that object to

> establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.

45 C.F.R. § 147.133(a)(2).

The IFRs were superseded by the Final Rules issued in November, 2018, which became effective in January, 2019. See 83 Fed. Reg. 57,536 ("Religious Exemption Rule"); 83 Fed. Reg. 57,592 ("Moral Exemption Rule").  The Final Rules maintain and formally codify the expanded exemptions adopted in the IFRs without substantive change.

**D. The Supreme Court's Decision in Little Sisters**

In January, 2020, the Supreme Court granted certiorari to review a decision by the Third Circuit Court of Appeals ("Third Circuit") to uphold a lower court ruling which enjoined the implementation of the Final Rules.  Shortly thereafter, the parties in the instant action sought, and this Court granted, a stay of the proceedings pending the Supreme Court's decision because it was anticipated that the ruling would have a

-7-

significant, if not dispositive, effect on the claims raised in
this case.

In <u>Little Sisters of the Poor Saints Peter & Paul Home</u> v.
<u>Pennsylvania</u>, 140 S. Ct. 2367 (2020) ("<u>Little Sisters</u>"), the
Supreme Court held that the Departments had the legal authority
under the ACA to provide exemptions from the contraceptive
mandate for employers with religious and moral objections.  The
Court further ruled that it was appropriate and perhaps required
that the Departments consider the RFRA in formulating the
Religious Exemption Rule.  Finally, the Court concluded that the
procedures by which the Departments issued the Final Rules
complied with the notice and comment requirements of the
Administrative Procedure Act ("APA").

Following the decision in <u>Little Sisters</u>, the parties
requested that the stay in this case be lifted which it was in
September, 2020.

### E.   Procedural Background

In October, 2017, shortly before the IFRs were to become
effective, the Commonwealth filed the instant action seeking a
declaration that the IFRs are unlawful and to enjoin their
implementation and enforcement.  After consideration of cross-
motions for summary judgment, this Court granted judgment to the
Departments, ruling that the Commonwealth lacked Article III

standing to challenge the IFRs.  The Commonwealth timely appealed that decision.

In May, 2019, the First Circuit Court of Appeals ("First Circuit") vacated this Court's decision and remanded the case for further proceedings.  The First Circuit held that the Commonwealth had established Article III standing by demonstrating a sufficiently imminent fiscal injury fairly traceable to the IFRs that likely would be redressed by a decision favorable to the Commonwealth.

On remand, the Commonwealth filed an amended complaint in July, 2019, alleging that 1) the Departments did not engage in notice and comment rulemaking before issuing the Final Rules in violation of the APA, 5 U.S.C. § 553, 2) the Final Rules exceed the Departments' authority under the ACA and are arbitrary and capricious in violation of the APA, 5 U.S.C. § 706, 3) the Final Rules violate the Establishment Clause of the First Amendment to the United States Constitution and 4) the Final Rules violate the equal protection guarantee of the Due Process Clause of the Fifth Amendment thereof.

The parties filed cross-motions for summary judgment before the case was stayed in February, 2020.  After the stay was lifted in September, 2020, they filed supplemental memoranda in support of their previously-filed cross-motions.

## II.  <u>Analysis</u>

### A.   Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

If the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in

the non-moving party's favor, the Court determines that no
genuine issue of material fact exists and that the moving party
is entitled to judgment as a matter of law.

In the administrative law context, the summary judgment
rubric has a "special twist". Assoc'd Fisheries of Me., Inc. v.
Daley, 127 F.3d 104, 109 (1st Cir. 1997).  In this context, a
court reviews "an agency action not to determine whether a
dispute of fact remains but, rather, to determine" whether the
agency acted lawfully. Boston Redevelopment Auth. v. Nat'l Park
Serv., 838 F.3d 42, 47 (1st Cir. 2016) (citing Mass. Dep't of
Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 526 (1st Cir.
1993)).  Where the parties treat the matter as a petition for
judicial review of agency action, the district court should
"follow[] the parties' lead and adjudicate[] the case in that
manner." Boston Redevelopment Auth. v. Nat'l Park Serv., 838
F.3d 42, 47 (1st Cir. 2016).  Here, the Commonwealth urges this
Court to treat its motion for summary judgment as "a vehicle to
tee up [the] case for judicial review" and defendants do not
dispute that characterization.  Accordingly, the Court will do
as requested.

B.  **Application**

The Commonwealth concedes, and this Court agrees, that
Little Sisters addressed and adversely disposed of two of

-11-

plaintiff's claims, namely that 1) the Departments failed to
follow properly the procedural requirements of the APA in
promulgating the Final Rules (Count I) and 2) the Final Rules
exceed the Departments' authority under the ACA (Count II).
Because the Supreme Court rejected both such arguments, there is
no need to address further either claim and defendants are
entitled to summary judgment on Count I and the portion of Count
II addressing their authority under the ACA.

The Commonwealth continues, however, to press its claims
that the Final Rules 1) are arbitrary and capricious under the
APA, 2) violate the Establishment Clause of the First Amendment
and 3) violate the equal protection guarantee implicit in the
Fifth Amendment.  Each of those claims will be addressed
<u>seriatim</u>.

### 1.  Arbitrary and Capricious under the APA

The Departments contend that, as a preliminary matter, to
the extent the amended complaint asserts an arbitrary and
capricious claim, the Commonwealth has waived it by failing to
raise the claim in its motion for summary judgment and that it
has improperly raised new theories in its supplemental
memorandum.  Although defendants' assertion would normally have
traction, because of the importance of the intervening Supreme

Court decree in Little Sisters, this Court will decide plaintiff's claim on the merits.

The APA requires agencies to engage in "reasoned decisionmaking" and instructs courts to "hold unlawful and set aside" agency actions found to be arbitrary or capricious. Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1905 (2020); 5 U.S.C. § 706(2)(A).  The standard of review is "narrow," however, and "a court is not to substitute its judgment for that of the agency." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009) (internal quotations and citations omitted).  Instead, a reviewing court should assess only

> whether the [agency's] decision was based on a
> consideration of the relevant factors and whether there has
> been a clear error of judgment.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

When an agency revises existing regulations, the agency "must show there are good reasons for the new policy." FCC, 556 U.S. at 515.  Yet it need not demonstrate that the reasons for the new policy are better than those supporting the old one. Rather, it is sufficient that

> the new policy is permissible under the statute, that there
> are good reasons for it, and that the agency believes it to
> be better, which the conscious change of course adequately
> indicates.

Id.

### a. Tailoring to the Scope of the Problem

The Commonwealth avers that the Departments did not engage in reasoned decisionmaking when issuing the Final Rules because they are insufficiently tailored to the scope of the subject problem.  It protests defendants' decision to exempt all employers with objections to the mandate even if the accommodation would have met their religious concerns. Defendants have made it clear, however, that expanding the accommodation, without more, "would not adequately address religious objections to compliance with the [contraceptive] Mandate." 83 Fed. Reg. 57,544. After "further consideration of the issues and review of the public comments," evincing reasoned judgment, the Departments concluded that "a broader exemption, rather than a mere accommodation, is the appropriate response." Id.

Plaintiff also confronts the scope of the Moral Exemption Rule, specifically noting that the Departments were aware of only three nonprofit organizations that have voiced a moral objection to the contraceptive mandate.  The Commonwealth does not, however, cite any law indicating that it was improper for the Departments to consider that additional objecting employers "might come into existence," 83 Fed. Reg. 57,626, in formulating

the Moral Exemption Rule.  Furthermore, the APA does not
"require agencies to tailor their regulations as narrowly as
possible" to the issues sought to be addressed by the
regulations. Associated Dog Clubs of N.Y. State, Inc. v.
Vilsack, 75 F. Supp. 3d 83, 92 (D.D.C. 2014).

The Departments did consider alternatives, as discussed
below, and came to the reasonable conclusion that broader
exemptions were appropriate to address sincere religious
objections to the contraceptive mandate.  Accordingly, the
Commonwealth has not demonstrated that the Final Rules are
overbroad in violation of the APA.

### b. Reliance Interests

Plaintiff contends that the Final Rules are arbitrary and
capricious because the Departments failed to consider the
reliance interests of women who stand to lose contraceptive
coverage due to the expanded exemptions.

Defendants respond, first, that they were not required to
consider such reliance interests because RFRA compels the
religious exemption.  The Supreme Court in Little Sisters
expressly did not consider the argument that RFRA prescribes the
religious exemption, see 140 S. Ct. at 2382, and this Court
likewise takes no position on that issue.

Defendants next submit, and this Court agrees, that the Departments adequately considered the relevant reliance interests in promulgating the Final Rules.

It is clear that an agency must provide a "more detailed explanation" than may otherwise be warranted when pivoting from a prior policy that has "engendered serious reliance interests." FCC, 556 U.S. at 515.  Here, the Departments detailed their review of comments and evidence that the contraceptive mandate "promotes the health and equality of women," including that "coverage of contraceptives without cost-sharing has increased use of contraceptives" and has led to "decreases in unintended pregnancies." 83 Fed. Reg. 57,556.  After considering "the comments, including studies . . . either supporting or opposing these expanded exemptions," the Departments concluded that

> it is not clear that merely expanding exemptions as done in
> these rules will have a significant effect on contraceptive
> use and health, or workplace equality, for the vast
> majority of women benefitting from the Mandate. There is
> conflicting evidence regarding whether the Mandate alone,
> as distinct from birth control access more generally, has
> caused increased contraceptive use, reduced unintended
> pregnancies, or eliminated workplace disparities, where all
> other women's preventive services were covered without cost
> sharing.

Id.; see also 83 Fed. Reg. 57,613.

The Commonwealth insists that defendants did not properly consider the hardship that some women who have relied on the contraceptive mandate may experience if it is attenuated, but it

has not shown that the Departments failed to assess such concerns and weigh them against the intended benefits of the Final Rules.

For instance, in response to defendants' assertion that some women who may lose coverage will be able to secure replacement coverage through safety net programs, such as Title X clinics, the Commonwealth contends that the Departments did not meaningfully consider that such programs are poorly positioned to meet the increased demand that could result from the implementation of the Final Rules.  The Departments reply, explicitly, that they have considered the limitations of those programs and decided nonetheless that the benefits of the rules outweigh those limitations. See 83 Fed. Reg. 57,551-56 (noting that commenters "contended that many women in employer-sponsored coverage might not qualify for [safety net] programs . . . because the programs were not intended to absorb privately insured individuals" but concluding the rules are warranted to "provide tangible protections for religious liberty, and [to] impose fewer governmental burdens").

### c. Reasonable Alternatives

The Commonwealth further contends that the Final Rules are arbitrary and capricious because the Departments failed to

consider reasonable alternatives that would purportedly limit the harm to women.

An agency must "consider responsible alternatives" and "give a reasoned explanation for its rejection of such alternatives." Brookings Municipal Tel. Co. v. FCC, 822 F.2d 1153, 1169 (D.C. Cir. 1987).  Nevertheless, an agency

> need not consider every alternative proposed nor respond to every comment made.  Rather, an agency must consider only significant and viable and obvious alternatives.

Nat'l Shooting Sports Found., Inc. v. Jones, 716 F.3d 200, 215 (D.C. Cir. 2013) (internal quotations and citations omitted).

Although plaintiff offers a litany of alternatives that the Departments could have pursued instead of promulgating the Final Rules, the Departments correctly point out that the Commonwealth offers little evidence that the proposed alternatives were obvious or suggested by any commenter prior to the issuance of the rules.

Several of plaintiff's proposed alternatives involve expanding the existing accommodation but the Departments have been clear that they considered such an alternative, noting that they "discussed public comments concerning whether [they] should have merely expanded the accommodation" rather than expanding the exemptions. 83 Fed. Reg. 57,569.  After deliberation, the Departments concluded that expanding the accommodation without

expanding the exemptions "would not adequately address religious objections to compliance with the Mandate." 83 Fed. Reg. 57,544.

Plaintiff also suggests that the Moral Exemption Rule need not have been expanded to be as broad as the Religious Exemption Rule.  The Commonwealth recognizes, however, that the Departments "dedicated an entire section of the Rule to discussing" the appropriateness of treating moral and religious objectors in a similar manner. See 83 Fed. Reg. 57,598-602.

Ultimately, even if the Departments did not consider every conceivable alternative, such vigorous analysis is not required under the APA. See Jones, 716 F.3d at 215.  Defendants fulfilled their obligation by properly considering a number of reasonable alternatives and offering an explanation for why they were rejected.  Although the decision to issue the Final Rules may be one of "less than ideal clarity," the rules are valid under the APA because the Departments' rationale "may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974).

### 2.  The Establishment Clause of the First Amendment

The Commonwealth submits that the Religious Exemption Rule impermissibly grants employers a religious veto over their employees' access to healthcare in violation of the Establishment Clause of the First Amendment.

-19-

The Establishment Clause "commands a separation of church and state." <u>Cutter</u> v. <u>Wilkinson</u>, 544 U.S. 709, 719 (2005).  Yet it

> do[es] not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice.

<u>Bd. of Educ.</u> v. <u>Grumet</u>, 512 U.S. 687, 705 (1994).  Indeed, the Supreme Court has long recognized that "the government may (and sometimes must) accommodate religious practices" without violating the Establishment Clause. <u>Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints</u> v. <u>Amos</u>, 483 U.S. 327, 334 (1987).  Further, it is permissible for the government to "accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." <u>Cutter</u>, 544 U.S. at 713 (internal quotations and citations omitted).

There is, however, a point at which an "accommodation may devolve into an unlawful fostering of religion." <u>Id.</u> at 334-35.  To analyze whether a government act is consistent with the Establishment Clause, the Supreme Court has instructed courts to use the three-part test established in <u>Lemon</u> v. <u>Kurtzman</u>, 403 U.S. 602 (1971):

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the

statute must not foster an excessive government
entanglement with religion.

403 U.S. at 612-13.

As a preliminary matter, two Justices of the Supreme Court
have already observed that "there is no basis for an argument"
that the Religious Exemption Rule violates the Establishment
Clause. Little Sisters, 140 S. Ct. at 2396 n.13 (Alito, J.,
concurring in which Gorsuch, J., joined). Nevertheless, this
Court independently concludes that there has been no showing of
an Establishment Clause violation in the instant action.

First, the requirement that the challenged act have a
secular legislative purpose "does not mean that the law's
purpose must be unrelated to religion." Amos, 483 U.S. at 335
(adding that "the Establishment Clause has never been so
interpreted"). Under this prong of the Lemon test, a court may
invalidate a government act "only if it is motivated wholly by
an impermissible purpose". Bowen v. Kendrick, 487 U.S. 589, 602
(1988).

The Commonwealth has not shown that the Departments
intended to advance a particular religion or to promote religion
in general. The Supreme Court has held that it is a permissible
purpose under the Lemon analysis

to alleviate significant governmental interference with the
ability of religious organizations to define and carry out
their religious missions.

-21-

Amos, 483 U.S. at 335.  Here, the Departments have evinced a similar desire to maintain neutrality and reduce interference with religious decisionmaking in promulgating the Final Rules. See, e.g., 83 Fed. Reg. 57,542 ("[T]he Departments conclude it is appropriate to maintain the [IFR] exemptions . . . to avoid instances where the [contraceptive] Mandate is applied in a way that violates the religious beliefs of certain [entities]."). Consequently, the Departments have identified the requisite "burden on the exercise of religion that can be said to be lifted by the government action." Amos, 483 U.S. at 348 (O'Connor, J., concurring).

Second, the requirement in Lemon that the challenged government act neither advance nor inhibit religion as its primary effect does not mean that a law cannot permit religious entities to advance religion. See id. at 337.  Rather, it is impermissible for the government itself to advance religion "through its own activities and influence." Id.

The Commonwealth has not shown that the principal effect of the Final Rules is the advancement of religion by the government.  Employers and plan sponsors with sincere religious objections are not better able to "propagate [their] religious doctrine," id., now that the Religious Exemption Rule permits them to refrain from specific action that would violate their

beliefs.  Permitting entities to practice their beliefs as they
would in the absence of the relevant government-imposed
regulations does not, in this instance, rise to an
unconstitutional violation of the Establishment Clause.

The Commonwealth's argument that the objectives behind
Religious Exemption Rule could be accomplished by other means,
namely through the existing accommodations process, is
unavailing.  The Departments have reiterated that the
accommodations process is insufficient to address the objections
of employers such as those who brought suit in Little Sisters,
who complain that requesting an accommodation renders them
complicit in the provision of contraceptive coverage to
employees against their religious beliefs. See 82 Fed. Reg.
47,799; 83 Fed. Reg. 57,546-48.

Although plaintiff is correct that a religious exemption
should not override other significant interests, Cutter, 544
U.S. at 722, it does not follow that the Final Rules must be
invalid under the Establishment Clause because they may result
in a loss of contraceptive coverage for some employees. See
Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 18 n.8 (1989)
(observing that a religious exemption that resulted in "some
adverse effect" on certain parties was constitutional because it
"prevented potentially serious encroachments on protected

religious freedoms"). Therefore, the Religious Exemption Rule does not impermissibly advance religion even if it may burden non-adherents to some extent.

Finally, the Commonwealth has not demonstrated that the Final Rules constitute excessive government entanglement with religion. Plaintiff points to Larkin v. Grendel's Den, 459 U.S. 116, 125-27 (1982) to support its argument that the rules create an unconstitutional entanglement with religion by granting to religious employers a "veto power" over access to a statutory benefit. The facts underlying the Larkin decision, however, make it inapplicable to the instant case.

In Larkin, a restaurant owner sued state licensing commissions with respect to the constitutionality of a state statutory provision which granted to churches and schools a veto power over applications for nearby liquor licenses. In striking down the challenged provision, the Supreme Court expressed concern regarding "the entanglement implications of a statute vesting significant governmental authority in churches." 459 U.S. at 126. Here, the Final Rules do not vest significant (or any) governmental authority in religious entities by creating an exemption from a statutory mandate.

Accordingly, the Commonwealth has not shown that the Final Rules violate the Establishment Clause.

### 3. The Equal Protection Guarantee of the Fifth Amendment

The Commonwealth contends that the Final Rules discriminate against women in violation of the equal protection guarantee of the Fifth Amendment.

Although plaintiff brings its equal protection claim under the Fifth Amendment, the analysis is similar to such claims brought under the Fourteenth Amendment. See Sessions v. Morales-Santana, 198 L. Ed. 2d 150, 159 n.1 (2017). In analyzing an equal protection claim, the first step is to identify whether the challenged classification is explicitly based upon sex or neutral on its face. If the challenged law or regulation is facially neutral, a viable equal protection claim exists only when the plaintiff can demonstrate the existence of a disparate impact and an intent to discriminate on the basis of sex. See Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 272-74 (1979).

Sex-based classifications, whether overt or otherwise, are subject to intermediate scrutiny, which means the Court must

> determine whether the proffered justification is
> "exceedingly persuasive." The burden of justification is
> demanding and it rests entirely on the [defendants]. The
> [defendants] must show at least that the challenged
> classification serves important governmental objectives and
> that the discriminatory means employed are substantially
> related to the achievement of those objectives. The
> justification must be genuine, not hypothesized or invented
> post hoc in response to litigation. And it must not rely

-25-

> on overbroad generalizations about the different talents,
> capacities, or preferences of males and females.

United States v. Virginia, 518 U.S. 515, 532-33 (1996) (internal

citations and quotations omitted).  In contrast, classifications

that do not discriminate on the basis of sex are analyzed under

rational basis review.  See Heller v. Doe, 509 U.S. 312, 319

(1993) ("[A] classification neither involving fundamental rights

nor proceeding along suspect lines is accorded a strong

presumption of validity.").  Such classifications

> must be upheld against [an] equal protection challenge if
> there is any reasonably conceivable state of facts that
> could provide a rational basis for the classification.

Id. at 320.

The parties disagree as to the nature of the classification

in the Final Rules.  The Commonwealth contends that the Final

Rules "overtly single out women for disadvantageous treatment"

and cannot survive heightened scrutiny.  The Departments respond

that the Final Rules are sex-neutral because they expand

exemptions that apply based on sincerely held religious and

moral beliefs and are intended to minimize government burdens in

the regulation of health insurance.  The only sex-based

distinction, defendants explain, "flow[s] from the statute

requiring preventative services for women only" rather than from

the rules promulgated under the statute.  Defendants insist that

-26-

plaintiff cannot succeed on its equal protection claim in the absence of a showing of discriminatory intent.

This Court is skeptical that the Final Rules facially differentiate on the basis of sex. Defendants are correct that the underlying statutory provision requiring coverage for additional preventative services pertains only to such services for women. See generally 42 U.S.C. § 300gg-13(a)(4). Consequently, any regulation under that provision would necessarily impact only women but that does not mean that such a regulation facially differentiates on the basis of sex. Defendants emphasize that the Final Rules serve a sex-neutral purpose, differentiating "on the basis of the religious or moral objections" of various entities and "not on the basis of [sex]." Under the circumstances, the Final Rules are more logically viewed as having a disparate impact on women, which means that a showing of discriminatory intent is required to maintain the equal protection claim. See Feeney, 442 U.S. at 272-74. The Commonwealth has failed to demonstrate any discriminatory intent behind the Departments' decision to issue the Final Rules and thus does not have a viable equal protection claim based on disparate impact.

The issue of which standard of scrutiny applies need not be conclusively decided, however, because the Final Rules survive

-27-

judicial review even under heightened scrutiny.  The
Commonwealth contends that the Final Rules go "well beyond what
is necessary to relieve any alleged burden" on religious or
moral beliefs and therefore the rules cannot satisfy heightened
scrutiny.  In so arguing, however, the Commonwealth
mischaracterizes what is required under intermediate scrutiny.
As Justice Scalia noted in Virginia,

> [i]ntermediate scrutiny has never required a least-
> restrictive-means analysis, but only a 'substantial
> relation' between the classification and the state
> interests that it serves.

518 U.S. at 573 (Scalia, J., dissenting).  Accordingly, the
Departments are not required to employ the least restrictive
means of accomplishing their stated goal of better accommodating
religious and moral objections to the contraceptive mandate.
The Supreme Court has indicated, and the Commonwealth does not
dispute, that the accommodation of sincerely held religious and
moral beliefs is an important government interest. See Amos, 483
U.S. at 334 (declaring "the government may (and sometimes must)
accommodate religious practices"); see generally Burwell v.
Hobby Lobby Stores, Inc., 573 U.S. 682 (2014).  Furthermore,
expanding existing exemptions to cover a broader range of
entities with sincere religious and moral objections to the
contraceptive mandate is indubitably related to that goal of
accommodating such objectors.

-28-

Accordingly, the Departments have met their burden under intermediate scrutiny and the Commonwealth has not established that it is entitled to judgment with respect to its equal protection claim.

### ORDER

For the foregoing reasons, the motion of defendants for summary judgment (Docket No. 121) is **ALLOWED**.  The motion of plaintiffs for summary judgment (Docket No. 115) is **DENIED.**


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated January 15, 2021